FILED
May 03, 2023
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY: _____ad_____
DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>ROY W. HILL, ERIC N. SHELLY, CLEAN ENERGY TECHNOLOGY ASSOCIATION, INC., and FREEDOM IMPACT CONSULTING, LLC,<br><br>Defendants. | Civil Action No.:  **6:23-cv-00321**<br><br>FILED UNDER SEAL<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission" or "SEC"), for its Complaint against Defendants Roy W. Hill ("Hill"), Eric N. Shelly ("Shelly"), Clean Energy Technology Association, Inc. ("CETA"), and Freedom Impact Consulting, LLC ("FIC") (collectively, "Defendants") alleges:

## SUMMARY

1.  This is an emergency action to stop Hill, Shelly, and entities they control from soliciting investors in an oil-and-gas-related fraudulent scheme. Hill controls CETA, a company that claims to build machines that enhance the marketability and recovery of hydrocarbons, referred to as carbon capture units ("CCUs"), which CETA purports to lease to major oil and gas producers in exchange for compensation based on a percentage of revenue from the enhanced hydrocarbon production. Shelly, a dentist, founded and controls FIC, which operates out of Shelly's home and offers and sells investments in funds that Shelly has formed to raise capital for CETA (together, the "Funds").

1

2. From December 2019 through the present (the "relevant period"), Defendants have raised at least $155 million from over 500 investors nationwide. Hill and Shelly, directly and through CETA and FIC, have represented (and continue to represent) to investors in the Funds that FIC and CETA will use all investor money to: (i) buy, lease, and deploy the CCUs; and (ii) acquire working interests in the oil or gas wells where the CCUs are deployed. The Defendants represent that FIC will pay investor returns from the revenues that CETA purportedly earns from CCU operations. Hill and Shelly lure investors with false claims that the Funds have consistently generated 10% quarterly returns, that the CCUs are patented, and that CETA has contracts with ExxonMobil Corporation ("Exxon") and other major oil and gas producers to lease hundreds of the CCUs.

3. Defendants entice investors with the allure of novel and complicated technology and exorbitant investment returns of 10% quarterly, but their securities offerings are just a vehicle to steal investors' money. In reality, as Defendants knew, or were severely reckless in not knowing, each of the statements listed above was (and is) false. CETA has not built the CCUs beyond a few prototypes to show prospective investors, or leased the CCUs to any major oil and gas producers. The company has no contract with Exxon. The technology is not patented. And bank records reveal that some investor distributions to date have been sourced from the money received from new or existing investors. Most critically, CETA has not generated revenues from any CCU operations, as represented to investors. Instead, CETA and Hill have used investor funds to pay quarterly "returns" to investors, for personal expenses, and to make CETA payroll and transfers to other accounts controlled by Defendants, among other undisclosed uses. To conceal and perpetuate this fraud, Hill and Shelly have provided investors with false financial statements showing investment returns that do not exist.

4.    The scheme is ongoing, and investor funds are at risk. Investor communications, bank records, and the CETA and FIC websites indicate that Hill and Shelly are actively raising money from investors, and will continue to do so unless stopped by the Court.

## VIOLATIONS AND RELIEF REQUESTED

5.    By committing the acts alleged in this Complaint, the Defendants directly and indirectly engaged in, and unless restrained and enjoined by the Court will continue to engage in, acts, transactions, practices, and courses of business that violate the anti-fraud provisions of the federal securities laws, specifically Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

6.    The SEC seeks permanent injunctions, disgorgement plus prejudgment interest, and civil penalties against each Defendant, and all other equitable and ancillary relief to which the Court determines the Commission is entitled.

## JURISDICTION AND VENUE

7.    The Court has jurisdiction over this action under Sections 20(d) and 22(a) of the Securities Act [15 U.S.C. § 77t(d) and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. § 78u(d), 78u(e) and 78(aa)].

8.    Venue is proper in this Court pursuant to Section 22(a) of the Securities Act and Section 27 of the Exchange Act [15 U.S.C. §§ 77v(a) and 78aa]. Certain of the transactions, acts, practices, and courses of business described herein occurred within the Western District of Texas. For example, CETA operates in Fairfield, Texas, where Hill also resides.

