**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | § § § | |
| **Plaintiff,** | § § | |
| **v.** | § § | **Civil Action No.:    6:23-cv-321** |
| **ROY W. HILL, ERIC N. SHELLY, CLEAN ENERGY TECHNOLOGY ASSOCIATION, INC., and FREEDOM IMPACT CONSULTING, LLC,** | § § § § § | **FILED UNDER SEAL** |
| **Defendants.** | § § § | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS APPLICATION FOR PRELIMINARY INJUNCTION, *EX PARTE* TEMPORARY RESTRAINING ORDER, ASSET FREEZE, APPOINTMENT OF RECEIVER, AND OTHER ANCILLARY EMERGENCY RELIEF**

Dated:    May 3, 2023.                    Respectfully submitted,

                                       s/ *Jennifer D. Reece*
                                       Jennifer D. Reece
                                       Texas Bar No. 00796242
                                       Direct phone: (817) 978-6442
                                       reecej@sec.gov

                                       Jason J. Rose
                                       Texas Bar No. 24007946
                                       Direct phone: (817) 978-1408
                                       rosej@sec.gov

                                       United States Securities and Exchange Commission
                                       Burnett Plaza, Suite 1900
                                       801 Cherry Street, Unit 18
                                       Fort Worth, Texas 76102

                                       ATTORNEYS FOR PLAINTIFF
                                       SECURITIES AND EXCHANGE COMMISSION

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................ii-v

I.    FACTUAL SUMMARY ..............................................................................1

    A.    Overview of the CETA/FIC Securities Offering .......................................1

    B.    Promotion of the CETA/FIC Securities Offering ......................................4

    C.    Defendants' Material Misrepresentations ...................................................4

        i.    Defendants Misuse Investor Funds and Fabricate Production Revenue.....................................................................................4

        ii.    Defendants Falsely Claim that Exxon is a CETA Customer .....................6

        iii.    Defendants Falsely Claim that CETA's Carbon Capture Technology is Patented ...............................................................7

    D.    Ongoing Activity and Risk of Dissipation.................................................7

II.    ARGUMENT AND AUTHORITIES.................................................................8

    A.    The Court Should Issue an Ex Parte Restraining Order, Preliminary Injunction, and Other Equitable Relief ......................................................8

        1.    A Special Standard Applies to SEC Requests for Injunctions and Asset Freezes...................................................................8

    B.    Defendants Violated the Federal Securities Laws and Should Be Enjoined.........................................................................................10

        1.    The Defendants are Conducting a Fraudulent Securities Offering...........10

        2.    The Defendants Are Likely To Continue Their Illegal Conduct ...............12

    C.    The Court Should Grant Additional Ex Parte Relief to Facilitate the Preservation of Investor Assets and the Prosecution of This Case ..................13

        1.    An Asset Freeze is Necessary .................................................14

        2.    Orders Requiring an Accounting, Prohibiting the Destruction of Documents, Granting Expedited Discovery, and Allowing

Alternative Means of Service are Necessary ...............................................15

3.     The Appointment of a Receiver is Necessary.............................................16

III.     CONCLUSION.....................................................................................................17

# TABLE OF AUTHORITIES

**Cases**

*Aaron v. SEC*,
446 U.S. 680 (1980) ................................................................................ 11

*Broad v. Rockwell Int'l Corp.*,
642 F. 2d 929 (5th Cir.) ........................................................................... 11

*CFTC v. Muller*,
570 F.2d 1296 (5th Cir. 1978) ................................................................. 14

*EEOC v. Cosmair, Inc.*,
821 F.2d 1085 (5th Cir. 1987) .................................................................. 8

*Ernst & Ernst v. Hochfelder*,
425 U.S. 185 (1976) ........................................................................... 11, 12

*Esbitt v. Dutch-American Mercantile Corp.*,
335 F.2d 131 (2d Cir. 1964) .................................................................... 16

*In re San Vicente Med. Partners Ltd.*,
962 F.2d 1402 (9th Cir. 1992) ................................................................. 16

*Koehler v. Pulvers*,
614 F. Supp. 829 (S.D. Cal. 1985) .......................................................... 10

*Reves v. Ernst & Young*,
494 U.S. 56 (1990) .................................................................................. 12

*SEC v. Am. Bd. of Trade, Inc.*,
830 F.2d 431 (2d Cir. 1987) .............................................................. 14, 16

*SEC v. Blatt*,
583 F.2d 1325 (5th Cir. 1978) ............................................................. 8, 13

*SEC v. Cayman Islands Reins Corp.*,
734 F.2d 188 (2nd Cir. 1984 .................................................................... 8

*SEC v. Cavanagh*,
155 F.3d 129 (2d Cir. 1998) ...................................................................... 9

*SEC v. Commonwealth Chemical Securities, Inc.*,
574 F.2d 90 (2d Cir. 1978) ...................................................................... 13

