**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | § | |
| | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | **Civil Action No.:**  **6:23-cv-321** |
| **v.** | § | |
| | § | |
| **ROY W. HILL**, *et al.*, | § | **FILED UNDER SEAL** |
| | § | |
| **Defendants.** | § | |
| | § | |

**APPENDIX**
**IN SUPPORT OF PLAINTIFF'S TRO APPLICATION**

Dated:    May 3, 2023.                    Respectfully submitted,

*s/ Jennifer D. Reece*
Jennifer D. Reece
Texas Bar No. 00796242
United States Securities and Exchange Commission
Burnett Plaza, Suite 1900
801 Cherry Street, Unit 18
Fort Worth, Texas 76102
Direct phone: (817) 978-6442
Fax: (817) 978-4927
reecej@sec.gov
ATTORNEY FOR PLAINTIFF
SECURITIES AND EXCHANGE COMMISSION

**CERTIFICATE OF SERVICE**

I certify that on May 3, 2023, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Western District of Texas, Waco Division using the electronic case filing system of the court. I hereby certify that I have served a copy of this document on all parties in accordance with FED. R. CIV. PRO. 5(b)(2).

*/s/ Jennifer D. Reece*
Jennifer D. Reece

## INDEX

**Document**                                                                                    **Appendix Page**

1. Declaration of Paul Martinchuk, Investor .......................................................... 003-008
     EX A   Bios and CETA Brochure................................................................. 009-020
     EX B1 Private Placement Memorandum.................................................... 021-050
     EX B2 Partnership Agreement..................................................................... 051-084
     EX B3 Investor Questionaire ....................................................................... 085-092
     EX B4 Subscription Agreement................................................................... 093-104
     EX B5 Business Plan .................................................................................. 105-113
     EX C   Wiring Instructions .........................................................................114
     EX D   Email Attaching Bill of Sale ......................................................... 115-118
     EX E   First Quarter 2023 Account Statement........................................... 119-122
2. Declaration of Paula C. Cohen, Exxon........................................................... 123-127
3. Declaration of Melvin Warren, SEC Accountant ........................................... 128-137
     EX 1 FIC Website...................................................................................... 138-141
     EX 2 Tax Benefits Webinar Transcript Excerpts ..................................... 142-143
     EX 3 Shelly E-Mail Update ...................................................................... 144-147
     EX 4 List of Bank Accounts ..................................................................... 148-152
     EX 5 Website References on Patents......................................................... 153-157
     EX 6 June 2020 Video Transcript Excerpts.............................................. 158-159
     EX 7 Webinar Transcript Excerpts ........................................................... 160-161

## DECLARATION OF PAUL MARTINCHUK

I, Paul Martinchuk, do hereby declare pursuant to 28 U.S.C. § 1746, as follows:

1.      I have personal knowledge of the matters stated herein, and if called as a witness, could and would testify competently thereto under oath.

2.      I am currently employed as a Chief Financial Officer at a technology company.  I am 44 years old and live in Glendale, California.  I graduated from UCLA with a degree in Business Economics, and earned an MBA from the University of California, Berkeley.

3.      I became familiar with Clean Energy Technology Association, Inc. ("CETA") in 2019 through Eric Shelly and Dave Zook, who are acquaintances of mine.  I met Shelly and Zook at various investment conferences that I attend and also at multiple investment clubs that I was/am a member of.  Shelly shared with me that he puts investment deals together through his company Freedom Impact Consulting, LLC ("FIC").  My understanding is that amongst other activities, FIC forms investment funds to raise capital for CETA.  I initially learned that CETA operated coal distillation units, which I understood to be essentially large ovens that remove impurities from coal and produce clean coal, a solvent called CETASolve, and other valuable by-products.

4.      In August 2020, I visited CETA's headquarters in Fairfield, Texas with a group of approximately 20 other potential investors (the "2020 Meeting").  I met with Roy Hill ("Hill"), who owns CETA, Shelly, and other investors who were doing diligence on CETA.

5.      During the 2020 Meeting on-site at CETA, I saw a few of its coal distillation machines.  There appeared to be about six employees on-site other than Hill.

6.      At the 2020 Meeting, Hill discussed and presented an opportunity to invest in a new technology CETA was offering, different from its distillation machines.  Hill did the vast majority of the speaking at the 2022 Meeting on behalf of CETA.  Hill told me and the other prospective investors that CETA had invented and patented a carbon capture unit ("CCU"), which I understood to be a machine that would filter carbon dioxide from a natural gas stream at a well site and capture it in the solvent called CETASolve, and then pump the solvent into the

well to facilitate enhance oil recovery.  The technology is specialized and complex, and I did not have a detailed understanding of how it worked beyond what Hill shared.  I do not have an oil and gas background, and have never invested in oil and gas before.

7.      At the 2020 Meeting, Hill showed us two of the CCUs, which were not connected or operating, but appeared to be prototypes of versions that Hill said CETA had deployed in the oil and gas fields.  Hill said that CETA operated about a dozen CCUs in the field at that time.

8.      Hill also specifically described a contract CETA had with ExxonMobil Corporation ("Exxon"), pursuant to which Exxon had committed to deploy over 400 CETA CCUs in the next five years.  I asked Hill to show me the contract with Exxon, and he told me that it was confidential, but that I could come back another time to view it in person.

9.      I also asked Hill whether CETA had audited financial statements.  Hill said that CETA is working with its accountants to produce them.  Hill's response was something to the effect that "we do things honorably in Texas on a handshake."

10.     During the 2020 Meeting, Hill explained that the CCUs would produce two revenue streams for CETA and ultimately investors who CETA would share revenue with.  Hill also stated that investing in CCUs would produce a tax benefit for the investors but that investors should speak with their CPAs about this.  In terms of revenue streams, first, Hill explained that Exxon pays CETA to purchase their CETASolve on a per barrel basis to remove CO2 from the gas stream.  Second, Hill explained that when the CO2-saturated CETASolve is injected back into the oil wells, CETA gets compensated a percentage for the increase oil or gas production resulting from this process (he defined this as enhanced oil recovery process).  FIC investors would receive portions of those two revenue streams.

11.     Later that day, Shelly discussed that investors would realize tax advantages through deductions that would offset active income.

12.     Between the 2020 Meeting and the time I invested, I spoke with Shelly multiple times in person at investment seminars and over the phone.  I never visited FIC's office.  I indicated my interest in investing in one of FIC's funds.  Shelly told me that other people were

ahead of me in line to invest.

13.     Also during that time, I spoke with a few other investors, who were mostly dentists and orthodontists.  I was aware that Shelly is a dentist.  The investors who invested into CETA ahead of me that I spoke to, told me that CETA/FIC had never missed a distribution.  I was told they were receiving regular distributions.

14.     Also during that time, Shelly told me that he was working with a sophisticated lawyer (Mauricio Rauld at the Premier Law Group), and an experienced CPA (Tim Gertz, who is a CPA from Arizona whose clients are all high net worth individuals) in putting together these deals.  Shelly further told me that Rauld and Gertz prepare FIC's offering documents.  Both Rauld and Gertz are listed as advisory team members on FIC's website at www.freedomimpactconsulting.com, and are prominently featured in the marketing brochure I received from FIC, a copy of which is attached hereto as **"Exhibit A"** (App. 009-020).

15.     The involvement of well-known legal and accounting experts, such as Rauld and Gertz, gave me comfort in making the investment.

16.     Around May 2021, Shelly indicated that a spot opened up to invest in one of his funds.  We corresponded via email and phone and Shelly sent me via email offering documents for a FIC fund called "03 Carbon Capture LP" ("the Fund"), which were legal documents that set out the terms of the investment and projected investment returns.  Included in the documents was a Private Placement Memorandum ("PPM"), a Partnership Agreement ("PA"), an Investor Questionnaire, a Subscription Agreement, and a Business Plan (together, the "Offering Documents").  Attached hereto as **Exhibit "B"** (App. 021-113) are the Offering Documents I received from FIC.

17.     According to the PPM, investors would contribute approximately $2.1 million to the Fund, which would purchase and control four of CETA's CCUs, at a cost of $5.2 million.  CETA loaned to the Fund 60% of the total cost, and we as investors provided 40% (or $2.1 million) in cash.  FIC is the sponsor and manager of the Fund.  The PPM states that "[a]ll proceeds from the Offering will be used to purchase the Carbon Capture Units and obtain the

working interest with the natural oil or gas wells." In making my decision to invest, I relied on the representation that 100% of my investment would be used for the stated purpose of the investment.

18.     According to the Business Plan ("BP") I received from Shelly, based on my investment of $422,400, I would receive an average annual return on investment ("ROI") of 75.7%, and with the tax benefit, the ROI was 81.5% over 12 years of revenue. (*See* App. 110.). In addition, I would receive, at a minimum, 100% of my investment as a tax deduction. The BP stated that 100% of my investment would be deductible against ordinary income in the first year. (*See* App. 110.) Based on the structure of the Fund, my understanding was that my tax deduction would actually be greater. The BP provided an excerpt from an opinion letter from an accountant on how the tax code would apply to the investment though the offering also clearly stated that I was to seek my own legal counsel and accounting advise. (*See* App. 111.)

19.     I understood that my investment was passive, in that once I contributed to the Fund, I did not have any role in the success of the investment or control over investment decisions. There was nothing else I had to do other than wire money to FIC.

20.     On June 30, 2021, I made the investment in 03 Carbon Capture, L.P. ("the 03 Fund") by wiring the money to the 03 Fund's account at Citizens & Northern Bank, account ending #3285. Attached hereto as **"Exhibit C"** (App. 114) is the wiring instructions Shelly provided. The Fund address is listed as 977 Carol Circle, West Chester, PA 19380.

21.     On July 2, 2021, Shelly emailed me a document signed by Hill and titled "Bill of Sale," which showed that CETA sold four CCUs to the Fund for a sale price of $5.28 million, of which $2,112,000 was provided in cash by the five fund investors, including my portion. Attached hereto as **"Exhibit D"** (App. 115-118) is the Bill of Sale I received from Shelly.

22.     Before I invested, I asked Shelly for a copy of the Exxon contract. He did not provide the contract and told me that it was highly confidential. I asked Shelly if he had seen it, and he told me that he had. To this day, neither Shelly nor Hill have shown me a copy of this contract. The fact that CETA had a contract with Exxon was an important factor in my decision

to invest.  If I had known that CETA had no contract with Exxon, I would not have invested.

23.     Before I invested, I asked Shelly for CETA's audited financial statements.  Shelly told me he didn't have them, but that Hill was working on them and would provide them "soon." I asked again a few times.  Each time, Shelly never told me no, but always said they were working on it and would provide them soon.  Neither CETA nor FIC ever provided them to me.

24.     Since I invested, I have received quarterly distributions of approximately $55,000 every single quarter, as promised.  The money is wired into my account from FIC.  I received the most recent distribution in March 2023.  Based on the information Shelley and Hill provided, I believed that the distributions FIC sent me came from the two revenue streams discussed in paragraph 10, based on my ownership of CCUs through the Fund.  I receive quarterly account statements from FIC.  Attached hereto as **"Exhibit E"** (App. 119-122) is the most recent account statement from the first quarter of 2023.

25.     Recently, I have had other opportunities to invest with FIC.  I have not done so, because I am concerned with the lack of documentation and transparency that I would expect in a normal course of business from a business of the scale of operation of this size.  I see emails from Shelly stating that millions of dollars are going into this operation, and it is concerning that a company of this size is not providing audited financial statements.

26.     I asked a friend to run a patent search on the patents CETA claimed it owned for the CCUs and the CETASolve.  The search revealed that there were no patents for that technology.  That raised another red flag and gave me reason for concern.

27.     On one of the FIC webinars, I also heard Shelly share that CETA will be providing its CCUs to be deployed in that hydrogen plant that Exxon is building in Texas.  A lot about that did not make sense to me, particularly how the CCUs would be used at a plant instead of in the field.

28.     One of the investment clubs that I belonged to is The Real Estate Guys ("TREG").  I believe Shelly is a member of TREG's "inner circle," which is the highest paid level of TREG.  In my observation, the Inner Circle members are primarily capital-raisers who

pay the club approximately $50,000 per year for mentoring, coaching, & collaboration services to become more effective at syndicating (putting together private deals and offering them to high net worth individuals), or, some sort of service providers (personal development coaches, attorneys, business service providers) that support these syndicators. TREG hosts seminars, tradeshows, and conferences around the country, and internationally in places like Belize. TREG also posts weekly blog posts to its website at www.realestateguysradio.com, and hosts an internet radio show available on its website, YouTube, Spotify, and iHeart Radio, among other places. TREG has a large following of high net worth individuals who invest into deals put forth by syndicators associated with TREG.

29.     Shelly appears on various podcasts of TREG members and is presented by TREG as an incredibly successful expert "syndicator," or in other words, someone who organizes investors and puts together investment funds that pool capital for passive investments in real estate or other opportunities. I have seen him on stage at the TREG events multiple times. My understanding is that Shelly currently markets interests in various funds FIC has formed to invest in CETA and that he offers them to the general public on FIC's website, via his email list, on webinars/podcasts, and in person.

Executed on April 26, 2023, in Glendale, California.

Paul Martinchuk

DocuSign Envelope ID: 60B058C0-37EF-4C90-99DC-1E4B56CD6BA2



**Clean Energy Technology Association, Inc.**

*Take it to the Source!*

123 East Commerce St.

Fairfield, TX, 75840

877-711-2382

r.hill@cetaenergy.com1

DocuSign Envelope ID: 69B058C0-33FE-4C99-90DC-1EAB66CD5BA2

# CETA LEADERSHIP



**Roy W. Hill**
President
Chairman of the
Board



**Michelle Moore**
Executive Vice
President Board of
Directors



**Al Thomas, II**
Board Vice
President



**Robert Buller**
Chief Global
Strategist Board of
Directors



**Charles Moncla**
Board of Directors



**Richard Sapienza, PhD.**
Science Director



**Tracy Thompson**
Vice President of
Construction

# Key Investment Highlights

- Revolutionary and Highly Disruptive Carbon Capture Solution and Process

- World's first and only Mobile Carbon Capture System

- Based on Patented and Proven Coal Distillation Technology Used in Major Public and Private Sector Projects

- Significant Environmental Benefits

     Reduction in Overall $CO_2$ Levels and Footprint Water

     Preservation

- Untapped Market Demand, with Multiple Avenues for Growth

- Strong Cash Flow Profile, With Superior Investor Returns

- World-Class Management Team

**App. 011**

# Carbon Dioxide Background

Carbon Dioxide ($CO_2$) is a non-combustible greenhouse gas that some scientists say is responsible for global warming, now called, climate change. It is one atom of carbon double bonded to two oxygen atoms. Those who consider it harmful seem to believe that  it is the complete burning of fossil fuels in cars and power plants that is responsible for cli- mate change.

What many do not consider is that $CO_2$ exists naturally in our environment for very beneficial reasons, including its role in photosynthesis for all plant life. The natural forms of $CO_2$ creation are just the simple acts of respiration (animals and humans breathing in Oxygen and exhaling $CO_2$) and other natural occurrences such as combustion, volcanic eruption, and decomposition of organic matter. They sometimes seem to forget how important $CO_2$ is to our atmosphere due to its ability to absorb infrared and ultra-violet light from the sun. $CO_2$ is soluble in water which is the source of life on earth.

There is an abundant supply of $CO_2$, but it is not necessarily in the right place for proper use as a commercial product. Currently, pipelines, rail, and trucking bring $CO_2$ to the places where it is needed for commercial use. In the oil and gas industry alone there are 123 projects for Enhanced Oil or Gas Recovery (EOR) that utilize $CO_2$. Shale oil and natural gas enhanced recovery projects have increased the $CO_2$ demand dramatically. It is a versatile industrial product that can be used in many ways besides just the oil and gas industry for EOR, for welding, fire protection, air guns, decaffeination of coffee, supercritical drying, added to drinking water and carbonated beverages, frozen for dry ice, dry cleaning, rubber and ethanol making, as well as medical, pharmaceutical, and agricultural uses.

App. 012

# Examples of Failed CO$_2$ Capture Projects in Recent Years

Carbon Capture and Sequestration (CCS) have been around for many years. One such Project (CCS) in the USA was the **Texas Clean Energy Project** of Summit Power near Odessa, Texas. It was to be a small combined cycle power plant (gasification of coal) that could generate 400 megawatts of electricity while capturing up to 90% of the CO$_2$ produced by the power plant itself. The CO$_2$ was to then be sequestered into a reservoir nearby, and later used in the recovery of oil and gas from nearby field. This project ultimately cost investors and the government over $3.98 billion, and had to be scrapped.





A second such project in Mississippi was the **Kemper Project** of the Southern Company. It was also intended to be an integrated gasification combined cycle facility which would convert lignite coal into Syngas to be used to power an electric generation facility. This process would produce a large amount of CO$_2$ as well. So, it had a secondary goal of capturing 65% of the CO$_2$, and then utilizing it for EOR. Because the capture points were all fixed locations and required expensive infrastructure (such as many miles of pipeline at costs that could range as high as $400,000.00 per mile) to get the captured gases to the oilfields, as well as political head-winds, this project also failed after a final estimated cost from both government and private sector expenditures of $6.7 billion dollars.

App. 013

A third example is the **Petra Nova Project** done near Houston, Texas in a combined effort with NRG/Reliant, Mitsubishi, Kansai Electric, J. X. Nippon Oil and Gas and Hilcorp. It was constructed near NRG's old W. A. Parish Power Plant. It had a cost of over $1 billion. The undertaking was funded in part by several hundred million dollars in U.S. government subsidies, and $250 million in direct loans from the Japanese government. This process is energy intensive and requires a dedicated natural gas unit.



In the Petra Nova Project, the $CO_2$ from a unit of the W.A. Parish Power Plant is captured, sequestered, compressed into a liquid with chemicals, separated, and then sent by pipeline to the West Oil Field of Hilcorp near Victoria, Texas about 80 miles away. It has dramatically increased the production of the field. However, the return on investment in this stationary project model that is coupled with a power plant, is not as high as it should be. This is mostly due to over-engineering, and pipeline, CAPEX, and OPEX costs of the project. It does, however, prove what many in the oil and gas sector have known for a long time; that injection of $CO_2$ into oil and gas reservoirs does significantly enhance recovery.

There are similar CCS projects going on all over the world, such as, the ones in Saskatchewan, Canada at the Weyburn Fields; called Weyburn - Midale, Cenovus, and Apache Canada. But, as best we have been able to determine, all are expensive, stationary projects which require rail, trucking, or lots of pipelines in the ground.





6

# Further CCS Examples and EOR Information

All these EOR project examples are **stationary** projects coupled to oilfields for Carbon Capture and Sequestration (CCS). The logic of this model is that $CO_2$ is injected into or adjacent to producing oil or gas wells or reservoirs. Effective EOR usually requires supercritical conditions, meaning, the $CO_2$ becomes miscible with the oil and/or natural gas. *(An example of miscible is when something can be mixed with another thing like sugar and warm water.)* As stated previously, this approach has been around for a long time. It is known to increase oil or gas production, and total recovery by reducing residual oil or gas saturation by 7 to 23% and sometimes even higher additional to primary extraction. It acts as a pressurizing agent, and when dissolved into the underground reservoir, significantly reduces the viscosity, enabling the oil or gas to flow more rapidly through the reservoir to the removal well, thus increasing production itself.

Excluding the West Field Project of Petra Nova, one of the longest EOR Projects has been the Permian Basin of West Texas and Southern Oklahoma. In that field, the $CO_2$ is mostly sourced from sequestration sites in the McElmo, Brazos, or Sheep Mountain domes, and is delivered by the Cortez pipeline that is owned by several major oil companies. This requires added transportation costs, operating costs, incremental capital costs, and lifting costs in order to succeed. These costs continue to mount.

Current federal regulations for delivered natural gas allow for concentrations of no more than 1 to 2% $CO_2$ for home consumption. The gas pumped out of the ground after a $CO_2$ injection into a producing reservoir goes into a transportation pipeline has between 3 to 30% concentration of $CO_2$. It has to be removed and separated in the pipeline transportation process for retail sales. Sequestration of $CO_2$ into underground reservoirs is still, after all these years, not stabilized; as it can leak out of an abandoned reservoir or dome, and, as such, is not totally secure, and requires constant monitoring.

## **CETA** has a better way!

App. 015

*Take it to the Source!*

# **CETA's** *Lite & Nimble*CO$_2$

### (The L/N-CO$_2$ Process)

Mobile CO$_2$  Recycling Unit
for Enhanced Oil and Gas Recovery

As opposed to capture and storage in underground reservoirs, **CETA** sees **recycling** of  CO$_2$ as  a  more sensible way to go. Mobile CO$_2$ capture and on-site delivery for injection at any oil or gas recovery source is a more practical and economical way of accomplishing CO$_2$ removal wherever needed. Our process cost-effectively separates, captures, and delivers CO$_2$ for direct use, *without the necessity of underground storage or expensive transportation* for secondary oil and gas recovery, drilling and fracking, as well as many other useful products described on page 9.

## **How It Works**

Based on the composition of our **CETA***solve*, we have designed a CO$_2$ capture technology which absorbs CO$_2$ from natural gas, power plants, or a combustion gas stream. Within the *Light &  Nimble*CO$_2$, **CETA***solve*  (extracted from coal in our distillation process) absorbs CO$_2$ into solution, making ammonium bicarbonate as  a byproduct. This resulting solution (with absorbed CO$_2$) is marketable for many useful purposes including  using it in enhanced oil and gas recovery. The solution is delivered into well bores where the CO$_2$ naturally separates (due to temperatures above 180ºF.) The released CO$_2$ enhances the amount of oil or gas that can be ultimately extracted from any given source well.



*Our mobile units can be set up to capture CO$_2$ at any given CO$_2$ source, and can deliver our proprietary recovery-enhancement solution to any oil and gas source.*

See attached economics.

8

# **CETA***Solve* Chemical Composition

Detailed chemical breakdown and composition percentages are available upon NDA.



Pure Phenol

m-Cresol

o-Cresol

Other Phenols

Other Organics

Ammonia

Other Inorganics

# CETA STAFF

### Rebecca Dodge

Director of Logistics



### Brandi Rhodes

Director of Accounting Services



### Michelle Childs

HR Administrator



### Jessica Growden

Executive Assistant



### Bill Brown

Foreman of Operations



### David Housewright

Special Advisor to President



### Coy Turner

Foreman of Operations



App. 018

## BIOS

### Roy W. Hill: CEO & President, CETA, Inc.





For more than 40 years, Roy has been a key player in the shale oil industry as an attorney, corporate advisor and business owner and has played a key role in the development of one of the largest onshore oil and gas programs in Texas including coal program development. He specializes in advising and organizing all phases of transactions, leasing, drilling and mining programs, start-up companies, working with government officials and actual project construction for major energy companies. His wealth of experience includes several business degrees, solid expertise in all aspects of field and mineral, fossil fuel ad natural resource development and project management with prove skillfulness in negotiation with government officials and private and public corporate liaison.

### Eric N. Shelly DMD CEO Freedom Impact Consulting LLC





As an investor Eric N. Shelly DMD manages and maximizes a portfolio of 40 rentals, up to 70 notes, and over 25 syndication investments.

As a founding manager of six investor funds, he has over $10 million in assets under management. Eric also serves on the advisory boards of several other funds.

As a consultant, Eric coaches high net worth professionals to deploy their capital resources and to create passive income and ultimately, to attain financial freedom. He is also adept at creating financial structures in his funds that provide significant tax benefits for his investors and that meet the mandates of investment fund managers.

In his 30+ year career as an entrepreneurial dentist, Eric built a large multi-million, multi-doctor general dental practice and a 2-doctor satellite practice. He lives in West Chester PA.  Eric earned his BA in Physics from Franklin & Marshall College and earned his DMD from University of Pennsylvania School of Dental Medicine.

## Mauricio Rauld: Attorney and Legal Counsel



**Mauricio Rauld**
Founder and CEO

Mauricio is the founder and CEO of Premier Law Group. With almost 20 years of securities experience, Mauricio is one of the premier syndication attorneys in the country focusing exclusively on syndications for real estate investors. Named as a "Rising Star" by Super Lawyers magazine, Mauricio is an educator at heart and regularly travels around the country speaking to real estate investors on how the syndication legal piece fits into the overall syndication puzzle.

A constant on the real estate investing podcast circuit, Mauricio is a regular contributor to The Real Estate Guys Radio show where Mauricio is Robert Helms' personal attorney. He has also been featured on The Lifetime Cashflow through Real Estate (Rod Khleif), The Ken McElroy Podcast, and The Best Real Estate Show Ever (Joe Fairless) among countless others.

A graduate of The University of California at Berkeley, Mauricio lives in Southern California with his wife Heidi, and their little angels, Adelina and Alessandra.

## Tim Gertz with Provision: Accounting



**Tim Gertz, CPA**
Partner

—

Tim is a certified public accountant and partner of ProVision Wealth Strategist, a firm specializing in developing wealth and tax strategies for entrepreneurs, professionals, and investors

With more than 16 years of experience, Tim is a highly-trained and educated professional with a focus in public accounting, working with highly diversified market groups.

# 03 CARBON CAPTURE, LP

## CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

THE INTERESTS REPRESENTED HEREBY (THE "INTERESTS") HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND MAY NOT BE SOLD, PLEDGED OR OTHERWISE TRANSFERRED WITHOUT AN EFFECTIVE REGISTRATION THEREOF UNDER THE SECURITIES ACT OR AN OPINION OF LEGAL COUNSEL, THAT SUCH REGISTRATION IS NOT REQUIRED.

THE INTERESTS ARE BEING OFFERED AND SOLD UNDER THE EXEMPTION PROVIDED BY SECTION 4(A)(2) OF THE SECURITIES ACT AND PURSUANT TO RULE 506(B) THEREUNDER.

THERE IS NO OBLIGATION ON THE ISSUER TO REGISTER THE INTERESTS UNDER THE SECURITIES ACT. A PURCHASER OF ANY INTEREST MUST BE PREPARED TO BEAR THE ECONOMIC RISK OF THE INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

THE INTERESTS REPRESENTED HEREBY HAVE NOT BEEN REVIEWED OR APPROVED BY THE SECURITIES ADMINISTRATORS OF CERTAIN STATES OR OTHER JURISDICTIONS NOR HAVE THEY BEEN QUALIFIED OR REGISTERED UNDER THE APPLICABLE SECURITIES LAWS OF CERTAIN STATES OR OTHER JURISDICTIONS AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE QUALIFICATION OR REGISTRATION REQUIREMENTS OF SUCH LAWS. THEREFORE, A PURCHASER OF ANY INTEREST WILL NOT BE ABLE TO RESELL IT UNLESS THE INTEREST IS QUALIFIED OR REGISTERED UNDER THE APPLICABLE STATE SECURITIES LAWS OR LAWS OF OTHER JURISDICTIONS OR UNLESS AN EXEMPTION FROM SUCH QUALIFICATION OR REGISTRATION IS AVAILABLE.

THIS PRIVATE PLACEMENT MEMORANDUM HAS BEEN PREPARED FOR SUBMITTAL TO A LIMITED NUMBER OF POTENTIAL INVESTORS FOR CONSIDERATION OF THE PURCHASE OF AN INTEREST IN THE COMPANY AND IS FOR USE ONLY BY THE INTENDED RECIPIENT. IT IS NOT AUTHORIZED FOR ANY OTHER PURPOSE OR ANY UNINTENDED RECIPIENT. IF YOU ARE AN UNINTENDED RECIPIENT OR IF YOU ACCEPT DELIVERY OF THIS MEMORANDUM AND DO NOT PURCHASE AN INTEREST WITHIN THE TIME ALLOWED, YOU AGREE TO RETURN IT AND ALL ENCLOSED DOCUMENTS TO THE COMPANY. THIS MEMORANDUM MAY NOT BE REPRODUCED IN WHOLE OR IN PART OR FORWARDED TO OTHER POTENTIAL INVESTORS. IT MAY ONLY BE DISTRIBUTED AND DISCLOSED TO THE PROSPECTIVE INVESTORS TO WHOM IT IS PROVIDED DIRECTLY BY THE GENERAL PARTNER.

# PRIVATE PLACEMENT MEMORANDUM

## 03 CARBON CAPTURE, LP

### $2,112,000

### LIMITED PARTNERSHIP INTERESTS

### OFFERED AT $1,000 PER UNIT

03 CARBON CAPTURE, LP, a Texas limited partnership, through its sponsor, Freedom Impact Consulting, LLC, hereby offers (the "Offering") two thousand, one hundred and twelve (2,112) general partnership interests (the "Partnership Interests," "Partnership Units" or "Units") in the Company. This is a Best-Efforts Offering made only to Accredited Investors.  Freedom Impact Consulting, LLC will serve as the Manager.  Dakota Dog Family Limited Partnership, an Affiliate of the Sponsor, is the current limited partner.

The Company was formed for the purpose of investing in a two (2) $CO_2$ TRANSMISSION Pipeline Units (the "Transmission Units") and two (2) $CO_2$ NOMAD Units (the "Nomad Units") which allow the Company to have a working interest in gas wells that uses this proprietary distillation processes to increase production of the wells. (See **Exhibit D, Project Prospectus**).

| General Partner Interests | Price to Investors | Number of Units | Total Proceeds to Company |
|---|---|---|---|
| Per Unit | $1,000 | 1 | $1,000 |
| Target Offering | $2,112,000 | 2,112 | $2,112,000 |
| **Total** | | | **$2,112,000** |

DATE OF THIS PRIVATE PLACEMENT MEMORANDUM: June 11, 2021.

## IMPORTANT NOTICES TO INVESTORS

INVESTMENT IN THE UNITS INVOLVES A HIGH DEGREE OF RISK, POTENTIAL CONFLICTS OF INTEREST, AND PAYMENT OF FEES TO THE MANAGER. INVESTORS WILL BE REQUIRED TO REPRESENT THAT THEY ARE FAMILIAR WITH AND UNDERSTAND THE TERMS OF THE OFFERING. (SEE "RISK FACTORS," "CONFLICTS OF INTEREST" AND "COMPENSATION AND FEES TO THE MANAGER AND AFFILIATES.")

INVESTMENT IS NOT PERMITTED FOR INVESTORS WHO LACK SUBSTANTIAL NET WORTH (SEE "QUALIFICATION OF INVESTORS."). ALTHOUGH THE MANAGER IS OF THE OPINION THAT THE COMPANY WILL BE CLASSIFIED AS A "LIMITED PARTNERSHIP (LP)" FOR FEDERAL INCOME TAX PURPOSES, THE INTERNAL REVENUE SERVICE ("IRS") HAS NOT BEEN REQUESTED TO ISSUE A RULING ON THE FEDERAL INCOME TAX STATUS OF THE COMPANY OR OTHER TAX ASPECTS OF THE INVESTMENT AND THE OPINION OF THE MANAGER IS NOT BINDING ON THE IRS.

THE UNITS HAVE NOT BEEN REGISTERED WITH NOR APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION ("COMMISSION") NOR HAS THE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THIS OFFERING HAS NOT BEEN APPROVED OR DISAPPROVED UNDER APPLICABLE STATE SECURITIES LAWS, BY THE STATE DEPARTMENT OF CORPORATIONS, SECURITIES REGULATION DIVISION ("DIVISION"), NOR HAS ANY DIVISION REVIEWED OR PASSED UPON THE ACCURACY OF THIS OFFERING. ANY REPRESENTATION TO THE CONTRARY MAY BE A CRIMINAL OFFENSE.

THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER TO SELL TO OR A SOLICITATION OF AN OFFER TO BUY FROM ANYONE IN ANY STATE OR IN ANY OTHER JURISDICTION WITHIN WHICH SUCH AN OFFER OR SOLICITATION IS NOT AUTHORIZED.

DURING THE COURSE OF THE OFFERING AND PRIOR TO SALE, EACH OFFEREE OF THE UNITS AND HIS ADVISOR(S) ARE INVITED TO ASK QUESTIONS OF AND OBTAIN ADDITIONAL INFORMATION FROM THE MANAGER CONCERNING THE TERMS AND CONDITIONS OF THE OFFERING, THE COMPANY, THE DEBT TO BE OWED BY THE COMPANY AND ANY OTHER RELEVANT MATTERS (INCLUDING, BUT NOT LIMITED TO, ADDITIONAL INFORMATION TO VERIFY THE ACCURACY OF THE INFORMATION SET FORTH HEREIN), TO THE EXTENT THE MANAGER POSSESSES SUCH INFORMATION OR CAN ACQUIRE IT WITHOUT UNREASONABLE EFFORT OR EXPENSE. OFFEREES OR ADVISORS HAVING QUESTIONS OR DESIRING ADDITIONAL INFORMATION SHOULD CONTACT THE MANAGER.

THIS MEMORANDUM DOES NOT CONTAIN AN UNTRUE STATEMENT OF A MATERIAL FACT OR OMIT TO STATE A MATERIAL FACT NECESSARY TO MAKE THE STATEMENTS MADE, IN LIGHT OF THE CIRCUMSTANCES UNDER WHICH THEY WERE MADE, NOT MISLEADING. IT CONTAINS A FAIR SUMMARY OF THE MATERIAL TERMS OF DOCUMENTS PURPORTED TO BE SUMMARIZED HEREIN. THIS MEMORANDUM CONTAINS SUMMARIES OF CERTAIN DOCUMENTS, THAT ARE BELIEVED TO BE ACCURATE, BUT REFERENCE IS HEREBY MADE TO THE ACTUAL DOCUMENTS, COPIES OF WHICH ARE ATTACHED HERETO OR ARE AVAILABLE AT THE OFFICE OF THE MANAGER, FOR COMPLETE INFORMATION CONCERNING THE RIGHTS AND OBLIGATIONS OF THE PARTIES HERETO. ALL SUCH SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY BY THIS REFERENCE, AND NOTHING IN THIS MEMORANDUM SHALL EXTEND THE LIABILITY UNDER ANY SUCH DOCUMENTS OF ANY OF THE PARTIES HERETO. ALL DOCUMENTS RELATING TO THE OFFERING WILL BE MADE AVAILABLE TO THE OFFEREE NAMED BELOW AND/OR HIS ADVISOR(S) UPON REQUEST.

ANY ADDITIONAL INFORMATION OR REPRESENTATIONS GIVEN OR MADE BY THE COMPANY OR THE MANAGER IN CONNECTION WITH THIS OFFERING, WHETHER ORAL OR WRITTEN, ARE SUPERSEDED IN THEIR ENTIRETY BY THE INFORMATION SET FORTH IN THIS MEMORANDUM AND ITS EXHIBITS (ALL OF WHICH ARE INCORPORATED HEREIN BY REFERENCE), INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS DESCRIBED HEREIN.

THE OFFERING CAN BE WITHDRAWN AT ANY TIME BEFORE CONSUMMATION AND IS SPECIFICALLY MADE SUBJECT TO THE CONDITIONS DESCRIBED IN THIS MEMORANDUM. IN CONNECTION WITH THE OFFERING AND SALE OF THE UNITS, THE MANAGER RESERVES THE RIGHT, IN ITS SOLE DISCRETION, TO REJECT ANY SUBSCRIPTION IN WHOLE OR IN PART OR TO ALLOT TO ANY PROSPECTIVE INVESTOR LESS THAN THE UNITS SUBSCRIBED FOR BY SUCH PROSPECTIVE INVESTOR.

SINCE THERE ARE SUBSTANTIAL RESTRICTIONS ON THE TRANSFERABILITY OF THE UNITS, EACH OFFEREE MUST ASSUME THAT THE OFFEREE WILL BEAR THE ECONOMIC RISK OF THE OFFEREE'S INVESTMENT FOR AN INDEFINITE PERIOD. THE UNITS MAY NOT BE TRANSFERRED WITHOUT THE PRIOR WRITTEN CONSENT OF THE REMAINING MEMBERS. IN ADDITION, UNITS ARE NOT REGISTERED FOR SALE TO THE PUBLIC UNDER THE SECURITIES ACT OF 1933 OR THE SECURITIES LAWS OF ANY STATE AND THE UNITS MAY BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF BY AN INVESTOR ONLY IF, AMONG OTHER THINGS, THE UNITS ARE REGISTERED OR, IN THE OPINION OF COUNSEL TO THE COMPANY, REGISTRATION IS NOT REQUIRED UNDER SUCH LAWS.

THIS MEMORANDUM HAS BEEN PREPARED SOLELY FOR THE USE OF PERSONS WHO MAY WANT TO PURCHASE UNITS AND DELIVERY THEREOF CONSTITUTES AN OFFER ONLY IF THE NAME OF AN OFFEREE APPEARS IN THE APPROPRIATE SPACE PROVIDED ABOVE AND IF THE PERSON SO NAMED MEETS THE SUITABILITY STANDARDS SET FORTH UNDER "QUALIFICATION OF INVESTORS."

