IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, § <br> § <br> Plaintiff, § <br> § <br> V. § <br> § <br> ROY W. HILL, ERIC N. SHELLY, § <br> CLEAN ENERGY TECHNOLOGY § <br> ASSOCIATION, INC., and § <br> FREEDOM IMPACT CONSULTING, LLC, § <br> § <br> Defendants. § <br> § | Case No. 6:23-cv-00321 |

## RECEIVER'S PRELIMINARY REPORT

Receiver Albert C. Black III provides this preliminary report, respectfully stating:

### Introduction

1. On May 3, 2023, the Court entered its Order Appointing Receiver (Doc. 8).

2. Since the entry of the order, the Receiver has been working to execute the duties the Court has assigned to the Receiver. Thus far, inquiries from over two hundred investors have been received. Although the initial report of the Receiver is not due until June 2, 2023, the Receiver makes this preliminary report in the interest of advising all interested parties of the status of the work of the Receiver and the preliminary results of his investigation.

### Roles of the Parties

3. Roy W. Hill ("Hill") is the principal party in control of Clean Energy Technology Association, Inc. ("CETA").

4. Eric N. Shelly ("Shelly") is the principal party in control of Freedom Impact Consulting, LLC ("FIC").

RECEIVER'S PRELIMINARY REPORT – Page 1

5. CETA was a relatively small operation from 2009 to 2019, but then Shelly became involved in promoting CETA and the fundraising expanded exponentially. One of the main catalysts was the introduction of supposed tax benefits for investors. Another was the promotion of the CETA investments by members of various networks of which Shelly was a part.

## CETA

6. Immediately after his appointment, the Receiver, his counsel, and members of his team went to the CETA office, which is located in three adjacent storefronts on the main street of Fairfield, Texas.

7. In the course of that day and those that immediately followed, the Receiver, his counsel, and members of his team were able to review the books and records of the company, interview numerous employees, inspect the company's two industrial yards in Fairfield and Streetman, Texas, interview suppliers, obtain and review bank records, interview promoters and investors, review marketing materials, review investor files, review the company's accounting system, review the company's server, review information on personal phones, and undertake other investigative efforts.

8. Based upon this work, the Receiver does not believe CETA actually generated revenues from oil and gas operations, but was instead entirely dependent upon investor funds for its existence. While there are numerous facts leading to this conclusion, following are a few.

   a. The company's accounting system was set up so that the revenue subaccount was linked to the cash account. The cash account was funded entirely from investor funds. Distributions to investors were drawn from the cash account. The Director of Accounting was not aware of any outside revenue, and, in fact, indicated she did not set up the subaccounts and did not create contemporaneous financials for the

company; rather, she just received investor funds, paid various expenses, and paid returns from investor funds.

b. The company's records reflect only the same Exxon letter agreement provided to the Court by the SEC (which did not pertain to oil and gas production). There is a draft of a second agreement, but no signed copy of that second agreement has been found. No other, similar agreements were found with oil and gas production companies.

c. No record was found of a revenue payment from an oil and gas company. No employee could identify any such payment.

d. The equipment was demonstrative. No record was found of the installation of any carbon capture units at any well. Only demonstration models of the carbon capture units have been found. None of the employees were aware of the actual installation of carbon capture units at a well site anywhere. The manufacturer of the carbon capture units stated only 47 were ever manufactured, and all were sent to the company's own yards at Fairfield or Streetman. This is inconsistent with investment contracts reflecting over 85 carbon capture units were purchased and were generating revenues at well sites. This is also inconsistent with the investor payments that were supposedly derived from oil and gas production, and the production of the CETA solvent, at well sites using this equipment. Based upon inspections and employee reports, the Receiver believes all of the carbon capture units are located on company property or with company employees; in other words, not at well sites. Similarly, the coal distillation units are located on company property and employees report they have only been operated on a test basis.

e.  The records and the principal supplier indicate the costs of the equipment was far less than the amounts represented to investors.

f.  The only person who is the source of the revenue statistics is Mr. Hill. He provided hand-written notes for CETA employees to create one-page statements reflecting supposed revenues.

g.  A note found in Mr. Hill's desk provided the February account balances of the intermediate accounts through which investor funds flowed to the company. The company itself did not have onsite records of the intermediate accounts.

9. The extent of the investor loss will be difficult to determine. The company did not keep orderly investor files, and the inbound investor funds were funneled through dozens of accounts. The Receiver and his counsel have received investor documents from many investors. The Receiver will be establishing a web page for further investor submissions. It will be some time before these materials can be compiled into a correct investor schedule.

10. The investor loss will not be total. The bank records so far indicate fundraising of approximately $150 million  In the past ten days, over $60 million has already been frozen in various accounts.

11. The investor losses will include losses of tax benefits. The tax benefits were premised upon oil and gas equipment actually being installed at well sites. There were also supposed matching loans in many cases that increased the amount of the equipment supposedly purchased and thus the amount of the depreciation investors were told they could claim. On the other hand, the adverse tax impact will be somewhat mitigated. Investors were told to claim phantom income. Investors were told the returns they received were the result of production and

therefore also income, when, in fact, they were merely a return of invested capital. This will likely be the type of case for which the Internal Revenue Service permits a theft loss to be claimed.

### FIC

12. Shelly presently appears to have been the largest promoter of CETA. The receivership includes a freeze on his personal assets. The assets are significant, and will be reported in more detail in the Receiver's initial report. The Receiver has been actively working to implement the Court's asset freeze.

### Response of Hill and Shelly

13. Both Hill and Shelly have submitted Fifth Amendment statements. Both have agreed to the entry of preliminary injunctions.

Respectfully submitted,

*/s/ Dennis Roossien*
Dennis L. Roossien, Jr.
Texas Bar No. 00784873
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75201-6659
Telephone: 214.855.7535
droossien@munsch.com

COUNSEL FOR PLAINTIFFS

### CERTIFICATE OF SERVICE

I hereby certify that on the 12th day of May, 2023, a true and correct copy of the foregoing instrument was served electronically in compliance with the Court's Electronic Filing Procedures on all counsel of record who are deemed to have consented to electronic service.

*/s/ Dennis Roossien*