IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | Case No. 6:23-cv-00321 |
| | § | |
| ROY W. HILL, ERIC N. SHELLY, | § | |
| CLEAN ENERGY TECHNOLOGY | § | |
| ASSOCIATION, INC., and | § | |
| FREEDOM IMPACT CONSULTING, LLC, | § | |
| | § | |
| Defendants. | § | |
| | § | |

**RECEIVER'S INITIAL REPORT**

Receiver Albert C. Black III ("Receiver") provides this initial report, respectfully stating:

**Introduction**

1.    This receivership pertains to Roy W. Hill ("Hill"), his company Clean Energy

Technology Association, Inc. ("CETA"), Eric N. Shelly ("Shelly"), and his company Freedom

Impact Consulting, LLC ("FIC"), as well as various entities under their control.

2.    This receivership is ancillary to a civil enforcement action brought by the Securities

and Exchange Commission ("SEC").  The main action commenced on May 3, 2023 with the filing

of a Complaint (Doc. 1) and motions seeking an asset freeze and the appointment of a receiver

(Docs. 2 & 4).  In support, the SEC presented legal authorities and supporting evidence to

demonstrate to the Court the Defendants were engaged in a fraudulent scheme involving at least

$155 million in invested dollars (Docs. 4.1 – 4.5).  Based upon the SEC's submission, the Court

determined it was proper to issue temporary orders under seal granting the SEC's requests (Doc.

3, 7, & 8).  The Defendants later consented to the issuance of preliminary injunctions that affirmed

the relief originally granted (Doc. 22-24).

RECEIVER'S INITIAL REPORT – Page 1

3.      The Order Appointing Receiver (Doc. 8) appoints Albert C. "Tre" Black III and

directs him to present an initial report as follows:

> Within thirty (30) days of the entry of this Order, the Receiver shall file a written
> status report with the Court.  The status report will include a summary of the
> receivership activities to date.  It will also include a proposed plan for administering
> the receivership going forward, including (a) whether the receivership should be
> continued (and, if so, why); (b) an analysis of whether instituting appropriate
> bankruptcy proceedings would be in the best interests of investors and creditors;
> and (c) if the Receiver recommends continuing the receivership going forward, a
> proposed deadline by which the Receiver will submit the Liquidation Plan.

(Doc. 8 at 16).

4.      Due to a large influx of investor inquiries, the Receiver presented a high-level

version of this report early (Doc. 27).

5.      It has now been thirty days since the start of the receivership, and so the Receiver

now presents a complete initial report.

6.      The Receiver's next reporting obligation is the filing of a quarterly report that is

supposed to set forth the next deeper level of detail as to the assets and liabilities of the receivership

estate (Doc. 8 at 16-17).  The Receiver is working to extract and to assemble the necessary

information for the report from the documents that have been preserved, the investor reports and

claims that have been submitted, ongoing discussions with the parties, and other sources.  The

quarterly report will provide such information as has been assembled at that time.  Successive

reports will be made thirty days after the end of each quarter.  Each report is likely to contain

similar information at an increasing level of detail.

7.      The Receiver is mindful that investors wish to know as soon as possible whether a

fraudulent scheme actually occurred and what is the likelihood of recovery.  The Receiver has

been inundated with inquiries along such lines.  The Receiver has already circulated his

preliminary report through a website, as is customary in cases of this nature.  The Receiver has

RECEIVER'S INITIAL REPORT – Page 2

been advising investors to follow the development of information on that site.  To help investors find the site, the Receiver redirected the CETA website (www.cetaenergy.com) to point to a website where the Receiver posted his preliminary report and the key pleadings (pnc.5fd.myftpupload.com).  The Receiver intends to post on the site key pleadings in the case, this report, and successive reports.  The Receiver is already using the site to collect investor submissions in the form of early claims.[1]

I.      SUMMARY OF RECEIVERSHIP ACTIVITIES TO DATE

8.      Following is a summary of the receivership activities to date.

A.      **Implementation of the Asset Freeze**

9.      The Court's determination to issue the temporary orders under seal (Doc. 3) allowed the SEC and the Receiver to contact financial institutions to implement the asset freeze, to obtain electronic records from the Defendants, and to secure movable assets.  The result was the securing of bank accounts, easily secreted valuables, and electronic records.

