IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>V.<br><br>ROY W. HILL, ERIC N. SHELLY,<br>CLEAN ENERGY TECHNOLOGY<br>ASSOCIATION, INC., and<br>FREEDOM IMPACT CONSULTING, LLC,<br><br>Defendants. | § § § § § § § § § § § § § § § Case No. 6:23-cv-00321 |

### RECEIVER'S QUARTERLY REPORT

Receiver Albert C. Black III ("Receiver") provides this quarterly report for the period May 3, 2023 through June 30, 2023, respectfully stating:

### Introduction

1. This is the first quarterly report made pursuant to the requirements of the Order Appointing Receiver (Doc. 8, at 16, para. 53).

2. This report builds upon, and presumes knowledge of, the Receiver's earlier reports in the case (Docs. 27 & 32).

   A. **Summary of the Operations of the Receiver**

3. The Receiver's May operations are described in his earlier reports.

4. In June 2023, the Receiver engaged in the following principal activities:

   a. Established procedures to address frequently asked investor questions, and streamlined the means of the receipt, acknowledgment, and initial review of claims;

  b. Established a single document repository and offered access to the individual defendants;

  c. Requested compliance by the individual defendants with the requirements of the Order Appointing Receiver for disclosures of assets (which Defendant Roy W. Hill ("Hill") ignored, while Defendant Eric N. Shelly ("Shelly") substantially cooperated);

  d. Engaged in communications with counsel for the individual defendants to attempt to limit the need for investigative work by the Receiver's team;

  e. Gathered information for this report to the extent not provided by the individual defendants, including conducting interviews of key parties involved in raising money based upon technologies supposedly developed by Clean Energy Technology Association, Inc. ("CETA");

  f. Continued to work to secure receivership assets not yet turned over to the Receiver;

  g. Worked with involved banks to provide records and to transfer funds consistent with the directives of the Order Appointing Receiver;

  h. Worked to negotiate the resolution of certain claims;

  i. Established administrative procedures in order to provide quarterly reports; and

  j. Responded to inquiries from the Plaintiff, other authorities, and third parties.

**B.** **Cash and Administrative Expenses**

 5. The Receivership estate's combined cash is reflected on the attached Exhibit B.

 6. The Receiver's professionals have not yet submitted a fee application.

 7. The net unencumbered cash is therefore the amounts shown on Exhibit B.

C. **Receipts and Disbursements**

8. Exhibit A shows receipts and disbursements for the quarter and since inception. The business expenses principally pertain to resolving final wage claims from CETA employees.

D. **Receivership Property**

9. Due to Hill's failure to comply with the Order Appointing Receiver, this section of the Receiver's report is necessarily based upon the Receiver's efforts to discover receivership property in regard to Hill, CETA, and related parties.

10. While Shelly has substantially complied with the Order Appointing Receiver, the information provide is not yet fully complete.

**Cash**

11. The cash on hand is reflected on Exhibits A and B.

**Equipment**

12. The Receiver has identified and secured certain equipment purporting to be coal distillation, carbon capture units, or parts thereof. They are located in three places: a yard in Fairfield; a yard in Streetman; and at a supplier in Corpus Christi. Notably, while CETA purported to sell equipment to investor groups and operate that equipment to produce returns to investors, no equipment actually produced revenues; they were all demonstrative. Accordingly, the equipment is likely worth scrap value. The Receiver is presently retaining the Fairfield and Streetman equipment as evidence in the main proceeding. The Receiver intends to negotiate a resolution with the supplier in Corpus Christi to liquidate partially completed equipment parts in order to limit storage charges and mitigate that supplier's claim.

13. The Receiver has collected a number of CETA vehicles whose value has not yet been determined. The Receiver intends to sell these vehicles in due course.

### Real Estate

14. CETA owns industrial yards in Fairfield and Streetman, Texas. The value has not been determined. The land costs little to retain, and so the Receiver intends to retain the property pending further developments in the main action.

15. CETA Land and Mineral Investments, Inc. appears to own a few lots of limited value in Caddo Parish, Louisiana.

16. Shelly owns real estate as reflected on Exhibit C. The Receiver intends to cooperate with Shelly in maintaining these properties pending resolution of the main action.

### Investments

17. Shelly has a number of investments as shown on Exhibit C. The Receiver has contacted the issuers or managers of these investments, and intends to leave these assets frozen for the immediate future.

18. The investment assets Exhibit A consist of the Shelly investments on Exhibit C.

**E. Claims Held by the Receivership Estate**

19. Hill transferred millions of dollars to "Trust No. 2", which owns the house where he often lives, the office where he worked, and other property. That trust received millions of dollars from CETA investor funds. Absent compliance with the required disclosures from Hill, the Receiver will need to gather the information Hill should have provided in respect of transferred investor funds and subsequently transferred investor funds. The Receiver has accumulated the majority of the involved bank records. The Receiver expects to incur modest forensic resources tabulating these transfers, although these expenses could be mitigated if Hill were to comply with the Order Appointing Receiver.

