IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

SECURITIES AND EXCHANGE COMMISSION,  §
                                     §
V.                                   §        Case No. 6:23-cv-00321
                                     §
ROY W. HILL, et al.                  §

## RECEIVER'S UNOPPOSED FIRST INTERIM FEE APPLICATION

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Receiver Albert C. Black III ("Receiver") submits this First Interim Fee Application, respectfully stating:

## Introduction

1.    This Application seeks the Court's approval of the fees and expenses incurred during the period of May 3, 2023 through June 30, 2023.  The Receiver has filed three status reports that summarize his efforts during this period, identify the assets and liabilities of the receivership estate, and provide other information pertinent to this application (Docs. 27, 32 & 34).  As more fully detailed in the reports, this case involves over 400 investors who contributed in excess of $240 million based upon promises that innovative technology was generating tens of millions in revenue.  As detailed below and in the accompanying appendix, the Receiver worked during the relevant period to implement the asset freeze, deal with emergent issues, compile information concerning the assets and liabilities, handle investor inquiries and claims, and otherwise take reasonable and customary steps in a case of this nature to discharge the duties assigned by the Court.

## Amount Sought

2.    This application seeks approval to pay $136,675.90 for fees and expenses incurred in administering the receivership estate in accordance with this Court's appointment order.

RECEIVER'S UNOPPOSED FIRST INTERIM FEE APPLICATION – Page 1

## Services Provided

3.      The Court's determination to issue the temporary orders under seal allowed the SEC and the Receiver to contact financial institutions to implement the asset freeze, to obtain electronic records from the Defendants, and to secure movable assets.  The result was the securing of bank accounts, easily secreted valuables, and electronic records.

4.      The Receiver was also able to appear unannounced on the day of the appointment at the offices of Defendant Clean Energy Technology Association, Inc. ("CETA") in Fairfield, Texas; the industrial sites in Fairfield and, later, Streetman, Texas; the residence of Defendant Roy Hill ("Hill") in Fairfield, Texas; and the residences of Eric Shelly ("Shelly") in Ocala, Florida and Westchester, Pennsylvania.  The result was the securing of valuable property, mobile devices, computers, and other records, as well as the interviewing of staff and inspection CETA's actual equipment and operations as they actually existed at that point in time.

5.      Starting that first day and continuing in due course thereafter, the Receiver's logistical support team secured CETA's heavy equipment, records, vehicles, and other items from the Fairfield offices, an adjacent warehouse, the industrial sites, and in the possession of various employees.  Both the landlords of the offices and the warehouse asserted lease obligations that the Receiver mitigated by transporting and storing equipment, along with recovered records.

6.      In seeking to fully implement the asset freeze, the Receiver sought, but did not find, signs of equipment having been placed in offsite production.  The Receiver also inquired of employees and Hill's counsel in this regard.

7.      The Receiver also attempted to identify customer relationships relative to purported sales in material quantities of solvents, processed coal, or rare earth minerals.  Neither the employees nor the Defendants have identified any such customers.

8.     The Receiver worked to review the recovered records and electronic devices to determine whether additional steps were needed to implement the asset freeze.  The Receiver also conferred with counsel for the individual Defendants as they appeared in the case.

9.     Neither of the individual Defendants timely provided the inventories of assets and other information as directed by the Court in the appointment order and freeze order.  The Receiver therefore compiled information regarding secondary assets from employees, recovered electronic records, and recovered documents.  Shelly's cooperation came first, and the Receiver and his counsel worked with Shelly to develop a cooperative means of inventorying and preserving assets, maximizing their value and resolving a path forward (a process that would continue beyond the period covered by this application).  During the period covered by this application, Hill was not cooperative, except that Hill's counsel confirmed that the Receiver did not have to search for equipment installed at oil and gas wells, since there was none.

10.     Shelly's real estate assets are located in a number of states.  As a result, applicable federal statutory law requires the filing of notices of the receivership in each state where such property is located.  In those districts that required local counsel for the filing, the receiver retained Lathrop & Gage and Nelson Mullins, whose invoices are included in the chart below and in the appendix.

11.     Shelly was living at the time in Ocala, Florida, the Receiver utilized the Perez firm as local counsel due to their familiarity with implementing an asset freeze to assist the Receiver's logistical personnel in preparation for and on the first day.  Suitable counsel with similar experience was not available in Philadelphia, but the Munsch Hardt firm did not bill travel hours or expenses for sending counsel there.

12.    As a result of these efforts, by the end of the period covered by this application, the Receiver was relatively confident that the asset freeze was substantially implemented as to the assets of the Receivership Defendants, except as to certain indications pertaining to probable Hill assets.

13.    In addition to securing assets and records, the Receiver also handled a very substantial number of investor inquiries.  Indeed, word of the receivership circulated quickly.  The resulting syndicator and investor inquiries quickly exceeded two hundred and continued daily.

