IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, § <br> § <br> V. § <br> § <br> ROY W. HILL, et al. § <br> § | Case No. 6:23-cv-00321 |

**APPENDIX IN SUPPORT OF**

**SECOND MOTION TO APPROVE RETENTION OF PERSONNEL**

Respectfully submitted,

*/s/ Dennis Roossien*
Dennis L. Roossien, Jr.
Tex. Bar No. 00784873
MUNSCH HARDT KOPF & HARR, P.C.
3800 Lincoln Plaza
500 North Akard Street
Dallas, TX 75201-6659
(214) 740-5108
(214) 855-7584 (facsimile)

**CERTIFICATE OF SERVICE**

   I hereby certify that I electronically filed this document with the Clerk using the electronic case filing system of the court. The electronic case filing system sends a "Notice of Electronic Filing" to the attorneys of record in this case with a link to all pleadings simultaneously with the filing thereof.

*/s/ Dennis Roossien*
Dennis Roossien

## Byron W. Veech

57 Barbados Drive || Putnam, Illinois 61560 || (815) 878-9436
bwveech@yahoo.com || https://www.linkedin.com/in/byron-veech-446b9892/

---

**EDUCATION**

LINDENWOOD UNIVERSITY, Saint Charles, Missouri, Master of Science, Management and Finance, 2000

MILLIKIN UNIVERSITY, Decatur, Illinois, Bachelor of Science, Chemistry and Environmental Studies, 1977

---

**EXPERIENCE**

**Independent Consultant – October 2022 to Present**

Utility industry consulting and expert advice on plant safe layup /closing and transition of facilities.

**VISTRA Corporation, Joppa, Illinois – 2019-2022**

*Managing Director of Plant Operations, EEI and MEPI Power Stations – 2021-2022*

Oversaw all day-to-day plant activities and transition the team thru the planned 2022 site closure.  Directed production maintenance, environmental, lab, fuel handling and fuel acquisitions, staffing, and administrative activities for Havana and Hennepin plants.  Managed company technology transfer and coordinated annual participation with EPRI, serving as sponsor of chemistry and boiler tube failure team for coal plants.  Acted as member of hazardous materials COE team for all Vistra facilities.  Supervised administrative and operational processes of both facilities (total of 116 workers and 11 units producing more than 1300 megawatts, with combined annual O&M budget of more than $42,000,000).  Developed templates for and managed the safe shutdown and decommissioning of three Coal generation and two natural gas combined cycle facilities.  Assisted in the planning and siting of 37MW Battery storage facility and potential development of Solar generation investment at Joppa site.  Worked with McKenzie Company on plant process optimization tools and techniques saved 24M in avoided costs over two years.  Completed PMP classes towards certification in 2022.  Completed GEMBA Academy - six sigma courses.

*Managing Director of Plant Operations, Newton Power Station, 2019 -2021*

Oversaw and executed organizational vision, operational strategy, and all day-to-day plant activities.  Directed production maintenance, environmental, lab, fuel handling and fuel acquisitions, staffing, and administrative activities for Newton.  Managed company technology transfer and coordinated annual participation with EPRI, serving as sponsor of chemistry and boiler tube failure team for coal plants.  Continued to acted as member of hazardous materials COE team for all Vistra facilities and participated in Combustible Dust audit at various other Vistra facilities.  Supervised administrative and operational processes of both facilities (total of 79 workers producing more than 620 megawatts, annual O&M budget of more than $24,000,000).  Completed Associate Safety professional training and Certification in 2020.  Worked with McKenzie Company on plant process optimization tools and techniques saved 16M in avoided costs over two years.  Led team to develop the addition of a 42 MWs of Bitcoin Data storage facility converting existing plant space and resources to the site Newton site for post closure use in 2021.

