IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, § § § | |
| V. § | Case No. 6:23-cv-00321 |
| § § | |
| ROY W. HILL, et al. § | |

### RECEIVER'S UNOPPOSED SECOND REPORT AND RECOMMENDATION FOR CLAIM APPROVAL AND FOR PARTIAL INTERIM DISTRIBUTION

Receiver Albert C. Black III ("Receiver") reports and recommends to the Court as follows:

### Introduction

1. This second claims recommendation pertains to the claim of Defendant Eric Shelly ("Shelly") to a portion of the receivership estate traceable to real estate investments he made prior to becoming involved in the matters made the basis of the Complaint herein with funds saved in the course of his career as a dentist.

2. For the reasons stated more specifically below, the Receiver recommends that the Court approve a partial lifting of the asset freeze to permit Shelly and the Receiver to cooperating in managing and liquidating certain rental property in order to facilitate the payment of budgeted living expenses and legal expenses.

### Legal Standard

3. Just as this Court has authority to freeze assets in a civil enforcement action, it also has the discretion to unfreeze those assets when equity requires. *FTC v. Liberty Supply Co.*, 4:15-CV-829, 2016 WL 4182726, *2 (E.D. Tex. Aug. 8, 2016).

4. A request for attorneys' fees and living expenses pits the interests of enforcement authorities in obtaining disgorgement and restitution for victims of illegal conduct against the interests of the defendants subject to the asset freeze. *Id.*

SECOND CLAIM REPORT AND RECOMMENDATION – Page 1

5. In respect of the frozen proceeds of the illegal conduct, it has been observed, "Just as a bank robber cannot use the loot to wage the best defense money can buy, so a swindler in securities markets cannot use the victims' assets to hire counsel who will help him retain the gleanings of crime." *S.E.C. v. Dobbins*, 3:04-cv-0605, 2004 WL 957715, at *2 (N.D. Tex. Apr. 14, 2004), *quoting SEC v. Quinn*, 997 F.2d 287, 289 (7th Cir. 1993).

6. Additionally, courts have refused requests to modify asset freeze orders concerning untainted funds in order to preserve sufficient funds for the payment of a disgorgement award. *SEC v. Lauer*, 445 F. Supp. 2d 1362, 1367 & 1370-71 (S.D. Fla. 2006).

7. In requesting attorneys' fees, the burden is upon the defendant to show he lacks other resources from which to pay for legal services. *Liberty Supply Co., supra,* at *3.

8. When a modification of a freeze order is requested for living expenses, a federal district court may determine what constitutes sufficient living expenses. *See, e.g., SEC v. McClintock*, 1:12-cv-04028, 2013 WL 12070092 (N.D. Ga. Feb. 20, 2013) (rejecting request for $20,000 in monthly living expenses and setting living expense allocation equal to social security benefits); *FTC v. Next-gen, Inc.*, 4:18-cv-00128, 2018 WL 8754140 (W.D. Mo. Aug. 3, 2018 (setting living expense allocations at $10,000 for one defendant and $8,000 for another).

**Facts**

9. Shelly's frozen assets are reported on Exhibit C to the Receiver's last Quarterly Report (Doc. 34-3) ("Shelly Assets"). There is $358,000 in cash, a home with equity of $449,200, and investments of nearly $6.9 million (*id.* at 1). Against this are debts of approximately $760,000 (*id.* at 2).

10. In regard to the interests of the Securities and Exchange Commission ("SEC"), the investors who were the victims in this case, and the investing public, the SEC has demonstrated its allegations to the point of establishing a right to an asset freeze, preliminary injunction, and

SECOND CLAIM REPORT AND RECOMMENDATION – Page 2

judgment as to liability (Docs. 4, 7, 8, 22, 36, 38).  The questions of disgorgement, civil penalties, or other damages remain open.  However, the Receiver estimates these awards will exceed Shelly's assets.  Shelly and his associates were involved in raising $146 million out of the total CETA-based fundraising of at least $240 million resulting in an investor net cash loss likely in excess of $130 million (Doc. 34, at 6).  The receivership estate is presently insufficient to provide full restitution.  In addition to the above-described Shelly assets with a net value of approximately $7 million, the receivership estate includes approximately $67 million in cash, principally from CETA accounts (Doc. 34-2).  There are also a number of unresolved claims (Doc. 34, at 4-5).  Therefore, it is likely that investors will lose in excess of 50% of their invested principal.

