IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § | |
| | § | |
| V. | § | Case No. 6:23-cv-00321 |
| | § | |
| ROY W. HILL, et al. | § | |

## RECEIVER'S THIRD REPORT AND UNOPPOSED RECOMMENDATION FOR CLAIM APPROVAL AND FOR PARTIAL INTERIM DISTRIBUTION

Receiver Albert C. Black III ("Receiver") reports and recommends to the Court as follows:

## Introduction

1.      This third claims recommendation involves an unusual circumstance that the Receiver recommends be addressed now, even as the Receiver continues his work in reviewing several hundred other investor claims.

2.      Specifically, there is a group of investors whose investments were made through entities that are not subject to the receivership, but which contain invested funds that have been voluntarily frozen by the party controlling those investment vehicles.

3.      For the reasons stated more specifically below, the Receiver recommends that the Court approve (1) the claims of those investors and (2) a partial interim distribution of the voluntarily frozen funds to those investors.

4.      Counsel of record for the parties have been consulted, and there is no opposition from the Plaintiff or the individual defendants.

## Legal Standard

5.      This claims recommendation requires consideration of three issues:  (1) whether the Receiver should proceed toward a pro-rata distribution to investors of recovered funds based upon a net cash loss formulation for investors; (2) whether the proposed distribution here is

comfortably less than these investors are likely to ultimately receive in such a distribution; and (3) whether it is more advisable for the Receiver to allow the entities to proceed with an interim distribution at this time as opposed to attempting to include the frozen funds in the overall administration of the receivership estate.

6.     On the first issue, there is direct guidance from the Fifth Circuit, which has approved pro-rata distributions to fraud victims based upon the equitable power of a federal court. *U.S. v. Durham*, 86 F.3d 70, 73 (5th Cir. 1996); *SEC v. Forex Asset Mgt.*, 242 F.3d 325 (5th Cir. 2001).

7.     The second issue is a factual point that is addressed below.

8.     Guidance on the third issue can be derived from a situation that arose in the Stanford Ponzi scheme wherein a supplier of gold to a receivership entity had funds that were subject to the claims of both a creditor and the receivership estate, which was ultimately resolved, after years of litigation, by dividing the money equitably. *See Pre-War Art, Inc. v. Stanford Coins & Bullion, Inc.*, 3:09-cv-00559, 2021 WL 424283 (N.D.Tex. Feb. 8, 2021).   Near the beginning of the receivership, the supplier impleaded the subject funds and both the creditor and the receivership estate made claims to the funds.  *Id.* at *1-2.  Years of litigation then ensued over the subject funds, the amount of the claims of the supplier and the creditor, and whether the receiver could claw-back certain payments.  *Id.*  Thereafter, the District Court took up the question of the implead funds.  *Id.* The District Court first determined that it had equitable power to include the funds in the distribution to investors, even though they had not been captured within the terms of the freeze order and corresponding receivership appointment order.  *Id.* at 2-5.  Based upon the applicable law regarding the power of federal courts to do equity in the wake of a fraudulent scheme (*id.* at 2-3), the District Court reasoned it had equitable power over the funds because: ". . . the record is clear that SCB is interrelated with the Stanford Ponzi scheme, and the Gallery's interactions with

SCB were merely fortuitously kept separate from the other defrauded investors as a result of the temporal proximity between its transaction with the SCB, the collapse of the Stanford Ponzi scheme, and the imposition of the Receivership. Had the Receivership been imposed later, it is likely that the Gallery's funds would become irreparably entangled with the other funds in the Ponzi scheme." *Id.* at 5.  Moreover, the District Court recognized that investor claims to their stolen funds generally have equitable priority over the claims of trade creditors, and the District Court observed that, in this case, the creditor, if its claim were allowed in full, would receive a 35% recovery as compared to the 5% recovery of the investors in the receiver's pro rata distribution. *Id.*  Weighing against these factors, the District Court also considered the years of litigation between the receiver, the supplier, and the creditor, in the course of which the creditor had generally been proved right as against the various assertions of the receiver. *Id.*  Balancing these equities, the District Court split the money evenly between the receiver's corpus of cash to fund pro rata distributions to investors and the creditor's recovery. *Id.*  In sum, this case counsels in favor of a consensual resolution that avoids protracted litigation, so long as the result is fair and equitable to similarly situated investors.

### Facts

9.    In late 2020, William Keels ("Keels") organized a group of investors to purchase carbon capture units  offered and sold by Defendant Clean Energy Association, Inc. ("CETA").

10.    The group of investors sent funds to those investment vehicles.  Those entities, in turn, sent funds to CETA, net of certain expenses associated with the formation of the entities, the filing of taxes, and the keeping of an appropriate accounting.

