IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>V.<br><br>ROY W. HILL, ERIC N. SHELLY,<br>CLEAN ENERGY TECHNOLOGY<br>ASSOCIATION, INC., and<br>FREEDOM IMPACT CONSULTING, LLC,<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§  Case No. 6:23-cv-00321-ADA<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ |

## RECEIVER'S QUARTERLY REPORT FOR THE FOURTH QUARTER OF 2023

Receiver Albert C. Black III ("Receiver") provides this quarterly report for the period October 1, 2023 through December 31, 2023, respectfully stating:

### Introduction

1. This quarterly report is made pursuant to the requirements of the Order Appointing Receiver ("Appointment Order") (Doc. 8, at 16, para. 53).

2. This report builds upon the Receiver's earlier reports (Docs. 27, 32, 34 & 52).

**I. SUMMARY OF THE OPERATIONS OF THE RECEIVER**

3. During the fourth quarter of 2023, the Receiver engaged in the following principal activities:

**A. CETA Assets – Determination to Recommend Interim Distribution and Liquidation**

4. In the Receiver's last quarterly report, the Receiver advised that, in view of the agreed judgments entered with respect to the individual defendants, the Receiver would turn to questions of liquidation and interim distribution.

5. Since that time, the Receiver has been able to carefully consider the proper course of action to be taken with regard to the CETA assets with the benefit of an expert in the field. Based upon that work, the Receiver determined to seek Court approval for an interim distribution of the majority of the CETA cash and a liquidation of the CETA equipment.[1]

6. To assist him in assessing the CETA assets, the Receiver proposed (Doc. 47) and the Court approved (by text order) the retention of Byron Veech, who is an expert in the technology at issue in this case. As detailed in his CV (Doc. 48 at 2-5), Mr. Veech holds a Bachelor of Science degree in Chemistry and Environmental Studies from Millikin University, as well as a Master of Science, Management and Finance degree from Lindenwood University. He has spent a substantial portion of a more than forty-year career in the coal industry. He also has experience as a plant and coal lab chemist. The principal equipment owned by CETA consists of coal refining machinery and two small carbon capture research/demonstration models. It should be noted that none of the final design of the carbon capture unit are operational. Mr. Veech has substantial experience with the construction, operations of and the decommissioning of coal-fired power plants. He is also conversant with efforts to refine coal, including the chemical processes that have been attempted and worked at a DOE refined coal research project in the 1980s. He is further conversant with the chemistry and methods available to clean gas streams in oil and gas operations. Using his training and experience, Mr. Veech has undertaken a substantial review and analysis of the CETA records and physical equipment, and has interviewed witnesses.

7. Mr. Veech's charge was to assess and to determine the highest and best use of the items identified by Mr. Hill as assets of CETA in his sworn inventory. The relevant portions of the sworn inventory are listed on Exhibit D hereto.

---

[1] This course of action will entail seeking a Court resolution of the opposition of Mr. Hill. Mr. Hill generally asserts that the technology has great promise and should continue to be pursued.

8.      Mr. Veech was given access to the collected electronic and hard copy CETA records in the Receiver's document repository.  Mr. Veech toured the Fairfield and Streetman sites.  He examined equipment onsite at the fabricator that had not been delivered.  He examined equipment being stored by the Receiver.  He interviewed Mr. Hill, PWC personnel, and others.

9.      Based upon his work in compiling these information sources, Mr. Veech put together an overview as to how the equipment came to exist.  It seems Mr. Hill was influenced by the coal-fired Big Brown Power Plant located near Fairfield, as well as the coal mine that was a substantial source of its fuel.  Big Brown was constructed in 1971 and operated until 2018.  One substantial source of fuel was locally-mined lignite.  In 2007 and 2008, the possible closing of the plant for environmental and economic reasons was a matter of some concern in Fairfield.  At that time, Mr. Hill was the Mayor of Fairfield.  In 2009, CETA was incorporated and opened an office on Main Street in Fairfield.  CETA's stated objectives included helping the plant stay in operation by creating a cleaner type of fuel or, at least, helping the mine stay in operation by improving the performance of coal generally as a fuel.  To accomplish this, CETA examined several "Clean Coal" processes and determined that coal pyrolysis could be useful.  Generally speaking, there is nothing new about pyrolysis.  It is a process by which materials such as wood are turned into charcoal, and coke for metal working, and has since ancient times. The fact that a similar process can create liquid by-products was known to the ancient Egyptians, who created embalming fluid from cedar wood.  It generally involves applying low heat and limiting oxygen to the combustion process.  It is used in reducing organic materials to pure carbon (Char), and creating by products such as sulfuric acid, tars and solvents. The Char is even used in various methods of cooking food.  CETA applied this old technology by placing coal in a sealed lower temperature reducing environment to produce combustible char, liquids and various gasses.  Its stated objective was to produce a solid product that would have more concentrated energy (BTU) content, as well as by-products of oily