9.    In connection with the transactions, acts, practices, and courses of business described in this Complaint, the Defendants, directly and indirectly, made use of the means or

instrumentalities of interstate commerce, of the mails, or of the means and instruments of transportation or communication in interstate commerce.

## DEFENDANTS

10. **Hill**, age 75, is a resident of Fairfield, Texas and an attorney licensed by the State Bar of Texas. He founded and controls CETA as its president and Chairman. He is also named as an "advisor" on FIC's website and promotional materials. Hill served as mayor of Fairfield from 2014 through early 2018. Hill holds no securities licenses, and has never been registered with the Commission in any capacity.

11. **Shelly**, age 59, is a dentist currently residing in Ocala, Florida and West Chester, Pennsylvania. Shelly founded, owns, and controls FIC as its CEO. Shelly is also the President of West Chester Dental Arts, a dental practice located in West Chester, PA that shares an address with FIC. Shelly holds no securities licenses, and has never been registered with the Commission in any capacity.

12. **CETA** is a Texas corporation located in Fairfield, Texas. According to its website, www.cetaenergy.com, CETA is in the business of developing and commercializing environmentally sustainable technologies for oil and gas development. Neither CETA nor any CETA securities are registered with the Commission.

13. **FIC** is a Pennsylvania corporation formed by Shelly that operates out of a dental office in West Chester, Pennsylvania and/or Shelly's home. FIC purports to be in the business of marketing to investors passive income strategies and tax mitigation tools. According to its website, www.freedomimpactconsulting.com, FIC controls 61 investment funds with $263 million in assets under management. Neither FIC nor its securities are registered with the Commission in any capacity.

**FACTUAL ALLEGATIONS**

A.   **Overview of the CETA/FIC Securities Offering**

14.   Hill formed CETA as a Texas corporation in 2009 and has since controlled the entity as its President and Chairman. Before teaming up with Shelly and FIC in 2019, Hill oversaw CETA's development of a coal distillation process purportedly converting low-quality coal into cleaner burning "COALlite" and a residual solvent, "CETASolve." Although CETA raised money from private investors to fund the coal distillation business, Shelly was not involved in those transactions.

15.   In 2019, CETA began offering investments in a new technology, separate from its distillation machines that morphed into the business of CCUs. CETA claimed to have invented and patented CCUs, which are mobile scrubbing units that can be attached to an oil or natural gas well or pipeline. According to CETA, the CCU equipment uses a trademarked and patented solvent, CETASolve, to remove around 90% of the carbon dioxide ("$CO_2$") out of streams of natural gas, allowing gas producers to prepare the gas for sale at the site of the well, in lieu of shipping it to a processing site. CETA claims that it leases the CCUs to gas producers, charging them a fee per barrel for the CETASolve. After the $CO_2$ is removed from the gas, CETA claims that it resells the solvent, now infused with $CO_2$, to oil and gas producers for use in enhanced oil recovery.

16.   Shelly, a dentist, formed FIC in 2007. FIC purports to conduct business by providing investors with passive income strategies and tax mitigation tools. After meeting Hill in 2019, Shelly, through FIC, began offering and selling investments in CETA through a series of Funds that Shelly established.

17.   FIC has sponsored over 50 Funds since 2019, raising at least $155 million from

over 500 investors located throughout the United States.  For each Fund, FIC provides investors with the following documents: a Private Placement Memorandum; a Partnership Agreement; an Investor Questionnaire; a Subscription Agreement; and a Business Plan (together, the "Offering Documents").

18. Each Fund is similarly structured, and the representations in the Offering Documents for each Fund are similar or identical.  FIC holds itself out as the Fund "sponsor" and "manager."  FIC offers to investors general partner interests in the Funds, purportedly to allow investors to take advantage of certain tax benefits.  The Offering Documents represent that FIC may convert the general partner interests to limited partnership interests after one year, when the purported tax benefits associated with being a general partner have been realized.

19. The Funds' partnership agreements, however, vest "exclusive control and management" of the Funds in FIC, and in reality, FIC has controlled all aspects of the Funds with no involvement from the investors, regardless of the type of interest they hold.