*SEC v. Current Fin. Servs., Inc.*,
783 F. Supp. 1441 (D.D.C. 1992) ............................................................ 16

*SEC v. Dain Rauscher, Inc.*,
    254 F.3d 852 (9th Cir. 2001) ........................................................ 10

*SEC v. First Fin. Group of Tex.*
    645 F.2d 429 (5th Cir. 1981) ......................................................9, 16

*SEC v. Gann*,
    565 F.3d 932 (5th Cir. 2009) ........................................................ 10

*SEC v. Heartland Group Ventures, LLC*,
    2022 WL 1527542 (N.D. Tex. [Fort Worth] Mar. 18, 2022) .......................... 14

*SEC v. Heden*,
    51 F. Supp. 2d 296 (S.D.N.Y. 1999) ..............................................8, 14

*SEC v. Int'l Swiss Invest. Corp.*,
    895 F.2d 1272, 1276 (9th Cir. 1990) .............................................. 15

*SEC v. Lauer*,
    52 F.3d 667 (7th Cir. 1995) ......................................................... 10

*SEC v. Management Dynamics, Inc.*,
    515 F.2d 801 (2nd Cir. 1975) ........................................................ 8

*SEC v. Manor Nursing Centers*,
    458 F.2d 1082 (2d Cir. 1971) ...........................................12, 13, 15, 16

*SEC v. Materia*,
    745 F.2d 197 (2d Cir. 1984) ........................................................ 14

*SEC v. Savoy Industries, Inc.*,
    587 F.2d (D.C. Cir. 1978) .......................................................... 13

*SEC v. Scott*,
    565 F. Supp. 1513 (S.D.N.Y. 1983) ................................................... 8

*SEC v. Seghers*,
    298 Fed. Appx. 319 (5th Cir. 2008) ................................................. 10

*SEC v. Unifund SAL*,
    910 F.2d 1028 (2d Cir. 1990) .....................................................8, 14

*SEC v. Wencke*,
    622 F.2d 1363 (9th Cir. 1980) ..................................................... 15

*SEC v. Zale Corp.*,
    650 F.2d 718 (5th Cir. 1981) ........................................................ 9

*Vernazza v. SEC*,
    327 F.3d 851 (9th Cir. 2003) ....................................................... 10

**Statutes**

Section 20(b) of the Securities Act [15 U.S.C. §77t(b)] ................................................... 8

Section 21(d)(1) of the Exchange Act [15 U.S.C. §78u ...................................................... 8

Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] ............................................... 10

Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] ...................................... 10, 11

Rule 10b-5 [17 C.F.R. § 240.10b-5] .................................................................... 10, 11

Plaintiff U.S. Securities and Exchange Commission (the "SEC" or "Commission")
submits this Memorandum of Law in Support of its TRO Application to halt an ongoing
fraudulent securities offering by Defendants Roy W. Hill ("Hill"), Eric N. Shelly ("Shelly"),
Clean Energy Technology Association, Inc. ("CETA"), and Freedom Impact Consulting, LLC
("FIC") (collectively, "Defendants") and to protect the ability to recover assets for harmed
investors.[1]

# I. __FACTUAL SUMMARY__

## A. __Overview of the CETA/FIC Securities Offering__

Hill formed CETA as a Texas corporation in 2009 and has since controlled the entity as
its President and Chairman. (*See* Declaration of Melvin Warren ("Warren Dec.") at ¶ 5, App.
130.) Before teaming up with Shelly and FIC in 2019, Hill oversaw CETA's development of a
coal distillation process purportedly converting low-quality coal into cleaner burning
"COALlite" and a residual solvent, "CETASolve." (App. 131 [Warren Dec. ¶ 9].)

In 2019, CETA began offering investments in a new technology apart from its distillation
machines that morphed into the business of CCUs. (App. 131 [Warren Dec. ¶ 10].) CETA
claimed to have invented and patented CCUs, which are mobile scrubbing units that can be
attached to an oil or natural gas well or pipeline. (*Id.*) According to CETA, the CCU equipment
uses a trademarked and patented solvent, CETASolve, to remove around 90% of the carbon
dioxide ("$CO_2$") out of streams of natural gas, allowing gas producers to prepare the gas for sale
at the site of the well rather than ship it to a processing site. (*Id.*) CETA claims that it leases the
CCUs to gas producers, charging them a fee per barrel for the CETASolve. (*Id.*) After the $CO_2$
is removed from the gas, CETA claims it resells the solvent, now infused with $CO_2$, to oil and

---

[1] All evidentiary citations are to the Commission's Appendix in Support of Plaintiff's TRO
Application ("App."), filed simultaneously with this memorandum.

gas producers for use in enhanced oil recovery.  (*Id.*)