ANY DISTRIBUTION OF THIS MEMORANDUM TO ANY PERSON OTHER THAN THE OFFEREE NAMED BELOW (OR TO THOSE INDIVIDUALS WHOM THE OFFEREE RETAINS TO ADVISE THE OFFEREE WITH RESPECT THERETO) IS UNAUTHORIZED AND ANY REPRODUCTION OF THIS MEMORANDUM IN WHOLE OR IN PART, OR THE DIVULGENCE OF ANY OF ITS CONTENTS, WITHOUT THE PRIOR WRITTEN CONSENT OF THE MANAGER, IS PROHIBITED.

NO REPRESENTATIONS OR WARRANTIES OF ANY KIND ARE INTENDED TO BE MADE IN THIS MEMORANDUM OR SHOULD BE INFERRED THERE FROM WITH RESPECT TO THE ECONOMIC RETURN OR THE TAX TREATMENT WHICH MAY ACCRUE TO THE INVESTOR. NO ASSURANCE CAN BE GIVEN THAT EXISTING TAX LAWS WILL NOT BE CHANGED OR INTERPRETED ADVERSELY, EITHER OF WHICH MAY DENY THE INVESTORS ALL OR A PORTION OF THE TAX TREATMENT CONSIDERED HEREIN. PROSPECTIVE INVESTORS ARE NOT TO CONSTRUE THE CONTENTS OF THIS MEMORANDUM AS LEGAL, TAX OR INVESTMENT ADVICE. EACH PROSPECTIVE INVESTOR SHOULD CONSULT PROSPECTIVE INVESTOR'S OWN ATTORNEY, ACCOUNTANT AND OTHER ADVISORS AS TO LEGAL, TAX AND RELATED MATTERS CONCERNING A PURCHASE BY PROSPECTIVE INVESTOR OF A UNIT.

NO OFFERING LITERATURE OR ADVERTISING IN WHATEVER FORM WILL OR MAY BE EMPLOYED IN THE OFFERING EXCEPT FOR THIS MEMORANDUM AND STATEMENTS CONTAINED OR DOCUMENTS SUMMARIZED HEREIN. NO PERSON HAS BEEN AUTHORIZED TO MAKE ANY REPRESENTATIONS, OR GIVE ANY INFORMATION, WITH RESPECT TO THE UNITS, EXCEPT FOR INFORMATION CONTAINED OR REFERRED TO HEREIN.

DocuSign Envelope ID: 69B058C0-33EE-4C98-90DC-1EAB66CD65A2

# FORWARD LOOKING STATEMENTS

This Memorandum contains certain statements that are forward looking statements within the meaning of the United States federal securities laws. These are statements about the Company's or Manager's, or Sponsor's expectations, beliefs, intentions or strategies for the future. Prospective Investors will be able to identify these types of statements since they are indicated by words or phrases such as "anticipate," "expect," "intend," "plan," "will," "Company believes," "Manager believes" and similar language. In addition, these statements may be qualified by certain risks, uncertainties and assumptions which are explained more fully in each particular case. The Company has based its Forward-Looking Statements on the expectations of information currently available to the Manager. The Company's actual results may differ materially from the results anticipated in the statements.

These Forward-Looking Statements are made only as of the date hereof, and the Company/Sponsor undertakes no obligation to update or revise the forward-looking statements, whether as a result of new information, future events or otherwise.

Although the Company/Sponsor believes that the expectations reflected in the Forward-Looking Statements are reasonable, there can be no assurances that such expectations will prove to be accurate. All phases of the Offering's operations are subject to a number of uncertainties, risks and other influences, many of which are outside the control of the Sponsor and cannot be predicted with any degree of accuracy.

In light of the significant uncertainties inherent in the Forward-Looking Statements made in this Memorandum, the inclusion of such statements should not be regarded as a representation by the Sponsor or any other person that the objectives and plans of the Offering will be achieved.

DocuSign Envelope ID: 69B058C0-33FE-4C9B-9DDC-1EAB66CD6BA2

# TABLE OF CONTENTS

| | |
|---|---|
| GLOSSARY OF TERMS | 8 |
| SUMMARY OF OFFERING | 11 |
| QUALIFICATION OF INVESTORS | 12 |
| OFFERING | 13 |
| COMPANY | 13 |
| BUSINESS DESCRIPTION | 14 |
| MANAGER | 15 |
| COMPENSATION AND FEES TO MANAGER | 15 |
| RISK FACTORS | 16 |
| PROJECTED SOURCES AND USES OF CASH | 24 |
| DISTRIBUTIONS TO PARTNERS | 24 |
| NO TAX RULING | 25 |
| PARTNERSHIP AGREEMENT | 25 |
| CONFLICTS OF INTEREST | 25 |
| STANDARD OF CARE; INDEMNIFICATION | 26 |
| RESTRICTIONS ON TRANSFER | 27 |
| FURTHER INVESTIGATION | 28 |
| HOW TO SUBSCRIBE FOR PARTNERSHIP UNITS | 28 |

# EXHIBITS

EXHIBIT A –AGREEMENT OF LIMITED PARTNERSHIP

EXHIBIT B – PROSPECTIVE PURCHASER QUESTIONNAIRE

EXHIBIT C – SUBSCRIPTION AGREEMENT

EXHIBIT D – BUSINESS PLAN

App. 027

# GLOSSARY OF TERMS

"Accredited Investor" – shall have the definition as computed under Rule 501(a) of Regulation D promulgated under the Act, which means any person who comes within any of the following categories, or who the issuer reasonably believes comes within any of the following categories, at the time of the sale of the securities to that person:

1.      Any natural person whose individual net worth, or joint net worth with that person's spouse, at the time of his purchase exceeds $1,000,000 at the time of the purchase, excluding the value of the primary residence of such person;

2.      Any natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year;

3.      Any director, executive officer, or general partner of the issuer of the securities being offered or sold, or any director, executive officer, or general partner of a general partner of that issuer;

4.      Any entity in which all of the equity owners are accredited investors;

5.      Any bank as defined in section 3(a)(2) of the Act or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Act whether acting in its individual or fiduciary capacity; any broker dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934; insurance company as defined in Section 2(13) of the Act; investment company registered under the Investment Company Act of 1940 or a business development company as defined in Section 2(a)(48) of that Act; Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958; employee benefit plan within the meaning of Title I of the Employee Retirement Income Security Act of 1974, if the investment decision is made by a plan fiduciary, as defined in Section 3(21) of such Act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000; or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors;

6.      Any private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940;

7.      Any organization described in Section 501(c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000; and

8.      Any trust with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in Rule 506(b)(2)(ii).

9.      Natural persons who are "knowledgeable employees" as defined in Rule 3c–5(a)(4) under the Investment Company Act of 1940, of the private-fund issuer of the securities being offered or sold.

10.     Entities, including, but not limited to, limited liability companies, of a type not listed in Rule 501(a)(1), (a)(2), (a)(3), (a)(7) or (a)(8) of Regulation D promulgated under the Act, not formed for the specific purpose of acquiring the securities offered, owning investments in excess of $5 million.

11.     Securities and Exchange Commission and state-registered investment advisers, exempt reporting advisers, and rural business investment companies.

12.     Indian tribes, governmental bodies, funds, and entities organized under the laws of foreign countries, that own "investments," as defined in Rule 2a51-1(b) under the Investment Company Act, in excess of $5 million and that was not formed for the specific purpose of investing in the securities offered.

13.     Family offices (as defined in Rule 202(a)(11)(G)-1 under the Advisers Act with (i) assets under management in excess of $5 million, (ii) that are not formed for the specific purpose of acquiring the securities offered and (iii) whose prospective investments are directed by a person who has such knowledge and experience in financial and business matters that such family office is capable of evaluating the merits and risks of the prospective investment.

14.     "Spousal equivalent" (cohabitant occupying a relationship generally equivalent to that of a spouse) may pool their finances for the purpose of qualifying as accredited investors.

"Act" - The Securities Act of 1933, as amended.

"Affiliate" - of a Partner or Manager means any person, entity, or trust, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with the Partner or a Manager, as applicable. The term "control," as used in the immediately preceding sentence, means with respect to a corporation, limited liability company, limited life company or limited duration company (collectively, "limited liability company"), the right to exercise, directly or indirectly, more than fifty percent (50%) of the voting rights attributable to the controlled corporation or limited liability company and, with respect to any individual, partnership, trust, estate, association or other entity, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled entity.

"Agreement" or "Partnership Agreement" - the First Amendment to Agreement of Limited Partnership, **Exhibit A** hereto, or as hereafter amended.

"Best Efforts" - the type of securities offering Sponsor intends to conduct.  Sponsor shall do the best it can to sell as much of the securities targets as possible but will commence operations as soon as the first Prospective Investor is accepted.  Immediately upon accepting the first investor, Sponsor may use the proceeds to conduct operations including, but not limited to, paying 3rd party vendors, such as architects, SEC attorneys, real estate attorneys, etc.  In the

event, however, that the Property is not purchased, then 100% of the Prospective Investors' initial Capital Contributions shall be returned to the Prospective Investors.

"Carbon Capture Units" – the larger capacity mobile carbon capture technology, knows as *Mobile CO$_2$ TRANSMISSION Pipeline Unit* and the lower capacity *CO$_2$ NOMAD Unit* that processes natural gas and removes CO$_2$ on location, thus avoiding the need to transport to the final destination. The Carbon Capture Units use a proprietary solvent (CETASolve™) to absorb the CO$_2$. This solvent will be utilized initially to capture CO$_2$ out of pipelines to make the gas stream more marketable by capturing over 85 to 92.5% of the CO$_2$. The CO$_2$ is then absorbed into the solvent which is then reinjected into natural gas producer's gas wells to improve production in that same geographic area.

"Capital Contributions" - the contributions made by the Members to the Company pursuant to Sections 6.1 or 6.4 of the Partnership Agreement and, in the case of all the Partners, the aggregate of all such Capital Contributions.

"CETA" - Clean Energy Technology Association, Inc., a Texas corporation that owns the proprietary distillation process.

"Company" - this limited partnership: 03 CARBON CAPTURE, LP, a Texas limited partnership.

"General Partner(s)" - the holder(s) of general partner Partnership Interests of the Company.

"Limited Partner(s)" - the holder(s) of limited partner Partnership Interests of the Company. The initial Limited Partner of the Company is Dakota Dog Family Limited Partnership, an Affiliate of Sponsor.

"Loan" shall mean the three (3) year personally guaranteed recourse loan issued by CETA carrying an 8.5% interest rate. Principal and interest on the Loan shall be paid quarterly and paid from the Prospective Investor's allocated cash flow, estimated to be $300,017.88 per quarter. The manager reserves the right to refinance the loan if better financing becomes available.

"Manager" or "Management" - Freedom Impact Consulting, LLC, one of the General Partners.

"Memorandum" - this Private Placement Memorandum.

"Net Cash Flow" - the Company's net operating income received from CETA following CETA paying all expenses associated with the Carbon Capture Units and CETA taking its Operator Fee of between 35% and 65%.

"Offer" or "Offering" - means the offering of Partnership Units at $1,000 per Unit pursuant to the Private Placement Memorandum.

"Operator" - CETA

"Operator Fee" – From the revenue share resulting from the revenues of the gas wells that

use the Carbon Capture Units, CETA will take between 35% and 65% of the revenue share allocated to the Carbon Capture Units under the following waterfall scenario.

(a)    35% until net revenue to the Company reaches 1.5x the purchase price of the Carbon Capture Units;

(b)    50% from 1.5x and 2x the purchase price of the Carbon Capture Units; and

(c)    65% after net revenue to the Company exceeds 2x the purchase price of the Carbon Capture Units.

"Partner" -means a General Partner or Limited Partner.

"Partnership Interest" or "Unit" - the interest of a Limited Partner or General Partner and the rights to receive profits or other compensation by way of income, and the return of contributions as set forth in the Agreement, and the rights, powers and privileges appurtenant thereto.

"Project" - the purchase of the Carbon Capture Units and the acquisition of a working interest in gas wells that will use the Carbon Capture Units to increase the production volume of the oil or gas well and result in a revenue share with the well owner of the excess oil or gas that the well produces as a result of the use of the Company's Carbon Capture Units.  The Project will last approximately twelve years (12) or until the useful life of the Carbon Capture Units comes to an end, unless refurbished as discussed in this Offering.

"Prospective Investor(s)" – Accredited Investor(s) interested in the purchase of Partnership Units, excluding the Sponsor and its Affiliates.

"Reserves" - all reserves established by the Manager in its sole discretion for Company purposes, including, but not limited to, operating expenses and other working capital needs, liabilities, and taxes.

"Sponsor" - Freedom Impact Consulting, LLC.

"Units" - means the Offering units: Limited and/or General Partnership Interests in the Company.

## SUMMARY OF THE OFFERING

This summary of certain provisions of the Memorandum is intended only for a quick reference and is not intended to be complete. This Memorandum describes in detail numerous aspects of the transaction, which are material to Prospective Investors, including those summarized below, and this Memorandum and the accompanying Exhibits must be read in their entirety by reference to the full text of this Memorandum and the underlying documents.

**The Offering**                    Sponsor seeks to raise an aggregate of $2,112,000 for the commencement and operation of the Project.  Prospective Investors will become General Partners of the Company and purchase Partnership Units at a purchase price of $1,000 per Unit.

| | |
|---|---|
| **Purpose of the Offering** | The purpose of this Offering is to raise monies to enable the Company to purchase the Carbon Capture Units and complete and operate the Project. (See **Exhibit D**, **Project Prospectus**). There are no assurances this can be accomplished. |
| **Capital Commitment** | The Company seeks an aggregate capital commitment of $2,112,000. |
| **Manager of Company** | The Company will be managed by Freedom Impact Consulting, LLC, the Sponsor and one of the General Partners. |
| **Eligible Investors** | Sponsor will accept only Accredited Investors. |
| **Management Fees** | Sponsor will not collect any fees and in fact will cover all Company fees out of its share of the Company.  Sponsor will retain a 25% ownership in the Company and receive 25% of the Net Cash Flow as compensation for this Offering. |
| **Allocation of Benefits** | The Prospective Investors will be allocated 75% of the Net Cash Flow from the Company, with the remaining 25% going to the Sponsor or its Affiliates, subject to the Loan repayment and Reserves. |
| **Risk Factors** | The purchase of the Units involves a high degree of risk to the Prospective Investor including certain risks relating to regulatory, operating, tax and investment matters. (See "RISK FACTORS.") A decision to invest in the Units should be reached only after carefully reading this entire Memorandum, including its Exhibits. |
| **Partnership Agreement** | Each Prospective Investor will be admitted as a General Partner or Limited Partner of the Company pursuant to the terms of the Partnership Agreement. |

## QUALIFICATION OF INVESTORS

This Offering is limited to Accredited Investors only.  Prospective Investors may be subject to additional information requests and certifications based on the SEC's "bad actor" rules that would disqualify securities offerings from the Rule 506 exemption if an issuer or other relevant persons have been convicted of, or are subject to court or administrative sanctions for, securities fraud or other violations of specified laws.

Relevant persons includes "any affiliated issuer; any director, executive officer, other officer participating in the offering, general partner or managing member of the issuer; *any beneficial owner of 20% or more of the issuer's outstanding voting equity securities, calculated on the basis of voting power*; any promoter connected with the issuer in any capacity at the time of such sale; any investment manager of an issuer that is a pooled investment fund; any person that has been or will be paid (directly or indirectly) remuneration for solicitation of purchasers in connection with such sale of securities; any general partner or managing member of any such investment manager or

solicitor; or any director, executive officer or other officer participating in the offering of any such investment manager or solicitor or general partner or managing member of such investment manager or solicitor."

The representations made by, and the information provided by, each Prospective Investor will be reviewed to determine his, her or its suitability, and the Company will have the unfettered right to refuse a subscription for Units if, in its sole discretion, it believes that the Prospective Investor does not meet the applicable suitability requirements or the Units are otherwise an unsuitable investment for the Prospective Investor.

Prospective Investors may be individuals, entities, trusts, IRAs, or other retirement plans. Investment in the Units involves substantial risk and is suitable only for persons of financial means who have provided for liquidity in their other investments. No Units will be sold to Prospective Investors who will not warrant and represent to the Company and the Manager (and unless the Manager shall have reasonable grounds to believe) that such offeree, alone or with offeree's legal or financial representative, has such knowledge and expertise in financial and business matters, is capable of evaluating the merits and risks of the prospective investment and is able to bear the economic risks of the investment. In either case, the Prospective Investor must also warrant and represent to the Company and the Manager that the Prospective Investor is acquiring the securities for his, her or its own account or on behalf of other persons who may be considered as separate purchasers.

Each Prospective Investor must also satisfy the Manager that the Prospective Investor can bear a total loss of investment. Manager will also require the Prospective Investors to represent that the Prospective Investors are acquiring the Units for investment and for their own account, and not with a view to resale or distribution. Prospective Investors are purchasing restricted securities and the resale of the Units is subject to extensive restrictions (see "RESTRICTIONS ON TRANSFER"). It is not expected that any public market for the resale of the Units will develop.

## OFFERING

### General

The Memorandum describes an Offering to Prospective Investors of Partnership Units in 03 Carbon Capture, LP formed under the state laws of Texas. An aggregate of up to two thousand, one hundred and twelve (2,112) General Partnership Units are being offered to Prospective Investors for a purchase price of $1,000 per Unit. The $2,112,000 will be used, along with the Loan, to purchase the Carbon Capture Units.

Prospective Investors wishing to qualify for certain tax benefits must initially become General Partners of the Company and subsequently have the option to exchange their General Partnership interest for Limited Partnership interests. In addition, Prospective Investors must be 'at risk' for the Loan and therefore Prospective Investors will be required to sign personal guarantees for the Loan up to three times their capital contribution.

The Prospective Investors will receive 75% of the Net Cash Flow and Sponsor, through its Affiliate will receive the remaining 25% net Cash Flow. At the conclusion of the investment, Partners will not receive any return of their Initial Capital Contribution since the Carbon Capture Units will have been fully depleted and not worth much, if anything, in the market.

The day-to-day operations of the Company will be run by Manager, who is one of the General Partners. As such, Prospective Investors will have no or extremely limited input in this Project. This is truly a passive investment for Prospective Investors.

In order to extend the life of the Carbon Capture Units, the Company has the option to refurbish the Carbon Capture Units once their useful life has expired. The cost of such refurbishment is approximately $500,000 per Carbon Capture Unit. The Company will pay for this refurbishment by keeping reserves equal to $10,000 per quarter, per Carbon Capture Unit. Whether the reserves are kept in cash reserves with the Company or invested in bullion precious metals to retain the reserves' purchasing power shall be left to the sole discretion of the Prospective Investor.

The Units are offered on a Best Efforts basis and is scheduled to close no later than July1, 2021. The securities shall be considered sold to the Prospective Investors on the date Sponsor accepts and countersigns the Subscription Agreement attached hereto.

The purpose of this Offering is to raise monies to enable the Company to purchase the Carbon Capture Units and acquire a working interest on a natural gas well and subsequently generate revenues from the excess barrels of gas produced and sold as a result of the well owner's use of the Carbon Capture Units. (See **Exhibit D, Business Plan**). There is no assurance these objectives can be obtained.

The Prospective Investors' initial cash contributions will be deposited into a segregated checking account. Upon execution of the Subscription Agreement by the Sponsor, the Prospective Investors will be admitted to this Company.

### Allocations and Distributions From Operations

Net Cash Flow shall be allocated and distributed as follows:

First, subject always to and subordinate to the Loan payments, $10,000 per quarter per Carbon Capture Unit will be taken from the Net Cash Flow and retained by the Company as Reserves for the sole purpose of refurbishing the Carbon Capture Units once their useful life has expired.

Second, Prospective Investor will be allocated 75% of the remaining Net Cash Flow and Sponsor, through its Affiliate, will receive the remaining 25% of Net Cash Flow.

Please note that in the first 3 years of operations, Net Cash Flow allocations to the Prospective Investor will be lower as the 3-year Loan needs to be paid off from Net Cash Flow. Then, in year four (4) it is likely that Prospective Investors will be allocated some basis recapture as a result of the Loan being paid off. Thus, we recommend working with your tax professional in order to anticipate and plan accordingly.

### Exempt Offering

While this Offering is made to various parties, it is not a registered offering under federal securities laws. This Offering is being made pursuant to the private offering exemption of Section 4(a)(2) of the Act and/or Rule 506(b) of Regulation D promulgated under the Act. This Offering is

also being made in strict compliance with the applicable state securities laws. Each Prospective Investor must represent that the Prospective Investor is acquiring the Membership Units for investment purposes only and not with a view to resale or distribution. All Units are offered subject to prior sale, when, as and if issued, and subject to the right of the Manager to reject any subscription in whole or in part. The Company will only sell Units to persons meeting its suitability standards, which the Company's Manager may determine in its sole and absolute discretion.

The Prospective Investors who are becoming Partners of the Company will have their initial cash contributions deposited into the Company checking account. Upon execution of the Subscription Agreement by the Manager's authorized representative, the Partners will be admitted to this Company.

## COMPANY

03 Carbon Capture, LP, a Texas limited partnership, was formed on March 22, 2021 when its Certificate of Formation was filed with the Texas Secretary of State's Office pursuant to the Texas Limited Partnership Act, as amended by the State of Texas. The office of the Company shall be located at 5900 Balcones Drive, Suite 100, Austin, Texas 78731.

## BUSINESS DESCRIPTION

The business of the Company as more fully described in the Business Plan, attached hereto as **Exhibit D** is to purchase the Carbon Capture Units and acquire a working interest on a natural oil or gas well and subsequently generate revenues from the excess barrels of oil or gas produced and sold as a result of the well owner's use of the Carbon Capture Units.

The Company will share revenue with the oil or gas well owner and pay CETA an Operator Fee for operating the entire process and handling the relationships and agreements.

We anticipate the Project lasting until the Carbon Capture Units are no longer operational which we believe will be in approximately twelve (12) years. Once no longer operational, the Company will refurbish the Carbon Capture Units to extend its lifetime and will continue to do so until the Carbon Capture Units have no more useful life.

## MANAGER

The General Partners may appoint the Manager of the Company to supervise day-to- day operations of the Company. In no instance shall there be less than one Manager. The General Partners have appointed Freedom Impact Consulting, LLC as the Manager of the Company. As such, the Manager has the power and authority on the Company's behalf and in its name to manage, administer, and operate the Company's day-to-day business affairs and to do or cause to be done on behalf of the Company anything necessary or appropriate for the same, including but not limited to the powers and authority set forth in the Partnership Agreement. The Manager's power and authority is subject to the limitations set forth in the Partnership Agreement. The Manager shall serve until resignation or a successor is appointed by the General Partners as provided in the Partnership Agreement.

## COMPENSATION AND FEES TO MANAGER

Manager shall not receive any management fees for its role as manager of the Company. The Manager's compensation comes from retaining a 25% partnership interest in the Company and sharing in the profit distributions as discussed above. Manager will also retain the entire annual 15% depletion allowance on the solvent, oil, and gas revenue. This benefit will be allocated to the Manager or its Affiliate to offset project expenses.

## SELLING AGENT

Units are being offered directly through the Company. No commissions of any kind will be paid to selling agents or brokers for the sale of any Units.

## RISK FACTORS

The purchase of the Units involves a high degree of risk to the Prospective Investor and is suitable only for persons of financial means who have no need for liquidity in investments and who can afford the possible loss of their entire investment. These risks include certain risks relating to regulatory, operating, tax and investment matters. Prospective Investors should give careful consideration to the following risk factors contained herein. Risk and consult with their own professional advisor(s) to consider carefully the following factors, the Partnership Agreement and the Company.

### Risks Related to the COVID-19 Coronavirus Worldwide Pandemic

On March 11, 2020, the World Health Organization declared the COVID-19 coronavirus outbreak a worldwide pandemic (the "Pandemic"). On March 13, 2020, then President Trump declared a national emergency in the United States. Various cities and States followed and declared emergencies, which for many cities and States are still in effect around the country to this day. As a result, the Pandemic and the reactions of various governments and citizens continue to cause (and any future outbreaks of the coronavirus disease may cause) massive disruptions in economies, financial markets, supply chains, businesses and daily life on a worldwide scale never seen in recent history. Such disruption may continue for an extended period or indefinitely, may lead to a recession or depression in the United States and/or globally, and may adversely impact the Company. In some areas in the United States, the Pandemic continues to cause a near total cessation of all non-essential economic activities. Many businesses continue to temporarily suspended operations and lay off employees. In the United States, persons have been diagnosed with COVID-19 in each of the 50 states. While the Company has a business continuity plan, it may be materially affected by the Pandemic. The Pandemic and reactions by governments and citizens, and the impact of the Pandemic and such reactions on businesses and the economy, are creating and are likely to continue to create various issues for the economy that are impossible to fully predict or list here but all or many could, and are likely to be, material, with such likelihood of materiality increasing the longer the duration of the Pandemic (and whether or not there is a recurrence of coronavirus even after the current Pandemic improves). The Pandemic may worsen substantially before it improves, and the entirety of the United States will continue to be impacted. There is little certainty as to when the Pandemic will completely abate, or to what extent the United States economy will recover from the disruption caused by the Pandemic. In addition to the severe impact of the Pandemic on financial markets and economies, other things that may impact the Company in connection with the Pandemic include the

continued closure of courts and state governments. The closure of certain businesses or limitations in the ability of certain businesses to function, as well as declarations of states of emergency, and "shelter at home" measures in certain areas, have and could continue to affect the ability of the staff of the Manager, and/or applicable property managers to function properly. A reduction in liquidity and increase in volatility in financial markets could affect the valuation of real estate, the health of the Company's financing partners or other persons necessary for the Company to implement its strategy and the ability to find third party financing. Also, key executives and staff members of the Manager and/or Sponsors could become infected with COVID-19, develop symptoms, and not be able to work, or not be able to work effectively.

**Operations Risks**

1.    <u>Revenue Risks</u>. The Company's future revenue and operating results are unpredictable and may fluctuate significantly. It is difficult to accurately forecast revenues and operating results and they could fluctuate in the future due to a number of factors. These factors may include: demand for Company's products or the natural gas products; the amount and timing of operating costs and capital expenditures; competition from other market venues that may reduce market share and create pricing pressure; and adverse changes in general economic, industry and regulatory conditions and requirements. Company's operating results may fluctuate from year to year due to the factors listed above and others not listed. At times, these fluctuations may be significant.

2.    <u>Dependence on CETA</u>. We will be very dependent on CETA to install, maintain and operate our Carbon Capture Units and operate the gas wells that we have leased. As a result, almost all of our operational risk is concentrated on CETA, which means that their inability to perform or their substandard performance will significantly impact our ability to generate revenue, and may cause your investment to lose value.

3.    <u>Production Risks</u>. Company's operations will be dependent on Company's ability to produce its commercial products. It is possible that the production facilities may be vulnerable to unauthorized access, system failures and other security problems. Persons who circumvent security measures could wrongfully use its technology incorrectly or cause damage to its operations. It may be necessary for Company to expend significant resources to protect against the threat of security breaches or to alleviate problems caused by any such breaches. Although Company plans to always utilize industry-standard security measures, these measures may prove to be inadequate and system failures and delays may occur that could have an adverse effect on Company's financial condition, operating results and cash flow.

Company's equipment and operations are also vulnerable to damage or interruption from human error, natural disasters, power loss, sabotage, computer viruses, intentional acts of vandalism, and similar events. Any system failure that causes an interruption in product could impair Company's reputation, damage the brand, and negatively impact operating revenues.

4.    <u>Component Supply Risks</u>. Raw coal is the primary component for the production of the CETASolve™ component that is critical for the operation of the Carbon Capture Units and the resulting excess gas production. The limited or lack of availability of raw coal or an increase in the acquisition of raw coal because of factors including supply shortages, unforeseen price

increases, or increased transportation costs could result in interruptions in production or increased costs.

5.  Regulatory Considerations. The Company will be subject to various government regulations, including regulations covering air quality. These regulations are mandated by the United States Environmental Protection Agency ("EPA") and various state and local governments and are usually implemented through a permitting process, with ongoing compliance requirements. In addition, the Company's activities will fall under a number of health and safety agencies. Compliance with the agencies regulations and permitting requirements could be costly and harm the Company's financial condition.

The Company will be required to comply with numerous environmental laws and regulations, including those related to air emissions and the handling, transportation, storage, disposal, release and cleanup of, or exposure to, hazardous substances and wastes. The Company will also have to obtain numerous state and local governmental permits to operate its facilities. New environmental laws and regulations, or new interpretations of existing laws and regulations, could impose more stringent limitations on the Company's planned operations or require the Company to incur significant additional costs. The Company may not be able to obtain or maintain all required environmental regulatory approvals depending on how they are defined. If there is a delay in obtaining any required approval or if the Company fails to obtain, maintain or comply with the terms of any such approvals or to comply with any such laws or regulations, the Company could be subject to civil or criminal penalties, including but not limited to fines, and facility operations could be stopped or become subject to additional costs. Further, it may be uneconomical for the Company to comply with any such laws or regulations, which may cause the Company to shut down operations. In addition, the Company may be responsible for any on- site liabilities associated with the environmental condition of the facilities, regardless of when the liabilities arose and whether they are known or unknown and, at times, regardless of who caused such condition. The occurrence of any of these events could have an adverse effect on the Company's business.

6.  Market Risks. Company may not be able to create and maintain a competitive advantage, given the rapid technological and other competitive changes affecting all markets worldwide. Company's success will depend on its ability to stay ahead of any such changes. The potential markets for Company's products are characterized by rapidly changing technology, evolving industry standards, frequent enhancements to existing treatments and products, the introduction of new services and products, and changing customer demands. The Company's success could depend on Company's ability to respond to changing product standards and technologies on a timely and cost-effective basis. In addition, any failure by the Company to anticipate or respond adequately to changes in technology and customer preferences could have a material adverse effect on its financial condition, operating results and cash flow.

7.  Intellectual Property. The Company's profitability may depend in part on CETA's ability to effectively protect its proprietary rights, including obtaining patent protection for its distillation equipment and processes, maintaining the secrecy of its internal workings and preserving its trade secrets, as well as its ability to operate without inadvertently infringing on the proprietary rights of others. There can be no assurance that (i) any CETA distillation-related patents will be issued from any pending or future patent applications; (ii) the scope of any patent protection will be sufficient to provide competitive advantages; (iii) any patents CETA obtains

will be held valid if subsequently challenged; or (iv) others will not claim rights in or ownership of CETA's patents and its other proprietary rights.

8.    <u>Risk of Financing and Potential Foreclosure on Loan</u>.  The Loan will be secured by the Carbon Capture Units and personally guaranteed by the Prospective Investor.  The risk of foreclosure can arise from, among other things: (i) the failure of the Carbon Capture Units at any time to maintain revenue levels sufficient to meet expenses and mortgage amortization (specially, but not limited to, during an economic downturn), and (ii) the failure by the Company to meet any of the other various conditions existing in the Loan documents.  Payment of principal and interest on the Loan will be due on a quarterly basis. It is anticipated that these payments will be met from income generated by the Carbon Capture Units.  No assurance can be given that the Carbon Capture Units will generate sufficient income to meet the Loan payments.  In the event that the Company cannot meet the loan payments with the Net Cash Flow, the Prospective Investor will be 'at risk' and liable for the entire balance of the Loan.

**General Business Risks**

9.    <u>Economic Uncertainties</u>. The success of the Company will depend upon certain factors, which are beyond the control of the Sponsor and cannot be predicted accurately at this time. Such factors include general and local economic conditions, increased competition, increased construction costs, changes in demand, and limitations, which may be imposed by government regulation. Prospective Investors should also be aware that if the Company experiences liquidity constraints, the Partners may find it prudent or necessary to fund deficits that are not funded from Company receipts. The Partners, however, would not be under any legal obligation to pay such additional funds.

10.    <u>Reliance on Manager and CETA for the Management of the Project</u>. The Company will be dependent upon the experience and expertise of the Manager and CETA in Project business activities. In the event the Manager cannot serve as Manager for any reason, experienced management may not be readily available, and the Company may be negatively affected. The General Partners do not expect to obtain a "key man" life insurance policy for the Manager.

11.    <u>Uninsured Losses; Cost of insurance</u>. Although the Manager will arrange for certain insurance coverage to the extent that doing so is reasonable, costs of insurance may escalate beyond those anticipated, or certain kinds of losses may be uninsurable or may exceed available coverage. In the event of an uninsured loss, Investors may recognize a loss of all or a portion of investment.

12.    <u>Profitability</u>. The Company is a newly formed entity, which had no operation prior to this offering. There can be no assurance that the Company will operate profitably in the future.

13.    <u>Likelihood of Success-Business Risks</u>. The likelihood of success of the Offering must be considered in the light of the problems, expenses, difficulties, complications and delays frequently encountered in connection with coal production. There can be no assurance that the Company will be able to achieve profitability.

14.    <u>Results of Operations - Possible Operating Deficits</u>. Pursuant to this Offering, the Company is raising capital of $2,112,000 payable in full upon subscription. This Offering is based

upon projected results, which may be greater than results obtained from actual operations. Actual results may differ adversely for a number of reasons; following commencement of operations, the Company may be subject to rising operating costs, decreased demand, possible onerous government regulations and adverse economic and social events. These factors could also affect the operation of the Company. If operating income is substantially less than projected, and additional cash requirements are necessary and such funds are not provided by the Partners or by outside financing, the Project could fail. (See "USES OF FUNDS".)

If additional capital is needed, the Manager may seek additional capital contributions from the General Partners, and then, if they fail to contribute sufficiently, the Manager expects to sell interests in the Company or the Carbon Capture Units to new Prospective Investors or other investors, which would result in dilution of the interest of the existing Partners. The General Partners may loan funds to the Company from time to time on an interest only basis with principal payments deferred. Any such loans will bear interest at the rate of 10% per annum with interest accrued monthly in arrears. The Manager may also procure additional funds through loans from an affiliate or outside sources.

15.    <u>Limited Transferability</u>.  The Units have not been registered under the Securities Act of 1933, as amended (the "Act"), or under the securities laws of any state, but are being offered and sold in reliance upon exemptions from registration thereunder, including the exemptions from federal registration contained in Section 4(a)(2) of the Act and/or Regulation D, Rule 506 promulgated thereunder. As a consequence of the restrictions on subsequent transfer imposed by these exemptions, the Units may not be subsequently sold, assigned, conveyed, pledged, hypothecated or otherwise transferred by the holder thereof, whether or not for consideration, except in compliance with the Act and applicable state securities laws. There will be no public market for the Units following termination of this Offering and it is not expected that a public market for the Units will ever develop.

16.    <u>Restriction on Transferability of Units</u>. The Partnership Agreement places restrictions on the transfer or assignment of the Units. Any Partner who desires to transfer a Unit in the Company in accordance with the terms of the Partnership Agreement will nevertheless be prohibited from transferring said Unit except in compliance with all applicable federal and state securities laws. Accordingly, Investors in the Company should be prepared to remain Partners until the termination of the Company.

17.    <u>Lack of Liquidity</u>. There is no present market for the Units, and no such market is anticipated.  Further, there can be no assurance that a market for the Units will develop or, if such market develops that it will continue. Further, there are restrictions on transfer of the Unit in the event that a market develops for the Units. Accordingly, an investment in the Units will not be liquid and there can be no assurance that the Units offered hereby can be resold at or near the Offering price and, in fact, purchasers of the Units may be unable to resell them for an indeterminate period of time.

18.    <u>Management Decisions</u>. The Manager is vested with the exclusive authority as to the management and conduct of the business and affairs of the Company. The success of the Company depends, to a large extent, upon the management decisions made by the Manager.

19.    <u>Purchase of Units by Manager</u>.  In the event all Class A Units are not sold by closing

of the Property, Manager may, but is not obligated to, purchase any unsold Partnership Units as a placeholder, which will then be continued to be offered by the Company after the close of the Property. These purchaser, if they occur, will be on the same terms and conditions as any other Prospective Investor for investment and not for resale.

20. <u>No Business Appraisal of the Units</u>. The Offering price per Unit was unilaterally and arbitrarily determined by the Sponsor based upon acquisition costs, estimated operating expenses, estimated fees to be paid and estimated offering expenses. However, Sponsor believes the purchase price to be on competitive terms.

21. <u>No Assurance of Return of Invested Capital</u>. Any return to the Partners on their capital contribution will be dependent upon the ability of Sponsor. Such ability will be determined in part, upon economic factors and conditions beyond the control of Sponsor.

22. <u>Adequacy of Capital and Reserves</u>. An adequate amount of capital is necessary for success of the Company. In the event there are cost overruns or delays, further capital may be necessary.