10.     The Receiver was also able to appear unannounced at CETA offices, and sites owned by CETA and Shelly, and thereby secure valuable property, mobile devices, computers, and other records, as well as interview staff and inspect CETA's actual equipment and operations as they actually existed at that point in time.

11.     The Receiver's logistical support team secured CETA's heavy equipment and a number of its vehicles.  In seeking to fully implement the asset freeze, the Receiver sought, but

---

[1] Some investors have asked about a deadline for claims.  There is not one.  This case is not governed by bankruptcy rules, such that setting an aggressive bar date for claims is not customary.  Rather, the creation of a claim form allows investors to know what is the most critical information that the Receiver needs at this stage to establish communications with investors, to map the overall size and to determine the exact nature of the intertwined fraudulent schemes involved here, and, with that information, to formulate recommendations for the Court.  The investor submissions greatly expedite the work of the receiver, particularly in this case, where a substantial part of the fundraising was decentralized.

did not find, signs of equipment having been placed in offsite production.  The Receiver has also inquired of employees and Hill's counsel in this regard.

16.        12.        The Receiver also attempted to identify customer relationships relative to purported sales in material quantities of solvents, processed coal, or rare earth minerals.  Neither the employees nor the Defendants have identified any such customers.

13.        The Receiver worked to review the recovered records and electronic devices to determine whether additional steps were needed to implement the asset freeze.  The Receiver also conferred with counsel for the individual Defendants as they appeared in the case.

14.        As a result of these efforts, the Receiver is relatively confident that the asset freeze has been substantially implemented as to the assets of CETA, FIC, and Shelly.

15.        In respect of CETA bank accounts or other assets of Hill or entities controlled by Hill, there are gaps in the picture immediately available from the assembled records that the Receiver will need to close.  Part of this is due to the decentralized nature of the fundraising, which necessitates completing a picture, in part, from the bank records.  Whatever the case, neither CETA nor FIC is able to provide a complete picture, such that work remains to be done before the Receiver can advise the Court with confidence that the asset freeze has been fully implemented.  Additionally, Hill has raised questions about assets of a trust that the Receiver observes received millions in investor funds.  The Receiver will work with Hill's counsel to see if that matter can be resolved on the basis of what the completed assembly of records reveals.

**B.**        **Handling of Investor Inquiries and Collection of Investor Records**

16.        The Receiver has also been handling a very substantial number of investor inquiries.

17.        Word of the receivership circulated quickly.  The resulting syndicator and investor inquiries quickly exceeded two hundred and have continued each day.

RECEIVER'S INITIAL REPORT – Page 4

18.     An unusually large number of investors wished to send materials and information to the Receiver, and sought confirmation of their submissions, both as to their receipt and in respect of their completeness.  The Receiver initially outlined points for informal submissions via email, but later developed an investor claim form to address the requests for confirmation of the completeness of the submissions.  Many investors also wished to speak with the Receiver or his counsel, and so hundreds of calls have been handled.

19.     As noted above, to streamline these communications, the Receiver redirected the CETA Energy website (www.cetaenergy.com) to a website where the Receiver posted his preliminary report and the key pleadings (pnc.5fd.myftpupload.com).  The Receiver intends to continue to utilize this arrangement to publish reports and pleadings.  The Receiver has posted the claim form on this site, and so investors may submit claims and documents through a link on the site.

20.     In addition to responding to investor inquires, the Receiver has gathered and compiled investor submissions in order to complete the overall picture of the nature of the fundraising, the commingling of funds, and the resulting potential estate liabilities.  One result of these communications is that it is now apparent that the fundraising goes beyond just the efforts of FIC and Shelly, although those efforts produced the largest amount of fundraising thus far.  The investor communications also reveal that there were several variations on the same theme.  The most common was the assertion that an interested syndicator could raise funds from individual investors for the purpose of purchasing one of the CETA pieces of equipment that would supposedly go into operation and produce revenue.  The assembled funds supposedly matched the manufacturing cost of the equipment.