20. Hill transferred millions of dollars to accounts in the name of Freestone Energy as reflected on Exhibit A. The Receiver has yet to determine the purpose of these transfers, and Hill

is not saying. The Receiver therefore intends to confirm that all of the funds transferred to Freestone Energy accounts are, in fact, investor funds. At present, the Receiver expects for such to be the case. The Receiver expects this will require modest forensic resources, although, again, these expenses could be mitigated if Hill were to comply with the Order Appointing Receiver.

21. Hill appears to have loaned approximately $5.1 million to support the purchase by Mr. and Mrs. Allen of a family business located in Oil City, Louisiana that is involved the oil and gas industry. The business operates under the names Allen Brothers and W C Allen. The Receiver is investigating what value supported that transaction.

22. CETA and Hill did not keep a complete accounting of the use of the investor funds. The Order Appointing Receiver directs Hill to provide that accounting. At present, there is a significant gap between the cash invested, the known returns paid to investors, and the cash on hand. The Receiver therefore intends to complete an accounting to determine whether there are additional claims that the receivership estate has to recover diverted funds. The Receiver expects this will require modest forensic resources, although, again, these expenses could be mitigated if Hill were to comply with the Order Appointing Receiver.

23. The Receiver believes that the costs of this forensic work will be less than the value of the recoverable assets of Trust No. 2 and the Freestone Energy accounts, and that the results of the work will validate the Receiver's present belief that those assets are subject to recovery by the receivership estate. The Receiver also believes it is prudent to determine where the additional funds went, both because of the likelihood of revealing other claims and because of the strong investor interest in knowing the answer to that question.

24. It appears likely that certain investors in earlier periods did receive back more than they invested. These claims are subject to claw-back. As the Receiver will necessarily have to determine investor investments and returns as a part of the claims process, the Receiver will

determine the amount of returns in due course. The Receiver will assess the cost/benefit of any such claims once the accounting is complete.

### F. Claims of Creditors Against the Receivership Estate

25. The Receiver is presently gathering claims and compiling a claims ledger setting forth both investor and vendor claims.

26. In general, the Receiver has determined that the investor claims arise from four categories of fundraising: $27 million raised from two large investors who invested in CETA during the period 2009 to 2015; $50 million raised by Dave Zook and his associates during the period 2018 to 2023; somewhat over $146 million raised by Shelly and his associates during the period 2019 to 2023; and other smaller groups of investors, in the approximate amount of $20 million, likely during the period 2018 to 2023. The last category will take time to tabulate. In sum, at present, the Receiver has identified a period of fundraising by CETA running from 2009 to 2023, and a total raise in excess of $240 million.

27. These claims will be mitigated by investor returns. It is presently estimated that investor returns were approximately $110 million. But, some of this amount went to investor above and beyond their investments, such that the net cash loss likely exceeds $130 million.

28. The Receiver has established an investor claims process and hundreds of investor claims have been received. Shelly has also complied substantially with the Order Appointing Receiver, such that the majority of the positions of his investors are documented. Keels has provided a detailed accounting.

29. A preliminary list of investors is attached as Exhibit F. The Receiver has identified 421 specific investors, of which 398 have filed claims. The claims have been received, but not analyzed. Thus, Exhibit F is a summary of the claims themselves, and not an assessment of the

claims. The total investor claims submitted to date pertain to fundraising of approximately $170 million, and identify $37 million in returns, for a net cash loss of $133 million.

30. Claims and claim inquiries may be submitted through the former CETA website, located at www.cetaenergy.com.

31. Many vendors have submitted claims. By far the largest is a manufacturer in Corpus Christi who made components for the carbon capture units. Again, the Receiver is tabulating these claims and expects to be able to provide a claims ledger for them by his next report.

### G. Creditor Claims Proceedings

32. The Receiver is still gathering claims, and has not commenced any creditor claims proceedings.

### H. Continuation of the Receivership

33. This topic is covered in detail at the end of the Receiver's Preliminary Report.

34. The Receiver continues to recommend that the receivership be continued.

35. Consistent with the points previously presented, it is plain that CETA operated a ponzi scheme that produced many investor claims and that is likely to produce some fraudulent transfer claims. There is no reorganization purpose to be served by alternative proceedings, and CETA is not entitled to protection from creditors, having committed a large scale fraud. In the Fifth Circuit, such cases are typically resolved by means of a federal equity receivership. Such should occur here.

Respectfully submitted,

*/s/ Dennis Roossien*
Dennis L. Roossien, Jr.
Texas Bar No. 00784873
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75201-6659
Telephone: 214.855.7535
droossien@munsch.com

COUNSEL FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I hereby certify that on the 31st day of July, 2023, a true and correct copy of the foregoing instrument was served electronically in compliance with the Court's Electronic Filing Procedures on all counsel of record who are deemed to have consented to electronic service.

*/s/ Dennis Roossien*