14.    An unusually large number of investors wished to immediately send materials and information to the Receiver, and sought confirmation of their submissions, both as to their receipt and in respect of their completeness.   The Receiver initially outlined points for informal submissions via email, but quickly developed an investor claim form to address the requests for confirmation of the completeness of the submissions.  Many investors also wished to speak with the Receiver or his counsel, and so hundreds of calls were handled.  Of necessity, calls were initially handled by counsel, so that information could be compiled from investors in respect of CETA offerings not specifically detailed in the Complaint, a claim form could be properly tailored, and FAQ responses could be developed (even so, a substantial portion of this attorney time was not charged to the estate).  In due course, the Receiver redirected the CETA Energy website to a website where the Receiver posted his reports, key pleadings, a claim form, and an email link to the Receiver's claims personnel.  The communications work was transitioned to personnel at New Horizons, and preliminary claims data was compiled.  Meanwhile, the Receiver's counsel worked with Shelly to cooperate in the production of his investor records, which reduced claims estimation and will benefit the claims verification process.  As a result, the Receiver was able to both be

responsive to the investors and complete the overall picture of the nature of the fundraising, the commingling of funds, and the resulting potential estate liabilities.

15.    The Receiver and his counsel also assessed the tax implications of the structure used, which purported to offer investors tax benefits comparable to their investments.    The Receiver flagged this issue for investors, but also identified the possibility of an alternative theft loss deduction.

16.    The Receiver, his counsel, and certain of his other professionals have handled numerous inquiries from vendors, including requests for the return of equipment that had not yet been paid for or had been leased.  The Receiver began the process of assessing how best to salvage value from the equipment CETA constructed that is not actually able to produce the revenues CETA claimed.  CETA spent millions on this equipment.  This work continued beyond the period covered by this application.

17.    The Receiver compiled the necessary information for the reports that are required by the appointment order, and implemented administrative reporting procedures.    The development of information for reports included the identification of potential claims.  In the absence of accountings from CETA and/or Hill, this work was only preliminary in nature.

18.    The Receiver's counsel interacted with the parties to the main action.  This included establishing a single document repository and offering access to the litigants.

19.    The Receiver and his counsel assessed and make recommendations to the Court in respect of whether the receivership should be continued or sent to bankruptcy.

20.    The Receiver and his team worked with banks to effect appropriate transfers and to produce essential records.

21.    The Receiver and his team addressed claims of the former CETA employees and generally wound up that illusory business.

22.    Statements further detailing the efforts of the Receiver and his professionals, as well as the costs incurred, are detailed in the accompanying appendix.  The following chart summarizes the statements, which appear in the appendix in the order stated on the chart:

| Firm | Month | Amount | | Allocation |
|---|---|---|---|---|
| Receiver (New Horizons) | May | 24,750.20 | | 14,090.87 |
| New Horizons | May | 35,303.48 | | 20,099.11 |
| Munsch Hardt | May | 39,212.00 | | 22,324.32 |
| Lathrop & Gage | May | 813.50 | | 813.50 |
| Perez | May | 6,352.20 | | 6,352.20 |
| Nelson Mullins | May | 1,320.00 | Capped | 1,320.00 |
| | | 107,751.38 | 65,000.00 | 65,000.00 |
| | | | | |
| Firm | Month | Amount | | Allocation |
| Receiver (New Horizons) | June | 6,030.00 | | 6,030.00 |
| New Horizons | June | 44,534.80 | | 44,534.80 |
| Munsch Hardt | June | 21,111.10 | | 21,111.10 |
| | | 71,675.90 | | 71,675.90 |
| | | | | |
| Totals | | 179,427.28 | | 136,675.90 |

## Application of Johnson Factors

23.    The primary concern in regard to professional fees is that the fee awarded be reasonable. *Blum v. Stenson,* 465 U.S. 886, 893 (1984).  In this Circuit, the applicable test is set forth in *Johnson v. Georgia Hwy. Express, Inc.*, 488 F.2d 714 (5th Cir. 1974).  Under that test, a court must first determine the loadstar amount by multiplying the reasonable number of hours billed by a reasonable billing rate. That amount can then be adjusted by various factors.

24.    The following reviews this Application with regard to each of the *Johnson* factors:

(a)    <u>The time and labor required</u>.  The time and labor required are set forth in detail in the statements contained in the accompanying appendix.

(b)     <u>The novelty and difficulty of the questions</u>.  The questions addressed by the professionals herein are common to enforcement receiverships generally, but handling such receivership cases is a narrow specialty requiring experienced professionals conversant with a substantial body of largely common law and customary practice.