**DYNEGY/VISTRA – 2000-2019**

*Managing Director of Plant Operations, Hennepin and Havana Power Stations, 2013-2019*

Oversaw and executed Vistra's organizational vision, operational strategy, and all day-to-day plant activities including final Major turbine and boiler outage in 2020.  Directed production maintenance, environmental, lab, fuel handling and fuel acquisitions, staffing, and administrative activities for Havana and Hennepin plants.  Managed company technology transfer and coordinated annual participation with EPRI, serving as sponsor of chemistry and boiler tube failure team for coal plants.  Acted as member of hazardous materials COE team for all Vistra facilities.  Supervised administrative and operational processes of both facilities (total of 142 workers producing more than 800 megawatts, with combined annual O&M budget of more than $38,000,000).  Led team overseeing the lay-up and safe closure of four northern Illinois coal fired facilities that retired in late 2019.  Worked with Hennepin team for four years to achieve OSHA VPP Star Status in 2019, one of few coal-fired plants in the U.S. so honored.  Led operations due diligence and transformation teams for the coal-fired plants during the Ameren, Duke, ECP, and Enge acquisitions from 2012 through 2016.  Managed field activities to facilitate the transition for teams at the nine sites.  Awarded 2016 Dynegy Inspired Energy Award, one of ten Dynegy award winners who were nominated by the employees of the company.  Served as EPRI manager of technology transfer from 2015 to 2019.  Worked with McKenzie Company on plant process optimization tools and techniques saved 14M in avoided costs over three years.

*Production Manager, Havana Power Station, 2004-2013*

Managed all day-to-day plant operations and production activities.  Ensured the facility operated in compliance with all permit conditions; safety, health, and environmental programs; and all state and federal regulations.  Led operations staff, maintenance technicians, environmental compliance, lab, fuel handling and fuel acquisitions, and coordination of equipment outages for maintenance activities.  Developed and managed capital projects and O&M and strategic budgeting.  Organized and coordinated hiring and training for facility hourly and salaried staff.  Monitored daily unit capability rating and bidding into MISO.  Acted as designated media relations representative.  Served as primary qualified individual for spills and alternate facility security officer under MARSAC for Havana site.  Served as plant lead coordinator and point of contact on construction and successful startup of $210,000,000 dry scrubber and baghouse installation in 2009 and 2010.  Completed conversion and tuning of PRB for two CE units at Hennepin Power Station and restored units to 100% capacity.

*Production Manager, Hennepin and Oglesby Power Stations, 2001-2004*

Oversaw all day-to-day plant production, and managed operations staff, maintenance shift technicians, coal yard, IT support, and plant training.  Served on O&M and strategic budget planning team.  Acted as local media communications liaison.  Completed conversion and tuning of PRB for two CE units at Hennepin Power Station and restored units to 95% capacity.

*Manager, Process Engineering and Chemistry, 2001-2002*

Managed all DMG plant performance engineering activities and oversaw predictive maintenance activities and budgets.  Led and managed performance engineering, testing, and dispatch issues for eight power stations totaling 3,670 megawatts of coal, oil, and gas.  Coordinated all system-wide radiation safety and chemistry protocols.  Acted as primary DMG IT liaison and budget coordinator.

*Process Coordinator, Ops/Maintenance, 2000-2001*

Brought in to Wood River Station as production coordinator, assisting in day-to-day management of two coal units (90 and 370 megawatts), three gas-fired 50-megawatt units, and four remote peaking GE gas-/oil-fired 20-megawatt turbines.  Supported production director in operations during absence.  Facilitated management of plant outage maintenance activities and acted as unit start-up coordinator.  Functioned as operations/maintenance training coordinator, Safety Coordinator,  plant IT liaison, network administrator, and local media communications liaison.

**US Generating Co., 1994-1999**

*EH&S Manager/Environmental Start-Up Coordinator*
Monitored site construction activities and change orders for back-end operations equipment and all environmental systems for 399-megawatt coal-fired unit, with SCR, dry scrubbers, and baghouse.  Served as site manager and EH&S coordinator in all new permits and permit modifications for air, water use, and NPDES activities.  Appointed team leader for environmental equipment acceptance testing and turnover.  Selected as local media communications liaison.  Supported environmental, safety, and operational due diligence audits.  Developed plant emergency response guidebook.

**Illinois Power Co., 1979-1994**

*Assistant Ops Supervisor/EH&S Coordinator*
Acted as operations relief supervisor for Baldwin, Wood River, and Stallings.  Managed all site EH&S operations as well as sampling and reporting activities.  Served as ops budget coordinator (Wood River).  Worked as operations assistant shift supervisor.  Served as plant chemist, result engineer/supervisor, and plant maintenance planner.  Worked as site waste and water treatment plant certified operator.

**Cargil / CarMi Division, 1977-1979**

*Chemist*
Served as line chemist in high-fructose corn syrup production facility.