11.     In regard to Shelly's interests, although Shelly received substantial proceeds from the scheme in the form of enhanced payments of returns as compensation for promoting the scheme, Shelly was also a significant personal investor in the scheme who contributed much of his savings from this career as a dentist to the scheme.  A substantial portion of that original wealth is included in the frozen assets.

12.     Additionally, Shelly has been working to mitigate the harm he caused.  He has generally cooperated with the Receiver's efforts to carry out his duties.  Working through counsel, Shelly has assisted the Receiver in locating and securing an accounting of nearly all of the investments of his investors, fully described the nature of the offerings, identified key documents in respect of the representations made, identified his assets, and assisted in securing assets, particularly rental proceeds from certain real estate that would have otherwise been difficult to locate and secure.  These efforts have reduced the Receiver's administrative expenses, and aided the Receiver's ability to connect with investors and assess their claims.

13.     The Receiver believes substantially all of Shelly's assets are frozen.  As such, Shelly does not have access to other funds or assets.

14. Shelly seeks funds for living expenses and legal fees. Shelly has presented a budget to the Receiver for food, utilities, housing, insurance, and taxes totaling approximately $9,000. This budget is a substantial reduction in his previous rate of expenditure, and will entail Shelly's moving back to Philadelphia and the sale of the home in Florida that he recently purchased. Shelly has incurred attorneys' fees of $55,000 to date. Notably, most of these fees were incurred in the course of cooperating with the Receiver, and produced benefits to the receivership estate.

15. Among the Shelly Assets acquired with assets accumulated before the CETA schema are 11 "Shelly Investment Properties" with a value of approximately $1.5 million (Ex. 34-3). Shelly receives rental income of approximately $17,000 monthly from these properties.

16. Shelly proposes to cooperate with the Receiver and to provide transparency in respect to any transactions. Shelly also proposes to provide assistance to the Receiver in identifying the most prudent means of conserving the value of the Shelly assets, such as reducing debt, compromising investments, or otherwise preserving value.

17. Based upon Shelly's cooperation to date, the Receiver believes this is a credible offer. Further, the Receiver believes an approach of a partial lifting of the asset freeze will reduce administrative expenses.

### Recommendation

18. Considering the applicable legal standard and the facts on the various considerations, the Receiver believes that a partial lifting of the asset freeze for the purpose of allowing cooperation to occur in the management of the Shelly assets and the maximization of their value, and for Shelly to receive a $9,000 monthly from these efforts and the payment of legal fees, would be consistent with applicable legal standards.

19. The Receiver therefore recommends that the Court modify the asset freeze to allow Shelly's claim in part, and to direct that:

(1) Shelly may retain $9,000 monthly from real estate rental proceeds and use those funds for living expenses;

(2) Shelly's counsel's legal bills, in the amount of $55,000 and such additional fees to which the Receiver and the SEC may agree, may be paid from real estate rental proceeds and/or, as necessary, sales of "Shelly Investment Properties" as listed on Exhibit C to the Receiver's above-referenced report (Doc. 34-3);

(3) The Receiver may otherwise approve transactions in respect of the Shelly Assets that preserve and maximize the value of those assets;

(4) The asset freeze is lifted to allow the Receiver to authorize Shelly to carry out tasks necessary and proper to effect the foregoing, subject to the oversight of the Receiver and the reporting to the Court in the Receiver's quarterly reports, including directing property management or sale of the Shelly Investment Properties, opening bank accounts, maintaining a credit card, and engaging in such other appropriate transactions in respect of the Shelly assets as the Receiver may approve.

WHEREFORE, the Receiver prays that the Court enter an order to such effect.

Respectfully submitted,

/s/ Dennis Roossien
Dennis L. Roossien, Jr.
Texas Bar No. 00784873
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75201-6659
Telephone: 214.855.7535
droossien@munsch.com

COUNSEL FOR RECEIVER

SECOND CLAIM REPORT AND RECOMMENDATION – Page 5

## CERTIFICATE OF CONFERENCE

I hereby certify that this motion is not opposed by either the Plaintiff or Defendant Roy Hill, who are the only parties to have appeared in this case through counsel. It is also supported by Defendant Eric Shelly.

/s/ Dennis Roossien

## CERTIFICATE OF SERVICE

I hereby certify that on the 27th day of September, 2023, a true and correct copy of the foregoing instrument is being served contemporaneously with its filing electronically in compliance with the Court's Electronic Filing Procedures on all counsel of record who are deemed to have consented to electronic service.

/s/ Dennis Roossien