11.    Keels has provided an accounting demonstrating the net cash positions of the investors in the group, as follows:

| INVESTOR | NET LOSS |
|---|---|
| E P & MA Werner Rev Liv Trust | $ 950,000.00 |
| Elmer Keels and Anna Ford-Keels | $ 2,340,312.00 |
| The Keels-Pons Family US Trust/William Keels | $ 620,265.42 |
| The Andy Arnold Trust | $ 140,000.00 |
| Arturo Regueiro Barros | $ 258,333.33 |
| Dale Scott III | $ 173,750.00 |
| Tracey Evers | $ 53,500.00 |
| Felecia Froe | $ 44,583.33 |
| Jeremy Goodrich | $ 44,583.33 |
| Brian Moon | $ 89,166.67 |
| John Sengenberger II | $ 89,166.67 |
| The Son Family Living Trust | $ 89,167.00 |
| Ma'ayan BenNaim | $ 100,000.00 |
| Oliver Huskey | $ 150,000.00 |
| David Miller | $ 40,000.00 |
| Tyson Miller | $ 100,000.00 |
| Esther & Derek Isaac Family Trust | $ 200,000.00 |
| Justin Wong | $ 100,000.00 |
| Tijs Vanlier & Adelaida Aguilar | $ 300,000.00 |
| Tamara Zimmerman | $ 35,000.00 |
| Andrew Braun | $ 100,000.00 |
| Michael Wolsky & Renee Wolsky Revocable Trust | $ 150,000.00 |
| Chancally LLC | $ 700.00 |
| Cuarto Piso LLC | $ 700.00 |
|  |  |
| Total | $ 6,169,227.75 |

12.     After review of the documentation provided and CETA records and bank records, the Receiver is satisfied with this accounting.

13.     Upon learning of the receivership order, Keels voluntarily froze $788,182 in various bank accounts of the investment vehicles.

14.     Keels then retained local counsel, cooperated extensively with the Receiver, and voluntarily disclosed these circumstances to the Receiver.

15.     Based upon the preliminary figures in the Receiver's Quarterly Report (Doc. 34 at 6-7; Doc. 34-2), it is probable that any ultimate pro rata distribution in this case will exceed 40% of the net cash losses of the investors.  This is a conservative estimate that takes into account the possibility of priority claims, an increased number of investor claims, administrative expenses, and other contingencies.

16.     An interim pro rata distribution of the frozen funds to the Keels investors would result in an approximately 10% interim distribution to those investors.

17.     Keels requests that he be allowed to effect such an interim distribution and wind-up the investment vehicles.  As a part of that distribution, Keels further requests, with full disclosure to his investors, that approximately $198,000 be applied to administrative expenses incurred for the benefit of the investors in the investment vehicles to document the claims, negotiate a resolution, effect an interim distribution, file tax returns, and wind-up the entities. Further distributions could then be made directly by the Receiver to individual investors at such time as the Court may allow such further distributions to take place.  The interim distribution would stand as an offset to future distributions; in other words, in a future distribution at a level of 40 cents on a dollar, the Keels investors would receive only a further payment of 30 cents on a dollar.

18.     The Receiver sees no reason to stand in the way of this reasonable and fair proposal. Indeed, the only advantage being afforded to the Keels investors is a somewhat earlier timing of a portion of the distribution relative to similarly situated investors, and this is an equitable result given their voluntary disclosure, the clear presentation of their circumstances in such a way as to minimize the administrative costs of the receivership, and the total lack of benefit to the receivership estate of proceeding in any manner that would involve a clawing into the receivership estate of the voluntarily frozen funds and redistribution of the same amount later.

THIRD CLAIM REPORT AND RECOMMENDATION – Page 5

## Recommendation

19.     Taking into consideration the applicable law and the facts of this case in general and specifically in regard to the Keels investors, the Receiver recommends that the Court adopt a pro rata distribution methodology in this case, approve the net cash loss amounts of the Keels investors as stated herein, and direct the Receiver to cooperate with Keels in effecting the proposed interim distribution of the net voluntarily frozen funds as described herein.

WHEREFORE, the Receiver prays that the Court enter an order to such effect.

Respectfully submitted,

*/s/ Dennis Roossien*
Dennis L. Roossien, Jr.
Texas Bar No. 00784873
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75201-6659
Telephone:  214.855.7535
droossien@munsch.com

COUNSEL FOR RECEIVER

### CERTIFICATE OF CONFERENCE

I hereby certify that this motion is supported by the Plaintiff, and is not opposed by the individual defendants.

*/s/ Dennis Roossien*

### CERTIFICATE OF SERVICE

I hereby certify that on the 14th day of November, 2023, a true and correct copy of the foregoing instrument was served electronically in compliance with the Court's Electronic Filing Procedures on all counsel of record who are deemed to have consented to electronic service.

*/s/ Dennis Roossien*