liquids and combustible gas, while also removing the water and some of the environmentally undesirable materials in the course of the distillation process. In 2009, CETA employees also may have created lab-scale coal pyrolysis equipment, at least this is what CETA later reported in its investment marketing materials. They apparently promoted the creation of a "Mini Pilot Unit" weighing 100 pounds. They began work at a site in Fairfield on Bateman Street. They coined the term "CoalLite" to describe the refined coal. This effort appears to have attracted certain substantial investors. This allowed CETA to create larger equipment at the Fairfield plant. By 2012, the equipment was able to produce demonstration quantities of CoalLite, oils and solvents, and synthetic gas. Again, this was an application of known technology to produce an expected result. Plans were circulated, however, for a larger scale operation. According to CETA promotional materials, CETA reached out to utility companies, mines, investment brokers, and individual investors, some of whom inspected the test site and the products produced. But, funds for a large installation could not be raised. What could be raised was used to create somewhat larger demonstration units at the Fairfield plant. Mr. Hill reported that, in 2013, he championed an effort to purchase the Big Brown plant and the mine, which, in his view, would have allowed CETA to have a platform for proving the value of the CoalLite product. The proposals were not accepted. Mr. Hill also reports that CETA had many discussions in this timeframe with coal suppliers and power generation groups, both domestic and foreign, none of which were fruitful. It seems that sometime in 2014 Mr. Hill turned to presenting the solvent for use in the oil and gas industry. It was branded as CETASolve. The proposal was that this solvent could be employed in what was described as a carbon capture unit (CCU), which would be incorporated into well heads and oil pipelines. Again, small-scale demonstration models were created. Additionally, both the coal distillation units and carbon capture units were manufactured, principally, by the PWC company in Corpus Christi. As previously reported, although there were supposedly over

150 CCUs installed and operating in the field, in fact, PWC reports they only manufactured 47 of the central components.  Commencing in 2014 and expanding in 2018, various brokers were more successful in raising money from investors.  This allowed CETA to develop an additional site in Streetman for the purpose of building ten more of the commercial size versions of the original CoalLite distillation units.  Although these were built, the ten units at Streetman and five of the eleven units at Batmen were never completed, the first six commercial units at Batemen were operational but were not significantly used.  In late 2022 and 2023, CETA also worked to set up a larger laboratory.  As a result, when the Receiver was appointed in May 2023, there was equipment at the Fairfield and Streetman sites, laboratory equipment in a warehouse, and partially fabricated equipment at PWC.  None of this equipment was in commercial operation.

10. Mr. Veech observed that there was very little documentation reflecting operating or test results, and the condition of the equipment indicated relatively little use.  He found only 1500 tons of coal, and 500 tons of the CoalLite product, which, in the coal business, is not much.  Mr. Veech could not credit Mr. Hill's assertion that the equipment operated regularly.  Although Mr. Hill gave detailed stories of how the equipment was wound down over the weekends and brought back up into operation the next week, the physical evidence indicates this did not occur.  When asked about operating records, Mr. Hill referred to the "red files" and the digital historical records, which, when examined, indicated between 70 and 100 total runs of the coal distillation demonstration units.  Mr. Veech calculated the volumes of materials that would be involved in actual operations, and they are very much larger than the physical evidence indicates were actually processed.

11. Mr. Veech found the records do not support the view that commercial sales of the products ever occurred.  Mr. Hill did not dispute this point.

12. Mr. Veech noted that even the non-operating assets had served as the basis of a fraudulent scheme. Mr. Hill's detailed, generally hand-written, statements for investor quarterly reports as to the commercial operation of the units were entirely falsified.