20. In the Offering Documents, FIC represents that it will use all proceeds from the sale of Fund interests to purchase the CCUs and to obtain the working interests with the natural oil or gas wells on which the CCUs are to be deployed.  CETA, the inventor of the CCUs, in turn will lease the CCUs on behalf of the Funds to oil and gas producers (including deploying and maintaining the machines).

21. The Defendants represent to prospective investors that oil and gas producers are eager to lease the CCUs because they enhance hydrocarbon products in two ways.  First, the CCU will utilize CETASolve (the proprietary solvent developed by CETA) to absorb $CO_2$ directly from producers' natural gas pipelines, which in turn will enhance the marketability of the remaining gas stream.  Second, the solvent, after absorbing the $CO_2$, will be injected into the

producer's oil and gas wells and improve production in the wells.

22. The Offering Documents provide that revenues generated from the oil and gas producers' use of CCUs and the ownership of working interests in wells are to be split between FIC, CETA, and the investors. While there are some differences among the Funds in the structure of these splits, generally, the Offering Documents represent that investors can expect to earn a fixed 10% return paid every quarter beginning shortly after CCUs are leased, which is expected to occur within a few months of the closing of each Fund. Further, FIC's and CETA's marketing highlights the quarterly payment of returns, the fact that the payments begin within just a few months of closing, and that no Fund has missed a quarterly payment. Offering Documents for some Funds provide that investors will receive 75 percent of the net cash flow to the Fund from CETA's operations of the CCUs, and that the Funds will distribute such returns to investors on a quarterly basis.

**B.    Promotion of the CETA/FIC Securities Offering**

23. Shelly and Hill have actively promoted investments in the Funds through, among other means: (i) CETA and FIC websites; (ii) webinars hosted by Shelly; and (iii) quarterly and other periodic updates that Shelly, and in some cases, Hill, provides to investors.

24. On CETA's and FIC's websites, potential investors can access investment marketing materials, including but not limited to, private placement memoranda, Fund subscription documents, and wiring instructions. These documents are generally available to the public to download, without password protection or the need to request the materials.

25. The webinars are available as videos on YouTube, where FIC maintains a channel. Several of these videos, which feature Shelly (and at times, Hill) speaking about the advantages of investing in the Funds and display marketing materials, have hundreds of views

each. The periodic updates to investors contain information about CETA's performance, operations, and CCU deployment activity across multiple Funds, as well as information about FIC's ongoing fundraising activity.

26. In addition to Hill's and Shelly's direct marketing activities, investments in the Funds have been, and continue to be, promoted and sold by others. According to Shelly, at least six promotors have raised money from investors using their own websites.

27. Each Defendant continues to solicit investors through all of the means described above. In March 2023 alone, Shelly opened at least five bank accounts on behalf of new Funds for which FIC and Shelly are currently fundraising or have already fundraised.

### C.      Defendants' Material Misrepresentations

####      i.  *Defendants Misuse Investor Funds and Fabricate Production Revenue.*

28. The Funds' Offering Documents represent that "all proceeds" from the offerings will be used to purchase and assemble CCUs and to obtain from producers a working interest in the natural oil and gas fields where the CCUs are purportedly deployed. Shelly and FIC direct investors to wire their capital contributions into bank accounts in the name of each Fund held at Citizens & Northern Bank. Shelly controls these accounts.

29. The Offering Documents do not disclose that Shelly then transfers all or nearly all investor money from the Funds' accounts into other accounts held at Wells Fargo Bank in the name of "Roy Hill Trust" ("Hill Trust Accounts"). Hill controls the Hill Trust Accounts.

30. Once investor funds are transferred to the Hill Trust Accounts, CETA and Hill have not used the money to purchase and deploy CCUs or to obtain working interests in oil and gas fields, as they represented. Rather, CETA and Hill have used investor funds to, among other things, pay quarterly "returns" to investors, cover CETA's payroll expenses, make transfers to

other accounts controlled by the Defendants, and pay personal expenses.