Shelly, a dentist, formed FIC in 2007.  (App. 130 [Warren Dec. ¶ 6.])  FIC purports to conduct business by providing investors with passive income strategies and tax mitigation tools. (App. 130 [Warren Dec. ¶ 8.]  In 2019, Shelly, through FIC, began offering and selling investments in CETA through a series of Funds that Shelly established.  According to its website at www.freedomimpactconsulting.com, FIC controls 61 investment funds with $263 million in assets under management.  (*Id.*)  Neither FIC nor its securities are registered with the Commission in any capacity.  (*Id.*)

FIC has sponsored over 50 Funds since February 2020, raising a total of at least $155 million from over 500 investors located throughout the United States.  (App. 131-132 [Warren Dec. ¶¶ 11-12].)  For each Fund, FIC provides investors with the following documents, including: a Private Placement Memorandum; a Partnership Agreement; an Investor Questionnaire; a Subscription Agreement; and a Business Plan (together, the "Offering Documents").  (App. 132 [Warren Dec. at ¶ 13]; *see also* App. 005, 021-113 [Declaration of investor Paul Martinchuk ("Martinchuk Dec.") at ¶ 16 and Exhibit B].)

Each Fund is similarly structured, and the representations in the Offering Documents are similar or identical.  (App. 132 [Warren Dec. ¶ 13].)  FIC holds itself out as the Fund "sponsor" and "manager."  (*See, e.g.,* App. 053.)  FIC controls all aspects of the Funds with no involvement from the investors, regardless of the type of interest they hold.  (*See* App. 040, at ¶ 18.)  Investors understand that they have no role in the success of the investment or control over investment decisions.  (App. 006 [Martinchuk Dec. ¶ 19].)

In the Offering Documents, FIC represents that it will use all proceeds from the sale of Fund interests to purchase the CCUs and obtain the working interests with the natural oil or gas

wells on which the CCUs are to be deployed.  (App. 044; App. 005-006 [Martinchuk Dec. at ¶17].) Investors rely upon this representation in making a decision to invest.  (*Id.*)  CETA, who invented and patented the CCUs, in turn will lease the CCUs on behalf of the Funds to oil and gas producers (including deploying and maintaining the machines).  (App. 003 [Martinchuk Dec. at ¶ 6; App. 108.)

The Defendants represent to prospective investors that oil and gas producers are eager to lease the CCUs because they enhance hydrocarbon products in two ways.  First, the CCU will utilize CETASolve (the proprietary solvent developed by CETA) to absorb carbon dioxide ($CO_2$) directly from producers' natural gas pipelines, which in turn will enhance the marketability of the remaining gas stream.  (App. 004 [Martinchuk Dec. ¶ 10].)  Second, the solvent, after absorbing the $CO_2$, will be injected into the producer's oil and gas wells and improve production in the wells.  (*Id.*)

The Offering Documents provide that revenues generated from the oil and gas producers' use of CCUs and the ownership of working interests in wells are to be split between FIC, CETA, and the investors.  (App. 109.)  While there are some differences among the Funds in the structure of these splits, generally, the Offering Documents represent that investors can expect to earn a fixed 10% return paid every quarter beginning shortly after CCUs are leased, which is expected to occur within a few months of the closing of each Fund.  (App. 132 [Warren Dec. ¶ 14].)  FIC's and CETA's marketing highlights the quarterly payment of returns, the fact that the payments begin within just a few months of closing, and that no Fund has supposedly missed a quarterly payment. (*Id.*)  Offering Documents for some Funds provide that investors will receive 75 percent of the net cash flow to the Fund from CETA's operations of the CCUs, and that the Funds will distribute such returns to investors on a quarterly basis.  (*Id.*)

**B.      Promotion of the CETA/FIC Securities Offering**

Shelly and Hill have actively promoted investments in the Funds through, among other means: (i) CETA and FIC websites; (ii) webinars that Shelly hosts; and (iii) quarterly and other periodic updates that Shelly, and in some cases, Hill, provides to investors.  (App. 132 [Warren Dec. ¶ 16].)

On CETA's and FIC's websites, potential investors can access investment marketing materials, including but not limited to, private placement memoranda, Fund subscription documents, and wiring instructions.  (App. 132-33 [Warren Dec. ¶ 17].)  These documents are generally available to the public to download, without password protection or the need to request the materials.  (*Id.*)

The periodic updates to investors contain information about CETA's performance, operations, and CCU deployment activity across multiple Funds, as well as information about FIC's ongoing fundraising activity.  (App. 133 [Warren Dec. ¶ 18].)

Each Defendant continues to solicit investors through all of the means described above. In March 2023 alone, Shelly opened at least five bank accounts on behalf of new Funds for which FIC and Shelly are currently fundraising or have already fundraised.  (App. ** [Warren Dec. ¶ 22].)