**Special Risks of the Company Form and Partnership Units**

23. <u>Liability for Return of Capital Contribution</u>. Under Texas Law, which is applicable to the Company, any Partner who receives a return of any portion of the capital contribution to the Company may be liable to Company for the amount of the returned portion of the capital contribution, plus interest only to the extent necessary to discharge the Company's liabilities to creditors who extended credit to the Company or whose claims arose during the period the returned portion or capital contribution was held by the Company.

24. <u>No Right to Manage</u>. Prospective Investors are not permitted to take any part in management or control of the business or affairs of the Company or the Company except as specifically provided for in the Partnership Agreement. The Partnership Agreement vests exclusive control and management of the Company in the Manager. Accordingly, the Company will be totally dependent on the Manager and its Affiliates to manage the business of the Company. Accordingly, the success of the Company's business will depend in large part upon the expertise of the Manager. Removal of the Manager is permitted only under certain limited conditions as set forth in the Partnership Agreement.

25. <u>Limitation of Manager's Liability</u>. The Manager, its Affiliates, officers, shareholders, directors, employees, and agents will not be liable to any Partner, and the Company will indemnify the foregoing against any all liabilities, or damages, including attorney fees incurred by them by virtue of the performance any of them of the duties of the Manager acting as Manager in connection with Company's business, so long as such person acted within the scope of its, his, or her authority and in good faith on behalf of the Company, but only if such course of conduct does constitute gross negligence, fraud, and/or willful or intentional misconduct. Under the terms of the Partnership Agreement, the Manager, its Affiliates, and officers, shareholders, directors, employees and agents will not be liable for any loss or damage to Company property caused by any occurrence beyond the control of the Manager. A Partner may have a limited right of action against the Manager than would be available absent indemnification provisions contained in the Partnership Agreement.

26.     Securities Law Compliance. This Offering has not been registered under Securities Act of 1933, as amended (the "Act") or any applicable state securities laws such state laws. There is no assurance that the offering presently qualifies or will continue to qualify under such exceptive provisions due to, other things, the adequacy of disclosure, the manner of distribution of the offering, the existing of similar offerings conducted by the Company, or the retroactive change of any securities or regulations. If suits for rescission are brought against the Company under the Act or laws, both capital and assets of the Company could be adversely affected. Further expenditure of Company time and capital in defending an action by investors, the Securities Exchange Commission, or state regulators, even in the Company is ultimately exonerated adversely affect the Company's ability to profitably develop the Carbon Capture Units.

**Tax Risks**

1.     General.     A summary of federal income tax provisions is included in this Memorandum.  No representation or warranty of any kind is made by the Manager, the Company, counsel to the Manager or the Company with respect to any tax consequences relating to the Company, or the allocation of taxable income or loss set forth in this Memorandum or the Operating Agreement and each Prospective Investor should seek his own tax advice concerning the purchase of an Interest.

2.     Suitability of the Investment to the Investor.  It is expected that the Company will produce taxable income to its Investors.  Because of the 1986 Reform Act, in the event taxable loss is produced by the Company in any year, such loss will be available to a Prospective Investor only to the extent of the Prospective Investor's passive income from other sources.  Unutilized tax losses may be carried forward into subsequent years to offset future passive income or offset taxable gain upon disposition of the Company's assets.

3.     Federal Income Tax Risks.

i     *Necessity of Obtaining Professional Advice*.  THERE IS NO GENERAL EXPLANATION OF THE FEDERAL INCOME TAX ASPECTS OF INVESTMENT IN THE COMPANY CONTAINED IN THIS MEMORANDUM, AND ACCORDINGLY, EACH INVESTOR IS URGED TO CONSULT SUCH INVESTOR'S OWN TAX INVESTMENT AND LEGAL ADVISORS WITH RESPECT TO SUCH MATTERS AND WITH RESPECT TO THE ADVISABILITY OF INVESTING IN THE COMPANY.  The income tax consequences of an investment in the Company are complex, subject to varying interpretations, and may vary significantly between Prospective Investors depending upon such personal factors such as sources of income, investment portfolios and other tax considerations.   A Prospective Investor should consider with Prospective Investor's professional advisors the tax effects of Prospective Investor becoming a Class A or Class B Member.  Each Prospective Investor should, at Prospective Investor own expense, retain, consult with and rely on Prospective Investor own advisors with respect to the tax effects of Prospective Investor investment in the Company.  In addition to considering the federal income tax consequences, each Prospective Investor should also consider with Prospective Investor's own advisors the state and local tax consequences of an investment in the Company.

No representation or warranty of any kind is made by the Manager, the Company, counsel

to the Manager or the Company with respect to any federal, state or local tax consequences resulting from an investment in the Company, and no assurances are given that any deduction or other federal income tax benefits will be available to Members in the Company in the current or future years relating to the Company, or the allocation of taxable income or loss set forth in this Memorandum or the Operating Agreement.

ii    *Tax Law Changes*.  The existence and amount of particular credits and deductions, if any, claimed by the Company may depend upon various determinations and allocations, characterizations of payments, and other matters which are subject to potential controversy on factual as well as legal grounds.  Changes in the tax code and official interpretations thereof after the date of this Memorandum may eliminate or reduce any perceived tax benefits from an investment in the Units.  There can be no assurance that regulations having an adverse effect on the Members will not be issued in the future and enforced by the courts.  Any modification or change in the tax code or the regulations promulgated thereunder, or any judicial decision, could be applied retroactively to any investment in the Company.  In view of this uncertainty, Prospective Investors are urged to consider ongoing developments in this area and consult their advisors concerning the effects of such developments on an investment in the Company in light of their own personal tax situations.

iii    *Absence of Ruling or Opinion*.  The Company will not seek a ruling from the IRS or an opinion of counsel with respect to any tax matters described in this Memorandum.

iv    *Risk of Audit*.  Information returns filed by the Company are subject to audit by the IRS.  An audit of the Company's returns may lead to adjustments of a Member's return with respect to items other than those relating to the Member's investment in the Company, the costs of which would be borne by the affected Members.  The tax treatment of items of partnership income, loss, deductions, and credits is determined at the partnership level in a unified partnership proceeding, and Eric N. Shelly, as the "tax matters Member" of the Company, may, under certain circumstances, represent and bind all of the Members.  Any adjustment made to the Company's or a Member's return could result in the affected Members being subject to an imposition of interest, additional taxes and penalties.

4.    <u>Section 179 Depreciation/Bonus Depreciation</u>.  The Company has conferred with its own tax professional who has advised the Company that the Company operations are subject to numerous tax benefits, including bonus depreciation that can be taken in the first year of operations and passed along to the General Partners (the Limited Partners are not eligible for the bonus depreciation).  The Company has not obtained an opinion from the IRS that these deductions are allowable and there is a risk that the IRS may not agree with our tax professional that the operations qualify as a working interest and thus not eligible for the tax benefit.  In the event the IRS challenges the deduction, General Partners may be liable for the return of any tax depreciation taken, plus possible penalties and interest.

5.    <u>Investment by Tax-Exempt Entities</u>.  Tax-exempt entities, such as pension funds and individual retirement accounts, generally are exempt from taxation except to the extent that "unrelated business taxable income" ("UBTI") and "unrelated debt financed income" ("UDFI")(determined in accordance with Sections 511-514 of the Code) exceeds $1,000 during any tax year. A tax-exempt entity may have UBTI and/or UDFI from businesses in which it owns an interest. In addition, it may have UBTI and/or UDFI if a partnership in which it has an

interest  (i) owns "debt-financed property", that is, property in which there is "acquisition indebtedness" (in accordance with Section 514(d) of the Code), and the partnership earns interest income from the debt-financed property or realizes gains or losses from the sale, exchange or other disposition of the debt-financed property, or (ii) regularly carries on a trade or business.  In addition, UBTI and/or UDFI may be generated when an IRA holds an interest in real estate which obtained financing (such is the case with the Company).  The portion of the profit realized through the debt financing may be subject to UBTI and/or UDFI tax.  The Company expects that all or substantially all of the Company's income will constitute UBTI and/or UDFI with respect to a tax-exempt entity. The Code does not impose restrictions on the acquisition of interests in partnerships, such as the Company, by tax-exempt entities. However, the acquisition of such an interest may result in  a  tax- exempt entity being subject to UBIT and/or UDFI.  *If you are investing through an IRA, please consult your accountant and financial consultant for an evaluation of UBIT and/or UDFI as applied to your investment*.

CONSULT  YOUR  OWN  ATTORNEY,  ACCOUNTANT  AND/OR  FINANCIAL CONSULTANT FOR AN EVALUATION OF THE MERIT OF AND THE RISK INHERENT IN THIS INVESTMENT. EACH PROSPECTIVE INVESTOR IS RESPONSIBLE FOR ANY FEES OR CHARGES INCURRED IN CONNECTION WITH SUCH AN EVALUATION.

## PROJECTED SOURCES AND USES OF CASH FOR ENTIRE PROJECT

All proceeds from the Offering will be used to purchase the Carbon Capture Units and obtain the working interest with the natural oil or gas wells.

## DISTRIBUTION TO PARTNERS

This Memorandum contains estimates which have been prepared on the basis of assumptions and hypotheses favorable to Investors solely for the purpose of illustration and which have not been passed on by counsel or other professional advisors to the Company. (See "RISK FACTORS.")

No representation or warranty of any kind is or can be made with respect to the accuracy or completeness of, and no representation or warranty should be inferred from, these estimates or the assumptions underlying them.

Each Investor should consult his own tax counsel, accountants and other advisors as to the tax matters and economic benefits set forth herein. No part of this Memorandum or the attachments hereto is, or should be interpreted as legal, tax or investment advice.

Limitations on Cash Distributions.

The Manager is authorized to retain funds necessary to cover the Company's and Company's reasonable business needs, which may include reserves against possible losses and expenditures as may be necessary.

Allocations of Taxable Income, Gains and Losses from Operations, and Net Cash Flow, Etc.

To the extent advantageous to the Partners and permitted by applicable law and

regulations, Sponsor intends to seek the most favorable tax treatment for all expenditures of the Company and Company. Sponsor will cause the Company's tax returns to be prepared and filed on such basis as utilized in preparing the financial projections; provided, however, that such methods are, in the opinion of the Manager, in accordance with generally accepted accounting principles and/or current Internal Revenue Service Rules and Regulations and, if conflicting, whichever the Manager deems applicable.

In the event of a transfer of a Unit permitted by the Partnership Agreement, such transferee, when admitted to the Company as a Partner, shall be allocated income, gains, losses, deductions, credits and cash distributions in accordance with his Unit.

## NO TAX RULING

The Company will not seek a ruling from the Internal Revenue Service (the "IRS") as to any aspects of the Offering and will rely on the opinion of the Manager and their tax counsel with respect to its classification as a limited partnership for Federal income tax purposes. (See "RISK FACTORS - TAX RISKS.")

## PARTNERSHIP AGREEMENT

Each Prospective Investor who invests in the Company will be admitted as a General Partner of the Company pursuant to the terms of the Partnership Agreement. Various references to the Partnership Agreement are contained in this Memorandum, but such references do not purport to be complete descriptions of the provisions of the Partnership Agreement. Prospective Investors and their advisor(s) should read the entire Partnership Agreement.

## CONFLICTS OF INTEREST

The Company is subject to various substantial existing and/or potential conflicts of interest arising out of its relationship with the Manager and/or its Affiliates. These conflicts may involve:

(a)    Allocation of Manager' Activities. The Manager and/or its Affiliates are not required to devote themselves exclusively to the affairs of the Company. The Manager and/or its Affiliates believe that they have sufficient time and staff to be fully capable of discharging their responsibilities to the Company and to any other present or future activities.

The Manager and/or its Affiliates serve and may serve in such capacity in other limited partnerships, limited liability companies, corporations or entities which will compete with the activities of the Company or Company. The Manager and/or its Affiliates may have conflicts of interest in allocating management, time, services and functions between other limited partnerships or ventures and this Company as well as any future limited partnerships or limited liability companies. The Manager believes that, together with its Affiliates and any employees or agents which may be retained in the future, it has sufficient staff to be fully capable of discharging its responsibilities to this Company and any other present or future limited partnerships, limited liability companies, corporations or entities.

The Partnership Agreement provides that no contract, action or transaction is void or voidable with respect to the Company because it is between or affects the Company and one or more of its Partners, managers, or officers or because it is between or affects the Company and any other person in which one or more of its Partners, managers or officers are Partners, managers, directors, trustees, or officers or have financial or personal interest, or because one or more interested Partners, managers or officers participate in or vote at the meeting that authorizes the contracts, action, or transaction, provided certain circumstances apply.

(b)    Compensation to Sponsor.  This Offering involves compensation or benefits to the Sponsor and its Affiliates via ownership interest and profit participation.  The Sponsor believes that the compensation that the Company intends to provide are reasonable, in light of the tasks and risks undertaken, and will result in substantial benefits to the General Partners.

(c)    Lack of Independent Counsel.  The Prospective Investors, Manager and the Company have not had separate legal counsel in connection with the formation of the Company, the acquisition of the Property and the offering of the Units; nor have the Prospective Investors been represented in preparation of the Partnership Agreement. Therefore, the terms of such arrangements have not been determined on an arms-length basis. Prospective Investors should seek the advice of their own counsel.

(d)    Liability of Partners and Manager.  Applicable state law and the Partnership Agreement provide that the debts, obligations and liabilities of the Company, however or wherever arisen or derived, shall be solely those of the Company, and no Partner of the Company shall be personally liable for the same to third parties solely by reason of his or her status as a Partner, and that the failure of the Company to observe any formalities or requirements relating to the exercise of its powers or management of its business or affairs shall not be grounds for imposing personal liability on Partners for liabilities or obligations of the Company.

## STANDARD OF CARE; INDEMNIFICATION

Standard of Care of Managers. Texas law provides that managers of  a  limited partnership shall perform their duties as managers in good faith, in a manner they reasonably believe to be in or not opposed to the best interests of the Company, and with the care that an ordinarily prudent person in a similar position would use under similar circumstances. This is in addition to the several duties and obligations of and limitations on the managers as set forth in the Partnership Agreement. To impose liability on a manager, however, it must be shown by clear and convincing evidence that the standard of care was not met by the manager.

It should be noted that the cost of litigation against any manager for enforcement of the standard of care may be prohibitively high and that any judgment obtained may not be collectible since the managers are not bonded and any judgment exceeding their net worth may not be collectible. An investment decision should be based on the judgment of an Investor as to the investment factors described in this Memorandum rather than reliance upon the value of the right to bring legal actions against or to control the activities of the managers.

Notwithstanding the standards of care obligations, the managers have broad discretionary power under the terms of the Partnership Agreement and under applicable state law to manage the affairs of the Company with the assistance, if desirable, of consultants or others retained for the account of the Company or the managers. Generally, actions taken by the managers are not subject to vote or review by the Partners, except to the limited extent provided in the Partnership Agreement.

Indemnification. The Partnership Agreement provides that the Company may, to the fullest extent not prohibited by the Company's Partnership Agreement or any provisions of applicable law indemnify the Manager against any and all costs and expenses (including amounts paid in settlement, and other disbursements) actually and reasonably incurred by or imposed upon such person in connection with any action, suit, investigation or proceeding (or any claim or other matter therein), whether civil, criminal, administrative or otherwise in nature, including any settlements thereof or any appeal therein, with respect to which the Manager us named or otherwise becomes or is threatened to be made a party by reason of being or at any time having been a manager of the Company or, at the direction or request of the Company, a manager, director, trustee, officer, employee, or agent of or fiduciary for any other limited partnership, corporation, partnership, trust, venture, or other entity or enterprise.

Because there are provisions in the Partnership Agreement for indemnification of the Manager, purchasers of Partnership Units may have a more limited right of action than they would have absent such provision in the Partnership Agreement. Insofar as indemnification for liabilities arising out of the Securities Act of 1933, as amended, may not be provided to directors, officers and controlling persons pursuant to the foregoing, or otherwise, the Manager has been advised that in the opinion of the Securities and Exchange Commission, such indemnification is contrary to public policy and is, therefore, unenforceable.

## RESTRICTION ON TRANSFER

The Units have not been registered under the Act. The Units are being offered and will be sold in the absence of any registration under the Act, by reason of an exemption under Section 4(a)(2) and/or Regulation D promulgated under the Act. The availability of such exemption is dependent, in part, upon the "investment intent" of each Investor and will not be available if any Investor purchases a Unit with a view toward its distribution. Accordingly, each Investor will be required to acknowledge that his purchase is being made for investment, for his own record and beneficial account, and without any view to the distribution thereof.  A Unit may not be resold by a Partner unless and until it is subsequently registered under the Act and applicable state securities laws or unless appropriate exemptions from registration are available.

Investors have not been, and will not be, granted the right to require the registration of the Units under the Act and applicable state securities laws. Moreover, the Company has no intention to register the Units under federal securities laws (or to take any action to make exemptions from registration on resale or transfer available to the Investors) and, in view of the nature of the transaction, it is highly unlikely that there will be any such registration (or such action taken) at any time in the future. Accordingly, an Investor must bear the economic risk of an investment in a Unit for an indefinite period of time.

If a Partner wishes to dispose of his Units in a transaction not requiring registration under

the Act and applicable state securities laws, such disposition is governed by, among other things, the terms of the Partnership Agreement.

Notwithstanding the foregoing, after the termination of the Offering no Unit or any part thereof may be assigned, sold, exchanged or transferred if such conveyance, together with the conveyance of all other Units assigned, sold, exchanged or otherwise transferred within the period of twelve (12) consecutive months prior thereto might result in the termination of the Company under the provisions of Section 708(b) of the Internal Revenue Code, or any successor statute, except as set forth in the Partnership Agreement.

Finally, no sale, exchange or other transfer or assignment of the whole or any portion of a Unit will be permitted without the prior written consent of the Partners, which consent will be withheld if (a) all applicable Federal and state securities laws and regulations with respect to transfers of securities, including but not limited to the Act and the Securities and Exchange Act of 1934, as amended, are not complied with to the satisfaction of the Partners, or (b) in the sole opinion of counsel to the Company there will be adverse consequences to the Company or any of the non-transferring Partners under any applicable Federal, state or local income tax laws or regulations, or (c) for any other reason in the sole discretion of the Partners.

## FURTHER INVESTIGATION

Statements contained in this Summary or elsewhere in the Private Placement Memorandum as to the contents of the Partnership Agreement, or other documents, are not necessarily complete and each such statement is deemed to be qualified and amplified in all respects by the provisions of such agreements and documents, copies of which are either attached hereto or are available upon reasonable notice for examination by offerees, or their duly authorized representatives, at the office of the Manager, 977 Carol Circle, West Chester, PA 19380. The Partnership Agreement is set forth in its entirety as **Exhibit A** to this Private Placement Memorandum, and each offeree is urged to review this document carefully. Each offeree and his business and/or tax advisors are urged to examine all agreements and documents.

## HOW TO SUBSCRIBE FOR PARTNERSHIP UNITS

A Prospective Investor in our Limited Partnership Units has received Offering Documents containing the following documents which the Subscriber should complete, date, execute, acknowledge (where required) and deliver to the Manager:

1. **A Partnership Agreement, Investor Questionnaire and Subscription Agreement (attached hereto as Exhibits A, B and C, respectively); and**

2. **A check or wire transfer made in accordance with the instructions set forth in the Subscription Agreement.**

The Manager, in its sole discretion, may accept subscriptions for Partnership Units in amounts that are less than the minimum. Subscriptions may be accepted or rejected by the Manager in its sole discretion. If a Prospective Investor's subscription is rejected, his or her subscription payment will promptly be returned. If a Prospective Investor's subscription has been accepted, his or her subscription payment will be held until the earlier to occur of (i) the Maximum has been sold; or (ii)

it is terminated by the Manager.

# *EXHIBIT A*

AGREEMENT OF LIMITED PARTNERSHIP

# FIRST AMENDED AND RESTATED PARTNERSHIP AGREEMENT

of

## 03 CARBON CAPTURE, LP
### a Texas Limited Partnership

This First Amended Partnership Agreement of 03 Carbon Capture, LP is made and entered into effective as of June 11, 2021, by and among the Manager and the several Persons whose names and addresses are set forth in **_Exhibit "1"_** attached hereto and incorporated herein by reference, and whose signatures appear on the counterpart signature pages attached hereto, and any other Person who shall hereafter execute this Agreement as a Partner of 03 Carbon Capture, LP, pursuant to and in accordance with the Texas Business Organization Code, as amended from time to time.

## W I T N E S S E T H

WHEREAS, the parties hereto, wishing to form and become Partners of a limited partnership called 03 Carbon Capture, LP under and pursuant to the laws of the State of Texas, have caused the initial Certificate of Limited Partnership to be executed and filed with the Texas Secretary of State; and

WHEREAS, the parties agree that their respective rights, powers, duties and obligations as partners of the Partnership, and the management, operations and activities of the Partnership, shall be governed by this Agreement;

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree to amend and restate the Original Agreement in its entirety and agree to continue the Partnership as a limited partnership under the Texas Business Organization Code, as amended from time to time, as follows:

## ARTICLE 1
## DEFINITIONS

**Section 1.1    Certain Definitions**. Capitalized terms used in this Agreement without other definition shall, unless expressly stated otherwise, have the meanings specified in this Section 1:

1.1.1    "Act" means the Texas Business Organization Code, as from time to time in effect in the State of Texas, or any corresponding provision or provisions of any succeeding or successor law of Texas; provided, however, that in the event that any amendment to the Act, or any succeeding or successor law, is applicable to the Partnership only if the Partnership has elected to be governed by the Act as so amended

or by such succeeding or successor law, as the case may be, the term "Act" shall refer to the Act as so amended or to such succeeding or successor law only after the appropriate election by the Partnership, if made, has become effective.

1.1.2    "Affiliate" of a Partner means any Person, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with the Partner, as applicable. The term "control," as used in the immediately preceding sentence, means with respect to a corporation, limited liability company, or limited partnership, the right to exercise, directly or indirectly, more than fifty percent (50%) of the voting rights attributable to the controlled corporation. Limited liability company or limited partnership and, with respect to any individual, partnership, trust, estate, association or other entity, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled entity.

1.1.3    "Agreement" means this First Amended and Restated Partnership Agreement, as originally executed and as amended, modified or supplemented from time to time. Words such as "herein," "hereinafter," "hereof," "hereto," "hereby" and "hereunder," when used with reference to this Agreement, refer to this Agreement as a whole, unless the context otherwise requires.

1.1.4    "Assignee" means any transferee of a Partner's Interest who has not been admitted as a Partner of the Partnership in accordance with Section 9.4.

1.1.5    "Bankruptcy" means, with respect to a Partner: (i) such Partner makes an assignment for the benefit of creditors; (ii) such Partner files a voluntary petition in bankruptcy; (iii) such Partner is adjudged as bankrupt or insolvent, or has entered against him or it an order for relief, in any bankruptcy or insolvency proceeding; (iv) such Partner files a petition or answer seeking for himself or itself any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation; (v) such Partner files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against him or it in any proceeding of a nature described in this Subsection 1.1.5; (vi) such Partner seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Partner or of all or any substantial part of his or its properties; or (vii) 120 days after the commencement of any proceeding against the Partner seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation, if the proceeding has not been dismissed, or if within 90 days after the appointment without the Partner's consent or acquiescence of a trustee, receiver or liquidator of the Partner or of all or any substantial part of his or its properties, the appointment is not vacated or stayed, or within 90 days after the expiration of any such stay, the appointment is not vacated.

1.1.6    "Carbon Capture Units" – the larger capacity mobile carbon capture technology, knows as *Mobile CO$_2$ TRANSMISSION Pipeline Unit* and the lower

capacity *CO₂ NOMAD Unit* that processes natural gas and removes $CO_2$ on location, thus avoiding the need to transport to the final destination.

1.1.7    "<u>Capital Account</u>" means an account established and maintained (in accordance with, and intended to comply with, Income Tax Regulations Section 1.704- 1(b) for each Partner pursuant to <u>Section 5.2</u> hereof.

1.1.8    "<u>Capital Contributions</u>" means the contributions made by the Partners to the Partnership pursuant to <u>Sections 6.1 or 6.4</u> hereof and, in the case of all the Partners, the aggregate of all such Capital Contributions.

1.1.9    "<u>Certificate of Limited Partnership</u>" means the Certificate of Limited Partnership, as originally filed with the Texas Secretary of State and as amended, modified or supplemented from time to time.

1.1.10    "<u>General Partner(s)</u>" means any Person(s) named as a General Partner in **Exhibit 1** attached hereto, as such **Exhibit 1** may be amended from time to time.

1.1.11    "<u>Income Tax Regulations</u>" means, unless the context clearly indicates otherwise, the regulations in force as final or temporary that have been issued by the U.S. Department of the Treasury pursuant to its authority under the Code, and any successor regulations.

1.1.12    "<u>Investors</u>" means the subscriber of Limited or General Partnership Interests pursuant to the Partnership's Private Placement Memorandum dated June 2021.

1.1.13    "<u>Limited Partner</u>" means any Person named as a Limited Partner in **Exhibit 1** attached hereto, as such **Exhibit 1** may be amended from time to time.

1.1.14    "<u>Loan</u>" shall mean the three (3) year personally guaranteed recourse loan issued by CETA carrying an 8.5% interest rate.

1.1.15    "<u>Manager</u>" or "<u>Management</u>" Freedom Impact Consulting, LLC, one of the General Partners.

"Net Cash Flow" - means, the excess of all cash revenues of the Company over operating expenses and other expenditures for such fiscal period, including but not limited to principal and interest payments on indebtedness of the Company, other sums paid to lenders, and cash expenditures incurred incident to the normal operation of the Company's business, decreased by (i) any amounts added to Reserves during such fiscal period, and increased by (i) the amount (if any) of all allowances for cost recovery, amortization or depreciation with respect to Carbon Capture Units for such fiscal period, and

3

(ii) any amounts withdrawn from Reserves during such fiscal period.

1.1.16    "Partner"    means a Limited Partner or General Partner of the Partnership.

1.1.17    "Partnership" means 03 CARBON CAPTURE, LP, a Texas Limited Partnership.

1.1.18    "Partnership Interest" means an ownership interest in the Partnership held by either a Limited Partner or General Partner and includes any and all benefits to which the holder of such a Partnership Interest may be entitled as provided in this Agreement, together with all obligations of such Person to comply with the terms and provisions of this Agreement. There may be one or more classes or series of Partnership Interests. A Partnership Interest may be expressed as a number of Units.

1.1.19    "Percentage Interest" means with respect to any Partner as of any date of determination, the allocable interest of the Partner in the income, gain, loss, deduction or credit of the Partnership, determined by dividing the Capital Account of such Partner by the aggregate Capital Accounts of all Partners.

1.1.20    "Person" means a natural person or any partnership (whether general or limited and whether domestic or foreign), limited liability company, foreign limited liability company, limited life company, limited duration company, trust, estate, association, corporation, custodian, nominee or any other individual or entity in its own or any representative capacity or any other entity.

1.1.21    "Project" - the purchase of the Carbon Capture Units and the acquisition of a working interest in gas wells that will use the Carbon Capture Units to increase the production volume of the oil or gas well and result in a revenue share with the well owner of the excess oil or gas that the well produces as a result of the use of the Company's Carbon Capture Units.  The Project will last approximately twelve years (12) or until the useful life of the Carbon Capture Units comes to an end, unless refurbished as discussed in this Offering.

1.1.22    "Property" – the Carbon Capture Units and working interest in the oil and/or gas wells.

1.1.23    "Reserves" all reserves established by the Manager in its sole discretion for Company purposes, including, but not limited to, operating expenses and other working capital needs, liabilities, and taxes.

1.1.24    "Sponsor" means Freedom Impact Consulting, LLC

1.1.25    "Vote" includes written consent.

4

**Section 1.2  Forms of Pronouns; Number; Construction**. Unless the context otherwise requires, as used in this Agreement, the singular number includes the plural and the plural number may include the singular. The use of any gender shall be applicable to all genders. Unless otherwise specified, references to Articles, Sections or subsections are to the Articles, Sections and subsections in this Agreement. Unless the context otherwise requires, the term "including" shall mean "including, without limitation."

## ARTICLE 2
## ORGANIZATION

**Section 2.1    Formation**. The General Partners formed the Partnership as a limited partnership under and pursuant to the provisions of the Act. The Partners hereby agree that the Partnership shall be governed by the terms and conditions of this Agreement.

**Section 2.2    Name and Office**.  The name of the Partnership shall be 03 CARBON CAPTURE, LP.  All business of the Partnership shall be conducted under such name and title, and all property, real, personal, or mixed, owned by or leased by the Partnership shall be held in such name.  The principal place of business and office of the Partnership shall be located at 977 Carol Circle, West Chester, Pennsylvania 19380. The Partnership may have such other offices and places of business as the General Partners may from time to time designate.

**Section 2.3    Registered Agent**. The name and address of the Partnership's registered agent shall be as set forth in the Partnership's Certificate of Limited Partnership until such time as the registered office is changed by the General Partners in accordance with the Act.

**Section 2.4    Purpose of the Partnership**. The Partnership is organized for the following objects and purposes:

> *"to create a leveraged company that will participate in the investment in, construction and/or operation of the Property. This patent pending technology provides a reliable income stream from the production and sale of the commercial products for use in a variety of industries."*

It is understood that the foregoing statement of purposes shall not serve as a limitation on the powers or abilities of the Partnership, which shall be permitted to engage in any and all lawful business activities as shall be permitted under the laws of the State of Texas and any other State the General Partner deems in the best interest of the Partnership.

**Section 2.5    Filings**. The General Partners have caused, or shall promptly cause, the execution and delivery of such documents and performance of such acts consistent with the terms of this Agreement as may be necessary to comply with the requirements of law for the formation, qualification and operation of a limited partnership under the laws of

5

each jurisdiction in which the Partnership shall conduct business.

**Section 2.6    Effective Date; Term**.  This Agreement shall be effective as of the date set forth on the date on which the Certificate of Limited Partnership was filed with the Texas Secretary of State. The term of the Partnership commenced, and the Partnership commenced its business, on the date on which the Certificate of Limited Partnership was filed with the Texas Secretary of State and shall continue until terminated pursuant to the provisions hereof. The existence of the Partnership as a separate legal entity shall continue until the cancellation of the Certificate of Limited Partnership.

# ARTICLE 3
# PARTNERS; LIMITED LIABILITY OF LIMITED PARTNERS; CERTIFICATES

**Section 3.1    Partners**.

3.1.1    Persons admitted as a Partners of the Partnership pursuant to the Act and Section 9.4 of this Agreement, shall be Partner until they cease to be Partners in accordance with the provisions of the Act, the Certificate of Limited Partnership, or this Agreement. Upon the admission of any new Partner, **Exhibit 1** attached hereto shall be amended accordingly.

3.1.2    Partners shall have the rights, powers, duties, obligations, preferences and privileges set forth in this Agreement. The names of the Partners shall be set forth in **Exhibit 1** attached hereto and incorporated herein by reference, as amended from time to time.

**Section 3.2    Limited Liability**. Except as expressly set forth in this Agreement or required by law, no Limited Partner shall be personally liable for any debt, obligation or liability of the Partnership, whether arising in contract, tort or otherwise, solely by reason of being a Limited Partner.

**Section 3.3    Voting Rights**.

3.3.1 Except as may otherwise be provided in this Agreement or the Act or the Certificate of Limited Partnership, each of the Partners hereby waives his, her or its right to Vote on any matters.  All voting rights shall remain with the Manager.

**Section 3.4    Partners May Participate in Other Activities**. Each Partner of the Partnership, either individually or with others, shall have the right to participate in other business ventures of every kind, whether or not such other business ventures compete with the Partnership. No Partner, acting in the capacity of a Partner, shall be obligated to offer to the Partnership or to the other Partners any opportunity to participate in any such other business venture. Neither the Partnership nor the other Partners shall have any right to any income or profit derived from any such other business venture of a Partner or Affiliate.

**Section 3.5    Limited Partners Are Not Agents**. Pursuant to Section 4.1 of this

Agreement, the management of the Partnership is vested in the General Partners, who in turn have elected the Manager to run the day-to-day operations of the Partnership. The Limited Partners shall have no power to participate in the management of the Partnership. No Limited Partner, acting solely in the capacity of a Limited Partner, is an agent of the Partnership nor does any Limited Partner, unless expressly and duly authorized in writing to do so by the Manager, have any power or authority to bind or act on behalf of the Partnership in any way, to pledge its credit, to execute any instrument on its behalf or to render it liable for any purpose.

**Section 3.6    Transactions of Limited Partners with the Partnership**.  Subject to any limitations set forth in this Agreement and with the prior approval of the General Partner, a Limited Partner may lend money to and transact other business with the Partnership. Subject to other applicable law, such Limited Partner has the same rights and obligations with respect thereto as a Person who is not a Limited Partner.

## ARTICLE 4 MANAGEMENT OF THE PARTNERSHIP

**Section 4.1    Initial General Partners**.  The name of the initial General Partners, to hold office from and after the date of this Agreement, Freedom Impact Consulting, LLC, our Sponsor.

**Section 4.2    Management and Operations.**  Subject to the provisions of the Act, the business and affairs of the Partnership shall be managed and all its powers shall be exercised by or under the direction of the Managers.  All Partners hereby consent to the appointment of Freedom Impact Consulting, LLC to act as the Manager of the Partnership.

**Section 4.3    Duties and Conflicts.**

4.3.1    The Manager shall devote such time to the Partnership's business as they in their sole discretion, may deem to be necessary or desirable in connection with the Manager's responsibilities and duties hereunder.

4.3.2    The Manager shall not be liable to the Partnership or any Partner for action or inaction taken in good faith for a purpose that was reasonably believed to be in the best interests of the Partnership; for losses due to such action or inaction; or for the negligence, dishonesty or bad faith of any employee, broker or other agent of the Partnership, provided that such employee, broker or agent was selected, engaged or retained with reasonable care. The Manager may consult with counsel and accountants on matters relating to the Partnership and shall be fully protected and justified in acting in accordance with the advice of counsel or accountants, provided that such counsel or accountants shall have been selected with reasonable care. Notwithstanding any of the foregoing to the contrary, the provisions of this Section 4.2 shall not be construed so as to relieve (or attempt to relieve) any person of any liability incurred (a) as a result of recklessness or intentional wrongdoing, or (b) to the extent that such liability may not be waived, modified or limited under

7

applicable law.

**Section 4.4**       **Vacancies; Resignations**.

    4.4.1     A vacancy shall be deemed to exist in case of the death, bankruptcy, mental incompetence, resignation of the Manager, or if the authorized number of Managers be increased.

    4.4.2     All General Partner vacancies shall be filled by the outgoing General Partner.

    4.4.3     Any General Partner or Manager may resign effective upon giving thirty days' written notice to the Limited Partners of the Partnership, unless the notice specifies a later time for the effectiveness of such resignation.

**Section 4.5**       **Compensation of General Partners and Manager.** The General Partners and Manager shall receive no fees in connection with their role as General Partner and Manager, other than Freedom Impact Consulting, LLC will retain 15% of the Partnership as compensation for organizing the Partnership and executing its business plan.

## ARTICLE 5 INTERESTS

    **Section 5.1   Interests**. The Interest of each Partner shall be as set forth in **Exhibit 1** hereto.

    **Section 5.2   Capital Accounts**. A Capital Account shall be maintained for each Partner on the books of the Partnership. Each Partner's Capital Account shall be credited with the amount of any capital contribution made by such Partner pursuant to Sections 6.1 and 6.4, and shall be adjusted appropriately to take into account all items of income, gain, loss or deduction allocated to each Partner pursuant to Article 7 hereof and all distributions to each Partner pursuant to Article 8 hereof. A single Capital Account shall be maintained for each Partner (regardless of the time or manner in which such Interests were acquired) in accordance with the capital accounting rules of Section 704(b) of the Code and the regulations thereunder (including without limitation Section 1.704-1(b)(2)(iv) of the Income Tax Regulations). In general, under such rules, a Partner's Capital Account shall be:

    a.   increased by (i) the amount of money contributed by the Partner to the Partnership (including the amount of any Partnership liabilities that are assumed by such Partner other than in connection with distribution of Partnership property), (ii) the fair market value of property contributed by the Partner to the Partnership (net of liabilities secured by such contributed property that under Section 752 of the Code the Partnership is considered to assume or take subject to), and (iii) allocations to the Partner of Partnership income and gain (or item of), including income and gain exempt from tax; and of Partnership income and gain (or item thereof),

including income and gain exempt from tax; and

b.  decreased by (i) the amount of money distributed to the Partner by the Partnership (including the amount of such Partner's individual liabilities that are assumed by the Partnership other than in connection with contribution of property to the Partnership), (ii) the fair market value of property distributed to the Partner by the Partnership (net of liabilities secured by such distributed property that under Section 752 of the Code such Partner is considered to assume or take subject to), (iii) allocations to the Partner of expenditures of the Partnership not deductible in computing its taxable income and not properly chargeable to capital account, and (iv) allocations to the Partner of Partnership loss and deduction (or item thereof).

c.  Where Section 704(c) of the Code applies to Partnership property or where Partnership property is revalued pursuant to paragraph (b)(2)(iv)(t) of Section 1.704-1 of the Income Tax Regulations, each Partner's Capital Account shall be adjusted in accordance with paragraph (b)(2)(iv)(g) of Section 1.704-1 of the Income Tax Regulations as to allocations to the Partners of depreciation, depletion, amortization and gain or loss, as computed for book purposes with respect to such property.

d.  When Partnership property is distributed in kind (whether in connection with liquidation and dissolution or otherwise), the Capital Accounts of the Partners shall first be adjusted to reflect the manner in which the unrealized income, gain, loss and deduction inherent in such property (that has not been reflected in the Capital Account previously) would be allocated among the Partners if there were a taxable disposition of such property for the fair market value of such property (taking into account Section 7701(g) of the Code) on the date of distribution.

e.  The Manager shall direct the Partnership's accountants to make all necessary adjustments in each Partner's Capital Account as required by the capital accounting rules of Section 704(b) of the Code and the regulations thereunder.