21.     The Receiver has determined that the decentralized nature of this fundraising will require substantial work on the part of the Receiver, so that the Receiver can comply with his

reporting obligations and make recommendations to the Court.  Submissions from syndicators and investors are therefore important and useful, and the Receiver will continue to solicit them, as well as work to match the submissions with bank records, since CETA did not have a comprehensive set of investor records.  The Receiver is grateful for the extensive investor accounting that Shelly provided.  The Receiver hopes that other syndicators will do the same.  This would greatly accelerate the work of the Receiver.  Again, to be clear, the Receiver has not sought for any deadline to be established for investor claims.  In receiverships of this type, a receiver generally seeks to identify all investors and to work to provide restitution as broadly as possible, rather than to establish an early bar date, as happens in some bankruptcy proceedings.  Submission of claims is therefore something the Receiver will actively encourage, but not something that the Receiver expects will be required at this early stage.  Rather, at this stage, the information obtained through the claim form process is assisting the Receiver greatly in expediting his work.

22.     In the course of performing his duties, the Receiver has learned certain facts in respect of the central questions investors have posed to him.  As this report will be posted in an effort to streamline repetitive communications, the Receiver provides broad answers to frequently asked questions in this part of the report.

23.     First, with respect to the often-asked question as to whether the returns were paid with production or sales revenues, or instead with investor money, the Receiver can say with confidence that the returns came from later investor money.  Investors generally wish to know whether there was revenue from production because CETA was paying returns as if it had a large number of carbon capture units in the field as an adjunct to the production operations of major oil and gas companies, principally Exxon, as well as supposed coal refining operations that supposedly produced higher quality coal, rare earth minerals, and proprietary solvents.  The Receiver found no indication that there actually was meaningful production or sales revenue;

RECEIVER'S INITIAL REPORT – Page 6

rather, the indications are that returns were, in fact, funded by later investor money, and were not actually evidence of financial success as hundreds of investors had stated that they believed. Specifically, in seeking to determine whether the asset freeze had been fully implemented, the Receiver questioned employees, inspected CETA's industrial sites in Streetman and Fairfield, and, among other things, obtained documentation from the manufacturer of the central component of the carbon capture units, whose serial number was generally used on the investor documentation and supposed bills of sale.  The Receiver determined that only about a quarter of the number of central components were manufactured as compared to representations made to investors. Additionally, in seeking to determine whether there were ongoing profitable operations that the Receiver would need to address, the Receiver also reviewed various records to determine the general magnitude of investor returns, and sought evidence of production revenue.  The Receiver also questioned Hill's counsel.  The Receiver is presently confident that there was neither equipment in the field that needed to be secured, nor that there are customer relationships that need to be maintained.  Thus, the picture painted by the bank records that the SEC analyzed and presented to the Court fits with the Receiver's experience in discharging his duties.

24.     Second, as to the question of potential recovery, this is a case where a substantial amount of money has been frozen, but there is also a sizeable loss.  The extent of the loss will require work to ascertain in detail.  The Receiver has concluded that tabulation of bank records and investor submissions will be necessary to provide a complete picture.  The early tabulation indicates the funds raised were substantially greater than the $155 million figure calculated by the SEC that was largely in relation to Shelly-related fundraising.  The Shelly-related projects involved fundraising of approximately $146 million and returns of approximately $54 million, leaving a net cash loss of $90 million.  An additional $10 million in fundraising has been specifically identified as to which the loss amount appears to be $5 million.  But, there are other substantial fundraising

efforts that have been identified but not yet tabulated, such that the net cash loss amount is very likely to grow substantially beyond $95 million.  That said, there are frozen funds in excess of $60 million, such that investors in this particular case are likely to receive more restitution than is often the case in situations like this.

26.    Relatedly, there will also be tax losses.  The investors report and the documents reflect a large portion of the investments from 2019 forward were premised upon supposed tax benefits that would have been available if there was actual equipment and actual production.  This further confirms the scheme was premised upon claims of actual equipment being used in the field to produce revenues through payments from production companies operating wells, solvents being sold, or coal being refined.  The Receiver assessed the potential that investors will face negative tax impacts, and concluded that the factual basis for the tax deductions was not actually present.  That said, investors will also likely be able to claim theft loss deductions.  Investors are therefore encouraged to confer with their tax advisors to make preparations to address this situation.