(c)     <u>The requisite skill to perform the service</u>.  The fiduciary and legal services required the employment of individuals possessing considerable experience and capacity in handling equity receiverships.  The Receiver, his counsel, and his support staff have considerable experience in these areas.  The Receiver's support team also includes persons with more general administrative and logistical capacities of they type ordinarily required to administer assets such as those present in this case, to make business judgments, and to otherwise execute certain administrative functions.

(d)     <u>The preclusion of other employment due to the acceptance of the case</u>.  The Receiver and his professionals have not declined any representation solely because of their services as Receiver and counsel for the Receiver.

(e)     <u>The customary fee</u>.  The hourly rates sought herein are at least commensurate with the rates charged by other practitioners of similar experience levels in the Western District of Texas and in the case of the Receiver and his professionals.   Both the Receiver and his counsel have discounted their standard rates by ten percent and have agreed to a $65,000 cap for the first month of the case.

(f)     <u>Whether the fee is fixed or contingent</u>. The Receiver and his professionals' fees are fixed insofar as monies exist by way of receivership assets from which to pay such fees. Payment of such fees, however, is subject to Court approval, and is contingent upon the availability of receivership assets.

(g)     <u>Time limitations imposed by the client or other circumstances</u>. The early steps in the receivership were conducted on an emergent basis.  Thereafter, the Receiver and his professionals have generally not faced unusual time pressures.

(h)     <u>The amount involved and the results obtained</u>.  The amount involved in this case can be measured in a number of ways.  First, this case involves invested funds of approximately $240 million and a net cash loss in excess of $130 million.  Second, the remaining assets have a presently estimated market value of approximately $70 million.  Third, this case involves substantial investments by 400 investors who are entitled to know what actually happened and to address the tax implications of what occurred with the benefit of accurate knowledge.  The results obtained are many, including the implementation of the asset freeze, the halting of the fraudulent conduct both through the asset freeze and the provision of accurate and truthful information, the winding up of the CETA operations and all that entails, the interim resolution of claims and inquiries, and the proper administration of a receivership estate.  Ultimately, this case will provide both restitution to investors and proper payment of other claims consistent with applicable law.

(i)     <u>The experience, reputation and ability of the attorneys</u>.  Munsch Hardt is a broad-based commercial firm with substantial experience in the handling of matters generally related to civil trial law, dispute resolution, bankruptcy and general workout matters.  The practice of the attorneys specifically in this case regularly includes the representation of investors and other persons involved in business transactions in which the investors or other parties are victims or aggrieved in some fashion.  The Receiver and his counsel have also served as receivers or participated in other receiverships.  The reputations of the Receiver and his counsel are recognized and respected in their community and area of practice.

(j)    <u>The undesirability of the case</u>.    The service as Receiver and the representation of the Receiver incident to this case has not been undesirable.

(k)    <u>The nature and length of the professional relationship with the client</u>. This is not a factor with regard to this engagement.

(l)    <u>Award in similar cases</u>.  The Receiver submits that the fees requested in this case are commensurate with awards approved in comparable cases.

## **Certification**

The undersigned hereby certifies that the fees and expenses incurred herein and reflected on this Application were incurred in the best interests of the Receivership Estate; and (with the exception of the Billing Instructions agreed to with the Commission) the Receiver has not entered into any agreement, written or oral, express or implied, with any person or entity concerning the amount of compensation to be paid or to be paid from the Receivership Estate, or any sharing thereof.  Additionally, as required by the Billing Instructions, the undersigned hereby additionally certifies that he has read this Application, that to the best of his knowledge, information and belief formed after a reasonable inquiry, the Application and all fees and expenses herein are true and accurate and comply with the Billing Instructions, that all fees contained in the Application are based on the rates listed in the Applicant's original fee schedule and such fees are reasonable, necessary and commensurate with the skill and experience required for the activity performed, that he has not included in the amount for which reimbursement is sought the amortization of the cost of any investment, equipment, or capital outlay (except to the extent such may exist in the permitted allowable amounts set forth in the Billing Instructions with regard to photocopies), and in seeking reimbursement for a service which was justifiably purchased or contracted for a

professional from a third party, he requests reimbursement only for the amount billed by and paid

to the vendor and he is not making a profit on any reimbursable services provided by him.

### Conclusion

WHEREFORE, the Receiver prays that the Court approve the administrative expenses

sought herein.

Respectfully submitted,

*/s/ Dennis Roossien*
Dennis L. Roossien, Jr.
Texas Bar No. 00784873
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75201-6659
Telephone: 214.855.7535
droossien@munsch.com

COUNSEL FOR PLAINTIFFS

### CERTIFICATE OF CONFERENCE

I hereby certify that this motion is not opposed by the Plaintiff and Defendant Roy Hill.
These are the only two parties who have appeared through counsel.

*/s/ Dennis Roossien*

### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument was served
electronically in compliance with the Court's Electronic Filing Procedures on all counsel of record
who are deemed to have consented to electronic service.

*/s/ Dennis Roossien*