**CERTIFICATIONS**

- Completed training for PMP certification 2022
- Completed BSCP Associate safety Professional certification 2020
- *llinois Class K Wastewater*
- *Illinois Wastewater Treatment Operator*
- *IDNS Radiation Safety Officer*
- *Asbestos Supervisor, Illinois and Florida*
- *Asbestos Management Planner, Florida*
- *First Responder*
- *Hazmat Operator*
- *Confined Space Rescue*
- *MARSAC, Operation and Security Supervisor*

**AFFILIATIONS**

*Electric Power Research Institute, Manager of Technology Transfer*
*American Society of Mechanical Engineers*
*Risk Management Association*
*National Fire Protection Association*
*Voluntary Protection Programs Participants' Association*
*Board of Certified Safety Professionals*

**PROFESSIONAL DEVELOPMENT**

*Associate Safety Professional Certification Training, ASP Certification,* Anticipated Spring 2020
*Gallup-Certified Strengths Coach Training,* Anticipated December 2019
*Spray Nozzle Characteristics in SDA Applications*
*Accounting and Financial Management for Senior Management*
*The Principles and Qualities of Genuine Leadership for Managers*
*Incident Command Response System*
*Incident Commander Training*
*Condition-Based Maintenance*
*Media Relations and Coordination Training*
*Risk Management Association Certification, Classes 51 and 52*
*MARC Human Resources and Management Relations Training in Supervisory Relations*

## VERIFICATION

STATE OF TEXAS        §
                      §
COUNTY OF HARRIS      §

     BEFORE ME, the undersigned authority, on this day personally appeared ROY W. HILL, and after being duly sworn upon his oath deposed and said that Exhibits 1 through 8, attached hereto, are true and accurate to be best of his knowledge.

_____
ROY W. HILL

SUBSCRIBED AND SWORN TO BEFORE ME on the __3rd__ day of August 2023.

_____
Notary Public in and for the State of Texas

My Commission Expires:

__6-30-25__

JOANNE M TURTURRO
Notary ID #125347999
My Commission Expires
June 30, 2025

APPX. - 006

| Clean Energy Technology Association | Estimated Value 5-11-23 | Notes |
|---|---|---|
| Wells Fargo checking accounts | $34,000,000.00 | Estimated |
| Other CETA entities checking accounts Wells Fargo | $7,500.00 | Nominal amounts to set up checking accounts. CETA Land and Minerals Investments; Industrial Generating Co., CETA Licensing, Limestone Energy Inc., |
| Wells Fargo Investment | $9,000,000.00 | Estimated |
| Ceta Solve, gas and oil | | To be determined |
| Community Nat. Bank CETA | $1,900,000.00 | |
| Real estate at 1246 S. Bateman Fairfield (Plant) Tract 1 | $85,000.00 | |
| 40+ acres in Browns Creek, Fairfield Texas | $425,000.00 | |
| Streetman Plant 5 acres + | $200,000.00 | |
| undivided interest of 70 plus acres in a 101 acre tract near Streetman with IH-45 frontage | $125,000.00 | |
| Car wash for future expansion, corner of Bradley and Keechi St., Fairfield, Texas | $185,000.00 | |
| Fairfield Plant | | To be determined |
| Coal Barn, Fairfield plant | $130,000.00 | |
| Old portable control room, Fairfield plant | $15,000.00 | |
| Shop Complex, Fairfield plant | $75,000.00 | |
| New Lab Building, Fairfield plant | $450,000.00 | |
| Old lab building, Fairfield plant | $75,000.00 | |
| New visitor center, Fairfield plant | $50,000.00 | |
| Nitrogen generator building, Fairfield plant | $100,000.00 | |
| electronic building, Fairfield plant | $250,000.00 | |
| Panel Building and shed, Fairfield plant | $200,000.00 | |
| control center building, Fairfield plant | $125,000.00 | |
| non-equiped buildings, Fairfield plant | $1,470,000.00 | |