13. Mr. Veech further observed:

(1) The Fairfield plant does not appear capable of processing a large volume of coal, and does not appear to have done so. He points out that coal is messy to handle and is processed in large volumes that leave significant physical evidence, which he did not find. Neither does the Fairfield plant have the rail service needed for cost efficient operations.

(2) There was little evidence of the purchase of coal for the operation. Perhaps as many as five modest purchases occurred.

(3) There was a limited amount of CETASolve onsite.

(4) This are no records of shipping of CETASolve from the site. Very large volumes would have been employed if commercial operations had been occurring as claimed by the quarterly statements CETA issued to investors.

(5) The coal distillation units were designed to have operating needs for a very large volume of coal, which, as noted, was not supported by evidence or records.

(6) There was not even an operating demonstration model of the commercial design of the carbon capture unit.

(7) The Fairfield and Streetman plants do not bear physical evidence of material operations.

(8) The business records of CETA are poor.

(9) The claims about operations and results in the investment marketing materials are not supported by business records of such purported operations.

(10) The volumes of product found onsite are very low compared to what would be present at an operating facility if the operations had actually been occurring in the volumes indicated in the quarterly statements provided to investors.

(11) Records indicate CETA had fallen behind on payments to some of the earlier investors.

(12) In all of the records, no exact location was ever recorded for an operating unit; simply the term "Field" was used in the quarterly statements.

14. Mr. Veech reports that there are a few domestic companies exploring coal pyrolysis using somewhat different designs, but most ventures have not been economically succesful. There are also companies in Europe, Asia and India that are seeking to convert biomass and waste materials into synthetic gas. They all work to some degree, but there are economic and emissions issues. CETA's efforts would therefore face competition.

15. Mr. Veech concluded that CETA's demonstration coal distillation units do work to a degree, there are issues presented in regard to scale, economics, and a generally unfavorable domestic view of carbon-based combustion. Moreover, CETA was never commercially successful in any respect.

16. In summary, the coal pyrolysis or distillation process in not new. Rather, CETA took old technology and claimed that by containing the entire process of distillation and cooling, they could make the entire process more environmentally friendly by reducing the emissions. The patents CETA holds were directly linked to the more contained system but these ideas were never fully tested on any kind of scale that is meaningful. The four products they produced were basically the same as have always been generated by the coal pyrolysis process. CETA did find

some new applications for the products they produced and some interesting ideas. But, they were not commercially viable, and they would face substantial regulatory opposition as well.

17. Much of the equipment was tailored for CETA. While some equipment can be sold for use elsewhere, most will have to be sold for scrap. Additionally, some environmental remediation will be necessary.

18. Finally, it should be noted that Mr. Hill's inventory does not value the most significant supposed assets, but instead uses the phrase "to be determined" in respect of: "Ceta Solve, gas and oil"; "Fairfield Plant", "Streetman Plant", "6 patents". In fact, the inventory appears to be tracking Mr. Hill's rough estimation of how much was spent on various items, as opposed to what they may actually be worth.

19. Based upon the evidence developed to date, and the further findings and opinions of Mr. Veech, the Receiver recommends restoration to the investors of a large majority of the CETA cash, and the liquidation of the CETA equipment.

B. **CETA Bank Records Compilation and Analysis**

20. During the fourth quarter of 2023, the Receiver also commissioned, received, and began to digest a compilation of the CETA bank records.

21. This was done because the books and records of CETA were woefully incomplete, such that the Receiver did not have a reliable basis upon which to reconcile investor claims and vendor claims and to answer the question repeatedly put to him as to where hundreds of millions of dollars had actually gone and, relatedly, what he could and should do about it. The only credible source from which to work were bank records he had methodically gathered in the preceding months from Wells Fargo that spanned an eight-year period and contained over 21,000 transactions. So, what was needed was to design and to commission an efficient approach to summarizing those records.