31.     Most critically, the bank records reflect that CETA and Hill have not generated revenue from business operations.  Rather, the vast majority of money flowing into CETA's and Hill's accounts comes from transfers of investor funds from the Funds' bank accounts.

32.     In other words, funds from new or existing investors have been used to pay "returns" to other investors.  For example, in March 2023, the SYN 22 LP fund account started with a balance of $1,000.  During March 2023, the Fund received investor deposits totaling $500,000, with no other credits to the account.  The day after receiving the last investor deposit, the Fund paid out $200,000 in purported quarterly returns to two investors.

33.     Because CETA has not generated revenue for the Funds and has not deployed CCUs as it promised investors it would, much of the information in the periodic investor updates from Shelly is false and misleading.  For example, the quarterly reports that FIC has provided to Fund investors have a line item for "production revenue earned from CETA."  The reports also reflect how an investor's "return" for the period is derived from the "production revenue" number, after applying certain deductions.  This entire presentation is false and misleading because, as explained above, CETA has not generated production revenue, and the "return" that has been paid out is comprised of other investors' capital.

34.     Similarly, the quarterly reports contain other financial and operational details that convey the false and misleading impression that CETA is engaged in revenue-producing operations, including a listing of the CCUs that are deployed on behalf of a particular Fund, the length of time they have been deployed, the revenue they have generated, and how that revenue is split among various participants.

### ii. *Defendants Falsely Claim that Exxon is a CETA Customer.*

35. Throughout the relevant period, the Defendants have repeatedly referred to Exxon as one of CETA's biggest customers.

36. For example, during an August 2020 investor presentation at CETA's headquarters in Fairfield, Texas, Hill specifically described a contract that CETA purportedly had with Exxon, pursuant to which Exxon had committed to deploy over 400 CETA CCUs in the next five years. Shelly told an investor that he had seen the contract.

37. In another example, in a June 24, 2022, e-mail update to investors, Shelly stated that "[w]e have just received the first order of our CO2 pipeline equipment for use in Exxon's new hydrogen plant in the Houston area. This new use will likely increase demand for our equipment up to 2000 total units."

38. In another example, as a guest on "The Passive Investor Show" on September 8, 2022, available at https://youtu.be/fk1ivnATdEo?t=1230 at 9:23 (re-broadcast by FIC as a webinar, "Tax Benefits and Carbon Credit"), Shelly said, "I think Houston area Exxon is building a hydrogen plant, and they are going to use [the CCUs] to clean the gas coming into the plant, and to clean the exhaust going out of the plant. So, you know, that added probably, you know, 1,500 [CC] units of demand to our picture."

39. In addition, both Shelly and Hill repeatedly emphasized dealings with Exxon in face-to-face meetings with investors and potential investors.

40. Finally, CETA's website: (a) creates the false impression that Exxon's engineering subsidiary has endorsed its technology; and (b) mischaracterizes CETA's dealings with Exxon. In 2012, years before the offerings at issue in this case, ExxonMobil Research and Engineering Company ("EMRE"), a subsidiary of Exxon, agreed to test a liquid coal distillation

solution that CETA was developing. Following testing, EMRE concluded that application of this product for Exxon's commercial operations would require "significant upgrading." Following EMRE's testing, there has been no further engagement or arrangement between CETA and Exxon. Nonetheless, the CETA website's "Corporate Profile 2020" claims that "Extensive evaluations by the nation's leading laboratories consistently confirm CETA's findings with respect to our product streams," and the "Exxon Research and Engineering" logo appears next to this statement.

41. As Hill and Shelly knew, or were severely reckless in not knowing, their statements about business dealings between CETA and Exxon, and the implication that Exxon's engineering subsidiary endorsed CETA's technology, were entirely false.

42. Exxon has verified that it has no relationship with CETA, contractual or otherwise, and Exxon has not endorsed CETA's technology.

### *iii. Defendants Falsely Claim that CETA's Carbon Capture Technology is Patented.*

43. In webinar investor presentations, and on FIC's and CETA's websites, Shelly and Hill stated that both the CCUs and the solvent that CETA uses in its recovery enhancement process are patented.