**C.      Defendants' Material Misrepresentations**

*i.    Defendants Misuse Investor Funds and Fabricate Production Revenue.*

The Funds' Offering Documents represent that "all proceeds" from the offerings will be used to purchase and assemble CCUs and to obtain from producers a working interest in the natural oil and gas fields where the CCUs are purportedly deployed.  (*See, e.g.,* App. 044.)

4

Shelly and FIC direct investors to wire their capital contributions into bank accounts in the name of each Fund held at Citizens & Northern Bank. (*See, e.g.,* App. 114.) Shelly controls these accounts. (App. 133 [Warren Dec. ¶ 19].) Shelly then transfers all or nearly all investor money from the Funds' accounts into other accounts held at Wells Fargo Bank in the name of "Roy Hill Trust" ("Hill Trust Accounts"). (App. 134 [Warren Dec. ¶ 25].) Hill controls the Hill Trust Accounts. (*Id.*)

Once investor funds are transferred to the Hill Trust Accounts, CETA and Hill have not used the money to purchase and deploy CCUs or to obtain working interests in oil and gas fields, as they represented. Rather, CETA and Hill have used investor funds to, among other things, pay quarterly "returns" to investors, cover CETA's payroll expenses, make transfers to other accounts controlled by the Defendants, and pay personal expenses. (App. 134-135 [Warren Dec. ¶ 26].)

Most critically, the bank records reflect that CETA and Hill have not generated material revenue from business operations. (App. 136 [Warren Dec. ¶ 31].) Rather, the sole source of money flowing into CETA's and Hill's accounts comes from transfers of investor funds from the Funds' bank accounts. (*Id.*) In other words, investor funds have been used to pay new or existing investor returns.

Because CETA has not generated material revenue for the Funds and has not deployed CCUs as it promised investors it would, much of the information in the periodic investor updates from Shelly is false and misleading. For example, the quarterly reports that FIC has provided to Fund investors have a line item for "production revenue earned from CETA." (*See, e.g.,* App. 120.) The reports also reflect how an investor's "return" for the period is derived from the "production revenue" number, after applying certain deductions. (*Id.* at 120-121.) This entire

5

presentation is false and misleading because, as explained above, CETA has not generated material production revenue, and the "return" that has been paid out is comprised of other investors' capital. (App. 136 [Warren Dec. ¶ 31].)

Similarly, the quarterly reports contain other financial and operational details that convey the false and misleading impression that CETA is engaged in revenue-producing operations, including a listing of the CCUs that are deployed on behalf of a particular Fund, the length of time they have been deployed, the revenue they have generated, and how that revenue is split among various participants.  (*See, e.g.,* App. 121.)

### ii.  *Defendants Falsely Claim that Exxon is a CETA Customer.*

Throughout the relevant period, the Defendants have repeatedly referred to Exxon as one of CETA's biggest customers.  For example, during an August 2020 investor presentation at CETA's headquarters in Fairfield, Texas, Hill specifically described a contract CETA had with Exxon, pursuant to which Exxon had committed to deploy over 400 CETA CCUs in the next five years. Shelly told an investor that he had seen the contract.  (App. 004 [Martinchuk Dec. at ¶ 8].)

In another example, in a June 24, 2022, e-mail update to investors, Shelly stated that "[w]e have just received the first order of our $CO_2$ pipeline equipment for use in Exxon's new hydrogen plant in the Houston area.  This new use will likely increase demand for our equipment up to 2000 total units."  (App. 144.)

As Hill and Shelly knew, or were severely reckless in not knowing, their statements about business dealings between CETA and Exxon were entirely false.  Exxon has verified that it has no relationship with CETA, contractual or otherwise, and that it had no record of CETA as vendor or payee in invoices. (App. 123 [Declaration of Paula Cohen ¶ 4].)

### iii. Defendants Falsely Claim that CETA's Carbon Capture Technology is Patented.

In webinar investor presentations, and on FIC's and CETA's websites, Shelly and Hill stated that both the CCUs and the solvent CETA uses in its recovery enhancement process are patented.   For example, CETA's website states that "all of [CETA's] technology … carr[ies] U.S. Patents," while FIC's website states that "CETA has developed and patented two different Carbon Capture Units . . . ."  (App. 153-57.)  As another example, in a June 4, 2020, webinar, Hill answers a query by an attendee, "Who owns the patent on these [CCU] machines?" with the deceptively false response, "Clean Energy Technology Association, Inc." (App. 159).  Further, on a webinar dated February 17, 2022, Shelly says, "So, I just wanted to mention that we do get a patented solvent that is controlled and owned by CETA industries, and they are the ones that build and have patented our carbon capture units." (App. 161.)

As Defendants each knew, or were severely reckless in not knowing, those statements were false.  In reality, neither CETA's CCUs nor its solvent, is patented.  (App. 137 [Warren Dec. ¶ 36].)