**Section 5.3  Return of Capital**.  No Partner shall be liable for the return of the capital contributions (or any portion thereof) of any Partner, it being expressly understood that any such return shall be made solely from the assets of the Partnership. No Partner shall be entitled to withdraw any part of such Partner's Capital Contributions or Capital Account, to receive interest on such Partner's Capital Contributions or Capital Account or to receive any distributions from the Partnership, except as expressly provided for in this Agreement or under the Act as then in effect.

**Section 5.4  Liability**.  Except as otherwise provided by the Act or this Agreement, the debts, obligations and liabilities of the Partnership, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Partnership and General Partners, and no Limited Partner shall be obligated personally

for any such debt, obligation or liability of the Partnership solely by reason of being a Limited Partner. Except as otherwise expressly required by law, a Limited Partner, in such Limited Partner's capacity as such, shall have no liability in excess of (i) such Limited Partner's share of any assets and undistributed profits of the Partnership, (ii) such Limited Partner's obligations to make other payments expressly provided for in this Agreement (excluding the obligation to make capital contributions to the Partnership hereunder which shall be an obligation strictly among and enforceable by the Limited Partners, and no third party shall be a third-party beneficiary thereof), and (iii) the amount of any distributions wrongfully distributed to such Limited Partner.

## ARTICLE 6
## CAPITAL CONTRIBUTIONS AND LOANS

**Section 6.1    Capital Contributions**. Each Partner has made a Capital Contribution to the Partnership and owns Partnership Units in the amount and designation set forth for such Partner on **Exhibit 1**, as the same may be amended from time to time by the General Partners to the extent necessary to reflect accurately sales, exchanges, conversions or other transfers, redemptions, Capital Contributions, the issuance of additional Partnership Units, or similar events having an effect on a Partner's ownership of Partnership Units. Except as provided by law or in Section 6.4, the Partners shall have no obligation or right to make any additional Capital Contributions or loans to the Partnership.

**Section 6.2    Non Partner Loans to the Partnership**. The Partnership may obtain such further funds as it requires for its operations from sources and on terms, which are acceptable to the Manager, subject to the restrictions herein contained. Neither the Partnership nor any Limited Partner shall have any personal liability as a result of any such borrowing unless any of the Limited Partners shall agree in writing to be personally liable.

**Section 6.3    Partner Loans to the Partnership**. In the event that the Partnership shall require funds in order to carry out the purposes of the Partnership and such funds shall not be available from either prior capital contributions of the Partners or the proceeds of a third-party loan to the Partnership, then with consent of the Manager and subject to the restrictions hereof, any Partner may, but shall not be required to, loan to the Partnership such required funds. In the event such a loan is made, the same shall not be considered an increase in the Partner's Capital Account or an increase in such Partner's share of the profits. Each such loan shall be without recourse and shall be upon such terms as shall be agreed to by the lending Partner and shall be evidenced by a promissory note duly executed by the Manager on behalf of the Partnership and delivered to the lending Partner.

**Section 6.4    Additional Capital Contributions**.

6.4.1    If the Manager, at any time or from time to time, determines that the Partnership requires Additional Capital Contributions, then the Manager shall give notice to each Partner of (i) the total amount of additional Capital Contributions required, (ii) the reason the additional Capital Contribution is required, (iii) each Partner's proportionate share of the total additional Capital Contribution (determined in

accordance with this Section), and (iv) the date each Partner's Additional Capital Contribution is due and payable, which date shall be no less than ten (10) days after the notice has been given. A Partner's share of the total Additional Capital Contribution shall be equal to the product obtained by multiplying the Partner's Percentage Interest and the total Additional Capital Contribution required. Each Partner's share of the Additional Capital Contribution shall be payable in cash or by certified check, or wire transfer.

6.4.2    Notwithstanding anything herein to the contrary, no Partner shall be required to make any Additional Capital Contribution to the Partnership.

6.4.3    If a Partner fails to pay when due all or any portion of any Additional Capital Contribution required under Section 6.4.1 (each, a "Non-Contributing Partner"), then each Partner other than any Non-Contributing Partner (each, a "Contributing Partner") shall have the right, but not the obligation, to contribute to the Partnership (in addition to its initial pro rata share of the Additional Capital Contribution) its pro rata portion of those amounts that the Non-Contributing Partner fails to contribute (the "Remaining Contribution"), and the Manager shall have the right to re-allocate the Percentage Interests based on the then Capital Contributions made by the Contributing Partner and Non-Contributing Partners.

6.4.4    Each Partner shall receive a credit to his/her/its Capital Account in the amount of any Additional Capital Contribution which he/she/it makes to the Company and shall receive such other rights as have been approved by the Manager in connection with such Additional Capital Contribution in accordance with the terms of this Agreement.

6.4.5    Immediately following any Additional Capital Contribution, the Percentage Interests of the Partners may be adjusted if the Manager determines that the Percentage Interests of the Partners are to be altered as a result of the Additional Capital Contribution, and *Exhibit "1"* shall be revised to reflect any such Additional Capital Contribution and any such adjustment of the Percentage Interests of the Partners.  Any revision of *Exhibit "1"* in accordance with the preceding sentence shall require only the consent of the Manager (and not any consent of the Partners).

6.4.6    In the event any Remaining Contribution is not fully satisfied by Additional Capital Contributions of the Contributing Partners, the Manager may, but shall not be required to, contribute to the Partnership the amount required to satisfy the Remaining Contribution as a loan (a "Contribution Loan") to the Non-Contributing Partner. The Manager shall have the option of obtaining a third-party loan or using its own funds to fund the proceeds for any such Contribution Loan.  Such Contribution Loan shall not be treated as a Capital Contribution by the Manager or entitle the Manager to an increase in its Percentage Interest. The Contribution Loan (or Contribution Loans if more than one), shall each be deemed a loan owing by the Non-Contributing Partner to the Manager, as applicable. The Contribution Loan shall be repayable only out of the Net Cash Flow otherwise distributable to the Non-

Contributing Partner which shall be paid directly to the Manager, then in proportion to the amounts of their Contribution Loans, until Manager's Contribution Loan or Contribution Loans, as the case may be, and accrued and unpaid interest thereon have been paid-in-full. The Contribution Loan shall bear interest at lower of 15% per annum or the maximum rate permitted by law.

# ARTICLE 7
# ALLOCATION OF PROFITS AND LOSSES; TAX AND ACCOUNTING MATTERS

**Section 7.1    Allocations**. Each Partner's distributive share of income, gain, loss, deduction or credit (or items thereof) of the Partnership as shown on the annual federal income tax return prepared by the Partnership's accountants or as finally determined by the United States Internal Revenue Service or the courts, and as modified by the capital accounting rules of Section 704(b) of the Code and the Income Tax Regulations thereunder, as applicable, shall be determined as follows:

7.1.1    <u>Allocations</u>. Except as otherwise provided in this <u>Section 7.1</u>:

(a)    items of income, gain, loss, deduction or credit (or items thereof) shall be allocated among the Partners pursuant to the Preferred Allocation outlined in Exhibit "2", except that items of loss or deduction allocated to any Partner pursuant to this Section 7.1 with respect to any taxable year shall not exceed the maximum amount of such items that can be so allocated without causing such Partner to have a deficit balance in his or its Capital Account at the end of such year, computed in accordance with the rules of paragraph (b)(2)(ii)( d) of Section 1.704-1 of the Income Tax Regulations. Any such items of loss or deduction in excess of the limitation set forth in the preceding sentence shall be allocated as follows and in the following order of priority:

(1)    first, to those Partners who would not be subject to such limitation, in proportion to their Preferred Allocation outlined in Exhibit "2", and

(2)    second, any remaining amount to the Partners in the manner required by the Code and Income Tax Regulations.

Subject to the provisions of subsections 7.1.2 – 7.1.11, inclusive, of this Agreement, the items specified in this Section 7.1 shall be allocated to the Partners as necessary to eliminate any deficit Capital Account balances and thereafter to bring the relationship among the Partners' positive Capital Account balances in accord with their pro rata interests.

7.1.2    <u>Allocations With Respect to Property</u>.  Solely for tax purposes, in determining each Partner's allocable share of the taxable income or loss of the

Partnership, depreciation, depletion, amortization and gain or loss with respect to any contributed property, or with respect to revalued property where the Partnership's property is revalued pursuant to paragraph (b)(2)(iv)(f) of Section 1.704-1 of the Income Tax Regulations, shall be allocated to the Partners in the manner (as to revaluations, in the same manner as) provided in Section 704(c) of the Code. The allocation shall take into account, to the full extent required or permitted by the Code, the difference between the adjusted basis of the property to the Partner contributing it (or, with respect to property which has been revalued, the adjusted basis of the property to the Partnership) and the fair market value of the property determined by the Partners at the time of its contribution or revaluation, as the case may be.

7.1.3    Minimum Gain Chargeback. Notwithstanding anything to the contrary in this Section 7.1, if there is a net decrease in Partnership Minimum Gain or Partnership Nonrecourse Debt Minimum Gain (as such terms are defined in Sections 1.704-2(b) and 1.704-2(i)(2) of the Income Tax Regulations, during a Partnership taxable year, then each Partner shall be allocated items of Partnership income and gain for such year (and, if necessary, for subsequent years) in the manner provided in Section 1.704-2 of the Income Tax Regulations. This provision is intended to be a "minimum gain chargeback" within the meaning of Sections 1.704-2(f) and 1.704-2(i)(4) of the Income Tax Regulations and shall be interpreted and implemented as therein provided.

7.1.4    Qualified Income Offset. Subject to the provisions of subsection 7.1.3, but otherwise notwithstanding anything to the contrary in this Section 7.1, if any Partner's Capital Account has a deficit balance in excess of such Partner's obligation to restore such Partner's Capital Account balance, computed in accordance with the rules of paragraph (b)(2)(ii)(d) of Section 1.704-1 of the Income Tax Regulations, then sufficient amounts of income and gain (consisting of a pro rata portion of each item of Partnership income, including gross income, and gain for such year) shall be allocated to such Partner in an amount and manner sufficient to eliminate such deficit as quickly as possible. This provision is intended to be a "qualified income offset" within the meaning of Section 1.704-1(b)(2)(ii)(d) of the Income Tax Regulations and shall be interpreted and implemented as therein provided.

7.1.5    Depreciation Recapture. Subject to the provisions of Section 704(c) of the Code and subsections 7.1.2 – 7.1.4, inclusive, of this Agreement, gain recognized (or deemed recognized under the provisions hereof) upon the sale or other disposition of Partnership property, which is subject to depreciation recapture, shall be allocated to the Partner who was entitled to deduct such depreciation.

7.1.6    Loans. If and to the extent any Partner is deemed to recognize income as a result of any loans pursuant to the rules of Sections 1272, 1273, 1274, 7872 or 482 of the Code, or any similar provision now or hereafter in effect, any corresponding resulting deduction of the Partnership shall be allocated to the

13

Partner who is charged with the income. Subject to the provisions of Section 704(c) of the Code and subsections 7.1.2 -7.1.4, inclusive, of this Agreement, if and to the extent the Partnership is deemed to recognize income as a result of any loans pursuant to the rules of Sections 1272, 1273, 1274, 7872 or 482 of the Code, or any similar provision now or hereafter in effect, such income shall be allocated to the Partner who is entitled to any corresponding resulting deduction.

7.1.7   <u>Tax Credits</u>. Tax credits shall generally be allocated according to Section 1.704-1(b)(4)(ii) of the Income Tax Regulations or as otherwise provided by law. Investment tax credits with respect to any property shall be allocated to the Partners pro rata in accordance with the manner in which Partnership profits are allocated to the Partners under <u>subsection 7.1.1</u> hereof, as of the time such property is placed in service. Recapture of any investment tax credit required by Section 47 of the Code shall be allocated to the Partners in the same proportion in which such investment tax credit was allocated.

7.1.8   <u>Change of Pro Rata Interests</u>. Except as provided in <u>subsections 7.1.6 and 7.1.7</u> hereof or as otherwise required by law, if the proportionate interests of the Partners in the Partnership are changed during any taxable year, all items to be allocated to the Partners for such entire taxable year shall be prorated on the basis of the portion of such taxable year which precedes each such change and the portion of such taxable year on and after each such change according to the number of days in each such portion, and the items so allocated for each such portion shall be allocated to the Partners in the manner in which such items are allocated as provided in <u>section 7.1.1</u> during each such portion of the taxable year in question.

7.1.9   <u>Effect of Special Allocations on Subsequent Allocations</u>. Any special allocation of income or gain pursuant to <u>subsections 7.1.3 or 7.1.4</u> hereof shall be taken into account in computing subsequent allocations of income and gain pursuant to this <u>Section 7.1</u> so that the net amount of all such allocations to each Partner shall, to the extent possible, be equal to the net amount that would have been allocated to each such Partner pursuant to the provisions of this <u>Section 7.1</u> if such special allocations of income or gain under <u>subsection 7.1.3 or 7.1.4</u> hereof had not occurred.

7.1.10   <u>Nonrecourse and Recourse Debt</u>. Items of deduction and loss attributable to Partner nonrecourse debt within the meaning of Section 1.7042(b)(4) of the Income Tax Regulations shall be allocated to the Partners bearing the economic risk of loss with respect to such debt in accordance with Section 1704-2(i)(l) of the Income Tax Regulations. Items of deduction and loss attributable to recourse liabilities of the Partnership, within the meaning of Section 1.752-2 of the Income Tax Regulations, shall be allocated among the Partners in accordance with the ratio in which the Partners share the economic risk of loss for such liabilities.

14

7.1.11  State and Local Items. Items of income, gain, loss, deduction, credit and tax preference for state and local income tax purposes shall be allocated to and among the Limited Partners in a manner consistent with the allocation of such items for federal income tax purposes in accordance with the foregoing provisions of this Section 7.1.

**Section 7.2  Accounting Matters**. The Manager shall cause to be maintained complete books and records accurately reflecting the accounts, business and transactions of the Partnership on a calendar-year basis and using such cash, accrual, or hybrid method of accounting as in the judgment of the Manager is most appropriate; provided, however, that books and records with respect to the Partnership's Capital Accounts and allocations of income, gain, loss, deduction or credit (or item thereof) shall be kept under U.S. federal income tax accounting principles as applied to partnerships.

**Section 7.3  Fiscal Year**. The Partnership's fiscal year shall begin on January 1st and end on December 31st.  The Manager may at any time elect a different fiscal year if permitted by the Code and applicable regulations of the United States Treasury.

**Section 7.4    Tax Status and Returns**.

7.4.1   The Partnership shall file as a partnership for Federal income tax purposes. Any provision hereof to the contrary notwithstanding, solely for United States federal income tax purposes, each of the Partners hereby recognizes that the Partnership may be subject to the provisions of Subchapter K of Chapter 1 of Subtitle A of the Code; provided, however, the filing of U.S. Partnership Returns of Income shall not be construed to extend the purposes of the Partnership or expand the obligations or liabilities of the Partners.

7.4.2   The Manager shall prepare or cause to be prepared all tax returns and statements, if any, that must be filed on behalf of the Partnership with any taxing authority, and shall make timely filing thereof. Within ninety (90) days after the end of each calendar year, the Manager shall prepare or cause to be prepared and delivered to each Partner a report setting forth in reasonable detail the information with respect to the Partnership during such calendar year reasonably required to enable each Partner to prepare such Partner's federal, state and local income tax returns in accordance with applicable law then prevailing.

7.4.3   Unless otherwise provided by the Code or the Income Tax Regulations thereunder, Eric Shelly shall be the "Tax Partnership Representative." The Manager shall make all decisions for the Partnership relating to tax matters including, without limitation, whether to make any tax elections (including the election under Section 754 of the Code), the positions to be taken on the Partnership's tax returns and the settlement, further contest or litigation of any audit matters raised by the Internal Revenue Service or any other taxing authority. The Tax Matters Partner shall be the "Tax Matters Partner" for U.S. federal income tax purposes.

15

DocuSign Envelope ID: 69B058C0-33EE-4C98-90DC-1EAB66CD85A2

# ARTICLE 8
## DISTRIBUTIONS

**Section 8.1    Distributions**.

8.1.1    Subject to the reasonably anticipated business needs and opportunities of the Partnership, taking into account all debts, liabilities and obligations of the Partnership then due, working capital and other amounts which the Manager deems necessary for the Partnership's business or to place into reserves for customary and usual claims with respect to such business, and subject also to any restrictions under applicable law (including, without limitation, any obligation to withhold and remit any amounts to any governmental authority), the Manager the Manager shall distribute the Partners' share of the Net Cash Flow not less often than quarterly in accordance with preferred allocation outlined in Exhibit "4".

8.1.2    Without limiting the generality of subsection 8.1.1, if and to the extent that the Partnership is earning income which will result in the Partners being subject to income tax on their distributive share of the Partnership's income, minimum distributions shall be made to the Partners in such amounts and at such times (but in no event later than March 31st each year) as shall be sufficient to enable the Partners to meet United States income tax liability arising or incurred as a result of their participation in the Partnership. For the purposes of such distributions, it shall be assumed that the Partners are taxable at combined U.S. federal individual, state and local rates of forty percent (40%). Any such distribution shall be made on a nondiscriminatory basis to all Partners pro rata in accordance with their respective Percentage Interests.  It is specifically recognized that in making a forty percent (40%) assumption regarding tax distributions, some Partners may receive a distribution that is in excess of their actual tax liabilities, and some Partners may receive a distribution that is less.

**Section 8.2    Form of Distributions**.

8.2.1  No Partner, regardless of the nature of the Partner's Capital Contribution, has any right to demand and receive any distribution from the Partnership in any form other than money. No Partner may be compelled to accept from the Partnership a distribution of any asset in kind.

**Section 8.3    Restriction on Distributions**.

8.3.1   No distribution shall be made if, after giving effect to the distribution the Partnership would not be able to pay its debts as they become due in the usual course of business; or

(a)    The Manager may base a determination that a distribution is not prohibited on any of the following:

(b)    financial statements prepared on the basis of generally

accepted accounting principles;

(c)    A fair valuation; or

(d)    Any other method that is reasonable in the circumstances.

The effect of a distribution is to be measured as of the date the distribution is authorized if the payment is to occur within one hundred twenty (120) days after the date of authorization, or the date payment is made if it is to occur more than one hundred twenty (120) days after the date of authorization.

**Section 8.4  Return of Distributions**.  Partners and Assignees who receive distributions made in violation of the Act or this Agreement shall return such distributions to the Partnership. Except for those distributions made in violation of the Act or this Agreement, no Partner or Assignee shall be obligated to return any distribution to the Partnership or pay the amount of any distribution for the account of the Partnership or to any creditor of the Partnership. The amount of any distribution returned to the Partnership by a Partner or Assignee or paid by a Partner or Assignee for the account of the Partnership or to a creditor of the Partnership shall be added to the account or accounts from which it was subtracted when it was distributed to the Partner or Assignee.

**Section 8.5  Withholding from Distributions**. To the extent that the Partnership is required by law to withhold or to make tax or other payments on behalf of or with respect to any Partner, the Partnership may withhold such amounts from any distribution and make such payments as so required. For purposes of this Agreement, any such payments or withholdings shall be treated as a distribution to the Partner on behalf of whom the withholding or payment was made.

**Section 8.6  754 Election**. In the event of a distribution of property to a Partner, the death of an individual Partner or a transfer of any interest in the Partnership permitted under the Act or this Agreement, the Partnership may, in the discretion of the Partner upon the written request of the transferor or transferee, file a timely election under Section 754 of the Code and the Income Tax Regulations thereunder to adjust the basis of the Partnership's assets under Section 734(b) or 743(b) of the Code and a corresponding election under the applicable provisions of state and local law, and the person making such request shall pay all costs incurred by the Partnership in connection therewith, including reasonable attorneys' and accountants' fees.

## ARTICLE 9
## TRANSFER OF PARTNERSHIP INTERESTS

**Section 9.1  No Transfer**. No Partner, shareholder (direct or indirect) of a corporate Partner, partner (whether general or limited) of a partnership (general or limited), member of a limited liability company or owner of all or any portion of any other entity which is a Partner or which has a beneficial interest, either direct or indirect, in a Partner, may sell, assign, transfer, give, hypothecate or otherwise encumber (any such sale,

assignment, transfer, gift, hypothecation or encumbrance being hereinafter referred to as a "Transfer"), directly or indirectly, or by operation of law or otherwise, any interest in the Partnership or in such corporation, partnership or other entity (each an "Intermediary"), except as hereinafter set forth in this <u>Article 9</u> or otherwise with the consent of the Manager.  Any Transfer of any interest in the Partnership or an Intermediary in contravention of this <u>Article 9</u> shall be null and void. No Partner, without the prior written consent of the Manager (other than the retiring or withdrawing Partner), shall retire or withdraw from the Partnership, except as a result of such Partner's death, disability, insanity, incompetency or the final adjudication of such Partner as a Bankrupt.

**Section 9.2    Redemption and Permitted Transfers**.

(a)    The Manager may at any time, for any reason and by mutual consent enter into negotiations for and consummate a redemption by the Manager, or its Affiliates, of the Partner's Partnership Interest. Such redemption shall not be subject to the Right of First Refusal provisions of <u>Section 9.6</u> below.

(b)    Any Partner may, from time to time and in its sole discretion, transfer its Interest, in whole or in part, to (i) any Affiliate of such Partner, or (ii) a living or revocable trust for the benefit of the Partner or such Partner's Immediate Family (as hereinafter defined) (a "Family Trust") so long as the transferring Partner is the sole trustee of such Family Trust. As used in this Article 9, the term "Immediate Family" shall mean any spouse, parents, children, including those adopted, siblings and direct descendants and spouses of any of the foregoing, of an individual.

(c)    Any transferee referred to in clause (b) above shall become a Partner of the Partnership.

(d)    In the event that (i) a Partner Transfers its Interest, pursuant to this <u>Section 9.2</u>, to a limited liability company or limited partnership controlled by such Partner or to a Family Trust, and (ii) at any time thereafter, such Partner ceases to control the transferee limited liability company or limited partnership, or such Partner ceases to be the sole trustee of the transferee Family Trust (each, a "Triggering Event"), the Partnership shall have the option to purchase such transferee's Interest for the fair market value of such Interest determined as of the date of the Triggering Event. The Partnership shall provide written notice to the transferee of its election to exercise its option to purchase the Interest within sixty (60) days after the Triggering Event, on which date such option shall expire. The fair market value of the Interest shall be determined in accordance with the fair market valuation procedure discussed in <u>Section 9.7</u> hereto.

(e)    Manager shall have the right and authority, following consultation with the Company's certified public accountant, to transfer the general partnership interest to limited partner interest in the same pro-rata ownership interest.  Such transfer may be made without further approval of the general partners as execution of this

DocuSign Envelope ID: 69B058C0-33FE-4C98-90DC-1EAB66CD6BA2

Agreement shall be considered express written consent to do so.

**Section 9.3    Succession by Operation of Law**. In the event of the death or incapacity of an individual Partner or in the event of the involuntary merger, consolidation, dissolution or liquidation of any Partner not an individual, all of such Partner's rights hereunder, including such Partner's Interest, shall, subject to the remaining provisions of this Article 9, pass to such Partner's personal representative, heir or distributee, in the case of an individual Partner, or to such Partner's legal successor, in the case of any Partner not an individual. Upon and contemporaneously with any such transfer of a Partner's Interest by operation of law, the Partnership shall purchase from the transferee such Interest, and the transferee shall sell to the interests of the transferee in the Partnership, other than the right to its share of the Partnership's distributions and allocations, including such transferee's right, if any, to vote and participate in the management of the Partnership, except those rights that cannot be waived by an assignee of an economic interest in the Partnership pursuant to the Act.

**Section 9.4    New Partners**.  Notwithstanding Section 9.2 hereof, no person or entity, not then a Partner, shall become a Partner hereunder under any of the provisions hereof unless such person or entity shall expressly assume and agree to be bound by all of the terms and conditions of this Agreement. Each such person or entity shall also cause to be delivered to the Partnership, at his or its sole cost and expense, a favorable opinion of legal counsel reasonably acceptable to the Manager, to the effect that (a) the contemplated Transfer of such Partnership Interest to such person or entity does not violate any applicable securities law, (b) that such person or entity has the legal right, power and capacity to own the Interest, and (c) that the contemplated Transfer will not cause a termination of the Partnership within the meaning of Section 708 of the Code or that such termination would not have material adverse tax consequences for the non-transferring Partners. All reasonable costs and expenses incurred by the Partnership in connection with any Transfer of an Interest and, if applicable, the admission of a person or entity as a Limited Partner hereunder, shall be paid by the transferor. Upon compliance with all provisions hereof applicable to such person or entity becoming a Partner, all other Partners agree to execute and deliver such amendments hereto as are necessary to constitute such person or entity a Partner of the Partnership.

**Section 9.5  Rights of New Partners**. Notwithstanding anything to the contrary in this Agreement, (a) a transferee of a Partner's Interest in the Partnership pursuant to a Transfer under this Article 9 (other than pursuant to Section 9.2 hereof) shall be admitted to the Partnership as a Partner with respect to such Partner's Interest only with the written consent of the Manager, it being understood that the giving or withholding of such consent shall be within the sole and absolute discretion of the Manager, (b) until and unless such transferee is admitted as a Partner, such transferee shall be entitled to its share of the Partnership's distributions and allocations but shall not have any other rights or privileges of a Partner, except as otherwise required by this Agreement or the Act, and (c) until and unless such transferee is admitted as a Partner, the transferor shall not cease to be a Partner of the Partnership and shall continue to be a Partner until such time as the transferee is admitted as a Partner under this Agreement.

**Section 9.6  Right of First Refusal**. Except for Transfers permitted by <u>Section 9.2</u>, each time a Partner proposes to Transfer all or any part of its, his or her Interest, such Partner shall first offer such Interest to the Manager in accordance with the following provisions:

(a)    Such Partner shall deliver a written notice to the Manager stating (i) such Partner's bona fide intention to Transfer such Interest, (ii) the name and address of the proposed transferee, (iii) the Interest to be Transferred, and (iv) the purchase price and terms of payment for which the Partner proposes to Transfer such Interest.

(b)    Within ten (10) days after receipt of the notice described in <u>Section (a)</u>, the Manager shall notify the transferring Partner in writing of Manager's desire to purchase a portion of the Interest being so Transferred. The failure of the Manager to submit a notice within the applicable period shall constitute an election on the part of the Manager not to purchase any of the Interest which may be so Transferred.

(c)    If the Manager elects not to purchase all of the Interest designated in such notice, then the transferring Partner may Transfer the Interest described in the notice to the proposed transferee, providing such Transfer (i) is completed within thirty (30) days after the expiration of the Manager's right to purchase such Interest, (ii) is made at the price and terms designated in such notice, and (iii) the requirements hereof relating to consent of Partners, securities and tax requirements are met. If such Interest is not so Transferred, the transferring Partner must give notice in accordance with this Section prior to any other or subsequent Transfer of such Interest.

**Section 9.7   Fair Market Value Procedures**. The Fair Market Value of the Interest shall be determined by either:

(a)    the Interest's fair market value as agreed upon by the transferring and acquiring Party; or

(b)    if the transferring and acquiring Party cannot agree on the fair market value, each party shall select a business valuation appraiser and the average valuation shall be used, subject to Section 9.7 (c).

(c) in the event that either Party is not satisfied with the average valuation obtained pursuant to Section 9.7 (b), then the two selected business valuation appraisers shall select a third independent business valuation appraiser who shall determine the fair market value of the Interest.

## ARTICLE 10
## BOOKS AND RECORDS; RESERVES

**Section 10.1** On reasonable notice, and at their own expense, a Partner may

Agreement of Limited Partnership

**App. 070**

inspect and copy during regular business hours, at a reasonable location specified by the Partnership, any record maintained by the Partnership regarding the Partnership's activities, financial condition and other circumstances, to the extent the information is material to the Partner's rights and duties under the Partnership Agreement or this chapter;

**Section 10.2** The Partnership shall furnish to each Partner, at Partner's expense:

(a)    On reasonable notice, any information concerning the Partnership's activities, financial condition and other circumstances which the Partnership knows and is material to the proper exercise of the Partner's rights and duties under the Partnership Agreement or this chapter, except to the extent the Partnership can establish that it reasonably believes the Partner already knows the information;

(b)    On reasonable notice, any other information concerning the Partnership's activities, financial condition and other circumstances, except to the extent the demand or information demanded is unreasonable or otherwise improper under the circumstances.

**Section 10.3**  During regular business hours and at a reasonable location specified by the Partnership, a Partner may obtain from the Partnership and inspect and copy full information regarding the activities, financial condition and other circumstances of the Partnership as is just and reasonable if:

(a)    The Partner seeks the information for a purpose material to the Partner's interest as a Partner;

(b)    The Partner makes a demand in a record received by the Partnership, describing with reasonable particularity the information sought and the purpose for seeking the information; and

(c)    The information sought is directly connected to the Partner's purpose.

**Section 10.4    Reserves**. The Manager shall establish reserves by deducting from income such amounts as it shall deem advisable.

**Section 10.5    Filings**. The Manager, at the Partnership's expense, shall cause the income tax returns for the Partnership to be prepared and timely filed with the appropriate authorities. The Manager, at the Partnership's expense, shall also cause to be prepared and timely filed, with appropriate federal and state regulatory and administrative bodies, amendments to or restatements of, the Certificate of Limited Partnership and all reports required to be filed by the Partnership with those entities under the Act or other then-current applicable laws, rules and regulations. If a Manager is required by the Act to execute or file any document fails, after demand, to do so within a reasonable period of time or refuses to do so, any other General Partner or Limited Partner may prepare,

execute and file that document with the Texas Secretary of State.

**Section 10.6     Bank Accounts**. The Manager shall maintain the funds of the Partnership in one or more separate bank accounts in the name of the Partnership, and shall not permit the funds of the Partnership to be commingled in any fashion with the funds of any other Person.

# ARTICLE 11
## TERMINATION

**Section 11.1     Dissolution**. Subject to the provisions of the Act or the Certificate of Limited Partnership, the Partnership shall be dissolved and its affairs wound up upon the first to occur of the following:

11.1.1 At the time specified in the Certificate of Limited Partnership, or upon the expiration of the term specified in <u>Section 2.5</u> of this Agreement;

11.1.2 Upon the sale of all or substantially all of the assets of the Partnership and the receipt of all consideration therefor;

11.1.3 The unanimous vote of the Manager; or

12.1.4 The entry of a decree of judicial dissolution.

**Section 11.2     Termination**. In all cases of dissolution of the Partnership, the Manager shall wind up the business of the Partnership and terminate the Partnership as promptly as practicable thereafter. The business of the Partnership shall be wound up and the Partnership terminated after each of the following shall be accomplished:

(a)     The Manager, by consulting with the Partnership's accountant(s), shall cause to be prepared a statement setting forth the assets and liabilities of the Partnership as of the date of dissolution, a copy of which statement shall be furnished to all of the Partners.

(b)     The property and assets of the Partnership shall be liquidated by the Manager as promptly as possible, but in an orderly, businesslike and commercially reasonable manner.

(c)     Any gain or loss realized by the Partnership upon the sale of its property and assets shall be allocated to the Partners in the manner set forth in <u>Article 7</u> hereof.

(d)     The proceeds of sale and all other assets of the Partnership shall be applied and distributed as follows and in the following order of priority:

(i)     To creditors of the Partnership including Partners of the Partnership to the extent otherwise permitted by law in satisfaction of (x)

22

the debts and liabilities of the Partnership whether by payment or the making of reasonable provisions for payment thereof and (y) the expenses of liquidation.

(ii)    To the setting up of any reserves which the Manager shall determine to be reasonably necessary for contingent, conditional or unmatured liabilities or obligations of the Partnership or the Partners arising out of or in connection with the Partnership. Such reserves may, in the discretion of the Manager, be paid over to a bank, selected by the Manager and authorized to conduct business as an escrow agent, to be held by such bank as escrow agent for the purposes of disbursing such reserves to satisfy the liabilities and obligations described above, and at the expiration of such period as the Manager may reasonably deem advisable, distributing any remaining balance as provided in clause (iii) below; provided, however, that, to the extent that it shall have been necessary, by reason of applicable law or regulation, to create any reserves prior to any distribution that would otherwise have been made under this subsection (d) and, by reason thereof, a distribution under clause (i) hereof has not been made, then any balance remaining shall first be distributed pursuant to clause (i) hereof.

(iii)    To all the Partners in the proportion of their respective positive Capital Accounts, as those accounts are determined after all adjustments to such accounts for the taxable year of the Partnership during which the liquidation occurs as are required by this Agreement and Income Tax Regulations § 1.704- I(b), such adjustments to be made within the time specified in such Income Tax Regulations.

(iv)    To the Partners in proportion to their Preferred Return.

The Manager is hereby irrevocably appointed as the true and lawful attorney in the name, place and stead of each of the Partners, such appointment being coupled with an interest, to make, execute, sign, acknowledge and file with respect to the Partnership all papers which shall be necessary or desirable to effect the dissolution and termination of the Partnership in accordance with the provisions of this Article and the Act. Without limiting the foregoing, the Manager shall, upon the completion of the winding up of the Partnership, file an appropriate certificate of cancellation of the Certificate of Limited Partnership as required by the Act. Each Limited Partner, upon the request of the Manager, shall promptly execute, acknowledge and deliver all such documents, certificates and other instruments as the Manager shall reasonably request to effectuate the proper dissolution and termination of the Partnership, including the winding up of the business of the Partnership.

DocuSign Envelope ID: 69B058C0-33FE-4C9B-90DC-1FAB66CD5BA2

## ARTICLE 12
## INDEMNIFICATION AND INSURANCE

**Section 12.1     Indemnification**. Neither the Manager, nor its shareholders, officers, directors, employees or agents, shall have any liability whatsoever to the Partnership or to any Partner for any loss suffered by the Partnership or any Partner which arises out of any action or inaction of the Manager or any of its shareholders, officers, directors, employees or agents, so long as the Manager or such other Person, in good faith, determined that such course of conduct was in the best interests of the Partnership and did not constitute fraud, bad faith or willful misconduct. The Manager and its shareholders, officers, directors, employees and agents and the employees and agents of the Partnership shall be entitled to be indemnified and held harmless by the Partnership, at the expense of the Partnership, against any loss, expense, claim or liability (including reasonable attorneys' fees, which shall be paid as incurred) resulting from the assertion of any claim or legal proceeding relating to the performance or nonperformance of any act concerning the activities of the Partnership, including claims or legal proceedings brought by a third- party or by Partners, on their own behalf or as a Partnership derivative suit, so long as the party to be indemnified determined in good faith that such course was in the best interests of the Partnership and did not constitute fraud, bad faith or willful misconduct; provided, that any such indemnity shall be paid solely from the assets of the Partnership.

**Section 12.2     Insurance**. Nothing herein shall prohibit the Partnership from paying in whole or in part the premiums or other charge for any type of indemnity insurance in which the Manager or other agents or employees of the Manager or the Partnership are indemnified or insured against liability or loss arising out of their actual or asserted misfeasance or nonfeasance in the performance of their duties or out of any actual or asserted wrongful act against, or by, the Partnership including, but not limited to, judgments, fines, settlements and expenses incurred in the defense of actions, proceedings and appeals therefrom.