C.    **Employee, Supplier, and Insider Claims**

26.    In addition to investor claims, the Receiver was immediately faced with employees, then suppliers, and ultimately claims from insiders.

27.    After speaking with employees and examining records, the Receiver concluded CETA did not have profitable operations that should be continued.  Indeed, it was quickly apparent that the CETA employees worked largely in silos in order to (a) create the necessary CETA promotional materials, solicitation documents, bills of sale, and other documents that created the illusion presented to investors; (b) conduct demonstrations of supposed CETA technology and to undertake development work; (c) execute the flows of funds; and (d) provide administrative support.  Based upon this, the Receiver determined not to continue the CETA operations, and took

necessary steps to advise the employees and to wind up their employment, including addressing employee claims in view of the payroll laws and rights to retain 401k accounts.

28.     The Receiver also interacted with various suppliers, a landlord, and other creditors. The Receiver intends to accept informal claims, and has already been provided certain claims. These claims will be evaluated and recommendations will be made to the Court on how to appropriately handle these claims.  Again, the Receiver's dealings with creditors reinforces the view that CETA was engaged in research and development, but not engaged in production.  One supplier, for example, reported production of only 47 of the central parts for the carbon capture units, even though investors were sold more than three times that number.  These central parts have largely been accounted for, and they were not in service.

29.     Both Hill and Shelly have requested that the Receiver release a portion of the frozen assets to them.  The Receiver will have to provide all parties with certain information in order to allow the parties to the main action to resolve such requests, or, if those efforts are not successful, then it may be necessary for the Court to address those requests.

**D.      Compilation of Information for Quarterly Reports**

30.     The Receiver has also been compiling information in anticipation of having to file his first quarterly report, which is due in late July.  The appointment order details the elements to be included in that report.  These include details as to assets and liabilities of the receivership estate as a whole.  The investor and other submissions are helpful to the compilation of this report.

31.     In respect of the Hill assets and liabilities, Hill has submitted a Fifth Amendment statement, and indicated he requires access to documents obtained by the Receiver in order to complete the information required of him in the appointment order.  The Receiver will be cooperating in this request.  The Receiver is also hopeful of Hill's informal cooperation.

32.     As for the CETA assts and liabilities, the CETA employees were unable to identify assets consistent with the representations made to investors.  This has caused the Receiver to examine the records that have been accumulated, including bank records, in an effort to determine whether additional assets exist.  Additionally, CETA does not appear to have maintained typical financial statements, which means the Receiver will have to create them in order to present the information required for quarterly reports.  The Receiver has contacted certain accountants who provided tax preparation services to CETA, and the Receiver will be attempting to utilize the materials to the extent they are helpful.

33.     Although Shelly has also asserted his Fifth Amendment rights, Shelly provided a general overview of his assets and the Receiver expects to be able to cooperate with Shelly in compiling the appropriate information for the quarterly reports.

34.     Shelly also provided an accounting of the FIC fundraising and the FIC sponsored syndications.

35.     In the absence of complete and organized financial records, the Receiver's approach will be to test the records that have been found against bank records in order to follow the investor deposits to their ultimate end, and to determine the scope of the necessary work based upon the picture outlined by the bank records.  With that picture in hand, the Receiver will be able to better define the scope of the receivership estate, and to provide the information required for the quarterly reports.

### E.     Preparation of Court Reports

36.     The Receiver prepared and submitted a preliminary report and this initial report. As noted, the preliminary report was a part of the Receiver's responses to investor inquiries.

**F.      Cooperation with Parties to the Main Action**

37.      The Receiver has been compiling, and intends to make available, the recovered records to both the Plaintiff and the Defendant.  The Receiver has a number of requests from each of the parties that the Receiver is attempting to fulfill.

**G.      Collection of Records from Third Parties**

38.      The Receiver was unable to identify a complete set of bank records in respect of the investor deposits, returns, and uses of investor funds.  The banks have been slow to cooperate in the Receiver's requests, and so it may take some time to put together a full set of records.