EXHIBIT 1
APPX. - 007

| Item | Amount | Notes |
|---|---|---|
| Fairfield Plant warehouse building, Fairfield plant | $95,000.00 | |
| Streetman Plant | | To be determined |
| Warehouse & cool storage, Streetman plant | $100,000.00 | |
| New Control room and electronics rooms, Streetman plant | $295,000.00 | |
| Ford pickups | $235,000.00 | Approximately 4 |
| John Deere frontend loader | $85,000.00 | |
| Bobcat | $20,000.00 | |
| 2 almost new Bobcats | $185,000.00 | |
| 2016 Mercedes | $25,000.00 | it is my understanding the automobile is in the possession of the receiver |
| 2020 CLS550 Mercedes | $68,000.00 | it is my understanding the automobile is in the possession of the receiver |
| 2021 GLC Mercedes | $55,000.00 | it is my understanding the automobile is in the possession of the receiver |
| 2018 GLS 450 | $35,000.00 | it is my understanding the automobile is in the possession of the receiver |
| 2 Handicap Golf carts | $8,000.00 | |
| 2016 GL | $24,000.00 | the parties are attempting to determine the location of the vehicle |
| John Deere mid-sized Tractor | $128,000.00 | tractor debt could be about $100,000.00 |
| 6 patents | | TBD |
| Gough conveyor Systems, | $625,000.00 | |
| Nitrogen Generators | $600,000.00 | |
| Tank and storage facilities | $150,000.00 | |
| Watlow Panels | $2,800,000.00 | |
| Crushers | $165,000.00 | |
| Trailers and portable welding rigs | $24,000.00 | |
| Original Filtration systems and additional valves, fittings and piping | $275,000.00 | |
| Cooling towers | $28,500.00 | |
| Hydrogen & gas separation systems | $525,000.00 | |
| Labrotory Equipment | $2,800,000.00 | This is an approximation based on the orginal budget |
| electronics and control systems | $585,000.00 | |
| wire and wiring | $485,000.00 | |
| Bray electronic valves | $182,000.00 | |
| accessible systems | $12,000.00 | |

| | | |
|---|---|---|
| R & S services | $248,500.00 | |
| Pipe inventory | | TBD |
| Valves, couplings, unions , ect. | $100,000.00 | Estimated |
| Coal inventory, Fairfield and Streetman plants | | TDB |
| Liquids inventory | | TDB |
| Fuel and Misc equip. | $71,000.00 | |
| Server systems at plants w/ outside Wifi system hookups | $78,680.00 | |
| Monitors, computers, printers, and programs | $48,000.00 | |
| In ground wiring and wiring in inventory w/ manpower and conduit | $500,000.00 | |
| Heating elements, thermal couples and pass through | $1,056,000.00 | |
| various other electrical components and instillation | $1,422,000.00 | |
| Buy backs on Equipment which increased ownership interest | $6,300,000.00 | Estimated net value of units subject to repurchase. |
| Scado Systems | $85,000.00 | |
| Electrical rooms & breaker systems | $550,000.00 | |
| High heat & cold insulation materials | $315,000.00 | |
| Equipment for concrete slabs not included with buildings | $225,000.00 | |
| Heat exchanger/condensors | $760,000.00 | |
| Primary pots 5 flanges | $210,000.00 | |
| Secondary pots & valves and pipe | $30,000.00 | |
| Hoppers | $1,470,000.00 | |
| Coalite Coolers Systems | $936,000.00 | |
| 14 desks, 23 chairs, 2 custom chairs, 4 couches, end tables, art work, lamps, credenzas, lamps, etc. | $25,000.00 | |
| Fin Fans | $600,000.00 | |

| Notes Receivable | | To be determined. Approximately $60,000,000 face value of original notes as of May 2023. |
|---|---|---|
| Air and storm water permitting | $795,000.00 | |
| Cash in Ceta safe | $100,000.00 | |
| Total Estimated Value | $75,407,180.00 | |

# CONSULTING AGREEMENT

**THIS CONSULTING AGREEMENT (the "Agreement") is dated this _____ day of _____, _____.**

| CLIENT | CONSULTANT |
|---|---|
| Albert C. Black, III | Byron W. Veech |
| Receiver for CETA, et al. | (the "Consultant") |
| (the "Client") | |

**BACKGROUND**

**A.** The Client is of the opinion that the Consultant has the necessary qualifications, experience and abilities to provide consulting services to the Client.

**B.** The Consultant is agreeable to providing such consulting services to the Client on the terms and conditions set out in this Agreement.

**IN CONSIDERATION OF** the matters described above and of the mutual benefits and obligations set forth in this Agreement, the receipt and sufficiency of which consideration is hereby acknowledged, the Client and the Consultant (individually the "Party" and collectively the "Parties" to this Agreement) agree as follows:

**SERVICES PROVIDED**

1. The Client hereby agrees to engage the Consultant to provide the Client with the following consulting services (the "Services"):

   - Site review, equipment analysis, document findings, process review and advisement.