22. The Receiver broke down the heart of the forensic problem by designing an efficient means of summarizing the bank records and commissioning his forensic accountants to execute that project. As Mr. Hill was not explaining how the accounts worked together, this first involved review and analysis of CETA documents and select transactions to create a skeleton of the relationships between the Wells Fargo accounts. For example, the Receiver had to resolve the role of Freestone Energy, which the Receiver determined was a supposed operating company that, in fact, was a mere conduit laundry of investor funds. Through this work, the Receiver identified which accounts principally received investor funds, which accounts were principally intermediary accounts, and, finally, which accounts principally effected payments back to investors. Having set the account relationships in order, the Receiver next determined most of the transactions involved a contribution by an investor (or investment entity into which investors had pooled funds) into one of the contribution accounts and corresponding payments back out the other side of the web of accounts to those same investors or earlier investors. A principal solution to segregating these transactions by investor and separating them from other transactions was to enter all of the transactions into a single worksheet with a common naming convention that would allow these transactions to be classified and understood. This effort would further expose transactions where investor funds had been diverted, either to the CETA operations, to insiders, or to others. This was a time consuming effort, but it produced highly useful work product that can be used to correctly divide the recovered funds and proceeds of liquidations among investors, to identify insider transfers, to assess the CETA equipment expenditures, to address vendor claims, and to identify and pursue funds diverted to third parties, in some cases without receiving reasonably equivalent return value.

23. This work also brings further into focus the particular means by which the CETA scheme was executed. First, as of early 2016, later investor dollars were already being used to

fund regular payments to earlier investors. Second, this produced a significant number of early "winners" who have not, as a result, presented themselves to the Receiver. Third, the forensic work when initially compared with the investor claims showed a substantial number of early investors neglected to include their early winnings on their claims. Since claims are adjusted on a net cash loss basis, this needs to be corrected, so as to direct distributions in line with the losses suffered. Fourth, fundraising continues to appear to total approximately $300 million dating back to 2012 premised upon the CETA technology, with the coal refining projects being the oldest and the carbon capture units being the most recent. Fifth, the net cash loss continues to hover somewhat over $205 million. Sixth, one can begin to see that the loss amount is due to approximately $51 million in payments to net winners, about $11 million in payments to insiders, nearly $6 million to the Allen Brothers or for the benefit of that company, over $73 million in payments to vendors, and a limited number of unidentified transfers, leaving approximately $63 million in cash recovered. The payments to net winners are, in part, to feeder entities through which investors pooled investments, and so determining the claims at the individual investor level will take additional work. The payments to insiders were principally deposited into Trust #2 (for the benefit of Mr. Hill's lifestyle and those of his ex-wife and other persons close to him). The payments generally described as being to the Allen Brothers went to legal fees to support litigation among the owners of that family business and to fund a line of credit that was used in part to settle that litigation and in part to enhance the oil and gas operations of the Allen Brothers business. Among the vendor payments, the largest recipient was PWC, which received over $20 million to fabricate custom equipment. Finally, no evidence of revenues from CETA technology were found, thus confirming CETA was a Ponzi scheme, due to the payment of funds derived from later investors to earlier investors accompanied by the representation that the payments were the fruits of revenues, when, in fact, they were not. The scheme also involved the laundering of funds

through Freestone Energy accounts for no actual purpose except to add complexity and to give a false impression that it was an actual operating company.

### C. Shelly Personal Assets and Liabilities

24.     During the fourth quarter, Shelly executed a court-approved joint plan to liquidate certain of his investments in real estate. Certain debts were also eliminated to reduce carrying costs on that debt. Certain asset estimates were refined. The resulting Shelly position is reflected on Exhibit C hereto.

25.     As Shelly and the SEC have not yet resolved the extent of civil penalties to be charged against the Shelly assets, the Receiver is seeking principally to maintain the status quo with regard to the Shelly assets, except to the extent that liquidation reduces overall debt service or other costs to maintain certain assets.

### D. Other Receivership Activities

26.     As a result of the need to obtain a Court determination in regard to the CETA assets, the Receiver took steps to secure and/or store the CETA equipment.

27.     The Receiver has also established a document repository containing sufficient CETA documents and related Hill documents to permit a reasonable reconstruction of the events that gave rise to this receivership.

28.     The Receiver has complied with administrative requirements.

29.     The Receiver has compiled claims and responded to investor inquiries. In the upcoming quarter, the Receiver will be taking steps to apply the bank records summary to adjust the claims.