44. CETA's website states that "all of [CETA's] technology … carr[ies] U.S. Patents," while FIC's website states that "CETA has developed and patented two different Carbon Capture Units . . . ."

45. In a June 4, 2020, webinar, Hill answers a query by an attendee, "Who owns the patent on these [CCU] machines?" with the deceptively false response, "Clean Energy Technology Association, Inc." (Freedom Energy Fund Q & A with Roy Hill, available at https://youtu.be/5TrLdRY-k5w?t=2442).

11

46. On a webinar dated February 17, 2022, Shelly says, "So, I just wanted to mention that we do get a patented solvent that is controlled and owned by CETA industries, and they are the ones that build and have patented our carbon capture units." (February 17, 2022 webinar, Collateralized Debt Fund webinar, hosted by FIC and two other sponsors, available at https://youtu.be/UywCE8m2s08?t=846.)

47. As Defendants each knew, or were severely reckless in not knowing, those statements were false. In reality, neither CETA's CCUs nor its solvent, is patented.

**D.     Ongoing Activity**

48. Defendants continue to solicit investors and their fraud is ongoing.

49. The CETA and FIC websites are live today, and prospective investors may currently view the Offering Documents.

## CLAIMS FOR RELIEF

### First Claim

**Fraud in Connection with the Purchase or Sale of Securities
Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) Thereunder
[15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]**

**(Against All Defendants)**

50. Plaintiff repeats and incorporates by reference paragraphs 1 through 49 of this Complaint as if set forth *verbatim* herein.

51. By engaging in the conduct described above, Defendants, directly or indirectly, in connection with the purchase or sale of a security, and by use of the means or instrumentalities of interstate commerce, or of the mails, or of any facility of a national securities exchange: (a) employed a device, scheme or artifice to defraud; and/or (b) made an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made,

in the light of the circumstances under which they were made, not misleading; and/or (c) engaged in an act, practice, or course of business that has operated or will operate as a fraud or deceit upon other persons.

52. By engaging in the conduct described above, each Defendant has violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## Second Claim

## Fraud in the Offer or Sale of Securities
## Violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]

**(Against All Defendants)**

53. Plaintiff repeats and incorporates by reference paragraphs 1 through 49 of this Complaint as if set forth *verbatim* herein.

54. By engaging in the conduct described above, Defendants, directly or indirectly, in the offer or sale of securities, and by the use of the means and instruments of transportation or communication in interstate commerce or by the use of the mails: (a) employed a device, scheme, or artifice to defraud; (b) obtained money or property by means of an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in a transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

55. With respect to violations of Section 17(a)(1), Defendants acted knowingly or with severe recklessness. With respect to violations of Sections 17(a)(2) and (3), Defendants were at least negligent.

56. For these reasons, Defendants each have violated and, unless restrained and

enjoined, will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

(1) Enter an Order finding that Defendants committed, and unless restrained will continue to commit, the violations alleged in the Complaint;

(2) Permanently enjoin Defendants from future violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

(3) Permanently enjoin Defendants from directly or indirectly participating in the issuance, purchase, offer, or sale of any securities provided, however, that such injunctions shall not prevent Hill or Shelly from purchasing or selling securities listed on a national securities exchange for their own personal accounts;

(4) Order Defendants to disgorge all ill-gotten gains received during the period of violative conduct, with prejudgment interest thereon, pursuant to the Court's equitable powers and Sections 21(d)(3), 21(d)(5), and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)];

(5) Order Defendants to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

(6) Grant such other and further relief as the Court may deem just and proper.

Dated:   May 3, 2023.                              Respectfully submitted,

*s/ Jennifer D. Reece*
Jennifer D. Reece
Texas Bar No. 00796242
Direct phone: (817) 978-6442
reecej@sec.gov

Jason J. Rose
Texas Bar No. 24007946
Direct phone: (817) 978-1408
rosej@sec.gov

United States Securities and Exchange Commission
Burnett Plaza, Suite 1900
801 Cherry Street, Unit 18
Fort Worth, Texas 76102

ATTORNEYS FOR PLAINTIFF
SECURITIES AND EXCHANGE COMMISSION