### D.    Ongoing Activity and Risk of Dissipation

Defendants are continuing to solicit investors and their fraud is ongoing.  The CETA and FIC websites are live today, and prospective investors may currently view the Offering Documents.  (App. 136 [Warren Dec. ¶ 35].)  Currently, Defendant-controlled business accounts hold over $42 million of investor assets.  (App. 136 [Warren Dec. ¶ 32-33].)

## II.    ARGUMENT AND AUTHORITIES

### A.    The Court Should Issue an *Ex Parte* Restraining Order, Preliminary Injunction, and Other Equitable Relief

#### 1.    *A Special Standard Applies to SEC Requests for Injunctions and Asset Freezes.*

Rule 65(b) of the Federal Rules of Civil Procedure provides that a court may grant a temporary restraining order to prevent immediate and irreparable injury, loss or damage.  FED. R. CIV. P. 65(b).  Section 20(b) of the Securities Act [15 U.S.C. §77t(b)] and Section 21(d)(1) of the Exchange Act [15 U.S.C. §78u(d)(1)] expressly authorize the Commission to seek and a court to enter "a permanent or temporary injunction or restraining order" upon "a proper showing" that the defendant "is engaged or is about to engage" in violations of the federal securities laws. Federal courts have broad equitable powers enabling them to fashion appropriate remedies necessary to grant full relief, including injunctions and asset freezes.  *See SEC v. Blatt*, 583 F.2d 1325, 1335-1336 (5th Cir. 1978).

Commission enforcement actions seeking injunctions are not governed by the same criteria as private injunctive actions.  Because the Commission is "not . . . an ordinary litigant, but . . . a statutory guardian charged with safeguarding the public interest in enforcing the securities laws," its burden to secure temporary or preliminary relief is less than that of a private party.  *SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 808 (2nd Cir. 1975).  The Commission need not show irreparable injury or a balance of equities in its favor.[2] *Id.*; *see also SEC v. Unifund SAL*, 910 F.2d 1028, 1035 (2d Cir. 1990); *EEOC v. Cosmair, Inc.,* 821 F.2d 1085, 1090 (5th Cir. 1987) ("When an injunction is expressly authorized by statute and the

---

[2] The Commission is also relieved of demonstrating the lack of an adequate remedy at law, as private litigants must, to obtain an injunction.  *Id.; SEC v. Scott,* 565 F. Supp. 1513, 1536 (S.D.N.Y. 1983), *aff'd sub nom., SEC v. Cayman Hedens Reins. Corp.,* 734 F.2d 118 (2nd Cir. 1984).

statutory conditions are satisfied, the movant need not establish specific irreparable injury to obtain a preliminary injunction."). Rather, the Commission is entitled to entry of temporary and preliminary injunctive relief against future securities law violations upon a substantial showing of likelihood of success as to both a current violation and the risk of repetition.[3] *See* 15 U.S.C. § 77t(b); *see also SEC v. Cavanagh*, 155 F.3d 129, 132 (2d Cir. 1998). In the Fifth Circuit, the SEC makes a proper showing and "is entitled to prevail when the inferences flowing from the defendant's prior illegal conduct, viewed in light of present circumstances, betoken a reasonable likelihood of future transgressions." *SEC v. Zale Corp.,* 650 F.2d 718, 720 (5th Cir. 1981).

To determine whether there is a "reasonable likelihood" of future violations, the court analyzes: (1) the nature of the past violation; (2) the defendant's present attitude; and (3) objective constraints on (or opportunities for) future violations of the securities laws. *Id*. "Such factors include the egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of *scienter* involved, the sincerity of the defendant's recognition of the wrongful nature of his conduct, and the likelihood that the defendant's occupation will present opportunities for future violations." *Id*. When the SEC has established a *prima facie* showing of violations and the likelihood that such violations will continue, issuance of a preliminary injunction is appropriate. *SEC v. First Fin. Group of Tex.* 645 F.2d 429, 434-35 (5th Cir. 1981).

As discussed below, the Commission has met its burden here. The Commission's evidence establishes that: (1) Defendants violated the antifraud and registration provisions of the federal securities laws; and (2) Defendants will likely continue to defraud investors absent the restraining order sought by the Commission.

---

[3] Absent a TRO, over $42 million of funds that could be returned to investors would remain in the control of the Defendants, who could dissipate, conceal, or transfer those funds and render them unrecoverable. (*See* Declaration of Eric Werner, Ex. 1 to TRO Application, at ¶¶ 3-6].)

**B.      Defendants Violated the Federal Securities Laws And Should Be Enjoined.**

As demonstrated in the SEC's evidentiary appendix, the SEC will likely succeed in proving that the Defendants are illegally engaging in a fraudulent securities offering.