## ARTICLE 13
## INVESTMENT REPRESENTATIONS; PRIVATE OFFERING EXEMPTION

Each Partner, by such Partner's execution of this Agreement, hereby represents and warrants to, and agrees with the Manager, the other Partners and the Partnership as follows:

**Section 13.1     Investment Intent**. Such Partner is acquiring the Interest for investment purposes for such Partner's own account only and not with a view to or for sale in connection with any distribution of all or any part of the Interest.

**Section 13.2     Economic Risk**. Such Partner is financially able to bear the economic risk of such Partner's investment in the Partnership, including the total loss thereof.

**Section 13.3** **No Registration of Units,** Such Partner acknowledges that the Interests have not been registered under the Securities Act of 1933, as amended (the "Securities Act"), or qualified under any state securities law or under the laws of any other jurisdiction, in reliance, in part, on such Partner's representations, warranties and agreements herein.

**Section 13.4** **No Obligation to Register**. Such Partner represents, warrants and agrees that the Partnership and the Manager are under no obligation to register or qualify the Interests under the Securities Act or under any state securities law or under the laws of any other jurisdiction, or to assist such Partner in complying with any exemption from registration and qualification.

**Section 13.5** **No Disposition in Violation of Law**. Without limiting the representations set forth above, and without limiting Article 9 of this Agreement, such Partner will not make any disposition of all or any part of the Interests which will result in the violation by such Partner or by the Partnership of the Securities Act or any other applicable securities laws. Without limiting the foregoing, each Partner agrees not to make any disposition of all or any part of the Interests unless and until:

13.5.1 there is then in effect a registration statement under the Securities Act covering such proposed disposition and such disposition is made in accordance with such registration statement and any applicable requirements of state securities laws; or

13.5.2 such Partner has notified the Partnership of the proposed disposition and has furnished the Partnership with a detailed statement of the circumstances surrounding the proposed disposition, and if reasonably requested by the Manager, such Partner has furnished the Partnership with a written opinion of legal counsel, reasonably satisfactory to the Partnership, that such disposition will not require registration of any securities under the Securities Act or the consent of or a permit from appropriate authorities under any applicable state securities law or under the laws of any other jurisdiction.

**Section 13.6** **Financial Estimate and Projections**. That it understands that all projections and financial or other materials which it may have been furnished are not based on historical operating results, because no reliable results exist, and are based only upon estimates and assumptions which are subject to future conditions and events which are unpredictable and which may not be relied upon in making an investment decision.

## ARTICLE 14
## DEFAULTS AND REMEDIES

**Section 14.1 Defaults**. If a Partner materially defaults in the performance of his or its obligations under this Agreement, and such default is not cured within ten (10) business days after written notice of such default is given by a Manager to the defaulting

Partner for a default that can be cured by the payment of money, or within thirty (30) calendar days after written notice of such default is given by a Manager to the defaulting Partner for any other default, then the non-defaulting Partners shall have the rights and remedies described in <u>Section 14.2</u> hereunder in respect of the default.

**Section 14.2   Remedies.** If a Partner fails to perform his or its obligations under this Agreement, the Partnership and the non-defaulting Partners shall have the right, in addition to all other rights and remedies provided herein, on behalf of himself or itself, the Partnership or the Partners, to bring the matter to arbitration pursuant to <u>Section 15.8</u>. The award of the arbitrator in such a proceeding may include, without limitation, an order for specific performance by the defaulting Partner of his or its obligations under this Agreement, or an award for damages for payment of sums due to the Partnership or to a Partner.

## ARTICLE 15
## MISCELLANEOUS

**Section 15.1   Entire Agreement.** This Agreement, and the exhibits hereto, constitute the entire agreement among the Partners with respect to the subject matter hereof, and supersedes all prior and contemporaneous agreements, representations, and understandings of the parties. No party hereto shall be liable or bound to the other in any manner by any warranties, representations or covenants with respect to the subject matter hereof except as specifically set forth herein.

**Section 15.2   Further Assurances.** Each Partner agrees to execute, acknowledge, deliver, file, record and publish such further certificates, amendments to certificates, instruments and documents, and do all such other acts and things as may be required by law, or as may be required to carry out the intent and purposes of this Agreement.

**Section 15.3   Amendments.** This Agreement may be amended only by the affirmative vote, in a writing duly executed, of a Majority of the Percentage Interests of the Partners, except clerical or ministerial amendments that may be approved by written consent of Partners holding not less than a majority of the Percentage Interests.

The Certificate of Limited Partnership may only be amended by the affirmative vote of all the General Partners. Any such amendment shall be in writing, and shall be executed and filed in accordance with the Act.

**Section 15.4   No Waiver.** No consent or waiver, express or implied, by the Partnership or a Partner to or of any breach or default by any Partner in the performance by a Manager of his, her or its obligations under this Agreement shall constitute a consent to or waiver of any similar breach or default by the Manager. Failure by the Partnership or a Partner to complain of any act or omission to act by the Manager, or to declare such Manager in default, irrespective of how long such failure continues, shall not constitute

a waiver by the Partnership or such Partner of his, her or its rights under this Agreement.

**Section 15.5    Third Parties**. Nothing in this Agreement, express or implied, is intended to confer upon any party, other than the parties hereto, and their respective successors and permitted assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement, except as expressly provided herein.

**Section 15.6    Severability**. If one or more provisions of this Agreement are held by a proper court to be unenforceable under applicable law, portions of such provisions, or such provisions in their entirety, to the extent necessary and permitted by law, shall be severed here from, and the balance of this Agreement shall be enforceable in accordance with its terms.

**Section 15.7    Governing Law**. This Agreement shall be governed by and construed under the substantive laws of the State of Texas.

**Section 15.8    Dispute Resolution**. In the event of any dispute or disagreement between the parties hereto as to the interpretation of any provision of this Agreement (or the performance of obligations hereunder), the matter, upon written request of any party, shall be referred to representatives of the parties for decision. The representatives shall promptly meet in a good faith effort to resolve the dispute. If the representatives do not agree upon a decision within thirty (30) calendar days after reference of the matter to them, any controversy, dispute or claim arising out of or relating in any way to this Agreement or the transactions arising hereunder shall be settled exclusively by arbitration in Austin, Texas. Such arbitration shall be administered by JAMS in accordance with its then prevailing expedited rules, by one independent and impartial arbitrator selected in accordance with such rules.  The arbitration shall be governed by the United States Arbitration Act, 9 U.S.C. § 1 et seq. The fees and expenses of JAMS and the arbitrator shall be shared equally by the parties to the dispute and advanced by them from time to time as required; provided that at the conclusion of the arbitration, the arbitrator shall award costs and expenses (including the costs of the arbitration previously advanced and the reasonable fees and expenses of attorneys, accountants and other experts) to the prevailing party. No pre-arbitration discovery shall be permitted, except that the arbitrator shall have the power in his sole discretion, on application by any party, to order pre-arbitration examination solely of those witnesses and documents that any other party intends to introduce in its case-in-chief at the arbitration hearing. The parties shall instruct the arbitrator to render such arbitrator's award within thirty (30) calendar days following the conclusion of the arbitration hearing. The arbitrator shall not be empowered to award to any party any damages of the type not permitted to be recovered under this Agreement in connection with any dispute between or among the parties arising out of or relating in any way to this Agreement or the transactions arising hereunder, and each party hereby irrevocably waives any right to recover such damages. Notwithstanding anything to the contrary provided in this Section 15.8 and without prejudice to the above procedures, any party may apply to any court of competent jurisdiction for temporary injunctive or other

provisional judicial relief if such action is necessary to avoid irreparable damage or to preserve the status quo until such time as the arbitrator is selected and available to hear such party's request for temporary relief. The award rendered by the arbitrator shall be final and not subject to judicial review and judgment thereon may be entered in any court of competent jurisdiction. The decision of the arbitrator shall be in writing and shall set forth findings of fact and conclusions of law.

**Section 15.9**        **Notices.** Unless otherwise provided in this Agreement, any notice or other communication herein required or permitted to be given shall be in writing and shall be given by electronic communication, hand delivery, registered or certified mail, with proper postage prepaid, return receipt requested, or courier service regularly providing proof of delivery, addressed to the party hereto as provided as follows:

15.9.1 all communications intended for the Partnership shall be sent to its principal executive office to the attention of the Manager;

15.9.2 all communications intended for a Partner shall be sent to the address of such Partner set forth in **Exhibit 1** to this Agreement, or such other address as such Partner shall have provided to the Partnership for such purpose by notice served in accordance with this Section 15.9; and

15.9.3 all communications intended for the Manager shall be sent to the address of the Manager set forth in **Exhibit 1**  to this Agreement, or such other address as the Manager shall have provided to the Partners for such purpose by notice served in accordance with this Section 15.9.

All notices shall be sent as aforesaid or at any other address of which any of the foregoing shall have notified the others in any manner prescribed in this Section 15.9. For all purposes of this Agreement, a notice or communication will be deemed effective:

(a)    if delivered by hand or sent by courier, on the day it is delivered unless that day is not a day upon which commercial banks are open for business in the city specified (a "Local Business Day") in the address for notice provided by the recipient, or if delivered after the close of business on a Local Business Day, then on the next succeeding Local Business Day;

(b)    if sent by facsimile transmission, on the date transmitted, provided oral or written confirmation of receipt is obtained by the sender, unless the transmission and confirmation date is not a Local Business Day, in which case on the next succeeding Local Business Day; and

(c)    if sent by registered or certified mail, on the fifth (5th) Local Business Day after the date of mailing.

**Section 15.10 Titles and Subtitles.** The titles of the sections and paragraphs of this Agreement are for convenience only and are not to be considered in construing this Agreement.

28

**Section 15.11 Currency**. Unless otherwise specified, all currency amounts in this Agreement refer to the lawful currency of the United States of America.

**Section 15.12 Counterparts,** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument, and facsimile signatures shall be deemed originals.

**Section 15.13 Preparation of Agreement**. This Agreement has been prepared by Premier Law Group (the "Law Firm"), counsel for the Partnership and the Manager in the course of its representation, and:

    i.    The Partners have been advised by the Law Firm that a conflict of interest exists among the Partners' individual interests; and

    ii.    The Partners have been advised by the Law Firm to seek the advice of independent counsel; and

    iii.    The Partners have been represented by independent counsel or have had the opportunity to seek such representation; and

    iv.    The Law Firm has not given any advice or made any representations to the Partners with respect to the tax consequences of this agreement; and

v.      The Partners have been advised that the terms and provisions of this Agreement may have tax consequences and the Partners have been advised by the Law Firm to seek independent counsel with respect thereto; and

vi.     The Partners have been represented by independent counsel or have had the opportunity to seek such representation with respect to the tax consequences of this Agreement.

[SIGNATURE PAGE FOLLOWS]

Agreement of Limited Partnership

IN WITNESS WHEREOF, the General Partners and the Limited Partners hereby execute this Partnership Agreement effective as of the date first above written.

**LIMITED PARTNER**

**GENERAL PARTNERS**

**Dakota Dog Family**
**Limited Partnership**

**Freedom Impact Consulting, LLC**

_____
Eric N. Shelly, Authorized

_____
Eric N. Shelly, Manager

Andrew Martinssen

_____

Paul Martinchuk

_____

Agreement of Limited Partnership

## EXHIBIT "1"

### Names, Addresses and Capital Contributions of Partners

**General Partners**

| Name | Address | ████ | ████ |
|---|---|---|---|
| ████ | ████ | ████ | ████ % |
| Paul Martinchuk | ████ | ████ | ████ |
| ████ | ████ | ████ | ████ |
| ████ | | ████ | ████ |
| ████ | | ████ | ████ |
| | | | ████ |
| ████ | ████ | ████ | ████ % |

**Limited Partners**

| Name | Address | ████ | ████ |
|---|---|---|---|
| ████ | ████ | ████ | ██ |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

## *EXHIBIT "2"*

*Preferred Allocations and Distributions*

### Distribution from Operations

Net Cash Flow shall be allocated and distributed as follows:

First, subject always to and subordinate to the Loan payments, $10,000 per quarter per Carbon Capture Unit will be taken from the Net Cash Flow and retained by the Company as Reserves for the sole purpose of refurbishing the Carbon Capture Units once their useful life has expired.

Second, Prospective Investor will be allocated 75% of the remaining Net Cash Flow and Sponsor, through its Affiliate, will receive the remaining 25% of Net Cash Flow.

Please note that in the first 3 years of operations, Net Cash Flow allocations to the Prospective Investor will be lower as the 3-year Loan needs to be paid off from Net Cash Flow. Then, in year four (4) it is likely that Prospective Investors will be allocated some basis recapture as a result of the Loan being paid off. Thus, we recommend working with your tax professional in order to anticipate and plan accordingly.

Bonus depreciation for the Carbon Capture Units shall be allocated exclusively to the Investors. To the extend depletion allowance on the solvent, oil, and gas revenue is allowed, the depletion allowance will be allocated to Manager or its Affiliates.

Agreement of Limited Partnership

## *EXHIBIT B*

PROSPECTIVE PURCHASER QUESTIONNAIRE

Agreement of Limited Partnership

Name of Prospective Purchaser: ___Paul Martinchuk___

(Please Print)

State of Domicile: ___CA___

# 03 CARBON CAPTURE, LP

---

# PROSPECTIVE PURCHASER QUESTIONNAIRE

---

<u>INSTRUCTIONS</u>:  IN ORDER TO INVEST IN UNITS OF 03 CARBON CAPTURE, LP YOU MUST COMPLETE THIS PROSPECTIVE PURCHASER QUESTIONNAIRE BY FILLING IN THE INFORMATION CALLED FOR, CHECKING THE APPROPRIATE BOXES, AND SIGNING AT PAGE 5.  THEN, YOU MUST COMPLETE THE SUBSCRIPTION AGREEMENT BY DESIGNATING THE NUMBER OF UNITS TO BE PURCHASED, PROVIDING THE INFORMATION REQUIRED AND SIGNING.  NO SUBSCRIPTION IS EFFECTIVE UNTIL ACCEPTED BY THE COMPANY.

<u>CONFIDENTIALITY</u>:  THE INFORMATION THAT YOU PROVIDE WILL BE USED SOLELY FOR PURPOSES OF MAKING VARIOUS DETERMINATIONS IN CONNECTION WITH THE COMPANY'S COMPLIANCE WITH APPLICABLE SECURITIES LAWS.  NO FINANCIAL INFORMATION DISCLOSED HEREIN WILL BE DISCLOSED TO THIRD PARTIES OR USED FOR ANY PURPOSES OTHER THAN SUCH LEGAL DETERMINATIONS BY THE COMPANY AND ITS LEGAL COUNSEL.

# 03 CARBON CAPTURE, LP

---

## PROSPECTIVE PURCHASER QUESTIONNAIRE

---

**TO:**        03 CARBON CAPTURE, LP

Dear Sponsor:

In connection with the proposed purchase of a membership interest (the "Securities") in 03 CARBON CAPTURE, LP (the "Company"), the undersigned hereby represents as follows:

1.  **Representations as to Accredited Investor Status.**  The undersigned has read the definition of "Accredited Investor" from Rule 501 of Regulation D attached hereto as "**Exhibit A"**, and certifies that either (check only one):

    A.  ☒     The undersigned is an "Accredited Investor" for one or more of the following reasons (check all that apply):

        ☒     The undersigned is an individual (not a partnership, corporation, etc.) whose individual net worth, or joint net worth with his or her spouse, presently exceeds One Million Dollars ($1,000,000), excluding the equity in the investor's primary residence;

        ☐     The undersigned is an individual (not a partnership, corporation, etc.) who had an income in excess of Two Hundred Thousand Dollars ($200,000) in each of the two most recent years, or joint income with their spouse in excess of Three Hundred Thousand Dollars ($300,000) in each of those years (in each case including foreign income, tax exempt income and full amount of capital gains and losses but excluding any income of other family members and any unrealized capital appreciation) and has a reasonable expectation of reaching the same income level in the current year;

        ☐     The undersigned is a director or executive officer of the Company, which is issuing and selling the Securities;

        ☐     The undersigned is a corporation, partnership, business trust, or non-profit organization within the meaning of Section 501(c)(3) of the Internal Revenue Code, in each case not formed for the specific purpose of acquiring the Securities and with total assets in excess of Five Million Dollars ($5,000,000);

        _____
        _____
        _____
        (describe entity)

        ☐     The undersigned is a trust with total assets in excess of Five Million Dollars ($5,000,000), not formed for the specific purpose of acquiring the Securities,

where the purchase is directed by a "sophisticated person" as defined in Regulation 506(b)(2)(ii);

☐    The undersigned is an entity all the equity owners of which are "Accredited Investors" within one or more of the above categories.  If relying upon this Category alone, each equity owner must complete a separate copy of this Agreement;

_____

_____

_____

(describe entity)

B.  ☐    The undersigned is <u>not</u> an "Accredited Investor," but has such knowledge and experience in financial and business matters that he/she is capable of evaluating the merits and risks of the prospective investment.  The undersigned further represents and warrants the following:

i.    The undersigned is an individual whose individual net worth, or joint net worth with his or her spouse, if applicable, is between:

☐    $200,000 or less.
☐    Between $200,000 and $500,000
☐    $500,000 or more.

ii.    The undersigned has gross income of:

☐    $60,000 or less.
☐    Between $60,000 and $100,000
☐    $100,000 or more.

iii.    The undersigned ☐ has ☐  has not personally invested in investments sold by means of private placements within the past five years.

iv.    The undersigned has made the following investments during the past five years (include dates, nature and amounts of investment):

_____

_____

_____

_____

_____

_____

v.    The undersigned possesses such knowledge and experience in financial and business matters to enable undersigned to evaluate the merits and risks of investment in the Company. As basis for my answer, here are examples of my financial and business experience (e.g. investment or business experience, profession, past review of other investment offerings, etc.).

2

_____

_____

_____

_____

_____

_____

_____

2.    **Entity Type.**  The undersigned is (check only one):

☒  An individual

☐  A limited liability company

☐  A corporation

☐  A partnership

☐  A trust

☐  Other: _____

3.    **Tax I.D. Number.**  The social security number or federal tax I.D. number of the undersigned is:

████████████  _____.

4.    **Address.**  The address of the undersigned is:

████████████████████  _____

████████████  _____

_____

The phone, fax and contact person (if an entity) are as follows:

Phone: _____

Fax: _____

Email: _____

Contact: _____

5.    **Investment Intent.**  By the execution of this questionnaire, the undersigned represents to the Company that the undersigned: (a) understands that the offering of the Securities has not been and will not be registered under the Securities Act of 1933, as amended, or state securities laws, by reason of claimed exemptions under the provisions of such laws which depend, in part, upon the undersigned's investment intention, (b) is purchasing or would purchase the Securities for the undersigned's own account for investment and not with a view toward the resale or distribution to others, and (c) was not formed for the specific purpose of purchasing securities of the Company.

6.    **Accurate and True Statements.**  The foregoing representation is true and accurate as of the date hereof and shall be true and accurate as of the date of Closing.  <u>If in any respect such representation shall not be true and accurate prior to Closing, the undersigned shall give immediate notice of such fact to the Managers of the Company</u>.

Dated: _6/27/2021_____

Very truly yours,

_Paul Martinchuk_____
Print Name of Investor

_____
Print Name of joint investor or other person
whose signature is required

_PAUL MARTINCHUK_____
—9D9A1DAC6F26494...
Signature

_____
Signature

_____
Print Title (if applicable)

_____
Print Title (if applicable)

Prospective Purchaser Questionnaire

## EXHIBIT A

**Rule 501.  Definitions and Terms Used in Regulation D.**

As used in Regulation D, the following terms have the meanings indicated:

(a)  **Accredited Investor.**  "Accredited Investor" shall mean any person who comes within any of the following categories, or who the issuer reasonably believes comes within any of the following categories, at the time of the sale of the securities to that person:

(1)  Any bank as defined in section 3(a)(2) of the Act or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Act whether acting in its individual or fiduciary capacity; any broker dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934; insurance company as defined in Section 2(13) of the Act; investment company registered under the Investment Company Act of 1940 or a business development company as defined in Section 2(a)(48) of that Act; Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958; employee benefit plan within the meaning of Title I of the Employee Retirement Income Security Act of 1974, if the investment decision is made by a plan fiduciary, as defined in Section 3(21) of such Act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000; or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors;

(2)  Any private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940;

(3)  Any organization described in Section 501(c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000;

(4)  Any director, executive officer, or general partner of the issuer of the securities being offered or sold, or any director, executive officer, or general partner of a general partner of that issuer;

(5)  Any natural person whose individual net worth, or joint net worth with that person's spouse, at the time of his purchase exceeds $1,000,000 at the time of the purchase, excluding the value of the primary residence of such person;

(6)  Any natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year;

(7)  Any trust with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in Rule 506(b)(2)(ii); and

(8)  Any entity in which all of the equity owners are accredited investors.

[*Remainder omitted*]

## *EXHIBIT C*

SUBSCRIPTION AGREEMENT

# SUBSCRIPTION AGREEMENT
## FOR
## 03 CARBON CAPTURE, LP
### a Texas Limited partnership

THIS SUBSCRIPTION AGREEMENT (the "Agreement") is made by and among 03 CARBON CAPTURE, LP, a Texas limited partnership (the "Company"), and the individuals and/or entities purchasing Units hereunder (individually, a "Subscriber" and collectively, the "Subscribers").

WHEREAS, the Company desires to issue Partnership Interests in the Company (the "Offering) at a price of $1,000 per Unit to certain accredited investors ("Accredited Investor(s)"), as that term is defined in Rule 501 of Regulation D as promulgated under the Securities Act of 1933, as amended (the "Act");

WHEREAS, the Subscriber has been furnished with a copy of the offering documents, including this Agreement, the Private Placement Memorandum, the Company's Partnership Agreement, Business Plan, and the Prospective Purchaser Questionnaire, as the same may have been amended or supplemented from time to time (collectively, the "Offering Documents"); and

WHEREAS, the Subscriber desires to purchase that value of Partnership Interest of the Company set forth on the signature page hereof on the terms and conditions set forth herein.

WHEREAS, any capitalized terms not defined in this Agreement shall have the same meaning as the definition contained in the Company's Partnership Agreement provided contemporaneously with this Agreement.

NOW, THEREFORE, in consideration of the mutual representations and covenants set forth herein, the parties agree as follows:

1.    Purchase and Sale of Units.

    1.1    Purchase of Units.  Subject to the terms and conditions of this Agreement, the Subscribers agree to purchase at the Closings (as defined below) and the Company agrees to sell and issue to the Subscribers at the Closings the Partnership Units. The Units issued to the Subscribers pursuant to this Agreement shall be referred to herein as the "Units."

    1.2    Company Reservation of Rights to Terminate or Deny.  The Company reserves the right to refuse all or part of any or all subscriptions. Furthermore, no Subscription Agreement shall be effective until accepted and executed by the Company and the Company shall have the right, in its sole discretion, for any reason or for no reason, to refuse any potential Subscribers.

2.     <u>Closing and Delivery</u>.  The purchase price for the Units is payable by check or wire transfer payable to the Company or its designee in an amount equal to the applicable purchase price per unit multiplied by the number of Units being purchased by such Subscriber.

3.     <u>Representations and Warranties of the Company</u>.  The Company hereby represents and warrants to the Subscribers that:

3.1     <u>Organization, Good Standing and Qualification</u>.  The Company is a limited partnership duly organized, validly existing and in good standing under the laws of the state of Texas and has all requisite corporate power and authority to carry on its business as now conducted. The Company is duly qualified to transact business in each jurisdiction in which the failure so to qualify would have a material adverse effect on its business or properties.

3.2     <u>Authorization</u>.  All action on the part of the Company, its members and managers, necessary for the authorization, execution and delivery of this Agreement and the issuance of the Units, the performance of all obligations of the Company hereunder and thereunder has been taken or will be taken prior to the Closing, and this Agreement constitutes a valid and legally binding obligation of the Company, enforceable in accordance with its terms.

3.3     <u>Valid Issuance of Units</u>.  The Units, when issued, sold and delivered in accordance with the terms hereof for the consideration expressed herein or therein, will be duly and validly issued and fully-paid and non-assessable. Based in part upon the representations of the Subscribers in this Agreement and subject to the completion of the filings referenced in Section 3.4 below, the Units will be issued in compliance with all applicable federal and state securities laws.

3.4     <u>Governmental Consents</u>.  No consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any federal, state or local governmental authority on the part of the Company is required in connection with the consummation of the transactions contemplated by this Agreement, except for the federal and state securities law filings to be made by the Company as necessary.

3.5     <u>Litigation</u>.  There is no action, suit, proceeding or investigation pending or currently threatened against the Company that questions the validity of this Agreement, or the right of the Company to enter into this Agreement, or to consummate the transactions contemplated hereby, or that might result, either individually or in the aggregate, in any material adverse changes in the assets, condition, affairs or prospects of the Company, financially or otherwise, or any change in the current equity ownership of the Company, nor is the Company aware that there is any basis for the foregoing. The Company is not a party or subject to the provisions of any order, writ, injunction, judgment or decree of any court or government agency or instrumentality. There is no action, suit, proceeding or investigation by the Company currently pending or which the Company intends to initiate.

3.6     <u>Compliance with Other Instruments</u>.  The Company is not in violation or default of any provisions of its Certificate of Formation or Partnership Agreement or of any instrument, judgment, order, writ, decree or contract to which it is a party or by which

it is bound or, to its knowledge, of any provision of federal or state statute, rule or regulation applicable to the Company. The execution, delivery and performance of this Agreement, and the consummation of the transactions contemplated hereby, will not result in any such violation or be in conflict with or constitute, with or without the passage of time and giving of notice, either a default under any such provision, instrument, judgment, order, writ, decree or contract or an event which results in the creation of any lien, charge or encumbrance upon any assets of the Company.

3.7 <u>Disclosure</u>. The forward-looking statements, including financial projections, contained in the Offering Documents were prepared in good faith; however, the Company does not warrant that such statements will ultimately become true. In addition to the foregoing, the Company restates as if rewritten herein the risk factors set forth in Private Placement Memorandum.

4. <u>Representations and Warranties of the Subscribers</u>. Each Subscriber hereby severally and not jointly represents and warrants to the Company that:

4.1 <u>Risk</u>. The Subscriber recognizes that the purchase of Units involves a high degree of risk in that (i) the Company has no operating history; (ii) an investment in the Company is highly speculative, and only investors who can afford the loss of their entire investment should consider investing in the Company and the Units; (iii) the Subscriber may not be able to liquidate his, her or its investment; (iv) transferability of the Units is extremely limited; and (v) in the event of a disposition, the Subscriber could sustain the loss of his, her or its entire investment.

4.2 <u>Investment Experience</u>. The Subscriber hereby acknowledges and represents that the Subscriber has prior investment experience, including investment in non-listed and unregistered securities, or the Subscriber has employed the services of an investment advisor, attorney and/or accountant to read all of the documents furnished or made available by the Company both to the Subscriber and to all other prospective investors in the Units and to evaluate the merits and risks of such an investment on the Subscriber's behalf.

4.3 <u>Due Diligence</u>. The Subscriber hereby acknowledges receipt and careful review of the Offering Documents, as supplemented and amended, and the attachments and exhibits thereto all of which constitute an integral part of the Offering Documents, and hereby represents that the Subscriber has been furnished by the Company during the course of this transaction with all information regarding the Company which the Subscriber has requested or desired to know, has been afforded the opportunity to ask questions of and receive answers from duly authorized managers, officers or other representatives of the Company concerning the terms and conditions of the offering and has received any additional information which Subscriber has requested. The Subscriber acknowledges that the Subscriber is relying upon the Offering Documents and not relying upon any prior documents prepared by the Company.

4.4 <u>Protection of Interests; Exempt Offering</u>. The Subscriber hereby represents that the Subscriber either by reason of the Subscriber's business or financial experience or the business or financial experience of the Subscriber's professional advisors (who are

unaffiliated with and who are not compensated by the Company or any affiliate of the Company, directly or indirectly) has the capacity to protect the Subscriber's own interests in connection with the transaction contemplated hereby. The Subscriber hereby acknowledges that the offering has not been reviewed by the United States Securities and Exchange Commission (the "SEC") because of the Company's representations that this is intended to be exempt from the registration requirements of Section 5 of the Act. The Subscriber agrees that the Subscriber will not sell or otherwise transfer the Units unless they are registered under the Act or unless an exemption from such registration is available.

4.5    Investment Intent.  The Subscriber understands that the Units have not been registered under the Act by reason of a claimed exemption under the provisions of the Act, which depends, in part, upon the Subscriber's investment intention. In this connection, the Subscriber hereby represents that the Subscriber is purchasing the Units for the Subscriber's own account for investment and not with a view toward the resale or distribution to others. The Subscriber, if an entity, was not formed for the purpose of purchasing the Units.

4.6    Restricted Units.   The Subscriber understands that there currently is no public market for any of the Units and that even if there were, Rule 144 promulgated under the Act requires, among other conditions, a one-year holding period prior to the resale (in limited amounts) of securities acquired in a non-public offering without having to satisfy the registration requirements under the Act. The Subscriber understands and hereby acknowledges that the Company is under no obligation to register the Units under the Act or any state securities or "blue sky" laws. The Subscriber consents that the Company may, if it desires, permit the transfer of the Units out of the Subscriber's name only when the Subscriber's request for transfer is accompanied by an opinion of counsel reasonably satisfactory to the Company that neither the sale nor the proposed transfer results in a violation of the Act or any applicable state "blue sky" laws (collectively, the "Securities Laws"). The Subscriber agrees to hold the Company and its members, managers, officers, employees, controlling persons and agents and their respective heirs, representatives, successors and assigns harmless and to indemnify them against all liabilities, costs and expenses incurred by them as a result of any misrepresentation made by the Subscriber contained in this Agreement or any sale or distribution by the Subscriber in violation of the Securities Laws. The Subscriber understands and agrees that in addition to restrictions on transfer imposed by applicable Securities Laws, the transfer of the Units will be restricted by the terms of the Offering Documents.

4.7    Legends.  The Subscriber consents to the placement of a legend on any certificate or other document evidencing the Units that such Units have not been registered under the Act or any state securities or "blue sky" laws and setting forth or referring to the restrictions on transferability and sale thereof contained in this Agreement. The Subscriber is aware that the Company will make a notation in its appropriate records with respect to the restrictions on the transferability of such Units and may place additional legends to such effect on Subscriber's unit certificate(s).

4.8    Rejection.  The Subscriber understands that the Company will review this Agreement and that the Company reserves the unrestricted right to reject or limit any subscription and to close the offering to the Subscriber at any time.

4.9    Address.    The Subscriber hereby represents that the address of the Subscriber furnished by the Subscriber on the signature page hereof is the Subscriber's principal residence if the Subscriber is an individual or its principal business address if it is a corporation or other entity.

4.10    Authority.    The Subscriber represents that he, she or it has full power and authority (corporate, statutory and otherwise) to execute and deliver this Agreement and to purchase the Units. This Agreement constitutes the legal, valid and binding obligation of the Subscriber, enforceable against the Subscriber in accordance with its terms.

4.11    Entity.    If the Subscriber is a corporation, company, trust, employee benefit plan, individual retirement account, Keogh Plan, or other tax-exempt entity, it is authorized and qualified to become an investor in the Company and the person signing this Agreement on behalf of such entity has been duly authorized by such entity to do so.

4.12    Foreign Investors.    If the Subscriber is not a United States citizen, such Subscriber hereby represents that he/she/it has satisfied itself as to the full observance of the laws of its jurisdiction in connection with any invitation to subscribe for the Units or any use of this Agreement, including (i) the legal requirements within its jurisdiction for the purchase of the Units, (ii) any foreign exchange restrictions applicable to such purchase, (iii) any governmental or other consents that may need to be obtained, and (iv) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale, or transfer of the Units. Such Subscriber's subscription and payment for, and his, her or its continued beneficial ownership of the Units, will not violate any applicable securities or other laws of the Subscriber's jurisdiction.

5.    Limitations on Transfer.

5.1    The Units are restricted as to transfer by the terms of the Partnership Agreement and as set forth in this Agreement.

6.    Miscellaneous.

6.1    Survival of Representations and Warranties.    The warranties, representations and covenants of the Company contained in or made pursuant to this Agreement shall survive the execution and delivery of this Agreement and the Closing for a period of one (1) year following the last Closing.

6.2    Governing Law.    NOTWITHSTANDING THE PLACE WHERE THIS AGREEMENT MAY BE EXECUTED BY ANY OF THE PARTIES HERETO, THE PARTIES EXPRESSLY AGREE THAT ALL THE TERMS AND PROVISIONS HEREOF SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF TEXAS WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.

6.3    Counterparts.    This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

DocuSign Envelope ID: 69B058C0-33EE-4C98-80DC-1FAB66CD65A2

6.4    <u>Titles and Subtitles</u>.  The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

6.5    <u>Notices</u>.

(a)    All notices, requests, demands and other communications under this Agreement or in connection herewith shall be given to or made upon the respective parties as follows:  if to the Subscribers, to the addresses set forth on the signature page hereto, or, if to the Company, c/o Freedom Impact Consulting, Manager 977 Carol Circle, West Chester, PA 19380.

(b)    All notices, requests, demands and other communications given or made in accordance with the provisions of this Agreement shall be in writing, and shall be sent by certified or registered mail, return receipt requested, or by overnight courier, and shall be deemed to be given or made when receipt is so confirmed.

(c)    Any party may, by written notice to the other, alter its address or respondent, and such notice shall be considered to have been given ten (10) days after the airmailing, telexing or telecopying thereof.

6.6    <u>Brokers</u>.

(a)    Each Subscriber severally represents and warrants that it has not engaged, consented to or authorized any broker, finder or intermediary to act on its behalf, directly or indirectly, as a broker, finder or intermediary in connection with the transactions contemplated by this Agreement. Each Subscriber hereby severally agrees to indemnify and hold harmless the Company from and against all fees, commissions or other payments owing to any such person or firm acting on behalf of such Subscriber hereunder. The Company will pay finder's fees only in compliance with applicable law.

(b)    The Company agrees to indemnify and hold harmless the Subscribers from and against all fees, commissions or other payment owing by the Company to any other person or firm acting on behalf of the Company hereunder.

6.7    <u>Expenses</u>.  If any action at law or in equity is necessary to enforce or interpret the terms of this Agreement, the prevailing party shall be entitled to reasonable attorney's fees, costs and necessary disbursements in addition to any other relief to which such party may be entitled.

6.8    <u>Third Parties</u>.  Nothing in this Agreement shall create or be deemed to create any rights in any person or entity not a party to this Agreement.

6.9    <u>Amendments and Waivers</u>.  Any term of this Agreement may be amended and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively), only with the written consent

DocuSign Envelope ID: 69B058C0-33FE-4C98-90DC-1FAB66CD65A2

of the Company and Subscribers holding a majority in interest of the Units purchased in the offering.

6.10    <u>Severability</u>.  If one or more provisions of this Agreement are held to be unenforceable under applicable law, such provision shall be excluded from this Agreement and the balance of the Agreement shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.

6.11    <u>Entire Agreement</u>.  This Agreement, the Offering Documents and the Prospective Investor Questionnaire constitutes the entire agreement between the parties hereto pertaining to the subject matter hereof, and any and all other written or oral agreements existing between the parties hereto are expressly canceled.

**SIGNATURE PAGE FOLLOWS**

[SUBSCRIBER PAGE FOR INDIVIDUALS]

I hereby agree to make a cash contribution in the sum of  $ ███████_____ as my
initial capital contribution to the Company, which represents funds needed for the operations of
the Company.

**SUBSCRIBER:**

Paul Martinchuk
_____
(Print or Type Name of Subscriber)

PAUL MARTINCHUK
—9D9A1DAC6F26494...
_____          _____
(Signature)                       (Second Signature, if subscribing jointly)

Address: ███████████████
███████████
Telephone: ███████████
Email: ███████████
Social Security#: █ ██ █

All the information that I consider necessary and appropriate for deciding whether to purchase the
interest hereunder has been provided to me, and, I have had an opportunity to ask questions and
receive answers from the Company to verify the accuracy of the information supplied or to which
I had access. I acknowledge that I am solely responsible for my own "due diligence" investigation
of the Company, for my own analysis of the merits and risks of my own investment made pursuant
to this purchase and for my own analysis of the fairness and desirability of the terms of this
investment. I hereby acknowledge that the investment is a speculative investment. I represent that
I have such knowledge and experience in financial business matters and that I am capable of
evaluating the merits and risks of the investment contemplated hereunder and that I have the ability
to risk losing my entire investment.

## [SUBSCRIBER PAGE FOR ENTITIES/TRUSTS]

The subscriber below hereby agree to make a cash contribution in the sum of $_____ as subscriber's initial capital contribution to the Company, which represents funds needed for the operations of the Company.