**H.      Evaluation of Potential Claims**

39.      The directives for the quarterly reports include the evaluation of potential claims. Under circumstances such as those the Receiver has encountered here, the most common claims are fraudulent transfer claims.  To evaluate the potential for such claims, the Receiver is assembling and reviewing any accounting records and the bank records in order to identify what transfers have been made, and will then work to examine the transfers in light of the available records and witnesses, so as to determine whether affirmative claims to recover any diverted funds are advisable.  Once this initial work is complete, the Receiver will follow the procedures as directed in the appointment order.

**II.      PLAN FOR ADMINISTRATION OF THE ESTATE**

40.      The Receiver believes that the immediate next steps should be those already directed in the Order Appointing Receiver.  Alongside the work needed to address investor inquiries, preserve the status quo, and create a first quarterly report, the Receiver can address, as needed, certain presently open questions as to whether the asset freeze has been fully implemented, and thereafter provide recommendations that are based upon the facts as will hopefully be set forth in a detailed report in the next sixty days.  It is already clear that this is a case where a significant

fraud has occurred, and it is likely that the receivership will lead to an equitable distribution and perhaps efforts to obtain further recoveries, but the available information is not yet sufficiently detailed for the Receiver to provide firm recommendations as to how the receivership should proceed and be resolved.

### A.      Whether the Receivership Should Be Continued

41.      First, the Receiver recommends that the receivership be continued because the SEC is entitled to such relief.  The appointment of a receiver is a well-established equitable remedy in civil enforcement proceedings for injunctive relief.  *See, e.g., SEC v. First Fin. Group of Texas*, 645 F.2d 429, 438 (5th Cir. 1981).  Here, the Defendants have agreed to the entry of preliminary injunctions, which confirms the entry of the Order Appointing Receiver.  Additionally, the individual defendants have asserted their Fifth Amendment rights, which further validates the Court's entry of temporary orders.    *U.S. v. Ferrand*, Case No. 05-00692006, fn. 4, 2006 WL 598212 (W.D. La. Feb. 7, 2006, Hayes, M.J.) (noting Fifth Amendment assertion gives rise to an adverse presumption in a civil case), *adopted and further relief granted*, 97 A.F.T.R.2d 2006-2183 (W.D. La. Apr. 11, 2006, James, J.).  Furthermore, the facts gathered in the course of the Receiver's work run in line with the evidence as presented to the Court.

42.      Second, the Receiver recommends the receivership be continued because it is serving appropriate purposes.  Courts will appoint a receiver (1) where necessary to preserve the *status quo* while various transactions are being unraveled in order to determine an accurate picture of the fraudulent conduct, *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1105 (2d Cir. 1972); (2) to protect "those who have already been injured by a violator's actions from further despoliation of their property or rights," *Esbitt v. Dutch-American Mercantile Corp.*, 335 F.2d 131, 143 (2d Cir. 1964); (3) to prevent the dissipation of the defendant's assets pending further action by the court, *SEC v. Am. Bd. of Trade, Inc.*, 830 F.2d 431, 436 (2d Cir. 1987); and (4) to install a

responsible officer of the court who could bring the companies into compliance with the law.  *Id.* at 437.  Each of these purposes is being served.  First, hundreds of investors have requested an accurate picture be provided, and the Receiver has been working to provide that picture through the court-required reports described in the appointment order, and through other communications with investors.  Second, there can be no doubt that investors were told they were receiving payments derived from profitable operations when, in fact, the payments were made from their own funds or later investor funds, and CETA did not require the funds to purchase the equipment as investors were told, but instead the funds were being used for other purposes.  Third, the implementation of the asset freeze should not be reversed given the circumstances present here; rather, for obvious reasons given the fraudulent conduct, the use of funds should be subject to a receiver's administration under the ultimate supervision of the Court.  Fourth, the Defendants have not been operating in compliance with applicable law, and so it is necessary to have a responsible officer of the court bring the companies into compliance with the law.

43.    Based upon the foregoing, the Receiver's present recommendation is to keep in place the existing directives in the Order Appointing Receiver (Doc. 8).  As noted above, the parties have agreed to this, and performance of the duties set forth in the order will provide the transparency to the investors that has been lacking during the course of years of fraudulent conduct, will halt the violators' actions, will keep the receivership estate under Court administration, and keep in place a fiduciary who will follow applicable law.