2. The Services will also include any other consulting tasks which the Parties may agree on. The Consultant hereby agrees to provide such Services to the Client.

**TERM OF AGREEMENT**

3. The term of this Agreement (the "Term") will begin on the date of this Agreement and will remain in full force and effect until the completion of the Services, subject to earlier termination as provided in this Agreement. The Term may be extended with the written consent of the Parties.

4. In the event that either Party wishes to terminate this Agreement prior to the completion of the Services, that Party will be required to provide 10 days' written notice to the other Party.

**PERFORMANCE**

5. The Parties agree to do everything necessary to ensure that the terms of this Agreement take effect.

**CURRENCY**

6. Except as otherwise provided in this Agreement, all monetary amounts referred to in this Agreement are in USD (US Dollars).

**COMPENSATION**

7. The Consultant will charge the Client for the Services at the rate of $325.00 per hour (the "Compensation").

8. The Client will be invoiced every month.

9. Invoices submitted by the Consultant to the Client are due within 30 days of receipt.

**REIMBURSEMENT OF EXPENSES**

10. The Consultant will be reimbursed from time to time for reasonable and necessary expenses incurred by the Consultant in connection with providing the Services.

**INTEREST ON LATE PAYMENTS**

11. Interest payable on any overdue amounts under this Agreement is charged at a rate of 1.00% per annum or at the maximum rate enforceable under applicable legislation, whichever is lower.

**CONFIDENTIALITY**

12. Confidential information (the "Confidential Information") refers to any data or information relating to the Client, whether business or personal, which would reasonably be considered to be private or proprietary to the Client and that is not generally known and where the release of that Confidential Information could reasonably be expected to cause harm to the Client.

13. The Consultant agrees that they will not disclose, divulge, reveal, report or use, for any purpose, any Confidential Information which the Consultant has obtained, except as authorized by the Client or as required by law. The obligations of confidentiality will apply during the Term and will survive indefinitely upon termination of this Agreement.

14. All written and oral information and material disclosed or provided by the Client to the Consultant under this Agreement is Confidential Information regardless of whether it was provided before or after the date of this Agreement or how it was provided to the Consultant.

**OWNERSHIP OF INTELLECTUAL PROPERTY**

15. All intellectual property and related material, including any trade secrets, moral rights, goodwill, relevant registrations or applications for registration, and rights in any patent, copyright, trademark, trade dress, industrial design and trade name (the "Intellectual Property") that is developed or produced under this Agreement, is a "work made for hire" and will be the sole property of the Client. The use of the Intellectual Property by the Client will not be restricted in any manner.

16. The Consultant may not use the Intellectual Property for any purpose other than that contracted for in this Agreement except with the written consent of the Client. The Consultant will be responsible for any and all damages resulting from the unauthorized use of the Intellectual Property.

**RETURN OF PROPERTY**

17. Upon the expiration or termination of this Agreement, the Consultant will return to the Client any property, documentation, records, or Confidential Information which is the property of the Client.

**CAPACITY/INDEPENDENT CONTRACTOR**

18. In providing the Services under this Agreement it is expressly agreed that the Consultant is acting as an independent contractor and not as an employee. The Consultant and the Client acknowledge that this Agreement does not create a partnership or joint venture between them and is exclusively a contract for service. The Client is not required to pay, or make any contributions to, any social security, local, state or federal tax, unemployment compensation, workers' compensation, insurance premium, profit-sharing, pension or any other employee benefit for the Consultant during the Term. The Consultant is responsible for paying, and complying with reporting requirements for, all local, state and federal taxes related to payments made to the Consultant under this Agreement.

**RIGHT OF SUBSTITUTION**

19. Except as otherwise provided in this Agreement, the Consultant may, at the Consultant's absolute discretion, engage a third-party sub-contractor to perform some or all of the obligations of the Consultant under this Agreement and the Client will not hire or engage any third parties to assist with the provision of the Services.

20. In the event that the Consultant hires a sub-contractor:

    - the Consultant will pay the sub-contractor for its services and the Compensation will remain payable by the Client to the Consultant.

    - for the purposes of the indemnification clause of this Agreement, the sub-contractor is an agent of the Consultant.