30.     The Receiver has interacted with the parties to the main action.

## II.  SUMMARY OF ASSETS AND LIABILITIES

### A. Cash versus Administrative Expenses

31. The receivership estate's combined cash and publicly traded liquid securities is reflected on the attached Exhibit A. The amount is $66,406,447.01.

32. As of the end of the fourth quarter, the Receiver's professionals have been paid $156,261.98.

### B. Receipts and Disbursements

33. Exhibit A shows receipts and disbursements for the quarter and since inception. This change reflects increases of approximately $800,000 due principally to stock market gains and $1,380,000 in cash distributions to a post-receivership order investor (unlike everyone else, this investor's funds were deposited after the entry of the receivership order).

34. Exhibit E provides minor corrections to the SFAR from last quarter.

### C. Receivership Assets

#### CETA, FIC, and Shelly Cash

35. As reflected on the attached Exhibit A, the value of the receivership estate's combined cash and publicly traded liquid securities was $66,406,447.01.

36. A breakdown of accounts by holder is provided as Exhibit B.

#### Shelly Investments and Real Estate

37. Shelly's investments and real estate are reported on Exhibit C hereto. Their value net of debt is estimated at approximately $6.9 million.

#### CETA Equipment, Vehicles, and Real Estate

38. The CETA equipment has been determined to have essentially salvage value.

39. The vehicles are being liquidated and those proceeds will be included in future reports.

40. CETA owns industrial yards in Fairfield and Streetman, Texas. The value has not been determined.

41. CETA Land and Mineral Investments, Inc. appears to own a few lots of limited value in Caddo Parish, Louisiana. The value has not been determined.

Hill Assets

42. Mr. Hill does not appear to have material assets denominated in his own name. Mr. Hill is reportedly and apparently being supported by the assets of Trust No. 2 and/or family members.

**D. Claims Held by the Receivership Estate**

43. Mr. Hill transferred approximately $11 million dollars to "Trust No. 2", which owns the house where he often lives and other property. An accounting of these transfers has now been prepared, and the Receiver will be pressing the question of how Trust No. 2 will address these improper transfers of investor funds.

44. CETA transferred closer to $6 million in respect of the Allen Brothers business, not only to settle a family dispute over ownership, but also to provide counsel to one side of the family. Additionally, some funds were employed to enhance oil and gas operations. These transfers have now been summarized. The Receiver intends to continue to assess possible remedies to either recover these funds or their value.

45. With the benefit of a forensic compilation of the bank records, it is now clear that certain investors in earlier periods received back more than they invested. This issue remains somewhat clouded due to the use of intermediary entities through which investments were pooled. The Receiver will be working to complete this accounting, and weigh the cost/benefit of the estate's claw-back rights.

E. **Claims of Creditors Against the Receivership Estate**

46. The Receiver has compiled a working claims ledger.

47. In regard to investor claims, with the benefit of the above-described forensic accounting, the investor claims will be examined and verified or adjusted. An updated claims list will be presented.

48. As previously reported, five vendor claims totaling $1,381,268.85 have been submitted.

49. Claims and claim inquiries may be submitted through the former CETA website, located at www.cetaenergy.com.

50. Shelly liabilities are reflected on Exhibit C.

F. **Creditor Claims Proceedings**

51. Claims have slowed and the Receiver believes he has received substantially all of the claims, and the Receiver also has a bank records summary from which to determine whether all investors have been identified.

52. The Receiver will be using the forensic work product to conduct a detailed claims review, so that an interim distribution can be made if the Court determines that an interim distribution should occur for the reasons discussed above.

III. **CONTINUATION OF THE RECEIVERSHIP**

53. This topic is covered in detail in the Receiver's prior reports. The basic situation has not changed, and therefore the Receiver recommends that the receivership be continued.

Respectfully submitted,

*/s/ Dennis Roossien*
Dennis L. Roossien, Jr.
Texas Bar No. 00784873
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 4000
Dallas, Texas 75201-6659
Telephone: 214.855.7535
droossien@munsch.com

COUNSEL FOR RECEIVER

**CERTIFICATE OF SERVICE**

I hereby certify that on the 18th day of March, 2024, a true and correct copy of the foregoing instrument was served electronically in compliance with the Court's Electronic Filing Procedures on all counsel of record who are deemed to have consented to electronic service.

*/s/ Dennis Roossien*