### 1.   *The Defendants are Conducting a Fraudulent Securities Offering.*

Each of the Defendants has violated Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder (the "antifraud provisions").  Section 17(a) of the Securities Act prohibits the employment of a fraudulent scheme or the making of material misrepresentations and omissions in the "offer or sale" of a security.  15 U.S.C. § 77q(a).  Section 10(b) of the Exchange Act and Rule 10b-5 thereunder prohibit the same conduct, if committed "in connection with the purchase or sale" of securities.[4]  15 U.S.C. § 78j(b); *see* 17 C.F.R. § 240.10b-5.  The antifraud provisions prohibit:  (1) employing any device, scheme or artifice to defraud; (2) making material misstatements of fact or omitting to state material facts necessary to make statements made not misleading; or (3) engaging in any act or practice that operates as a fraud.  *See, e.g., SEC v. Dain Rauscher, Inc.*, 254 F.3d 852, 855-56 (9th Cir. 2001) (citing the antifraud provisions).  Section 17(a)(2) requires additional proof that the defendant obtained "money or property" through the alleged misrepresentations.  15 U.S.C. § 77q(a)(2); *Vernazza v. SEC*, 327 F.3d 851, 858 (9th Cir. 2003).

A statement or omitted fact is material if there is a substantial likelihood that a reasonable investor would consider the information important in making an investment decision.  *SEC v. Seghers*, 298 Fed. Appx. 319, 328 (5th Cir. 2008); *see also SEC v. Gann*, 565 F.3d 932, 937 n.17 (5th Cir. 2009); *see Koehler v. Pulvers*, 614 F. Supp. 829, 842 (S.D. Cal. 1985) (finding omissions and misrepresentations about "the use of investor funds" material).  All of the facts

---

[4]  Even if the investments offered do not exist, the antifraud provisions of the federal securities laws still apply.  *SEC v. Lauer*, 52 F.3d 667, 670 (7th Cir. 1995).

misrepresented to and withheld from investors in this case are material. Among other things, they concern: (1) the very existence of legitimate assets and operations purportedly underlying the investment; (2) uses of investor funds; (3) investment risk; (4) promised rates of return on investment; and (5) the source of the funds to be used to pay the promised returns.

Defendants' lies were material to investors. The Defendants tell investors that all investor funds will be used for two things: (i) to buy, lease, and deploy the CCUs; and (ii) to acquire working interests in the oil or gas wells where the CCUs are deployed. However, the bank records establish that the Defendants are using no investor funds for either activity. Likewise, the Defendants are fabricating account statements that describe production revenue and how returns are calculated from that revenue, when in fact, CETA has no revenue from any source other than investor funds. Clearly, the fact that CETA, FIC, and the other Defendants are lying about the fact that CETA has a major contract with Exxon, that the CCU technology is patented, that they are not using investor funds and promised, and that CETA is generating no revenue from any major oil and gas company would have assumed actual significance in the investment deliberations of a reasonable investor.

Establishing violations of Section 17(a)(1) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder requires a showing of *scienter*. *Aaron v. SEC*, 446 U.S. 680 (1980). However, actions pursuant to Sections 17(a)(2) and (3) of the Securities Act do not require such a showing. *Id. Scienter* is the "mental state embracing intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976). In the Fifth Circuit, *scienter* is established by a showing that the defendants acted intentionally or with severe recklessness. *See Broad v. Rockwell Int'l Corp.*, 642 F. 2d 929 (5th Cir.) *en banc, cert. denied* 454 U.S. 965 (1981).

11

In this case, Defendants acted with *scienter.*  When Defendants solicited investments in CETA by making false and misleading statements, they certainly knew—or at the very least were severely reckless in not knowing—that CETA was not using investor funds as promised, had not deployed its CCUs in the field, had no revenue from oil and gas producers, and could not generate investment returns—let alone the exorbitant returns they promised.  Moreover, the actions of controlling individuals, and therefore their *scienter*, are attributable to the controlled company.  *See SEC v. Manor Nursing Centers*, 458 F.2d 1082, 1094 (2d Cir. 1971).

Defendants marketed the securities worldwide, and sold investment contracts to at least 500 investors, while secretly misapplying investor funds.  *See Reves v. Ernst & Young,* 494 U.S. 56, 61 (1990) ("Congress's purpose in enacting the securities laws was to regulate *investments,* in whatever form they are made and by whatever name they are called.").  Bank records establish that investor funds were not used for the stated purpose of the investment.  Rather, the offering proceeds were shuttled between accounts, used to make Ponzi payments to new and existing investors, and converted for the personal use of the individual Defendants.  Based on the compelling evidence of the fraud, the Commission is likely to prevail on its claims that the Defendants violated the antifraud provisions of the Securities Act and the Exchange Act by a preponderance of the evidence.