**SUBSCRIBER:**

_____
(Print or Type Name of Subscriber)

_____           _____
(Print or Type Name of Signatory)            (Print or Type Name of Second Signatory, if
                                             applicable)

_____           _____
(Signature)                                  (Second Signature, if applicable)

_____           _____
(Title of Signatory)                         (Title of Second Signatory, if applicable)

Address: _____
_____
Telephone: _____
Facsimile: _____
Tax I.D.#: _____

All the information that I consider necessary and appropriate for deciding whether to purchase the interest hereunder has been provided to me, and, I have had an opportunity to ask questions and receive answers from the Company to verify the accuracy of the information supplied or to which I had access. I acknowledge that I am solely responsible for my own "due diligence" investigation of the Company, for my own analysis of the merits and risks of my own investment made pursuant to this purchase and for my own analysis of the fairness and desirability of the terms of this investment. I hereby acknowledge that the investment is a speculative investment. I represent that I have such knowledge and experience in financial business matters and that I am capable of evaluating the merits and risks of the investment contemplated hereunder and that I have the ability to risk losing my entire investment.

[SUBSCRIBER PAGE FOR IRAs]

The subscriber below hereby agree to make a cash contribution in the sum of $_____ as subscriber's initial capital contribution to the Company, which represents funds needed for the operations of the Company.

**SUBSCRIBER:**

_____
(Print or Type Name of Subscriber)


_____          _____
(Print or Type Name of Signatory)          (Print or Type Name of Second Signatory, if
                                            applicable)



_____          _____
(Signature)                                (Second Signature, if applicable)


<u>IRA CUSTODIAN</u>
(Title of Signatory)

Address: _____
_____
_____
Telephone: _____
Facsimile: _____
Tax I.D.#: _____

All the information that I consider necessary and appropriate for deciding whether to purchase the interest hereunder has been provided to me, and, I have had an opportunity to ask questions and receive answers from the Company to verify the accuracy of the information supplied or to which I had access. I acknowledge that I am solely responsible for my own "due diligence" investigation of the Company, for my own analysis of the merits and risks of my own investment made pursuant to this purchase and for my own analysis of the fairness and desirability of the terms of this investment. I hereby acknowledge that the investment is a speculative investment. I represent that I have such knowledge and experience in financial business matters and that I am capable of evaluating the merits and risks of the investment contemplated hereunder and that I have the ability to risk losing my entire investment.

///

This Subscription Agreement is agreed to and accepted as of <u>6/25/2021</u>, 2021.

**03 CARBON CAPTURE, LP**
a Texas limited partnership
*by*: Freedom Impact Consulting, LLC
*its*: Manager

DocuSigned by:

*Eric N Shelly, Manager*

Eric N Shelly, Manager

## *EXHIBIT D*

BUSINESS PLAN



# Clean Energy Technology Investment Opportunity

## $CO_2$ *TRANSMISSION* Pipeline and $CO_2$ *NOMAD* Mobile Carbon Capture Technology

# 03 Carbon Capture LP





INVESTMENT OPPORTUNITY PRESENTED BY




## Disclaimer

*General Disclaimer*

This Business Plan contains privileged and confidential information and unauthorized use of this information in any manner is strictly prohibited. If you are not the intended recipient, please notify the sender immediately. This Business Plan is for informational purposes and not intended to be a general solicitation or a securities offering of any kind. The information contained herein is from sources believed to be reliable, however no representation by Sponsor(s), either expressed or implied, is made as to the accuracy of any information on this property and all investors should conduct their own research to determine the accuracy of any statements made. An investment in this offering will be a speculative investment and subject to significant risks and therefore investors are encouraged to consult with their personal legal and tax advisors. Neither the Sponsor(s), nor their representatives, officers, employees, affiliates, sub-contractor or vendors provide tax, legal or investment advice. Nothing in this document is intended to be or should be construed as such advice.

The SEC has not passed upon the merits of or given its approval to the securities, the terms of the offering, or the accuracy or completeness of any offering materials. However, prior to making any decision to contribute capital, all investors must review and execute the Private Placement Memorandum and related offering documents. The securities are subject to legal restrictions on transfer and resale and investors should not assume they will be able to resell their securities

Potential investors and other readers are also cautioned that these forward-looking statements are predictions only based on current information, assumptions and expectations that are inherently subject to risks and uncertainties that could cause future events or results to differ materially from those set forth or implied by such forward looking statements. These forward-looking statements can be identified by the use of forward-looking terminology, such as "may," "will," "seek," "should," "expect," "anticipate," "project, "estimate," "intend," "continue," or "believe" or the negatives thereof or other variations thereon or comparable terminology. These forward-looking statements are only made as of the date of this executive summary and Sponsors undertake no obligation to publicly update such forward-looking statements to reflect subsequent events or circumstances.

*Financial Disclaimer*

This Business Plan further contains several future financial projections and forecasts. These estimated projections are based on numerous assumptions and hypothetical scenarios and Sponsor(s) explicitly makes no representation or warranty of any kind with respect to any financial projection or forecast delivered in connection with the Offering or any of the assumptions underlying them.

This Business plan further contains performance data that represents past performances. Past performance does not guarantee future results. Current performance may be lower or higher than the performance data presented.

All return examples provided are based on assumptions and expectations in light of currently available information, industry trends and comparisons to competitor's financials. Therefore, actual performance may, and most likely will, substantially differ from these projections and no guarantee is presented or implied as to the accuracy of specific forecasts, projections or predictive statements contained in this Business Plan. The Sponsor further makes no representations or warranties that any investor will, or is likely to, achieve profits similar to those shown in the pro-formas or other financial projections.

DocuSign Envelope ID: 69B058C9-37EF-4690-99DC-1FAB56CD6BA2

# 03 Carbon Capture LP Business Plan

**Partnership**

03 Carbon Capture LP (03CC) is a partnership created to own and operate a package of Mobile $CO_2 TRANSMISSION$ Pipeline Units and $CO_2 NOMAD$ Units as shown in the chart below. These Carbon Capture units will be leased to a natural gas producer to remove $CO_2$ from gas streams at the wellsite and at the transmission pipelines. These two Carbon Capture units represent patented technology designed and developed by CETA (Clean Energy Technology Association Inc). The $CO_2 NOMAD$ Units are mounted on a single tractor trailer bed and is designed to be attached directly to a gas well. The $CO_2 TRANSMISSION$ Pipeline Units are mounted on 2 tractor trailer beds and are designed to be attached to 9-inch transmission pipelines. The $CO_2 TRANSMISSION$ Pipeline Units have a processing capacity of 3.5 times the $CO_2 NOMAD$ Units. The use of this equipment on site at the well or the transmission pipeline will save the producer the cost of transporting gas for processing. Both Carbon Capture units use a proprietary solvent, CETA$Solve^{TM}$, to absorb the $CO_2$. The saturated CETA$Solve^{TM}$ can then be used for enhanced oil recovery. This is a disruptive new technology that will change the way that natural gas will be processed.

03 Carbon Capture LP will receive revenue from a lease agreement with the gas well and pipeline operator for the $CO_2$ removal. It will also receive a percentage of additional oil and gas revenue from the gas or oil producers using our saturated solvent for enhanced oil and gas recovery (EOR). The Project is governed by an operating contract run by CETA.

**Equipment Package for 03 Carbon Capture LP**

| Type of Unit | # of Units | Cost | total |
|---|---|---|---|
| $CO_2 TRANSMISSION$ Pipeline | 2 | $1,500,000 | $3,000,000 |
| $CO_2 NOMAD$ | 2 | $1,140,000 | $2,280,000 |
| Totals | | | $5,280,000 |

**Lending Package for 03 Carbon Capture LP**

| Equipment Cost | Deposit | Loan amount | Interest | Quarterly Payment |
|---|---|---|---|---|
| $5,280,000 | $2,112,000 | $3,168,000 | 3 years @ 8.5% | $300,017.88 |

**Operator Contract and Revenue**

In addition to purchasing the equipment, 03CC will enter into an operating contract with CETA to manage the various processes involved in this project. This contract will be the source of revenue for 03CC. CETA will operate the various processes as described below in the operation section. CETA will earn revenue through the operation of these processes. The revenue will be shared with the fund with the following split. The fund will receive 65% of the profit until it has received 1.5x of its original investment or $7,920,000. After that it will receive 50% of profit until it has received 2X of its original investment or $10,560,000. After that it will receive 35% of the profit until the equipment reaches its useful life and there is no more revenue.

**Waterfall Revenue Split Chart**
**03CC – 65% / CETA** – 35% until 03CC receives 1.5X of the original investment in revenue
**03CC – 50% / CETA** – 50% until 03CC receives 2.0X of the original investment in revenue
**03CC – 35% / CETA** – 65% for the remaining life of the equipment

**Revenue Shares, Leverage, and Tax Benefit**

On this project, the revenue from 2 Transmission pipeline units and the 2 Nomad units will be split between the manager and 5 other investors. We will be borrowing 60% of the cost off the equipment from the Lender (CETA) at 8.5% for 3 years paid quarterly. The manager reserves the right to refinance the loan if better financing becomes available.

The first investor will contribute 1,056,000 of the capital for the down payment of the equipment and will sign a guarantee for 2,640,000 against the promissory note in order to qualify for the tax deduction against ordinary income of 2,640,000. The remaining four investors will each contribute 264,000 of the capital for the down payment of the equipment and will each sign a personal guarantee for 660,000 against the promissory note in order to qualify for the tax deduction against ordinary income of 660,000. The 2.64x loan exposure and the unlimited liability of being a general partner of 03CC is what should allow each investor to maximize his or her tax benefits.

The revenue on this project will be treated as follows. After receiving the revenue from CETA base on the waterfall split chart above, the loan payment will be made to Lender first (CETA). After that the revenue will be split 75% to the 5 investors and 25% to the manager. Please refer to the proforma below for the amounts projected for each investor and the manager

**The following Proforma estimates 12 years of revenue.**

| ceta loan 8.5% term 3years | | cost | deposit | loan | month pay | ann payment | | | |
|---|---|---|---|---|---|---|---|---|---|
| transmissions. Cost $1,500,000 | 2 | $3,000,000 | $1,200,000 | $1,800,000 | $28,410 | $681,840 | | | |
| nomads  cost 1,140,000 | 2 | $2,280,000 | $912,000 | $1,368,000 | $21,592 | $518,208 | | | |
| | | $5,280,000 | $2,112,000 | $3,168,000 | $50,002 | $1,200,048 | | | |
| **Package Nomad/Transmission** | 1 | 2 | 3 | 4 | 5 | 6 | yr 7-14 | 15 | |
| tot.lease and oil rev. 1 co2 units | 3,873,244 | 3,517,120 | 2,572,520 | 2,384,850 | 2,282,128 | 2,095,264 | " " | 2,095,264 | $35,582,502 |
| less loan payment11657/mon | 1,200,048 | 1,200,048 | 1,200,048 | | | | | | $3,600,144 |
| investor 75% split | 2,004,897 | 1,737,804 | 1,029,354 | 1,788,638 | 1,711,596 | 1,571,448 | " " | 1,571,448 | $23,986,769 |
| investor 1 | 250,612 | 217,226 | 128,669 | 223,580 | 213,950 | 196,431 | " " | 196,431 | $2,998,346 |
| investor 2 | 250,612 | 217,226 | 128,669 | 223,580 | 213,950 | 196,431 | " " | 196,431 | $2,998,346 |
| investor 3 | 250,612 | 217,226 | 128,669 | 223,580 | 213,950 | 196,431 | " " | 196,431 | $2,998,346 |
| investor 4 | 250,612 | 217,226 | 128,669 | 223,580 | 213,950 | 196,431 | " " | 196,431 | $2,998,346 |
| investor 5 | 1,002,449 | 868,902 | 514,677 | 894,319 | 855,798 | 785,724 | " " | 785,724 | $11,993,384 |
| manager 25% split | 668,299 | 579,268 | 343,118 | 596,213 | 570,532 | 523,816 | " " | 523,816 | $7,995,590 |
| **investor coc return based on 2,112,000K i** | 83.5% | 72.4% | 42.9% | 74.5% | 71.3% | 65.5% | " " | 65.5% | |
| avg annual return | 75.7% | | | | | | | | |
| avg annual return with tax benefit | 81.5% | | | | | | | | |
| Tax benefit (5,280,00 X .35% = 1,848,000) | | | | | | | | | |

**Tax benefits summary[1]**

- 100% investment is deductible against ordinary income in year 1
- With the 60% leverage, the full bonus depreciation should be as follows: $2,112,000K investment would yield $5,280,000K in bonus depreciation.
- there is an annual 15% depletion allowance on the solvent, oil, and gas revenue. This benefit will be allocated to the managing partner's share to offset project expenses.

**Operation**

The operating agreement with CETA is the source of revenue for the project. In this section we will explain how the revenue is calculated. First, there is a service fee of $20 per barrel based on daily usage rates and number of days of operation per quarter. Next, the baseline enhanced oil recovery revenue is calculated based on the average daily usage of CETA*Solve*™ barrels. The cost of a CETA*Solve*™ barrel is $73.50 and a barrel of saturated CETA*Solve*™ is sold for $96.50 which sets the baseline of the project's percentage of enhanced oil and gas production. Each $CO_2$ saturated CETA*Solve*™ barrel for enhanced oil recovery derives a baseline revenue of $23 per barrel. Additionally, every six months the project receives the percentage of enhanced recovery revenue earned above the baseline percentage.

There are several factors that will affect the baseline revenue. The number of barrels used per quarter will vary. The concentration of $CO_2$ in the gas stream will determine the usage rate of CETA*Solve*™. We will experience set-up and deployment time in our first quarter which will affect revenue. Normally, the equipment is operating an average of 81 days per quarter once the unit has been fully deployed. The saturated CETA*Solve*™ can also be recycled more than once in the enhanced oil and gas recovery process which also affect the revenue.

**CETA's Lease/Management Agreement**

There are several pieces to the full operation of the CETAs lease/management agreement. The following describes the lease/management agreement and establishes a working interest in the oil production. The agreement establishes 03CC's ownership of all resources from the beginning to the end of the process. An opinion letter from Provision's Tim Gertz on one of our prior funds using CO$_2$TRANSMISSION units provides information on how the various provisions in the tax code apply to this project.

**Tax Treatment**

The following paragraphs discuss the tax codes that pertain to this deal to share with your accountant and tax professional excerpted from one of our other fund documents.

**Background**: Freedom Energy Fund, LP currently has an executed ground lease to extract coal, oil, gas, and liquid hydrocarbons for a designated fee. This work is being completed via a working interest contract with CETA. Under this contract the taxpayer is responsible and has the burden of all operating expenses. The working interest agreement further assigns the Limited Partnership an undivided interest in all oil and gas sales.

**Law**: Section 469(c)(3) exempts "any working interest in any oil or gas property which the taxpayer holds directly or through an entity which does not limit the liability of the taxpayer with respect to such interest" from being considered a "passive activity." Further, Sec. 469(c)(4) states that the prior sentence "shall be applied without regard to whether or not the taxpayer materially participates in the activity."

Additionally, Under Reg § 1.469-1(e)(4)(iv) a working interest in oil or gas property is defined by reference to the depletion rules. These rules cover "minerals in place," including ores of metals, coal, oil, gas, and all other natural metallic and nonmetallic deposits.

**CETA's Lease/Management Agreement cont.**

This transaction will start with a coal lease on properties in Montana, assigned to the investment group. Then an operating/management agreement will be in place for CETA and Westmoreland to handle the mining operation for this solvent rich, raw coal. The coal is then contractually shipped to Fairfield, Texas by truck or rail with BNSF.

03 Carbon Capture (03CC) and team will have an agreement with CETA to operate and process the coal for them using coal distillation units also operated by CETA. As a processing fee to 03CC, CETA will be allowed to keep the other byproducts produced from the distillation process including heavy sweet shale oil, COALlite, and syngas. Note that CETA keep records of when coal is processed from our mines or other mines so we know what coal (and for whom) is subject to depletion for all concerned. In this case 03CC does not get the depletion allowance on the coal. 03CC continues to own the solvent that CETA has distilled and separated from the coal. The chain of ownership is never broken. 03CC's solvent is taken to West Texas to be used,

currently, in the Wolfcamp shale oil field. This solvent will be utilized initially to capture $CO_2$ out of pipelines to make the gas stream more marketable by capturing over 85 to 92.5% of the $CO_2$. The $CO_2$ is then absorbed into the solvent which 03CC still owns. Using 03CC' Carbon Capture equipment with 03CC's solvent, this capture and absorption process is contractually operated for 03CC by CETA. Under the lease agreement, they are paid a fee for this $CO_2$ capture and absorption. 03CC will have a Bill of Sale to show ownership of the Carbon Capture equipment.

The Solvent with $CO_2$ captured and absorbed is then is reinjected into oil and gas wells to improve production in that same geographic area. There will also be an operating agreement with CETA to inject into the wells on behalf of 03CC and team. In return, 03CC and team will get a percentage of owned production from the injected wells that they are to be paid a flat amount per barrel based on this economic model.

So 03CC owns the solvent all the way through the process, owns the equipment subject to a revenue sharing Memo with CETA on profit split, owns an interest in the added production from the wells that their $CO_2$ embedded solvent is injected, and has operating agreements on both ends, and has marketable shale oil product ownership for sale.

These operating agreements gives 03CC liability exposure and participation in the decisions so that 03CC's transaction with CETA should qualify for both a working interest, equipment write offs for depreciation, and some depletion on the percentage of solvent and oil product generated from the wells in which they participate.

**Refurbishing Equipment**

In order to be able to refurbish the equipment at the end of its serviceable life, the manager and investors may decide to retain 10,000 as a reserve every quarter. The cost of refurbishing the equipment is about 500,000 of today's dollars. We will have about 500,000 at the end of 5 years if we contribute to reserve at this pace. We could purchase gold bullion or cryptocurrency with this reserve contribution (with the investors approval) to preserve the value of this capital. This may reduce the amount of contributions we make. This reserve contribution will be at the discretion of the manager.

**Summary**

To summarize, the capital raised by 03CC will purchase a package of Mobile $CO_2 TRANSMISSION$ Pipeline Units and $CO_2 NOMAD$ Units and allow participation in an operating agreement managed by CETA. The investment will include a 60% leveraged loan and credit line. If there are deposits required to order the equipment, the investor will contribute enough capital to cover all interest payments to the credit line until it is converted to a 3-year term 8.5% loan. This capital will be kept in investors capital account. The management reserves the right to refinance the loan if better financing becomes available. Through the management agreement 03CC will share revenue with CETA in a 65%, 50%, 35% split as previously described. Finally, because of the structure of the lease/management agreement with CETA as

operator and the ownership of the equipment and the other means of production, Shareowners of 03CC will receive substantial tax benefits against ordinary income.[1]

---

[1] Please check with your tax and legal professional as Sponsors do not provide tax or legal advice and the above is not intended to or should be construed as such advice.  Your specific circumstances may, and likely will, vary.



**WIRING INSTRUCTIONS**

Bank Name: Citizens & Northern Bank
Bank Address: 90-92 Main Street Wellsboro, PA 16901
Bank Routing #: 031308302
Beneficiary's Name – 03 Carbon Capture
Beneficiary's Account # ████3285
Fund address: 977 Carol Cir, West Chester, PA 19380



Investors

Bill of sale
Units 37,38 are allocated to Paul Martinchuk and █████████████
Units 39, 40 are allocated to █████████████████████████

---

📄 **03 Carbon Capture LP Bill of Sale (Executed by RWH).pdf**
346K

**NOTICE OF CONFIDENTIALITY RIGHTS:  IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

## BILL OF SALE

**Date:**  June 30th, 2021

**Seller:**         **CLEAN ENERGY TECHNOLOGY ASSOCIATION, INC., a Texas corporation**

**Seller's Mailing Address:**

129 East Commerce Street
Fairfield, Texas 75840

**Buyer:**  03 CARBON CAPTURE, L.P.

**Buyer's Mailing Address:** 977 Carol Cir.

West Chester, PA 19380-4111

**Consideration - Sales Price of $5,280,000.00**

Cash of $2,112,000.00 and a note executed by Buyer and payable to the order of Seller in the principal amount of **THREE MILLION, ONE HUNDRED SIXTY-EIGHT THOUSAND 00/100 DOLLARS ($3,168,000.00)** The note is secured by a first and superior vendor's lien and superior title retained in this Bill of Sale in favor of Seller and by a Security Agreement executed by Buyer in favor of Seller.

**Transferred Properties:**
CO2 Unit # 2021-PIL-CO2-37
CO2 Unit # 2021-Nomad-CO2-38
CO2 Unit # 2021-Nomad-CO2-39
CO2 Unit # 2021-PIL-CO2-40

Page 1 of 3

**Exceptions to Transfer and Warranty**:

    None.

    Seller, for the Consideration and subject to the Reservations from Transfer and the Exceptions to Transfer and Warranty, sells, transfers, and delivers the Transferred Properties to Buyer, together with all and singular the rights and appurtenances thereto in any way belonging, to have and to hold it to Buyer and Buyer's heirs, successors, and assigns forever. Seller binds Seller and Seller's heirs and successors to warrant and forever defend all and singular the Transferred Properties to Buyer and Buyer's heirs, successors, and assigns against every person whomsoever lawfully claiming or to claim the same or any part thereof when the claim is by, through, or under Seller but not otherwise, except as to the Reservations from Transfer and the Exceptions to Transfer and Warranty.

    As a material part of the Consideration for this sale, Seller and Buyer agree that Buyer is taking the Transferred Properties "AS IS" and that there are no representations, disclosures, or express or implied warranties except those contained in the purchase contract and this bill of sale. Buyer has not relied on any information other than Buyer's inspection and the representations and warranties expressly contained in the purchase contract and this bill of sale.

    When the context requires, singular nouns and pronouns include the plural.

Clean Energy Technology Association, Inc.

ROY W. HILL, President

STATE OF TEXAS

COUNTY OF FREESTONE

This instrument was acknowledged before me on ⟶July 1st⟵ , 2021, by
ROY W. HILL, as the President of CLEAN ENERGY TECHNOLOGY ASSOCIATION, INC.,
a Texas corporation, on behalf of said corporation.



Notary Public, State of Texas
My commission expires: 1 – 22 – 2022

Page 3 of 3

**Freedom Impact Consulting**



support@freedomimpactconsulting.com

Dear Paul,

We appreciate your trust in us to help make your financial goals a reality by managing your investments.

As a follow-up to your recent distribution, this quarter's investment report is available to view below.

**Fund Scorecard for: 3 Carbon Capture LP**
**Equipment In Service Date    08/20/21**
**Statement for Quarter Ended:    03/31/23**

| | Original Invested | Activity This Quarter | | Activity Since Fund Inception | | Ending Balance |
|---|---|---|---|---|---|---|
| | Amount | Amount | % | Amount | % | Amount |
| **Fund Cash Flow Summary** | | | | | | |
| Production Revenue Earned from CETA | | $683,968 | | $3,919,832 | | |
| Debt Principal Paid | | ($260,784) | | ($1,483,112) | | |
| Bank Fees | | $0 | | ($105) | | |
| Interest Expense Paid | | ($41,685) | | ($331,705) | | |
| **Return Before Cash Reserve & FIC Profit Share** | | $381,499 | 18.1% | $2,104,910 | 99.7% | |
| FIC Cash | | $0 | | $105 | | |
| Cash Held in Reserve | | ($10,000) | | ($60,000) | | |
| FIC Profit Share | | ($92,875) | | ($511,254) | | |
| **Return After Cash Reserve & FIC Profit Share** | $2,112,000 | $278,624 | 13.2% | $1,533,761 | 72.6% | $578,239 |
| | | | | | | |
| **Fund Balance Sheet Summary** | | | | | | |
| Cash - Operations | $650 | $0 | | ($105) | | $545 |
| Cash - Reserves Held for Equipment Refurbishment | | $10,000 | | $60,000 | | $60,000 |
| Equipment, Net of Accumulated Depreciation | $5,280,000 | | | ($5,280,000) | | $0 |
| **Total Assets** | $5,280,650 | | | | | $60,545 |
| Accounts Payable - FIC | $650 | $0 | | | | $650 |
| Note Payable - CETA | $3,168,000 | ($260,784) | | ($1,483,112) | | $1,684,888 |
| Equity | $2,112,000 | $270,784 | | ($3,736,993) | | ($1,624,993) |
| **Total Liabilities & Equity** | $5,280,650 | | | | | $60,545 |



**CETA**

Innovative Energy Technologies

03 CARBON CAPTURE, L.P.
C/O DR. ERIC SHELLY
10579 SW 11TH TERRACE
OCALA, FL. 34476

|  | February 27, 2023<br>QUARTERLY ACCOUNTING SUMMARY |
|---|---|
| ITEM: | CO2 CAPTURE & USEAGE |
|  | PROGRAM |
| MONTH(S): | OCTOBER, NOVEMBER & DECEMBER 2022 |
| UNIT(S): | #2021 - PIL - UNITS 37 & 40 |
|  | #2021 - NOMAD - UNITS 38 & 39 |
| LOCATION: | FIELD |
| DAYS OF USAGE: | PIL 2 UNITS - 66 DAYS AVERAGE |
|  | NOMAD 2 UNITS- 65 DAYS AVERAGE |
| PRODUCTION PERCENTAGE AVERAGE | PIL $5,804.00 X 66 DAYS X 2 = $766,128.00 |
| PRICING FOR QUARTER PER DAY: | NOMADS $2,201.00 X 65 DAYS X 2 = $286,130.00 |
|  | $286,130.00 + $766,128.00 = $1,052,258.00 |
| GROSS VALUE: | $1,052,258.00 |
| OWNERSHIP INTEREST: | 65% |
| NET VALUE BEFORE NOTE PAYMENT: | $683,967.70 |
| NET VALUE DISPERSED AFTER  PAYMENT: | $381,499.00 |

NOTE CALCULATION APPLIED: $1,945,672.71 X 0.085% INTEREST= $165,382.18 / 365 DAYS = $453.10  X 92 DAYS = $41,685.20 TOTAL INTEREST. YOUR ACTUAL TOTAL NOTE PAYMENT IS $302,469.46. WE ARE DEDUCTING THE INTEREST DUE FOR THIS QUARTER OF $41,685.20 FROM TOTAL NOTE PAYMENT OF $302,469.46 LEAVING $260,784.26 TO APPLY TO PRINCIPAL. $302,469.46 - $41,685.20 = $260,784.26 PAYMENT ON CURRENT NOTE BALANCE. $1,945,672.71 - $260,784.26 = $1,684,888.45 PRINCIPAL NOTE BALANCE. $683,967.70 - $302,469.46  = $381,498.24 (ROUNDED TO $381,499.00)

**Clean Energy Technology Association, Inc**
123 East Commerce Street  •  Fairfield, Texas 75840  •  877.711.CETA (O)  •  903.389.4946 (F)
CETAenergy.com

App. 121

**FREEDOM IMPACT**
CONSULTING LLC

**Freedom Impact Consulting**
support@freedomimpactconsulting.com

# Paul Martinchuk

Investor Statement
January 1, 2023 - March 31, 2023

## Summary

|  | This Period | All Time |
|---|---|---|
| Distributions | $55,724.85 | $306,752.26 |
| Contributions | $0.00 | $422,400.00 |

## Transaction Details

| Date | Period | Investment | Investing Entity | Type | Contributions | Distributions |
|---|---|---|---|---|---|---|
| 3/6/23 | Dec 2022 | 03 Carbon Capture, LP | Paul Martinchuk | Preferred Return | -- | $55,724.85 |

## Current Positions

### 03 Carbon Capture, LP Details

| Investing Entity | Ownership | Committed | Contributions | Distributions | Unreturned Capital |
|---|---|---|---|---|---|
| Paul Martinchuk | 15.00% | $422,400.00 | $422,400.00 | $306,752.26 | $422,400.00 |
| **Total** | | **$422,400.00** | **$422,400.00** | **$306,752.26** | **$422,400.00** |

## Declaration of Paula C. Cohen

1. I, Paula C. Cohen, submit this declaration, to the best of my knowledge, pursuant to 28 U.S.C. § 1746, in response to a request for information from the staff of the Securities and Exchange Commission.

2. I am a Senior Paralegal in the Law Department at Exxon Mobil Corporation ("ExxonMobil"). I have been employed as a paralegal by ExxonMobil for more than 20 years.

3. As a paralegal in the litigation group, I routinely assist with the collection of documents for government requests or discovery purposes.

4. In March of 2023, ExxonMobil undertook reasonable efforts to search available records in various ExxonMobil systems to determine, for the period of January 1, 2018 through the present (the "date range"), whether Clean Energy Technology Association, Inc., Freedom Impact Consulting, Inc., Eric Shelly, or Roy Hill (the "entities/individuals") were listed as parties in technology agreements or contracts, or were listed as vendors or payees in invoices. No documents within the date range were located. However, in the course of the search described above, we located a Letter Agreement dated October 31, 2011, which is attached as Exhibit A.

5. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on March 27, 2023.

*Paula C. Cohen*

Paula C. Cohen
Senior Paralegal

# Exhibit A

## CONTRACT DESCRIPTION SHEET
## EMRE LAW DEPARTMENT

| | |
|---|---|
| **Contract Number:** | EM07395 |
| **Title:** | Letter Agreement for Sample Testing |
| **Parties:** | EMRE / Clean Energy Technology Association, Inc. (CETA) |
| **Related Names:** | |
| **Third Party's Country:** | |
| **ExxonMobil Signer:** | F. Emil Jacobs |
| **IP Team:** | |
| **Attorney:** | Paul E. Purwin |
| **Client Contact** (Agreement Owner): | Robert A. Crane |
| **Organizational Source:** | CSR |
| **Effective Date:** | November 7, 2011 |
| **Expiration Date:** | |
| **Confidentiality End Date:** | |
| **Destructive Review Date:** | |
| **Contract Type Code:** | B3 |
| **Original Contract (Y/N):** | Yes |
| **File Location / Subfolder:** (Filled in by CL Law File Room) | |
| **Related Documents / Agreements:** | |
| **Remarks:** (If necessary, attach "Supplemental Contract Document Description Sheet"): | |
| **Obligations List Attached:** | Yes: X |

**Approved by** _(signature)_

**All information is to be filled in by the attorney or administrative assistant. Before CD Sheet is released for distribution, it should be approved and initialed by the responsible attorney.**

ADDITIONAL DISTRIBUTION (Not entered into database):

To Law Files:  1 Sets (1 should be Original Document & Original CD Sheet) – 1 extra copy of CD Sheet
To Clinton:    1 copy CD Sheet and Original Obligations List to Peggy Harper – Clinton
To TS&L:       1 copy to R. J. Luick (when Royalty Payments/Fees are involved and Documents relating to Licenses/TAA's) – Fairfax
               1 copy to Jean Low (when Royalty Payments/Fees are involved and Documents relating to Licenses/TAA's) - Fairfax

REMARKS:

- Non-proprietary tests of CETA samples; test results are given to CETA. EMRE cannot reveal (beyond Affiliates) that the test results came from a CETA samples for five (5) years from May 6, 2012.

**ExxonMobil Research and Engineering Company**
1545 Route 22 East
Annandale, New Jersey 08801

# ExⲭonMobil

EM07395

October 31, 2011

Clean Energy Technology Association, Inc.
123 East Commerce Street
Fairfield, Texas 77027
Attn.: Roy Hill, President

Re: <u>Letter Agreement for Sample Testing</u>

Dear Mr Hill:

This Letter Agreement for Sample Testing (as hereinafter defined) effective November 7, 2011, hereinafter the "Effective Date," is made by and between Clean Energy Technology Associates, Inc., a Texas corporation, having a place of business at 123 East Commerce Street, Fairfield, Texas 77027 (hereinafter referred to as ("CETA"), and ExxonMobil Research and Engineering Company, a Delaware corporation, (hereinafter referred to as "EMRE").

CETA has developed liquid products from a coal distillation process which they consider proprietary to CETA (hereinafter "Samples"),

CETA is willing to make Samples available to EMRE, at no charge, for EMRE's testing and evaluation of the Samples for their potential use as blendstocks and/or feed streams to the processes practiced by EMRE or its Affiliates, as part of EMRE's evaluation of its interest in a potential business arrangement with CETA ("Purpose").

Sample Testing shall be limited to EMRE's performing elemental analysis for Carbon, Nitrogen, Oxygen, Sulfur, Hydrogen and metals, water content, API gravity, boiling point distribution, and paraffin, naphthenes and aromatics analysis.

EMRE shall maintain the Samples in confidence and use the Samples only for the stated Purpose, and upon CETA request return any unconsumed Samples.

EMRE agrees to share with CETA all results of its Sample Testing ("Test Results"), and may share the Test Results with its Affiliates, but may not otherwise disclose the source of the Test Results to others, i.e. may not disclose to a third party that the Test Results are from a CETA sample. EMRE's obligation shall survive any termination or expiration of this Letter Agreement for five (5) years. This obligation shall not apply to information that: (i) which is or thereafter becomes, through no fault of EMRE, part of the public domain by publication or otherwise, (ii) which EMRE can show was received by it from a third party as a matter of right without any restriction on disclosure, or (iii) which EMRE can show was developed by its

- 2 -

employees who did not have access or recourse to the disclosing party's technical information or Samples.

Other than the Samples the parties shall not provide one another any confidential information.

This Letter Agreement shall remain in effect for six months from the Effective Date, i.e. until May 6, 2011, or may be terminated upon thirty (30) days prior written notice.

2012

Except as specifically set forth hereinabove, this Agreement contains no grants under any of either party's technical information or grants of any patent rights. Neither Party may use the name of the other Party (or derivations thereof) in any advertising or publicity matter without prior written consent.

The Term "Affiliate" as utilized herein shall mean any company of which EMRE, now or hereafter, owns or controls, directly or indirectly, fifty percent (50%) or more of the stock having the right to vote for directors thereof. For the purpose of this definition, the stock owned or controlled by a particular company shall be deemed to include all stock owned or controlled, directly or indirectly, by any other company of which the particular company owns or controls, directly or indirectly, fifty percent (50%) or more of the stock having the right to vote for directors thereof.

The validity and interpretation of this Agreement and the legal relations of the parties to it shall be governed by the laws of the State of New Jersey without reference to its conflicts of Laws provisions.

If the foregoing is acceptable, please sign and return a copy of this Letter Agreement.

Very truly yours,

EXXONMOBIL RESEARCH AND ENGINEERING COMPANY

By _____

AGREED TO:

Clean Energy Technology Association, Inc.

By _____

Title _____

Date _____

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** § | |
| § | |
| § | |
| **Plaintiff,** § | |
| § | **DECLARATION OF MELVIN** |
| **v.** § | **WARREN IN SUPPORT OF** |
| § | **PLAINTIFF'S APPLICATION** |
| **ROY W. HILL, ERIC N. SHELLY,** § | **FOR A TEMPORARY** |
| **CLEAN ENERGY TECHNOLOGY** § | **RESTRAINING ORDER AND** |
| **ASSOCIATION, INC., and** § | **OTHER ORDERS** |
| **FREEDOM IMPACT CONSULTING, LLC,** § | |
| § | |
| **Defendants.** § | |
| § | |

I, Melvin Warren, do hereby declare under penalty of perjury, in accordance with 28 U.S.C. § 1746, that the following is true and correct, and that I am competent to testify to the matters stated herein.  I have personal knowledge of the matters stated herein, and if called as a witness, could and would testify competently thereto.

1.      I am currently employed as a Senior Enforcement Accountant with the United States Securities and Exchange Commission (the "Commission") in its Fort Worth Regional Office in Fort Worth, Texas.  I have been employed by the Commission since November 2014.  Prior to joining the Commission, I was employed by the Public Company Accounting Oversight Board ("PCAOB") as an Inspections Specialist from June 2012 to October 2014.  Prior to working at the PCAOB, I worked as an auditor and forensic accountant at PricewaterhouseCoopers LLP from August 2005 to June 2012.  Since June 2011, I have been a Certified Public Accountant and am licensed in New York by the New York State Board of Public Accountancy.

1

2.      As a Senior Enforcement Accountant with the Commission, my official duties include participating in the Division of Enforcement's fact-finding inquiries and investigations, and then assisting in the Commission's litigation of resulting enforcement actions. This includes interviewing witnesses, reviewing and analyzing financial and other records of various entities and individuals, and tracing financial transactions to determine their source and use. The results of my review of voluminous bank and financial records are summarized in various schedules and charts. I may also testify regarding my summaries at hearings and/or trials.