44.    In regard to providing transparency, the compilation of the first quarterly report will require some substantial forensic work because, as noted above, CETA itself did not maintain clear records of the scope of the fundraising and there were intertwined offerings organized by various third-party syndicators that raised money for supposed CETA equipment and other projects.

RECEIVER'S INITIAL REPORT – Page 13

45.     The Receiver therefore intends to put together sufficient information to make as complete of a first quarterly report as practical, and to include in that report further recommendations for the Court as to appropriate next steps at that time.

46.     The Receiver will also take into account the further progress of the main action, some of which may be resolved and some of which may be expanded, and the Receiver will tailor his actions accordingly.

**B.     Bankruptcy Proceedings Should Not Be Instituted**

47.     In the Fifth Circuit, it is appropriate to resolve a receivership arising from a securities fraud by means of a pro-rata equitable distribution, and a district court has broad equitable authority to do so.  *SEC v. Forex Asset Mgmt. LLC,* 242 F.3d 325, 332 (5th Cir. 2001).

48.     There is, however, some authority for the proposition that a district court should evaluate whether the case is simply an ordinary insolvency proceeding that should be administered by the bankruptcy courts.  *See SEC v. Byers*, 637 F.Supp.2d 166, 175-76 (S.D.N.Y. 2009).  The district court in the *Byers* case observed that a federal district court has broad equitable authority and discretion as to the ultimate course of a receivership, such many receiverships run their course and end in an equitable distribution plan.  *Id.*  Receivership is generally considered more equitable means of resolving a fraudulent scheme; as the district court in *Byers* determined:  "This is an SEC fraud case involving a massive Ponzi scheme.  The reason the Wextrust entities are in shambles is not—as is typical in a bankruptcy case—because of poor economic conditions or garden variety mismanagement.  The reason is fraud."  *Id.* at 176.  In assessing whether a case should ultimately be resolved through bankruptcy liquidation or an equitable distribution plan, the district court should take into account the views of the SEC and the receiver.  *Id.*

49.     This case is plainly not an ordinary insolvency.  CETA and FIC did not simply become insolvent; rather, they were instrumentalities of a fraudulent scheme, as the SEC

RECEIVER'S INITIAL REPORT – Page 14

demonstrated in its moving papers, and as has been confirmed by the evidence and facts discovered since.  As such, providing the Defendants protection from their creditors is not appropriate.  This is a civil enforcement action, in which the overwhelming majority of any distributions will be in the nature of restitution.  Even recoveries by the SEC, through disgorgement or civil penalties, are generally turned over for equitable compensation to defrauded parties through the Fair Funds Act. *See* 17 CFR §§ 201.1101, et seq.  Additionally, the above four purposes have not been completed, such that even if a bankruptcy liquidation might become advisable in the future, it is not advisable now.  Thus, the SEC and the Receiver favor continuing to administer the frozen assets by means of an equitable receivership under the supervision of this Court.

        **C.**       **Deadline for Liquidation Plan Proposal**

    50.     The Receiver will need time to appropriately determine the scope of the scheme and related intertwined schemes, and to propose an appropriate plan to the Court.  The work will require, in part, reliance upon bank records that will take time to assemble.  As a result, the Receiver does not expect to be in a position to give a full and complete quarterly report on his first attempt.  Additionally, the Receiver expects to tailor his work in line with the resolution of the main case, which is in its initial stages.  The Receiver therefore recommends that the Court determine that the Receiver's second quarterly report in this case should include a proposal for a distribution plan.

Respectfully submitted,


*/s/ Dennis Roossien*

Dennis L. Roossien, Jr.
Texas Bar No. 00784873
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75201-6659
Telephone:  214.855.7535
droossien@munsch.com

COUNSEL FOR PLAINTIFFS


## CERTIFICATE OF SERVICE

I hereby certify that on the 2nd day of June, 2023, a true and correct copy of the foregoing instrument was served electronically in compliance with the Court's Electronic Filing Procedures on all counsel of record who are deemed to have consented to electronic service.

*/s/ Dennis Roossien*