**AUTONOMY**

21. Except as otherwise provided in this Agreement, the Consultant will have full control over working time, methods, and decision making in relation to provision of the Services in accordance with the Agreement. The Consultant will work autonomously and not at the direction of the Client. However, the Consultant will be responsive to the reasonable needs and concerns of the Client.

**EQUIPMENT**

22. Except as otherwise provided in this Agreement, the Consultant will provide at the Consultant's own expense, any and all equipment, software, materials and any other supplies necessary to deliver the Services in accordance with the Agreement.

**NO EXCLUSIVITY**

23. The Parties acknowledge that this Agreement is non-exclusive and that either Party will be free, during and after the Term, to engage or contract with third parties for the provision of services similar to the Services.

**NOTICE**

24. All notices, requests, demands or other communications required or permitted by the terms of this Agreement will be given in writing and delivered to the Parties at the following addresses:

   Byron W. Veech
   57 Barbados Dr.
   Putnam, Illinois 61560

   Albert C. Black, III
   c/o Dennis L. Roossien, Jr.
   Munsch Hardt Kopf & Harr, P.C.
   500 N. Akard, Ste. 3800
   Dallas, TX 75201

   or to such other address as either Party may from time to time notify the other and will be deemed to be properly delivered (a) immediately upon being served personally, (b) two days after being deposited with the postal service if served by registered mail, or (c) the following day after being deposited with an overnight courier.

**INDEMNIFICATION**

25. Except to the extent paid in settlement from any applicable insurance policies, and to the extent permitted by applicable law, each Party agrees to indemnify and hold harmless the other Party, and its respective affiliates, officers, agents, employees, and permitted successors and assigns against any and all claims, losses, damages, liabilities, penalties, punitive damages, expenses, reasonable legal fees and costs of any kind or amount whatsoever, which result from or arise out of any act or omission of the indemnifying party, its respective affiliates, officers, agents, employees, and permitted successors and assigns that occurs in connection with this Agreement. This indemnification will survive the termination of this Agreement.

**MODIFICATION OF AGREEMENT**

26. Any amendment or modification of this Agreement or additional obligation assumed by either Party in connection with this Agreement will only be binding if evidenced in writing signed by each Party or an authorized representative of each Party.

**TIME OF THE ESSENCE**

27. Time is of the essence in this Agreement. No extension or variation of this Agreement will operate as a waiver of this provision.

**ASSIGNMENT**

28. The Consultant will not voluntarily, or by operation of law, assign or otherwise transfer its obligations under this Agreement without the prior written consent of the Client.

**ENTIRE AGREEMENT**

29. It is agreed that there is no representation, warranty, collateral agreement or condition affecting this Agreement except as expressly provided in this Agreement.

**ENUREMENT**

30. This Agreement will ensure to the benefit of and be binding on the Parties and their respective heirs, executors, administrators and permitted successors and assigns.

**TITLES/HEADINGS**

31. Headings are inserted for the convenience of the Parties only and are not to be considered when interpreting this Agreement.

**GENDER**

32. Words in the singular mean and include the plural and vice versa. Words in the masculine mean and include the feminine and vice versa.

**GOVERNING LAW**

33. This Agreement will be governed by and construed in accordance with the laws of the State of Illinois.

**SEVERABILITY**

34. In the event that any of the provisions of this Agreement are held to be invalid or unenforceable in whole or in part, all other provisions will nevertheless continue to be valid and enforceable with the invalid or unenforceable parts severed from the remainder of this Agreement.

**WAIVER**

35. The waiver by either Party of a breach, default, delay or omission of any of the provisions of this Agreement by the other Party will not be construed as a waiver of any subsequent breach of the same or other provisions.

**COURT SUPERVISION**

36. This agreement is subject to the approval of the United States District Court for the Western District of Texas, which appointed Albert C. Black, III, as Receiver, in the case styled *Securities and Exchange Commission v. Roy Hill, Ceta Energy Technology Association, Inc., et al.* and numbered 6:23-cv-00321. The Receiver will submit all invoices to the court for approval, and payment will be subject to the approval of the court. Any disputes arising out of this agreement will be brought to said court.

---

**IN WITNESS WHEREOF** the Parties have duly affixed their signatures.

_____     Date: _____

Byron W. Veech


_____     Date: _____

Albert C. Black, III, Receiver

Clean Energy Technology Association, Inc., et al.