### 2.  *The Defendants Are Likely To Continue Their Illegal Conduct.*

The second prong of the test for issuing a TRO—that a substantial likelihood exists that the wrong will be repeated unless enjoined—is also satisfied here.  Among the factors to be considered in assessing the likelihood that defendants will repeat their wrongdoing are the character of the violation, the degree of *scienter* involved, and whether a defendant has acknowledged the wrongfulness of his conduct and given sufficient assurances that it will not be

repeated. *See SEC v. Savoy Industries, Inc.,* 587 F.2d at 1149, 1168 (D.C. Cir. 1978), *cert. denied,* 440 U.S. 913 (1979); *SEC v. Commonwealth Chemical Securities, Inc.,* 574 F.2d 90, 100-01 (2d Cir. 1978).

In the present case, based on their recent conduct, Defendants have demonstrated a high probability that violations of the federal securities laws will continue unless they are restrained and enjoined.  Defendants' fraudulent scheme is ongoing.  Bank records show that, within the last month, FIC has opened at least five new Fund accounts.  (App. 134.)  Defendants are actively soliciting investors to invest in a purported patented technology with unlimited demand from major oil and gas producers when the technology is neither patented nor in demand.  (*See* App. 157.)  Further, Defendants are promising unreasonable returns to investors based on a revenue stream that does not exist, and secretly misappropriating their funds.  This conduct is egregious and exhibits a high degree of *scienter*.  Given the serious nature of the Defendants' violations, and their persistence in pursuing their fraud, it is highly likely that Defendants will continue to violate the securities laws unless enjoined.  Indeed, since late November, FIC's claimed assets under management have grown from $100.7 million to $263 million.  (App. 131.)

### C.    The Court Should Grant Additional *Ex Parte* Relief to Facilitate the Preservation of Investor Assets and the Prosecution of This Case.

In addition to a restraining order, the SEC also seeks an asset freeze, the appointment of a receiver, and orders requiring an accounting, prohibiting the destruction of documents, allowing alternative means of service, and allowing expedited discovery, which are well justified here. Federal courts have broad equitable powers enabling them to fashion appropriate ancillary remedies necessary to grant full relief.  *Manor Nursing Centers,* 458 F.2d at 1103-4; *SEC v. Blatt*, 583 F.2d 1325, 1335-1336 (5th Cir. 1978). "[O]nce the equity jurisdiction of the district court properly has been invoked, the court has power to order all equitable relief necessary under

the circumstances." *SEC v. Materia*, 745 F.2d 197, 200 (2d Cir. 1984).

### 1.  An Asset Freeze is Necessary.

In its Complaint, the Commission seeks injunctive relief, disgorgement, prejudgment interest thereon and civil penalties.  The ancillary remedy of a freeze as to all assets in the possession, custody or control of the Defendants is appropriate to assure satisfaction of whatever equitable relief the court ultimately may order and to protect investors against further dissipation of their assets.  *See, e.g., CFTC v. Muller*, 570 F.2d 1296, 1300 (5th Cir. 1978); *SEC v. Heartland Group Ventures, LLC,* 2022 WL 1527542, at *2 (N.D. Tex. [Fort Worth] Mar. 18, 2022) (Slip Op.); *see* Exchange Act Section 21(d)(5) [15 U.S.C. § 78u(d)(5)].

Moreover, an asset freeze may be granted "even in circumstances where the elements required to support a traditional SEC injunction have not been established."  *See Unifund Sal*, 910 F.2d at 1041.[5]  When there are concerns that defendants might dissipate assets, this Court need only find "some basis" for inferring a violation of the federal securities laws in order to impose a freeze order.  *Unifund SAL*, 910 F.2d at 1041 (upholding asset freeze order even though the evidence was insufficient to support entry of a preliminary injunction); *see also SEC v. Heden*, 51 F. Supp. 2d 296, 298 (S.D.N.Y. 1999).  Accordingly, courts have imposed orders freezing assets of defendants, so that if the Commission is ultimately successful in an enforcement action, meaningful relief for defrauded investors can be obtained.  *See Unifund SAL*, 910 F.2d at 1041; *SEC v. Am. Bd. of Trade, Inc.*, 830 F.2d 431, 438 (2d Cir. 1987).

There is a compelling need to freeze the assets of Defendants in this case.  As set forth in

_____

5  To obtain an asset freeze, the Commission need not show a reasonable likelihood of future violations. *Muller*, 570 F.2d at 1300.  The Commission's burden when seeking an asset freeze is lower than the burden facing the Commission when seeking a temporary or preliminary injunction, because injunctive relief raises the possibility of future liability for contempt; an asset freeze only preserves the *status quo*. *Unifund Sal*, 910 F.2d at 1039.

detail above, Defendants have engaged in repeated violations of the federal securities laws.  The
Commission does not yet know where all of the investor funds have been dispersed, but it is
aware that over $40 million remains in Defendant-controlled bank accounts.  The Court should
freeze Defendants' assets to ensure the most complete recovery for the victims of their fraud.