3.      As part of my official duties, I have been involved in a Commission investigation of defendants Roy W. Hill ("Hill"), Eric N. Shelly ("Shelly"), Clean Energy Technology Association, Inc. ("CETA"), and Freedom Impact Consulting, LLC ("FIC")(collectively, "Defendants"). As part of this investigation, the Commission staff sought to determine whether Defendants violated the federal securities laws in connection with their offer and sale of investment contracts in the form of interests in dozens of investment funds formed by FIC (together, the "Funds"), as well as investment vehicles formed by CETA, to invest in CETA's business operations. CETA claims it builds carbon capture units ("CCUs")—machines that enhance the marketability and recovery of hydrocarbons—leases the CCUs to major oil and gas producers, and receives a percentage of revenue from the enhanced production. In connection with this investigation, and pursuant to subpoenas and document requests, I, and other members of the Commission staff, reviewed various documents related to the Defendants, including but not limited to, offering materials, bank account records, public records, and records produced to the Commission by other third-parties.

4.      As part of my official duties, I reviewed and analyzed bank records to determine the sources and uses of investor money in connection with the Defendants' offer and sale of

interests in the Funds. The Defendants have offered and sold interests in the Funds between at least December 2019 to the present ("the Relevant Period"). The first deposit of investor funds was in February 2020.

## I.    Defendants

5.    **Hill**, age 75, is an attorney with a Texas bar license who resides in Fairfield, Texas. He founded CETA in 2009, and has since controlled CETA as its president and Chairman. He is also named as an "advisor" on FIC's website and promotional materials. Hill served several terms as mayor of Fairfield. Hill holds no securities licenses, and has never been registered with the Commission in any capacity.

6.    **Shelly**, age 59, is a dentist currently residing in Ocala, Florida and West Chester, Pennsylvania. Shelly founded FIC in 2007, and has since controlled FIC as its CEO. Shelly is also the President of West Chester Dental Arts, a dental practice located at 403 North Five Points Road, West Chester, PA 19380 and listed as FIC's business address. Shelly holds no securities licenses, and has never been registered with the Commission in any capacity.

7.    **CETA** is a Texas corporation located in Fairfield, Texas. According to its website, at www.cetaenergy.com, CETA is in the business of developing and commercializing environmentally sustainable technologies for oil and gas development. Neither CETA nor any CETA securities are registered with the Commission.

8.    **FIC** is a Pennsylvania corporation formed by Shelly that operates out of a dental office in West Chester, Pennsylvania and/or Shelly's home. FIC purports to be in the business of marketing to investors passive income strategies and tax mitigation tools. According to its website at www.freedomimpactconsulting.com, FIC controls 61 investment funds with $263 million in assets under management. Neither FIC nor its securities are registered with the

Commission in any capacity.

## II.    **General Background**

9.    Based on materials I reviewed during the Commission's expedited investigation, I became aware that before teaming up with Shelly and FIC in 2019, Hill oversaw CETA's development of a coal distillation process purportedly converting low-quality coal into cleaner burning "COALlite" and a residual solvent, "CETASolve."

10.    The Commission's investigation revealed that in 2019, CETA began offering investments in a new technology apart from its distillation machines that morphed into the business of CCUs.  CETA claimed to have invented and patented CCUs, which are mobile scrubbing units that can be attached to an oil or natural gas well or pipeline.  According to CETA, the CCU equipment uses a trademarked and patented solvent, CETASolve, to remove around 90% of the carbon dioxide ("CO2") out of streams of natural gas, allowing gas producers to prepare the gas for sale at the site of the well rather than ship it to a processing site.  CETA claims that it leases the CCUs to gas producers, charging them a fee per barrel for the CETASolve.  After the CO2 is removed from the gas, CETA claims it resells the solvent, now infused with CO2, to oil and gas producers for use in enhanced oil recovery.

11.    The records the Commission obtained showed that in 2019, Shelly, through FIC, began offering and selling investments in CETA through a series of Funds that Shelly established.  According to FIC's website, FIC controls 61 investment funds with $263 million in assets under management.  In November 2022, FIC claimed to have 52 funds with $100.7 million in assets under management.  Attached hereto as **"Exhibit 1"** (App. 138-141) are screen shots of FIC's website on November 23, 2022, and from May 1, 2023.

12.    Based on my analysis of the bank records, I concluded that between February

2020 and March 2023, the Defendants raised at least $155,879,844 from more than 500 investors nationwide.  The Defendants primarily obtained investor funds via wire transfers, checks, and other electronic payment methods.

13.    For each Fund, FIC provides investors with the following documents, including: a Private Placement Memorandum; a Partnership Agreement; an Investor Questionnaire; a Subscription Agreement; and a Business Plan (together, the "Offering Documents").  Each Fund is similarly structured, and the representations in the Offering Documents are similar or identical.

14.    While there are some differences among the Funds in the structure of how profits from CCU operations are to be split, generally, the Offering Documents represent that investors can expect to earn a fixed 10% return paid every quarter beginning shortly after CCUs are leased, which is expected to occur within a few months of the closing of each Fund.  FIC's and CETA's marketing highlights the quarterly payment of returns, the fact that the payments begin within just a few months of closing, and that no Fund has supposedly missed a quarterly payment. Attached hereto as **"Exhibit 2"** (App. 142-143) is a true and correct copy of an excerpt of a webinar transcript.

15.    Offering Documents for some Funds provide that investors will receive 75 percent of the net cash flow to the Fund from CETA's operations of the CCUs, and that the Funds will distribute such returns to investors on a quarterly basis. (*See, e.g.,* App. 034.)

16.     Shelly and Hill have actively promoted investments in the Funds through, among other means: (i) CETA and FIC websites; (ii) webinars that Shelly hosts; and (iii) quarterly and other periodic updates that Shelly, and in some cases, Hill, provides to investors.

17.    On CETA's and FIC's websites, potential investors can access investment marketing materials, including but not limited to, private placement memoranda, Fund

subscription documents, and wiring instructions.  These documents are generally available to the public to download, without password protection or the need to request the materials.

18.     Periodic updates to investors contain information about CETA's performance, operations, and CCU deployment activity across multiple Funds, as well as information about FIC's ongoing fundraising activity.  Attached hereto as **"Exhibit 3"** (App. 144-147) is a true and correct copy of an example of an investor update.

## II.     Relevant Bank Accounts

19.     Generally, accounts that Shelly controls (directly or through FIC), of which the Commission is aware, are held at Citizens & Northern Bank ("C&N"), and accounts that Hill controls (directly or through CETA and other entities), of which the Commission is aware, are held at Wells Fargo Bank ("WF") (together, the "Relevant Accounts").

20.     The Commission obtained bank records for the vast majority of the Relevant Accounts for the Relevant Period.  A list of the Relevant Accounts for which I have reviewed bank records is attached to this declaration as "**Exhibit 4**" (App. 148-152).  For each such account, when available, I reviewed account opening documents and signature cards.  I also reviewed account statements, transaction data files, deposit and withdrawal supporting documentation, and client correspondence.

21.     Accounts Shelly controls at C&N include (i) separate accounts that Shelly opens for each Fund that FIC forms (the "Fund Accounts"), the purpose of which, as discussed further below, is to receive investor money; (ii) business accounts in the name of FIC; and (iii) Shelly's personal accounts.  Bank records I reviewed reflect that the business address listed for the Fund Accounts, as well as for FIC business accounts at C&N, is 977 Carol Circle, West Chester, PA 19380, which is Shelly's personal home in a residential neighborhood.  Corporate records show a

business address for FIC of 403 N. Five Points Road, West Chester, PA 19380, which is also the location of West Chester Dental Arts, a dental practice owned by Shelly.

22.     Accounts that Hill controls at WF include: (i) accounts in the name of "Roy Hill Trust" (or some variation thereof); (ii) business accounts in the name of CETA; and (iii) a business account in the name of Freestone Energy Inc.

23.     The Commission continues to discover additional Relevant Accounts as its investigation continues.  The Commission also continues to analyze transaction activity in certain of the relevant accounts, including those for which transaction records are incomplete.  For example, I recently learned that, since December 23, 2022, Shelly has opened at least eight new Fund Accounts.  In March 2023 alone, Shelly opened at least five bank accounts on behalf of new Funds for which FIC and Shelly are currently fundraising or have already fundraised.

**III.    Flow of Investor Funds**

24.     As set forth above, investors invest in the Funds by wiring money to the Fund Accounts, as instructed by Shelly and FIC.  Each fund sponsored by FIC has a corresponding Fund Account at C&N.  Based on my review of the records available to date, all money invested in the Funds was invested by being deposited into the Shelly-controlled Fund Accounts at C&N.

25.     My review of the Relevant Accounts revealed that, for any Fund, once investor money is deposited into a Fund Account, Shelly immediately or eventually transfers all or nearly all of the money to the same WF account in the name of "Roy W. Hill Trust #21" ending in 9758 (the "Hill Trust Account").  Hill controls the Hill Trust Account.  Once investor money transferred from a Fund Account enters the Hill Trust account, it is commingled with investor money flowing from the other Fund Accounts.

26.     Hill then transfers the investor funds to other accounts, including ones he controls

7

at WF as described above.  My review of accounts Hill controls at WF revealed that he uses investor funds for, among other items: (a) distributions to Fund investors; (b) CETA payroll expenses; (c) transfers to other Relevant Accounts Hill controls; (d) personal expenses; and (e) payments to certain oilfield services and manufacturing companies (the nature and purpose of these payments is currently not known to the Commission).

### *Detailed Example of Flow of Investor Funds: CC3 Shares 21 LP Fund*

27.    The flow of investor money Defendants raised for the CC3 Shares 21 LP Fund is generally representative of the activity in FIC's other Funds.

28.    Defendants began marketing the CC3 Shares 21 LP Fund in or around August 25, 2021.  According to the private placement memorandum for this fund, FIC targeted the fund size to be $3,145,000.  Shelly opened the CC3 Shares 2021 LP account ending in 5456 (the "CC3 Account") at C&N on August 27, 2021.  The CC3 Account had a zero balance on August, 31, 2021.  Over the next month, $3,146,000 in investor funds were deposited in the CC3 Account, and $3,145,000 was transferred to the Hill Trust Account.  By September 30, 2021, the account balance was $580.

29.    Once in the Hill Trust Account, the CC3 Fund investor money ($3.145M) was commingled with (1) wire-in transfers from other fund accounts ($3,916,485) and also (2) direct investor deposits ($265,000), and then the entire $7.311M was transferred to other WF accounts solely controlled by Hill.  Based on my review, I determined that, possibly excluding the $1,000 opening balance from an unknown source, the source of the $7,311,456 was exclusively from investors.

30. The following chart depicts the flow of CC3 Fund investor money between August 31, 2021 and September 30, 2021:



## IV. No Evidence of Revenue or Income Other Than Investor Deposits

31. Based on my review to date of the available records of the Relevant Accounts, I saw no evidence of any revenue or income to any Relevant Account. In this regard, I did not identify any payments from oil and gas producers or any other business that could be attributed to revenues from oil and gas production or any other income stream. The sole source of funds flowing into the Relevant Accounts is investor deposits.

## V. Current CETA Bank Account Balances and Ongoing Activity

32. As of April 17, 2023, the Defendants held $2,403,408 in C&N accounts.

33. As of April 17, 2023, the Defendants held $40,556,465 in WF accounts.

34. Separately, I recently discovered that during March 2023, at least $17,787,500 in investor funds was deposited into Fund Accounts at C&N. During the same month, at least $15.8 million was transferred from those Fund Accounts to the Roy Hill Trust Account.

35. The CETA and FIC websites are live today, and prospective investors may currently view the Offering Documents.

9

## V.    Neither the CCUs or the Solvent are Patented

36.    During the Commission's investigation, a patent search revealed no results for either CCUs or a solvent by Hill or CETA.  The search showed that Hill has three patents relating to the earlier carbon distillation technology.

## VI.    Other Documents Attached

37.    Attached hereto as **"Exhibit 5"** (App. 153-157) is a true and correct copy of portions of linked documents on CETA and FIC's websites representing that CETA's solvent and CCUs are patented.

38.    Attached hereto as **"Exhibit 6"** (App. 158-159) is a true and correct copy of a portion of a transcript of a June 4, 2020 webinar.

39.    Attached hereto as **"Exhibit 7"** (App. 160-161) is a true and correct copy of a portion of a transcript of a February 17, 2022 webinar.

Executed on May 2, 2023, in Fort Worth, Texas.

Melvin Warren

10

Case 8:23-cv-00221-ADA    Document 4-2    Filed 09/03/23    Page 138 of 161




**Free Report: Top Benefits of Carbon Capture Technology**    **REQUEST REPORT**



FREEDOM IMPACT CONSULTING LLC

Home   About Us   Portfolio ⌄   Resources ⌄   Appearances   Blog   Invest with Us   Contact Us    **Investor Login**

## CO₂ Nomad

*Take it to the source!*

# Freedom Impact Consulting

CETA



## About Freedom Impact Consulting

Freedom Impact Consulting LLC is a company that provides entrepreneurial investors and busy professionals with passive income strategies and tax mitigation tools to take control of their family's financial future. It provides several investment opportunities in the Clean Energy Sector. These funds are opportunities for accredited investors to find cash flow, good returns, and tax benefits.

**READ MORE**

## Solving the Tax Issues of the CO2 Funds

Since we began our Carbon Capture investments back in 2019, we've found that the tax planning benefits of these funds are most effective in reducing tax liability in the first year.

The leveraged funds allow for 2x bonus depreciation in Year 1 taking it to the next level. As time goes on, we are starting to understand how taxes are affected in subsequent years.

**READ MORE**



TAX

## Testimonials

### MAB

Having known Eric now for several years, I've been impressed not only by his high-level integrity and professionalism, but also by his ability to source deal opportunities in the alternative investment space that provide consistent, predictable returns for investors looking outside of wall street. I love seeing that check hit the bank every month and feel good knowing Eric is at the helm, watching our funds and looking for the next opportunity.

### Ross W. Stryker

I have known Dr. Eric Shelly for many years and have invested in numerous opportunities that he has sponsored and will surely do so again.  Today, more than ever before, one needs to be cautious with whom they invest and in what types of opportunities they invest. THE PRIMARY focus I have is the sponsor or managing partner. Can you trust them?  Do they have the core competency?  Do they have the capacity or band width?  Do they have the track record?  Eric gets a positive check mark on all these items and more.

### Glenn Stromberg

I want to say that I am in 3 of Eric's funds and I couldn't be happier!
The returns and fantastic and the monthly payments are always prompt
I strongly recommend Eric Shelly, he is a man of integrity, smart and offers great investments!

### Ann L. Hunsicker-Morrissey

I have known Eric for 35 years and have been investing with him since 2016. It has been a privilege to know and work with Eric. He is very knowledgeable about different types of investments and spends considerable time working hard at furthering his knowledge. Eric is someone that you can trust and I highly recommend working with him.

## Interested in Becoming an Investor?

Meet with Investor Relations Manager, John Harasin. John can lead you through the steps needed to become a verified investor with Freedom Impact Consulting.

**What's the benefit of becoming an investor with us?**

Our energy funds are structured to allow for unique tax benefits and substantial returns for our investors. Our portfolio of funds is averaging a 25.7% return on investment!

Our onboarding process to becoming an investor is simple, and you can get started by choosing an option below.

**GET STARTED**    **SCHEDULE A CALL**





## Our Numbers

$ | **Total Funds** | 52

👤 | **EUM** | $100.7 Million

👥 | **Total Investors** | 347

$ | **Average ROI** | 25%



FREEDOM IMPACT CONSULTING LLC

**Quick Links**

Home   About Us   Invest with Us   Portfolio   Contact Us

Sign up for our Newsletter!

First Name *    Last Name *    Email *

First Name    Last Name    Email

**SUBMIT**

© Copyright 2022 by Freedom Impact Consulting LLC. All Rights Reserved.



Free Report: Top Benefits of Carbon Capture Technology    REQUEST REPORT

**FREEDOM IMPACT**    Home    About Us    Portfolio ▾    Resources ▾    Appearances    Blog    Invest with Us    Contact Us    **Investor Login**

# About Us

Freedom Impact Consulting LLC is a company that provides entrepreneurial investors and busy professionals with passive income strategies and tax mitigation tools to take control of their family's financial future. It provides several investment opportunities in the Clean Energy Sector. These funds are opportunities for accredited investors to find cash flow, good returns, and tax benefits.

## Meet the Team

### Eric Shelly



Dr. Eric N. Shelly is an entrepreneur and investor. After earning a BA in Physics at Franklin & Marshall College and a DMD from the University of Pennsylvania, Eric established and grew a thriving multi-doctor, multi-office dental business which has prospered for three decades.

Eric sold his dental business and now focuses on sharing his skills, connections, knowledge, and opportunities with successful professionals. He and his team build and manage diversified strategic portfolios and projects targeting high yields, tax advantages, and equity growth and preservation.

Currently, Eric and his team are focusing on the clean energy technology space, where they have acquired over $50 million in assets over the past 2 years.

### John Harasin – Investor Relations Manager



John Harasin obtained three degrees from the University of Michigan with a Bachelor of Science in Biology, Master of Science in Environmental Health Studies (cell chemistry), and a Doctorate in Dental Surgery. In 2014, John joined Freedom Founders, an organization founded to teach health care providers how to invest in hard assets, focused primarily on real estate to create financial freedom through cash flow investments. He was the first member to receive the Freedom Founder's Free For Life Award.

After multiple awards for demonstrating his desire to lead others and his ability to take action, he was asked to join the Freedom Founders Leadership Team. Amongst his many duties, John's passion was evaluating potential members, onboarded qualifying individuals to the group, and mentoring them on how to orchestrate their path to financial freedom.

After obtaining his own financial independence, John sold his dental practice in 2017, and continues to educate himself and others on growing their net worth through passive investment in a diversity of real and tax advantaged assets.

**GET STARTED**

### Gary Varney – Chief Financial Officer



New Phase Advisory Services Managing Partner, Gary Varney, is a senior financial executive with over 30 years of business experience in small and mid-size firms with a heavy concentration in high-growth start-ups and early-stage enterprises.

Gary is a Certified Public Accountant and Certified Management Accountant and earned his B.S. in accounting from the University of Delaware. His career started in public accounting with a Wilmington, Delaware-based regional firm.

Before creating his own consulting practice, Gary spent five years as the Vice President and Chief Financial Officer for Leading Edge Logistics. He helped double the size of the company through organic growth as well as acquisitions.

### Rowan Shelly – Executive Assistant



For two and a half years, Rowan Shelly studied culinary arts at Johnson & Wales University. His Associate's Degree in culinary arts included basic business management and nutrition.

At 23, Rowan bought and sold his first fix-and-flip property and played an instrumental role in acquiring a 4-plex rental property.

Rowan has attended several high-level master-mind meet-ups such as Freedom Founders, High-Speed Alliance, and The Real Estate Guys Summit.

As an Executive Assistant, he has worked closely with Eric Shelly assisting in over 12 syndication investments. He has specialized in investor on-boarding, legal document management, document inscription software manipulation, and investor relations.

## Advisory Team

### Roy Hill, CEO & President



For more than 40 years, Roy has been a key player in the shale oil industry as an attorney, corporate advisor, and business owner and has played a key role in the development of one of the largest onshore oil and gas programs in Texas including coal program development. He specializes in advising and organizing all phases of transactions, leasing, drilling, and mining programs, start-up companies, working with government officials, and construction projects for major energy companies. His wealth of experience includes several business degrees, solid expertise in all aspects of field and mineral, fossil fuel and natural resource development, and project management with prove skillfulness in negotiation with government officials and private and public corporate liaison.

### Tim Gertz, CPA at ProVision: Accounting



Tim is a certified public accountant and partner of ProVision Wealth Strategist, a firm specializing in developing wealth and tax strategies for entrepreneurs, professionals and investors. With more than 16 years of experience, Tim is a highly-trained and educated professional with focus in public accounting, working with highly diversified market groups. Tim received his undergraduate and Master's degree in Accountancy from Arizona State University. There, he studied accounting, tax and business information systems.

### Mauricio Rauld, Esq., Attorney and Legal Counsel



Mauricio is the founder and CEO of Premier Law Group. With almost 20 years of securities experience, Mauricio is one of the premier syndication attorneys in the country focusing exclusively on syndications for real estate investors. Named as a "Rising Star" by Super Lawyers magazine, Mauricio is an educator at heart and regularly travels around the country speaking to real estate investors on how the syndication legal piece fits into the overall syndication puzzle. A constant on the real estate investing podcast circuit, Mauricio is a regular contributor to The Real Estate Guys Radio Show where Mauricio is Robert Helms' personal attorney. He has also been featured on the Lifetime Cashflow through Real Estate (Rod Khleif), the Ken McIlroy Podcast, and the Best Ever Real Estate Show (Joe Fairless) among countless others.

### Staci Gray, Organize to Scale



Staci Gray and her team at Organize To Scale™ align with mission-driven leaders to develop strategic initiatives, provide operational disciplines and streamline day-to-day execution for quickly maximizing results. We accomplish this by building strong processes and teams around clearly defined goals so that real estate syndicators can confidently raise capital, do deals and consistently produce profits for their investors. To learn more about Organize To Scale™, visit www.OrganizeToScale.com.

**GET STARTED**



**FREEDOM IMPACT**

### Quick Links

Home    About Us    Invest with Us    Portfolio    Contact Us

### Sign up for our Newsletter!

First Name *    Last Name *    Email *

SUBMIT

© Copyright 2022 by Freedom Impact Consulting LLC. All Rights Reserved.

Case 6:23-cv-00221-ADA    Document #:2    Filed 05/03/23    Page 140 of 151



Free Report: Top Benefits of Carbon Capture Technology    REQUEST REPORT

FREEDOM IMPACT CONSULTING LLC

Home    About Us    Portfolio ⌄    Resources ⌄    Appearances    Blog    Invest with Us    Contact Us        Investor Login

# Solving the Tax Issues of the CO2 Funds

Since we began our **Carbon Capture** investments back in 2019, we've found that the tax planning benefits of these funds are most effective in **reducing tax liability in the first year**.

The leveraged funds allow for **2x bonus depreciation in Year 1** taking it to the next level. As time goes on, we are starting to understand how taxes are affected in subsequent years.

For the 50% leveraged funds, the investor ends up paying tax on the **$40,000 per share revenue** plus the **$33,000 principal** paydown of the 50% loan in the second year.

That loan is **paid by the fund**, but this is still considered as income to the investor and is passed on through the K-1. That is a **total taxable income of $73,000** for Years 1-3 and then **$40,000 for Years 4-7**.

The point is that once we take the bonus depreciation there are **no more deductions** left for that fund and the income is fully taxable.

## The Tax Problem

To **cover the tax liability** for the final income for the next year, many of you are investing every year. The upside is that you are **creating great cash flow streams**.

The problem is you are rolling up a **giant snowball in tax liability**.

## Real Estate Investing

We need a way to **use some of the proceeds and other investment capital** to invest in Real Estate. The strategy needs to address several issues:

1. We need to have depreciation.
2. We need to **extend cashflow beyond 7 years** since the leveraged deal ends at that time.
3. We need to avoid taxable events like an asset sale.
4. We need to have cashflow to support the strategy.
5. We need to convert active income to passive income.

If we can **identify a real estate asset** that can address these issues, we can solve some of the tax issues created by the CO2 funds. Many deals we see today in multifamily and self-storage are structured for value add and sale in 3-5 years.

This doesn't make sense for our situation because it will just **create a taxable event**. We would have the **option of a 1031** but that would only make sense if we had a large gain, and we could upgrade the asset.



## Infinite Return Model

A better strategy would be the **infinite return model**. In this model, we would buy the property at a good price and add value through improvements, rent increases, and possible zoning changes.

We would do a cost segregation to give us **60-80% bonus depreciation in Year 1**. This would create a cashflow that would support the deal but allow for **maximum equity growth**.

Finally, we would do a **cash out refinance every 3-5 years** and return most or all of the initial investor capital, **tax-free**. The investor could then reinvest this in another real estate asset and **repeat the process** with the same capital.

I want to emphasize that unlike selling the property, a **cash out refinance** can take advantage of value add, appreciation, and equity paydown without creating capital gains.

Think of this like a tax-free ATM.

## Converting Active Income to Passive Income

Investing in Real Estate assets creates passive income. The CO2 funds have an active income which is **taxed at an ordinary tax rate**.

By using the income from CO2 funds to **invest in Real Estate assets**, we are effectively **converting from active income assets to passive income assets** and reducing the tax rate.

Other advantages of this model would include a modest cash flow of **6% preferred cashflow**. We would also get **27-40 years straight line depreciation** for each asset we invest in.

We would get tax deductions for property expenses and interest on the mortgage which would likely offset most or all the cashflow income.

Another advantage that I'd like to mention is that the **value of each asset** should continue to appreciate over time. Each time we build up enough equity to justify a cash out refinance we will continue to **harvest our equity** to reinvest in more assets.



## Conclusion

By investing in both CO2 funds and infinite return real estate, we can **take some control** of the ever-growing snowball of CO2 fund taxes and **use the real estate depreciation** to reduce the size of that snowball. We can also extend the cashflow on the leveraged CO2 funds **beyond 7 years**.

We can **convert our active income to passive income** and shrink the impact of taxes.

I am working with an expert to figure out some **optimum ratios** for this combination of investing. We have identified some **potential properties** that are currently available.

If we can close a deal, **I'm going to personally invest** and may have opportunities for you to invest alongside me. Please stay tuned for information on future investment opportunities.

We will be announcing a **webinar** shortly to discuss this concept and assess your appetite for this type of investment. **We would appreciate your feedback!**

*This newsletter is for informational purposes and to gauge potential investor interest. This email summary is not intended to be a securities offering of any kind.*

*Prior to making any decision to contribute capital, all investors must review and execute all private offering documents, including the Private Placement Memorandum and its exhibits, which contains the complete information about this investment opportunity.*

*The information contained herein is from sources believed to be reliable, however no representation by Freedom Impact Consulting, LLC, either expressed or implied, is made as to the accuracy of any information on this property and all investors should conduct their own research to determine the accuracy of any statements made.*

FREEDOM IMPACT CONSULTING LLC

### Quick Links

Home    About Us    Invest with Us    Portfolio    Contact Us

### Sign up for our Newsletter!

First Name *        Last Name *        Email *
[First Name *]      [Last Name *]      [Email *]

SUBMIT

© Copyright 2022 by Freedom Impact Consulting LLC. All Rights Reserved.



**FREEDOM IMPACT** CONSULTING LLC

Home    About Us    Portfolio ⌄    Resources ⌄    Blog    Invest with Us    Contact Us    Investor Login

# Passive Income Strategies and Tax Mitigation Tools

About Freedom Impact Consulting

Free Report: Top Benefits of Carbon Capture Technology    REQUEST REPORT

**FREEDOM IMPACT** CONSULTING LLC

Home    About Us    Portfolio ⌄    Resources ⌄    Blog    Invest with Us    Contact Us    Investor Login

## Solving the Tax Issues of the CO2 Funds

Since we began our Carbon Capture investments back in 2019, we've found that the tax planning benefits of these funds are most effective in reducing tax liability in the first year.

The leveraged funds allow for 2x bonus depreciation in Year 1 taking it to the next level. As time goes on, we are starting to understand how taxes are affected in subsequent years.

READ MORE



Free Report: Top Benefits of Carbon Capture Technology    REQUEST REPORT

**FREEDOM IMPACT** CONSULTING LLC

Home    About Us    Portfolio ⌄    Resources ⌄    Blog    Invest with Us    Contact Us    Investor Login

## Our Numbers

Total Funds
61

AUM
$263 Million

Total Investors
347

Average ROI
25%

Interested in Becoming an Investor?

Free Report: Top Benefits of Carbon Capture Technology    REQUEST REPORT

**FREEDOM IMPACT** CONSULTING LLC

Home    About Us    Portfolio ⌄    Resources ⌄    Blog    Invest with Us    Contact Us    Investor Login

Freedom Impact Consulting

What's the wealth of knowing another entrepreneur
Our energy funds are structured to allow for unique tax benefits and substantial returns for our investors. Our portfolio of funds is averaging a 25.7% return on investment!

Our onboarding process to becoming an investor is simple, and you can get started by choosing an option below.

GET STARTED    SCHEDULE A CALL

Free Report: Top Benefits of Carbon Capture Technology    REQUEST REPORT

**FREEDOM IMPACT** CONSULTING LLC

Home    About Us    Portfolio ⌄    Resources ⌄    Blog    Invest with Us    Contact Us    Investor Login

Testimonials

**Ross W. Stryker**

Having known Eric now for several years, I've been impressed not only by his high-level integrity and professionalism, but also by his ability to source deal opportunities in the alternative investment space that provide consistent, predictable returns for investors looking outside of wall street. I love seeing that check hit the bank every month and feel good knowing Eric is at the helm, watching our funds and looking for the next opportunity.

**Glenn Stromberg**

I have known Dr. Eric Shelly for many years and I have invested in numerous opportunities that he has sponsored and will surely do so again. Today, more than ever before, one needs to be cautious with whom they invest and in what types of opportunities they invest. THE PRIMARY focus I have is the sponsor or managing partner. Can you trust them? Do they have the core competency? Do they have the capacity or band width? Do they have the track record? Eric gets a positive check mark on all these items and more.

I want to say that I am in 3 of Eric's funds and I couldn't be happier!

The returns and fantastic and the monthly payments are always prompt. I strongly recommend Eric Shelly, he is a man of integrity, smart and offers great investments!

**Ann L. Hunsicker-Morrissey**

I have known Eric for 35 years and have been investing with him since 2016. It has been a privilege to know and work with Eric. He is very knowledgeable about different types of investments and spends considerable time working hard at furthering his knowledge. Eric is someone that you can trust and I highly recommend working with him.

Free Report: Top Benefits of Carbon Capture Technology    REQUEST REPORT

**FREEDOM IMPACT** CONSULTING LLC

Home    About Us    Portfolio ⌄    Resources ⌄    Blog    Invest with Us    Contact Us    Investor Login

* Please check with your tax and legal professional as Freedom Impact Consulting LLC does not provide tax or legal advice and the above is not intended to or should be construed as such advice. Your specific circumstances may, and likely will, vary.

* Any performance data shared by Freedom Impact Consulting LLC represents past performance and past performance does not guarantee future results. Neither Freedom Impact Consulting LLC nor any of its funds are required by law to follow any standard methodology when calculating and representing performance date and the performance of any such funds may not be directly comparable to the performance of other private or registered funds

* All offers and sales of any securities will be made only to Accredited Investors, which for natural persons, are investors who meet certain minimum annual income or net worth thresholds or hold certain SEC approved certifications.  Any securities that are offered, are offered in reliance on certain exemptions from the registration requirements of the Securities Act of 1933 (primarily Rule 506(c) of Regulation D and/or Section 4(a)(2) of the Act) and are not required to comply with specific disclosure requirements that apply to registrations under the Act

* The testimonials, statements, and opinions presented are applicable to the individuals listed. Results will vary and may not be representative of the experience of others. The testimonials are voluntarily provided and are not paid, nor were they provided with free products, services, or any benefits in exchange for said statements. The testimonials are representative of client experience, but the exact results and experience will be unique and individual to each client.



**FREEDOM IMPACT**    Sign up for our Newsletter!

results and experience will be unique and individual to each client.



**FREEDOM IMPACT** CONSULTING LLC

Sign up for our Newsletter!

### Quick Links

Home    About Us    Invest with Us    Portfolio    Contact Us
Website Disclosure

First Name *    Last Name *    Email *

[First Name *]    [Last Name *]    [Email *]

SUBMIT

Page 1

1 THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION

2

3 In the Matter of:              )

4                               ) File No. FW-04561-A

5 CLEAN ENERGY TECHNOLOGY        )

6 ASSOCIATION, INC.              )

7

8 SUBJECT:  Webinar:  Tax Benefits and Carbon Credits with

9           Eric Shelly

10 PAGES:   1 through 22

11

12

13

14

15

16           AUDIO TRANSCRIPTION

17

18

19

20

21

22

23

24     Diversified Reporting Services, Inc.

25           (202) 467-9200

Page 2

1          P R O C E E D I N G S

2 Webinar:  Tax Benefits and Carbon Credits with Eric

3 Shelly

4          MR. WILSON:  Welcome to the Passive Investing

5 Show.  I am Ashley Wilson and I'm joined here with my

6 co-host, Jay Scott.  On today's episode, we had Eric

7 Shelly from Freedom Impact Consulting.

8          MR. SCOTT:  Yeah, Eric was great.  So, Eric

9 runs a whole set of funds.  I think his company actually

10 has about 60 different funds that are focused on oil

11 drilling, specifically around the carbon credits

12 involved with oil drilling, so helping oil companies

13 that are drilling for oil offset the carbon credits they

14 need legally to generate.

15          The thing I love about Eric's fund is that

16 they are highly tax focused.  So, if you're looking for

17 depreciation benefits, if you're looking for tax

18 benefits to offset your W-2 income, these funds generate

19 a ton of tax benefits.  And on this episode, Eric talks

20 all about the tax benefits, and the great cash flow that

21 his funds return as well.

22          So, without any further ado, let's welcome

23 Eric Shelly to the show.

24          MS. WILSON:  Welcome, Eric, to the show.

25 We're really excited to have you on today.  Can you

Page 3

1 start with your background and how you started investing

2 in the asset class that you invest in?

3          MR. SHELLY:  All right, sure.  Well, my story

4 goes back to 30 years ago.  I became a dentist and I've

5 had a dental practice for the last 32 years.  I realized

6 that, in my early 50s, that I was going to have to be

7 responsible for my retirement, so I decided to learn

8 about passive investing.

9          And, through various masterminds, I started

10 out masterminding with other dentists that were learning

11 real estate and other investing processes.  And so,

12 through those masterminds, I started investing in real

13 estate and various other alternative assets.

14          So, as I became more adept at that, I started

15 to find some investments that other people wanted to

16 piggyback with me on.  And I realized that I was going

17 to probably learn how to do that as well, so I started

18 taking training on syndication and how to put together

19 those kind of investments, and make sure that we were

20 following the SEC guidelines.

21          So, I ended up joining another mastermind

22 group, the real estate guys, about that.  And so, I

23 started, you know, investing initially in some, you

24 know, properties and notes and that sort of thing.  But,

25 then, as I was seeking out other passive investments, I

Page 4

1 came into energy investments and that -- that's kind of

2 what led me to the current investment class that I'm

3 working in, which is carbon capture equipment.

4          So, we're working with various energy

5 companies and we're doing some processes which create

6 good tax benefits for our investors, and good returns as

7 well.  So, that's kind of the whole story, and you can

8 certainly ask me more questions about that, if I left

9 something out that you see.

10          MR. SCOTT:  So, you originally started in real

11 estate and you moved into carbon capture equipment.  Can

12 you talk a little bit about why you thought that was,

13 kind of, the right way to go?  What led you to pursue a

14 different asset class?

15          One of the similarities -- I know a lot of our

16 listeners are investors in real estate.  What are some

17 of the overlaps in those asset classes differences?  I

18 mean, maybe they're nothing at all the same, but just

19 curious what, kind of, led you in that direction.

20          MR. SHELLY:  Yeah.  Well, I mean, I still

21 invest in real estate.  I mean, I didn't stop investing

22 in real estate.  But, what I realized was that, you

23 know, you build up -- you know, as a professional, you

24 have a lot of W-2 income.  And many of the real estate

25 investments work against passive income.