### 2.  *Orders Requiring an Accounting, Prohibiting the Destruction of Documents, Granting Expedited Discovery, and Allowing Alternative Means of Service are Necessary.*

The SEC seeks orders requiring defendants to prepare and file sworn accountings,
prohibiting the destruction or alteration of documents, granting expedited discovery, and
allowing alternative means of service.  *Manor Nursing Centers*, 458 F.2d at 1105-06.  The
accounting will enable the Commission to accurately determine the scope of the fraud and
disposition of investor funds.  The Court should also require each of the defendants to prepare
accountings so the SEC can identify all available assets, to help ensure that funds and assets are
frozen properly and available to satisfy any future order of disgorgement or civil penalties
against defendants.  *See SEC v. Wencke*, 622 F.2d 1363, 1369 (9th Cir. 1980); *SEC v. Int'l Swiss
Invest. Corp.*, 895 F.2d 1272, 1276 (9th Cir. 1990) (ordering an accounting).  Expedited
discovery will help the staff trace and locate funds and assets purchased with such funds.
Expedited discovery is also necessary for the parties to take meaningful discovery between the
entry of a temporary restraining order and the hearing on the application for a preliminary
injunction.  *See* Fed. R. Civ. P. 65(b).  The preservation order will demand the preservation of
documents throughout litigation.  *See Wencke*, 622 F.2d at 1369.  Finally, alternate service on
Defendants and financial institutions by email and facsimile is appropriate here, because the
effectiveness of other relief the Commission seeks could be diminished by any delay in awaiting
the formal service of process.

### 3. *The Appointment of a Receiver is Necessary.*

The appointment of a receiver is a well-established equitable remedy in civil enforcement proceedings for injunctive relief. *See, e.g., SEC v. First Fin. Group of Texas*, 645 F.2d 429, 438 (5th Cir. 1981). Courts have wide discretion to order equitable relief in Commission actions. *In re San Vicente Med. Partners Ltd.*, 962 F.2d 1402, 1406 (9th Cir. 1992). Courts will appoint a receiver where necessary to: (1) to preserve the *status quo* while various transactions are being unraveled in order to determine an accurate picture of the fraudulent conduct, *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1105 (2nd Cir. 1972); (2) to protect "those who have already been injured by a violator's actions from further despoliation of their property or rights," *Esbitt v. Dutch-American Mercantile Corp.*, 335 F.2d 131, 143 (2d Cir. 1964); (3) to prevent the dissipation of the defendant's assets pending further action by the court, *SEC v. Am. Bd. of Trade, Inc.*, 830 F.2d 431, 436 (2d Cir. 1987); (4) to install a responsible officer of the court who could bring the companies into compliance with the law, *Id*. at 437; or (5) to place hopelessly insolvent entities in bankruptcy to effect their liquidation, *Id*. at 436.

"The Court may appoint a receiver on a prima facie showing of fraud and mismanagement." *SEC v. Current Fin. Servs., Inc*., 783 F. Supp. 1441, 1443 (D.D.C. 1992). As discussed above, the Commission has made a strong *prima facie* showing of fraud. The Defendants raised over $155 million while repeatedly lying to their investors about how their money would be spent. The appointment of a receiver will assist in preserving assets by preventing the Defendants who illegally obtained investor funds from disposing of, wasting, or further encumbering assets that would otherwise be available to satisfy a judgment against them, potentially for the benefit of the investors. Thus, a receiver is warranted.

The Commission staff has vetted receiver candidates to provide a recommendation to the Court, and has identified a candidate who possesses superior skill and experience in this area, agrees to the standard billing and reporting requirements, agrees to reduce professional fees, is poised to act immediately and simultaneously in Pennsylvania, Florida, and Fairfield, Texas, where Defendants' assets are located, and has cleared conflicts.  The Commission's proposed candidate is Albert "Tre" Black, III, New Horizons Receivership and Trustee Services, 1133 S. Madison Avenue, Dallas, TX 75208.  If appointed, Mr. Black has arranged to hire as counsel Dennis Roossien, an attorney at Munsch Hart Kopf & Harr, P.C., who is experienced in SEC receiverships, and specifically, oil and gas receiverships.  Mr. Roossien has also cleared conflicts, agreed to reduce professional fees, and is ready to act immediately.

## III.    CONCLUSION

For the foregoing reasons, and those set forth in the accompanying pleadings, declarations and exhibits thereto, the Commission respectfully requests that the Court: (1) grant the requested relief; (2) enter the proposed orders; and (3) grant Plaintiff such further relief as the Court may deem just and proper.

## CERTIFICATE OF SERVICE

I certify that on May 3, 2023, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Western District of Texas, Waco Division using the electronic case filing system of the court. I hereby certify that I have served a copy of this document on all parties in accordance with FED. R. CIV. PRO. 5(b)(2).

_/s/ Jennifer D. Reece_
Jennifer D. Reece

17