Page 9

1    So, from their standpoint, it checks a bunch
2 of environmental boxes. And from, you know, an economic
3 perspective, it saves them money, and then allows them
4 to produce oil more effectively. So, you know, for us,
5 we basically benefit from that revenue.
6    MR. SCOTT: So, how specifically do you get
7 paid? Are you collecting income on additional oil
8 that's drilled? Are you collecting commission on carbon
9 credits? Are you benefitting directly from the
10 production and the sale of the oil? Is it fixed price?
11 What does your revenue stream look like?
12    MR. SHELLY: Yeah, technically be -- by the
13 contract, our revenue stream is actually oil revenue
14 from the added production. So, we get a percentage of
15 that, but it's not based on the volatile price that you
16 see in the markets right now.
17    That's -- that -- those are, you know,
18 future -- oil futures contracts. And the volatility of
19 oil prices is not nearly as volatile for us in the field
20 like this. So, we don't get the wild price swings that
21 you see, you know, on the news.
22    But, as far as, you know, the way our funds
23 get paid, we get quarterly payments that are based on
24 the solvent amounts we use. But then, we adjust the
25 payments twice a year to reflect what the actual oil

Page 10

1 production was. So, that's a little complicated, but
2 because of the way we structure it, our revenue is
3 technically all oil and gas production so that it
4 qualifies for W-2 treatment.
5    MR. SCOTT: So, it sounds like investors can
6 expect quarterly cash flow payments. Is the -- is the
7 principle ever returned, or is there a lump sum profit
8 at the end, or is basically just the cash flow
9 throughout the lifecycle of the investment the core cash
10 return?
11    MR. SHELLY: Yeah, let me describe the way the
12 major fund that we do works for the investor, because
13 there's a couple components to it. So, let's say the
14 investor puts in 100 grand. They will get a bonus
15 depreciation in year one on the cost of the equipment,
16 okay?
17    So, the cool thing that we do is, we can
18 borrow half of the money to buy the equipment and
19 actually leverage the bonused appreciation. So, for our
20 leveraged deal, we end up -- the investor will invest
21 $100,000.00. We're borrowing 50% of the cost of the
22 equipment from CETA actually, and then we're paying it
23 back rather quickly because the revenue stream is
24 strong.
25    By doing that, the investor gets a $200,000.00

Page 11

1 bonus depreciation in year one against W-2 or any other
2 type of income. So, $100,000.00 investments gets you
3 approximately, if you're in the 35% bracket, about a
4 $70,000.00 tax benefit in that year. Okay?
5    And then, in addition to that, we pay a
6 $10,000.00 a quarter preferred payment for seven years,
7 or a total of $280,000.00 for -- over seven years, and
8 then, the investor's bought out of the deal. So, it's a
9 seven-year payback. It's a total of $280,000.00 and
10 that includes the return of principle, so the gain is
11 about $180,000.00 and that works out to about an average
12 annual return of about 25%.
13    MS. WILSON: And that's a typical deal, right?
14 That's not every single deal and obviously, it's not
15 guaranteed returns. This is the -- these are the
16 projected returns of a typical deal that you're
17 offering. Is that correct?
18    MR. SHELLY: Yeah. Well, the way we structure
19 this shares deal is that it is a preferred return, but
20 we don't get paid until the back end if we're not
21 delivering that return.
22    So, for example, if we had -- you know, we
23 have the money of $10,000.00 to pay for that quarter,
24 every investor gets their $10,000.00. If we have a low
25 quarter or something like that, and we wouldn't have

Page 12

1 enough to pay them the full $10,000.00, the next
2 quarter, we would catch up before we take any profit on
3 our own.
4    So, you know, we basically keep doing that
5 until they get their whole $280,000.00. So, it -- in a
6 sense, it's not guaranteed, but they will eventually get
7 it because of the way it's structured. It may take, you
8 know, a little more than seven years, but they would get
9 the whole full 280.
10    Now, we've been doing this for three years and
11 we haven't had anything close to missing one of those
12 payments. We have probably the ability to withstand a
13 20% decrease in revenue and still manage to pay that.
14    MR. SCOTT: That's great. What is the minimum
15 investment for an investor into your fund?
16    MR. SHELLY: Well, we have -- our investment
17 minimum is set at $100,000.00. Occasionally, we get
18 somebody that invests, you know, 250, which then leaves
19 us a half share. So, if somebody were to want to get in
20 for $50,000.00, we often have a place for that. But, we
21 -- you know, we hold it until we have one of those
22 oddball investment amounts.
23    MR. SCOTT: Got it. And do your investors
24 need to be accredited?
25    MR. SHELLY: Yes, because we're talking about

 Gmail



---

## Q2 2022 Update on Energy Funds

**Eric N. Shelly** <eric.shelly@freedomimpactconsulting.com>                    Fri, Jun 24, 2022 at 7:00 PM
To:



*Financial Freedom and Passive Income Strategies for Healthcare Professionals*

*June 2022*

## Q2 2022 Update on Energy Funds

Greetings

I am writing this newsletter from beautiful Belize where I just attended *The Real Estate Guys* 20th Annual Investor Summit. Many of my investors enjoyed the event with me. We were presented with many compelling views on the coming economy and investment landscape.

**What Can We Expect in Energy**

With the policies of the Biden administration and the effects of the war in Ukraine, my take on the energy sector is that there will be a **1–5-year unmet demand** on natural gas and oil. I believe that natural gas demand will be very strong during the next few years which will serve our project well.

Demand remains strong. We have just received the first order of our $CO_2$ pipeline equipment for use in Exxon's new hydrogen plant in the Houston area. This new use will likely increase demand for our equipment up to 2000 total units. We are currently **raising capital for 32 carbon capture units**. We have filled two funds this week and are well on the way to filling 4 funds with our sponsors.

1/4

SEC-FW-04561-E-0000792

**Statistics and facts**

Number of Funds currently open: 45

Number of units placed into operation: 130

Number of units currently ordered: 32

Distributions to investors from Q1: Over
$6,726,000



**Notes on Performance**

The first quarter of each year is usually the lowest performing period of the year because of the potential for freezing temperatures in the oil and gas fields. Anytime water could freeze in the pumping equipment in the field, they are shut down to prevent damage.

Without the pumps, our equipment is unable to operate as well. As a result, we usually lose several days of production. Last year we had a small amount of daily production loss however this year some equipment saw around 15 days of lost production. This only affects payouts in the ownership funds. Most of you are invested in shares funds and as you know, your payments were unaffected.

**Collateralized Development Fund**

As you may be aware, we are offering a monthly income fund paying a preferred 12% interest. We are using the fund to develop build-to-rent single family houses in Lakeland, Winterhaven, and Ocala, Florida.

The fund uses CO2 pipeline units for collateral and cash-flow to pay a monthly income to investors. The fund is also collateralized by a second position lien on the development property. If you have a bucket of investment capital for generating predictable and steady monthly income, then click the button below and enter the **password: CDF1** to learn more.

Collateralized Development Fund

App. 145
SEC-FW-04561-E-0000793



**Payouts and Reporting**

As the number of funds grows to over 50, both CETA and Freedom Impact Consulting will need additional days to process payments. We are getting our payments from the oil companies spread out over the first few days of the month.

We will continue to process payments as we get them but realistically, we may not complete all payments until the end of the month each March, June, September, and December.

Please understand that all the payments are not sent at the same time and that your payments may arrive any time over that payout month. We will be distributing reports after the payouts.

The Portal has improved our payout process and will help limit input errors on account numbers and you have the ability to check your account numbers to make sure they are accurate.

You will also have access to distribution history and all documents related to your investments including K-1s.

Please reach out if you have any questions.

Sincerely,



**ERIC N. SHELLY**

CEO & Fund Manager
eric.shelly@freedomimpactconsulting.com
www.FreedomImpactConsulting.com

Not interested in this particular offering? Rather than unsubscribe from EVERYTHING, including our weekly newsletter, and blog announcements …

Manage Your Preferences

Unsubscribe

Freedom Impact Consulting 977 Carol Circle West Chester, Pennsylvania 19380 United States (484) 883-2223

App. 146

SEC-FW-04561-E-0000794

App. 147
SEC-FW-04561-E-0000795

**Exhibit 4**

**List of Relevant Accounts**

| Item No. | Institution | Acct No. Ending | Acct Type | Acct Name | Primary Signer | Account Address |
|---|---|---|---|---|---|---|
| 1 | C&N | 1978 | Business Checking | 1 Carbon Capture LP | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 2 | C&N | 3243 | Business Checking | 02 Carbon Capture LP | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 3 | C&N | 3285 | Business Checking | 03 Carbon Capture LP | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 4 | C&N | 3392 | Business Checking | 04 Carbon Capture LP | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 5 | C&N | 6925 | Business Checking | 05 Carbon Capture LP | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 6 | C&N | 6959 | Business Checking | 06 Carbon Capture LP | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 7 | C&N | 5711 | Business Checking | 07 Carbon Capture LP | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 8 | C&N | 5745 | Business Checking | 08 Carbon Capture LP | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 9 | C&N | 4687 | Business Checking | 09 Carbon Capture LP | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 10 | C&N | 4710 | Business Checking | 10 Carbon Capture LP | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 11 | C&N | 4240 | Business Checking | 11 Carbon Capture LP | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 12 | C&N | 9149 | Business Checking | BB Pipeline LP | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 13 | C&N | 5472 | Business Checking | BB2 Pipeline LP | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 14 | C&N | 2017 | Business Checking | CC Shares 2021 LP | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 15 | C&N | 3821 | Business Checking | CC2 Shares 2021 LP | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 16 | C&N | 5456 | Business Checking | CC3 Shares 2021 LP | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 17 | C&N | 5753 | Business Checking | CC4 Shares 2022 LP | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 18 | C&N | 5761 | Business Checking | CC5 Shares 2022 LP | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 19 | C&N | 3690 | Business Checking | Denvet Pipeline Limited Partnership | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 20 | C&N | 9165 | Business Checking | EOY Pipeline LP | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 21 | C&N | 0053 | Business Checking | Eshelly REI LLC | Unknown | 977 Carol Circle, West Chester, PA 19380 |

1

| Item No. | Institution | Acct No. Ending | Acct Type | Acct Name | Primary Signer | Account Address |
|---|---|---|---|---|---|---|
| 22 | C&N | 5937 | Business Checking | IRA Shares LP | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 23 | C&N | 8256 | Business Checking | KD Carbon Capture LP | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 24 | C&N | 5846 | Business Checking | MCA Shares LP | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 25 | C&N | 5795 | Business Checking | Oshares 01 LP | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 26 | C&N | 5802 | Business Checking | Oshares 02 LP | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 27 | C&N | 4752 | Business Checking | Oshares 03 LP | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 28 | C&N | 4819 | Business Checking | Oshares 04 LP | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 29 | C&N | 0797 | Business Checking | PA Mich Enterprises Trust | Unknown | 6125 Vista Terrace, Orefield, PA 18069 |
| 30 | C&N | 4205 | Business Checking | Pennsylvania Academy of General Dentist | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 31 | C&N | 9394 | Business Checking | Pennsylvania Academy of General Dentist | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 32 | C&N | 6725 | Business Checking | Pennsylvania Academy of General Dentist | Eric Shelly | 4076 Market Street, Suite 209, Camp Hill, PA 17011 |
| 33 | C&N | 1944 | Business Checking | RR Carbon Capture LP | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 34 | C&N | 9148 | Business Checking | RS Pipeline LP | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 35 | C&N | 5804 | Business Checking | SF Rentals LLC | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 36 | C&N | 3848 | Business Checking | SLF Pipeline Limited Partnership | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 37 | C&N | 5448 | Business Checking | SLF2 Pipeline LP | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 38 | C&N | 6842 | Business Checking | SLF3 Pipeline LP | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 39 | C&N | 5555 | Business Checking | SYN 01 LP | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 40 | C&N | 9291 | Business Checking | SYN 02 LP | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 41 | C&N | 9308 | Business Checking | SYN 03 LP | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 42 | C&N | 9332 | Business Checking | SYN 04 LP | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 43 | C&N | 9340 | Business Checking | SYN 05 LP | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |

| Item No. | Institution | Acct No. Ending | Acct Type | Acct Name | Primary Signer | Account Address |
|---|---|---|---|---|---|---|
| 44 | C&N | 9390 | Business Checking | SYN 06 LP | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 45 | C&N | 5828 | Business Checking | SYN 07 LP | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 46 | C&N | 5836 | Business Checking | SYN 08 LP | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 47 | C&N | 4330 | Business Checking | SYN 09 LP | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 48 | C&N | 4653 | Business Checking | SYN 10 LP | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 49 | C&N | 4957 | Business Checking | SYN 11 LP | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 50 | C&N | 4999 | Business Checking | SYN 12 LP | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 51 | C&N | 5004 | Business Checking | SYN 13 LP | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 52 | C&N | 5012 | Business Checking | SYN 14 LP | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 53 | C&N | 1245 | Business Checking | SYN 15 LP | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 54 | C&N | 1253 | Business Checking | SYN 16 LP | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 55 | C&N | 4076 | Business Checking | SYN 17 LP | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 56 | C&N | 4084 | Business Checking | SYN 18 LP | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 57 | C&N | 4117 | Business Checking | SYN 19 LP | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 58 | C&N | 4141 | Business Checking | SYN 20 LP | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 59 | C&N | 2418 | Business Checking | ESML MO LLC | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 60 | C&N | 9157 | Business Checking | FEF3L Pipeline LP | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 61 | C&N | 3773 | Business Checking | Four Docs Pipeline Limited Partnership | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 62 | C&N | 5086 | Business Checking | Freedom Energy Fund 2 LP | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 63 | C&N | 2885 | Business Checking | Freedom Energy Fund  LP | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 64 | C&N | 2856 | Business Checking | Horsetail Legacy LLC | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 65 | C&N | 5361 | Business Checking | Freedom Capital Fund I LLC | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 66 | C&N | 0138 | Business Checking | Freedom Capital Fund II LLC | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |

3

| Item No. | Institution | Acct No. Ending | Acct Type | Acct Name | Primary Signer | Account Address |
|---|---|---|---|---|---|---|
| 67 | C&N | 2530 | Business Checking | Freedom Capital Fund III LLC | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 68 | C&N | 6234 | Business Checking | Freedom Capital Income Fund LLC | Unknown | 977 Carol Circle, West Chester, PA 19380 |
| 69 | C&N | 2585 | Business Checking | Freedom Impact Consulting LLC | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 70 | C&N | 2621 | Business Checking | Freedom Impact Consulting LLC | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 71 | C&N | 4274 | Business Checking | 12 Carbon Capture LP | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 72 | C&N | 3821 | Business Checking | 13 Carbon Capture LP | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 73 | C&N | 3995 | Business Checking | CC6 Shares 2022, LP | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 74 | C&N | 3839 | Business Checking | CC7 Shares 2023, LP | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 75 | C&N | 7603 | Business Checking | FIC RE1 LLC | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 76 | C&N | 3979 | Business Checking | Oshares 05 LP | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 77 | C&N | 3929 | Business Checking | Oshares 06 LP | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 78 | C&N | 9765 | Business Checking | SYN 21 LP | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 79 | C&N | 9799 | Business Checking | SYN 22 LP | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 80 | C&N | 3855 | Business Checking | SYN 23 LP | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 81 | C&N | 3863 | Business Checking | SYN 24 LP | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 82 | C&N | 3871 | Business Checking | SYN 25 LP | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 83 | C&N | 7927 | Personal Checking (Joint) | Eric N. Shelly / Margaret H. Lee | Eric Shelly | 403 N. Five Points Road, West Chester, PA 19380 |
| 84 | C&N | 2345 | Personal Checking (Joint) | Eric N. Shelly / Margaret H. Lee | Eric Shelly | 977 Carol Circle, West Chester, PA 19380 |
| 85 | C&N | 6895 | C&N Internal GL Account | C&N Internal General Ledger Account for ACH Prefunding | N/A | N/A |
| 86 | WF | 1218 | Business Checking | Clean Energy Technology Assoc, Inc C. | Roy W. Hill | 123 E. Commerce St, Fairfield, TX 75840 |

4

| Item No. | Institution | Acct No. Ending | Acct Type | Acct Name | Primary Signer | Account Address |
|---|---|---|---|---|---|---|
| 87 | WF | 9045 | Business Checking | Clean Energy Technology Assoc, Inc | Roy W. Hill | 123 E. Commerce St, Fairfield, TX 75840 |
| 88 | WF | 7662 | Business Checking | Clean Energy Technology Assoc, Inc | Roy W. Hill | PO Box 765, Fairfield, TX 75840 |
| 89 | WF | 7738 | Business Checking | Clean Energy Technology Assoc, Inc | Roy W. Hill | 123 E. Commerce St, Fairfield, TX 75840 |
| 90 | WF | 8801 | Business Checking | CETA Holdings, Inc. | Roy W. Hill | 123 E. Commerce St, Fairfield, TX 75840 |
| 91 | WF | 9758 | Business Checking | Roy W. Hill, Trust #21 | Roy W. Hill | 123 E. Commerce St, Fairfield, TX 75840 |
| 92 | WF | 4651 | Business Checking | Freestone Energy Inc | Roy W. Hill | 123 E. Commerce St, Fairfield, TX 75840 |
| 93 | WF | 6550 | Business Checking | Roy W Hill Trustee | Roy W. Hill | 123 E. Commerce St, Fairfield, TX 75840 |
| 94 | WF | 8568 | Business Checking | Roy W Hill, Trust Account # 2 | Roy W. Hill | 123 E. Commerce St, Fairfield, TX 75840 |

5

SEC-FW-04561-E-0000376



Corporate Profile
2020

129 East Commerce St.  Fairfield, TX 75840  ·  903.389.9393



# Roy W. Hill
# President & Chairman

12 years ago we came to the conclusion for a variety of reasons that someone was going to have to find an economical way to address the environment and still preserve and protect the use of all Our American Natural Resources. To that end, we formed Clean Energy Technology Association, Inc. (CETA).

We made a promise to ourselves and America from the beginning that whatever we did to accomplish our Company goal would preserve and create American jobs, our equipment if at all humanly possible would be US Made, we had to reduce Our National carbon footprint, and the products we were able to produce from Our Technology had to be profitable and not depend on Government Subsidies in order to have a viable company. We have met and continue to meet all these goals.

We have developed over the years in a series of small steps, each building on the other, a series of technologies that we feel has accomplished our end game.

All of our Technology to date carry US Patents and as we add something new to improve development, those technologies will also be patented as we move forward.

One of Our unique Patented technologies focuses on taking any form of US coal and turning it into a number of useful by-products. It is called the "CETA Distillation Process."

It is a closed loop system and as such does not put emissions into the air, ground or water tables.  We do not use water and in fact actually produce water in Our process.

Many useful by-products come from this process including a cleaner coal that is able to reduce emissions if burned as a fuel source, raw material for making steel or manufacture of carbon fiber, a oil product that has pharmaceutical uses, a solvent that

3

can capture $CO_2$ out of a gas stream and a synthetic gas that is rich in Nitrogen and other important gas compounds for uses in the medical and construction fields.

We then turned to Our second developed Equipment Technology which has the ability to use Our Solvents with equipment we have also developed, which is mobile, to capture and absorb over 90% of the $CO_2$ gases out of gas streams from a variety of sources and once captured, (the by-product) can be utilized in the oil field for secondary recovery at a lesser expense, or for a variety of other uses for which there is a significant set of markets.

Some of the other uses, not in the oilfield, for the absorbed $CO_2$ by-product include many other raw material uses as a component for the manufacture of concrete, food products, carbonated drinks, solar liquids, plastics and fiber including in wind turbines, adhesives, micro algae growing, syn-fuels, refrigeration, pharmaceuticals, oxygen additive, dry ice, and paint removal to just name a few.

Currently, we are building a major laboratory for the purpose of testing Our solvents for use in separating rare earth elements out of coal seams and coal refuse piles (called GOB). Our work to date is showing some very economical and cost effective results so we are taking this one to the next level.

Our Team is truly as good as it gets and everyone here knows how to think outside the box and get things done. I am thankful each day for them and the privilege of being a US based operation.

Every year one door seems to lead us to another door and builds one successful project on top of another. We are excited about the future for us all.

Please get in touch with us if you would like to come join in our vision and efforts for America.

God Bless.

Kindest regards,

Roy W. Hill

Roy W. Hill



# Top Benefits of Investing in Carbon Capture Technology



freedomimpactconsulting.com

SEC_000550

App. 156

SEC-FW-04561-E-0001488

# How Carbon Capture Units Work



The Carbon Capture Units represent patented technology designed and developed by CETA and are mounted on a single tractor-trailer bed, designed to be attached directly to a gas well or pipeline. The Carbon Capture Units use a proprietary solvent (CETASolveTM) to absorb the $CO_2$. The saturated CETASolveTM can then be used for enhanced oil recovery. This is a disruptive new technology that is changing the way that natural gas is processed. This solvent will be utilized initially to capture $CO_2$ out of pipelines to make the gas stream more marketable by capturing over 85 to 92.5% of the $CO_2$. The $CO_2$ is then absorbed into the solvent which the Company remains the owner. The solvent with $CO_2$ captured and absorbed is then re-injected into the natural gas producer's oil and gas wells to improve production in that same geographic area.



# High Demand

Carbon Capture and Sequestration are currently in high demand as oil and gas companies are being pressured to lower their carbon footprint, maximize existing well production, and lower the cost of production. The Carbon Capture Units are a patented technology operated by CETA, which is in very high demand from oil and gas producers currently operating in the Permian Basin in Texas and independent well owners, power plants, and the Department of Energy.

Freedom Impact Consulting placed the first two Carbon Capture Units at the end of 2019 and 16 in 2020, 30 units through July of 2021, with 24 more anticipated orders throughout the remainder of 2021. The market for portable equipment within the $CO_2$ capture space is clearly present.



SEC_000558

Page 1

1 UNITED STATES SECURITIES AND EXCHANGE COMMISSION

2

3 In the Matter of:        )

4                          ) File No. FW-04561-A

5 CLEAN ENERGY TECHNOLOGY    )

6 ASSOCIATION, INC.          )

7

8 SUBJECT:  Freedom Energy Fund QA With Roy Hill - June

9 2020

10 PAGES:    1 through 36

11

12

13

14        VIDEO TRANSCRIPTION

15

16

17

18

19

20

21

22

23

24       Diversified Reporting Services, Inc.

25           (202) 467-9200

Page 2

1              P R O C E E D I N G S

2      Freedom Energy Fund QA With Roy Hill - June 2020

3      MR. SHELLY:  So we're here on, I believe it's

4 June 4th.  It's Thursday evening.  And we're here to

5 talk about Freedom Energy Fund 2.  We have -- eventually

6 we're going to have Roy Hill here, who will be able to

7 answer some questions for you.  They've actually been

8 trying to get on for quite a little bit.  They had to

9 bring their technical expertise guy in.

10      So, they're working on that right now.  They

11 just called me and said they'll be a few more minutes.

12 So, I'm going to get started here.  I'd like to welcome

13 everybody.  Some of you have already been on a couple of

14 these webinars, and some of you may not have been.  So,

15 what I'm going to do is talk a little bit about what our

16 project is all about.  Hopefully I won't bore everybody

17 that's heard it a couple of times.  And then I'll talk a

18 little bit about the investment and what that looks

19 like.  And then we'll -- hopefully by that time, Roy

20 will be with us, and we can talk about questions.

21      All right.  So, to get started here, what we

22 are doing with Freedom Energy Fund 2 is to be -- we are

23 going to be purchasing six carbon capture units.  We

24 already have two of them in Freedom Energy Fund 1.

25 Freedom Energy Fund 2 is going to be doing six of them.

Page 3

1 What the carbon capture units are is a portable system

2 that can be put onto a well at a local site, oil or gas,

3 or actually in this case it's a gas well.  It can also

4 be attached to a pipeline, a gas pipeline.

5      And what -- what the equipment does is using a

6 specialized solvent that is made by another project

7 that's run by CETA Technologies, we can pull the CO2 out

8 of the natural gas.  And that allows the natural gas to

9 be at a level that is appropriate for sale.  The EPA

10 guidelines require that the gas have a certain low

11 percentage of carbon dioxide than it usually comes out

12 of the ground, with up to 25 percent carbon dioxide

13 saturation.

14      So our process removes that carbon dioxide to

15 the point where it is able to be sold from the site.

16 The normal approach to removing carbon dioxide is to

17 ship either via truck, train or pipeline, to somewhere

18 on -- in the processing facilities on the Louisiana

19 coast, which is where most of them are located.  And

20 that's also a hub site for where the gas is sold

21 offshore and moved around in the country as well.

22      So, once -- one we have processed the natural

23 gas at the site of the well, the barrels of the solvent

24 that are saturated now with the carbon dioxide can then

25 be sold and used for enhanced oil recovery in oil and

Page 4

1 gas wells in the Permian Basin area of Texas, where we

2 have our equipment in operation.

3      So, what happens is that -- that solvent with

4 the carbon dioxide gets injected into the local wells

5 that are underperforming.  And that can bring the

6 production of the well up almost 25 percent.  And part

7 of our lease agreement is that we get to participate in

8 that oil -- the sale of that oil.  We get some of that

9 profit.

10      Because of the sale of oil and -- we also have

11 the means of production for that oil.  That allows us

12 for the same tax treatment as oil and gas well drilling.

13 And that means that we can actually write off 100

14 percent of our investment in year one of the investment

15 against ordinary income.

16      Now, one thing we've kind of learned, you

17 know, since our first fund is that it is important that

18 you understand that if you put this investment into an

19 LLC, you are not eligible for the deduction against

20 ordinary income, because you need to be a general

21 partner with liability in the production of the oil for

22 the first year.  And so if you're in an entity like an

23 LLC, then you are not eligible for that liability.  And

24 also, not liable for the deduction against ordinary

25 income.

Page 25

1    It shields that fluid.  It goes into that
2 black tank that is down below that.  And then at that
3 juncture it is out of the system.  And then, it goes
4 over one more notch to that red CO2 looking unit that is
5 right above that white looking tank.  And then it goes
6 back into the pipeline.  It's clean gas.
7    Now, from that black unit, it is -- it is
8 piped back -- you'll see some more pipes on the ground
9 there.  It is piped back over to a second set of tanks,
10 where you have got -- where you've got the CETAsolve
11 with the CO2 added.  That butane tank and that flare
12 stack that you see, is just in case something happens
13 and the valves fail and you don't want to blow up --
14 that thing will immediately ignite and burn off the gas
15 drain to get it back down to operational pressures.
16    And that's really basically how the whole
17 system works.
18    MR. SHELLY:  So do these pieces of equipment
19 get mounted on some kind of flatbed?  Is that how --
20    MR. HILL:  That whole thing -- if you took the
21 butane tank off of the end, that fits on a 48 foot flat
22 bed 18 wheeler (inaudible) just like it looks right
23 there.
24    MR. SHELLY:  And does it remain on the tractor
25 trailer?

Page 26

1    MR. HILL:  Yes.  Yes, it does.
2    MR. SHELLY:  Okay.
3    MR. HILL:  It does not come off of the
4 trailer.  This is one that you had asked me for a
5 picture, and we just had that one then.  And I thought
6 I'd teach you one while we had it laid out before we
7 actually mailed it.  But that's exactly what it looks
8 like.
9    MR. SHELLY:  And the trailer bed is part of
10 the cost?
11    MR. HILL:  The what?
12    MR. SHELLY:  Is the trailer bed part of the
13 cost, or is that something --
14    MR. HILL:  No, that's part of the cost.
15    MR. SHELLY:  Okay.
16    MR. HILL:  But don't anybody get disillusioned
17 about the cost of the trailers for those things.  That -
18 - that's less than $25,000 of the total cost.  So a very
19 small --
20    MR. SHELLY:  I was curious if the oil
21 companies that -- if they supplied that or if that's
22 something that was part of the equipment?
23    MR. HILL:  No, that -- that belongs -- that
24 belongs to all of us.
25    MR. SHELLY:  Okay.

Page 27

1    MR. HILL:  We haven't sold anything.  It
2 belongs to the fund.
3    MR. SHELLY:  Right.  All right.  I'm going to
4 close off the share.  That was cool.  I appreciated
5 that.
6    MS. LEE:  (Inaudible)
7    MR. SHELLY:  Yes?
8    MS. LEE:  I've got a couple of questions.
9    MR. SHELLY:  Okay.
10    MS. LEE:  Who owns the patent on these
11 machines?
12    MR. HILL:  Clean Energy Technology
13 Association, Inc.
14    MR. SHELLY:  And that's Roy's company.
15    MS. LEE:  Say that again, please.
16    MR. HILL:  And they are patented.  They are
17 not --
18    MS. LEE:  They are patented?
19    MR. HILL:  -- patent-pending.  They are
20 patented.
21    MS. LEE:  Okay.  And where are they
22 manufactured?
23    MR. HILL:  Where?  Would that be --
24    JESSICA:  Mm-hmm.
25    MR. SHELLY:  Yes, where.

Page 28

1    MR. HILL:  Okay.  They're manufactured -- part
2 of the components come from Saint Louis, Missouri.  Part
3 of them come from Corpus Christi.  Part of them come
4 from Indiana.  And part of them come from the Freeport,
5 Louisiana.
6    MS. LEE:  Okay.  (Inaudible).
7    MR. HILL:  What?
8    MR. SHELLY:  You broke up.
9    MS. LEE:  Not China, right?
10    MR. HILL:  Put simply, Ms. Margaret, if you
11 don't mind me calling you that, we're -- we're a company
12 that believes that America -- that I grew up with, can
13 still and does exist.  And we buy our stuff at home,
14 period.  You won't find a -- you won't find one nut,
15 bolt, screw or anything else on any of our equipment
16 that's made overseas.
17    MS. LEE:  Okay.  Can I ask another question?
18    MR. SHELLY:  Yeah, another question.
19    MS. LEE:  Are you going to operate in Texas?
20 Or in that Southern Gulf area?
21    JESSICA:  Are you only operating in Texas?
22    MR. HILL:  Right, we're only operating in West
23 Texas and here, because that's where the more localized
24 demand is.  But obviously, if we had a customer that
25 wanted some, like for the Dakotas or Pennsylvania, or

Page 1

1 THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION

2

3 In the Matter of:          )

4                            ) File No. FW-04561-A

5 CLEAN ENERGY TECHNOLOGY       )

6 ASSOCIATION, INC.             )

7

8 SUBJECT: Collateralized Debt Fund Investor Zoom Webinar

9 PAGES:   1 through 77

10

11

12

13

14

15          AUDIO TRANSCRIPTION

16

17

18

19

20

21

22

23

24      Diversified Reporting Services, Inc.

25          (202) 467-9200

---

Page 2

1       P R O C E E D I N G S

2    Collateralized Debt Fund Investor Zoom Webinar

3       MR. CAVANAUGH:  All right, everyone, great.

4 Welcome.  We're glad you're here.  Thank you for coming.

5 We appreciate you guys taking time out of your night to

6 spend with us and to hear about this presentation and

7 this opportunity.

8       We really hope it's beneficial.  We really

9 hope that you get something out of it, and if you decide

10 to come along and partner with us, then we're excited to

11 have you, and we hope that this is a long and prosperous

12 relationship.

13       So, with that, I'm going to go ahead and bring

14 up the slides.  Once I do, if you could just let me know

15 that everyone can see them in the chat, and then I'm

16 going to dive right into the presentation, and I'll get

17 in to introducing our team, and what we're here to talk

18 about tonight.

19       Cool, all right, everyone has got the slides.

20 That's great.  Okay.  So, like I said, welcome, and

21 we're excited that you guys are here.  My name is Jarrid

22 Cavanaugh.  I'm going to kind of be moderating/guiding

23 the discussion tonight for our team, and then each of

24 our team members will present in between and handle

25 certain sections of the presentation.

---

Page 3

1       At the end of the presentation, what we're

2 going to do is collect all you guys's questions, and

3 we're going to answer those one at a time.  Towards the

4 end of the presentation, if you've felt like you've got

5 all the information you need to either proceed or maybe

6 not proceed, then that's okay; feel free to sign off.

7 We're going to be here as long as it takes to get

8 through all of your questions, or absolutely as many as

9 we can, and Diana, who is one of the panelists and who

10 is in the chat will be monitoring that.  She'll be

11 collecting them, and then she's going to present them to

12 us at the end where we can go through them one at a

13 time.

14       I will pitch the questions to the person -- to

15 the partner that it makes the most sense to answer.  If

16 it falls on me, I'll gladly answer it.  Otherwise, it

17 will be Eric, or Wagner, or Matt.

18       We expect the presentation itself to be about

19 45 minutes.  We're not going to pause during the

20 presentation for questions.  We'll take them all at the

21 end, and then we probably expect to go about an hour,

22 maybe an hour and a half, to answer all the questions

23 that we should typically get.

24       If there's any internet glitches along the way

25 for the panelists, please, if you notice it, just pause,

---

Page 4

1 and when you notice the internet is back online, go

2 ahead and come back up and continue where you left off.

3 If there's any internet glitches for the attendees,

4 please just let us know in the chat, and we will either

5 try to go back and let you know what you missed, or

6 we'll start back if it happened to everybody who is on

7 the -- on the call.  With that, I'm going to dive right

8 in.

9       So, this is your general disclaimer.  I'm not

10 going to read through it or bore you guys with it right

11 now, but you'll have a general disclaimer and a

12 financial disclaimer here.  If you decide to invest with

13 us, those will be in your legal documents.  They'll be

14 in your private placement memorandum.  I do recommend

15 you read through those.

16       I recommend you read through all of the

17 documents to include the operating agreement, the PPM,

18 and the disclaimers.  If you have any questions, reach

19 out to anyone on our team, or any one of the partners.

20       We will answer those questions for you, or we

21 will bring in our counsel to answer them if we can't,

22 and if there's anything that bothers you or worries you,

23 and you need to have that reviewed by your counsel, we

24 completely understand, and if you'd like your attorney

25 to talk to ours, we're more than willing to set that up

---

Page 13

1  carbon capture business as a whole.  There are all kinds
2  of projects going on right now, but the particular
3  project that we're involved with is managed by CETA
4  Technologies, Clean Energy Technology Associates.  They
5  are involved with two different types of projects right
6  now that kind of relate to the carbon capture business
7  that we're doing.
8      They have a project that manages coal
9  distillation, and one that has portable carbon dioxide
10  scrubbers.  The reason I bring up the carbon
11  distillation is because there is a patented solvent that
12  comes out of that process which is used in our $CO_2$
13  capture machinery.
14      So, I just wanted to mention that we do get a
15  patented solvent that is also controlled and owned by
16  CETA industries, and they are the ones that also build
17  and have patented our carbon capture units.
18      So, just to give you a sense, the -- we --
19  there are two types of mobile carbon capture units that
20  are built by CETA.  One is called a $CO_2$ Nomad, which
21  fits on one tractor trailer, and the pipeline units fit
22  on two tractor trailers.  There's a volumetric
23  difference of about three and a half times on the
24  pipeline units.
25      The pipeline units get hooked up to

Page 14

1  transmission pipelines that feed from various gas wells,
2  and the Nomad units get hooked up to the individual
3  wells.
4      So, our project is going to buy three of the
5  pipeline units.  The pipeline units for the net cost are
6  actually the most profitable.  So, I'll get into some of
7  the numbers a little later, and you'll probably
8  understand why we want to use those units.
9      So, our intent is to buy, as a fund, the fund
10  will buy three of these pipeline units, and then we'll
11  operate those units with the -- with CETA's lease and
12  operating agreement.
13      So, what the -- what CETA does is they will
14  lease this equipment to companies like Exxon and
15  Chevron, and there are some independent well owners that
16  will lease this equipment as well.
17      The reason they want to lease this equipment
18  is because when they pump natural gas out of the ground,
19  it comes out of the ground with 30 percent saturated
20  carbon dioxide in it.
21      So, if they were to burn that gas, it would
22  release so much of that carbon dioxide into the
23  atmosphere that it -- you know, our EPA doesn't like
24  that.  So, they have a standard of two percent or less
25  carbon dioxide in the gas.

Page 15

1      So, in order to be able to sell the gas that
2  they produce in their wells, they have to either
3  transport it and process it in the larger plants by the
4  ports, and absorb that cost into selling the gas, or
5  they can lease our equipment, and they have a much
6  cheaper way of doing it.
7      So, if you can go to the slide that has the
8  picture of the equipment, I'll just quickly go through
9  how the -- we might have to jump back to this one, but
10  I'm just going to kind of go through the -- the piece of
11  equipment.
12      This is one of the smaller Nomad units.  All
13  the components are the same as the -- as the larger
14  units.  It's just a volumetrically smaller piece of
15  equipment, but you see the tanks on the left of the
16  picture are where the solvent is filled up, and that
17  solvent feeds into the two vertical columns that you see
18  on the red spray tower unit there.  The natural gas line
19  enters this -- the spray towers, and the solvent enters
20  the sprayers within the spray tower, and as the natural
21  gas flows up through that equipment, then the solvent is
22  sprayed through the natural gas, and naturally absorbs
23  the $CO_2$.
24      Basically, that process gets recycled until
25  the meters show that there's less than two percent $CO_2$

Page 16

1  left in the natural gas.  It then passes through
2  chillers and a compressor, and that allows for
3  separation of the saturated solvent, and the natural gas
4  that's now ready to be sold.
5      So, basically, that tank to the right then is
6  where the saturated solvent is stored after the process,
7  and then the natural gas can get piped away and shipped
8  into, you know, pipelines, trailers, train cars, however
9  they're going to transport it or sell it.
10      So, the biggest savings to the oil company is
11  in the fact that they don't have to transport that gas
12  to the refinery to get that processing done.  It could
13  be done right on site.
14      Now, the second piece of the puzzle is when
15  they use that saturated solvent at the end, what they
16  can do is they can then take that solvent and kind of
17  repurpose it for a process called enhanced oil recovery.
18      So, enhanced oil recovery is kind of like
19  fracking.  What they do is inject that saturated
20  solvent, it's got the $CO_2$ attached to the CETA solvent,
21  which is the main solvent, and when that's injected into
22  the well, the kinetic energy of it heating up will break
23  up the shale formations, and it'll dilute the crude oil
24  or crude gasses and things that are in there.
25      And so, actually this -- our process will work