IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>V.<br><br>ROY W. HILL, et al. | §<br>§<br>§   Case No. 6:23-cv-00321-ADA<br>§<br>§<br>§<br>§ |

### RECEIVER'S UNOPPOSED THIRD INTERIM FEE APPLICATION

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Receiver Albert C. Black III ("Receiver") submits this unopposed Third Interim Fee Application, respectfully stating:

### Introduction

1. This Application seeks the Court's approval of the fees and expenses incurred during the period of October 1, 2023 through December 31, 2023, with the exception of the fees and expenses of Mr. Veech, which are contested and therefore are being presented in a separate Receiver's Fourth Interim Fee Application.

2. The Receiver has filed a corresponding status report that summarize his efforts during this period, identifies the assets and liabilities of the receivership estate, and provide other information pertinent to this application (Doc. 66).

3. The receivership defendants are Clean Energy Technology Association, Inc. ("CETA"), Roy Hill ("Hill"), Eric Shelly ("Shelly"), and Freedom Impact Consulting, LLC ("FIC").

4. The receivership assets are valued at approximately $74 million.

5. The largest liabilities are the claims of over 800 claims from investors who contributed in excess of $300 million. Net of returns, the investor loss is presently estimated at approximately $200 million.

6. The services provided to implement the appointment order are detailed below and in the accompanying appendix.

## Amount Sought

7. This application seeks approval to pay administrative costs of $232,583.55.

## Services Provided

8. When the fourth quarter began, the Receiver had been in place for five months, during which time he had secured records and assets; preliminarily assessed the overall situation and provided detailed reports to investors, the Court, and other stakeholders; and identified a path forward to resolve the case.

9. The first strategic obstacle the Receiver faced was that the books and records of CETA were woefully incomplete, such that the Receiver did not have a reliable basis upon which to reconcile investor claims and vendor claims and to answer the question repeatedly put to him as to where hundreds of millions of dollars had actually gone and, relatedly, what he could and should do about it. The only credible source from which to work were bank records he had methodically gathered in the preceding months from Wells Fargo that spanned an eight year period and contained over 21,000 transactions. So, what was needed was to design and to commission an efficient approach to summarizing those records.

10. The Receiver broke down the heart of the forensic problem by designing an efficient means of summarizing the bank records and commissioning his forensic accountants to execute that project. As Mr. Hill was not explaining how the accounts worked together, this first involved review and analysis of CETA documents and select transactions to create a skeleton of

the relationships between the Wells Fargo accounts.  For example, the Receiver had to resolve the role of Freestone Energy, which the Receiver determined was a supposed operating company that, in fact, was a mere conduit laundry of investor funds.  Through this work, the Receiver identified which accounts that principally received investor funds, which accounts that were principally intermediary accounts, and, finally, which accounts principally effected payments back to investors.  Having set the account relationships in order, the Receiver next determined that most of the transactions involved a contribution by an investor (or investment entity into which investors had pooled funds) into one of the contribution accounts and corresponding payments back out the other side of the web of accounts to those same investors or earlier investors.  A principal solution to segregating these transactions by investor and separating them from other transactions was to enter all of the transactions into a single worksheet with a common naming convention that would allow these transactions to be classified and understood.  This effort would further expose transactions where investor funds had been diverted, either to the CETA operations, to insiders, or to others.  This was a time consuming effort, requiring an expenditure of approximately $95,000 by Ahuja & Clark, but it produced highly useful work product that can be used to correctly divide the recovered funds and proceeds of liquidations among investors, to identify insider transfers, to assess the CETA equipment expenditures, to address vendor claims, and to identify and pursue funds diverted to third parties, in some cases without receiving reasonably equivalent return value.

11. Alongside this work, the Receiver retained less expensive personnel to create key document sets pertaining to the series of investment offerings, to "companies" such as Freestone Energy, to recipients of insider payments (such as "Trust #2" that received and used over $10 million to support the lifestyle of Mr. Hill, his ex-wife, and others close to him), to vendors, and to third party transfer recipients (such as the Allen Brothers who received $5 million).  The

Receiver also examined and/or created key document sets pertaining to various earlier and/or secondary schemes in which Mr. Hill has been involved, as well as various assets used as window dressing for those schemes, in order to determine whether there were recoverable receivership assets resulting from such schemes. The Receiver further examined and/or put together records pertaining to Mr. Hill's claims made along the way to various parties in respect of supposed personal wealth – items that did not appear on Mr. Hill's asset inventory – and conducted public records searches. This work was conducted in part by personnel at New Horizons, part by a contract researcher, and part by counsel. This work represents approximately another $50,000 of the overall expenditure during the fourth quarter. The benefit of this work is that the Receiver and his team have now been able to "follow the money" and to piece together the story that goes along with what the bank records reveal. This has led to initial contacts with recipients of diverted funds. As necessary, this work will provide the foundation for compiling a more detailed set of exhibits in the event formal steps are required to recover funds or assets purchased with investor funds. At present, the leading recipients of diverted funds are, as mentioned, Trust #2, the Allen Brothers, and earlier investors. However, there was also a great deal of money spent on CETA equipment and employees.

12.   The second strategic obstacle faced by the Receiver was that CETA spent approximately $73 million on CETA equipment and employees. Mr. Hill asserted the technology was viable and should be pursued. To address this, the Receiver located an expert. As the fourth quarter began, the Court had just commissioned Byron Veech to examine the equipment and the technology and to opine as to whether the technology should be pursued or whether the equipment should be liquidated and the bulk of the investor funds returned to investors. Mr. Veech ultimately opined that the technology was not viable. Mr. Hill has now objected to Mr. Veech's fees. As the

administrative expenses are otherwise uncontested, the Receiver has submitted the question of Mr. Veech's fees in a separate fee application.

13.     Meanwhile, the Receiver was obligated to secure certain CETA equipment at the larger sites against vandalism and theft using contractors arranged by New Horizons.  Providing security is expensive, and involved an expenditure of approximately $86,668.95.  These costs will terminate, however, if the Court agrees with Mr. Veech that the CETA equipment should be liquidated.  Likewise, certain equipment and documents are being stored at a rate of $7,633.70 monthly, and those costs will also be reduced as the equipment is liquidated.  Finally, the Streetman and Bateman sites are being maintained at a rate of $3,000 per month, which would be eliminated if these sites are cleaned up, the equipment removed, and the real property sold.[1]

14.     The Receiver's own time and expenses in providing strategic direction and oversight for the foregoing efforts was $9,000 in the fourth quarter.

15.     The Receiver's counsel incurred $31,000 to support the investigation, to assist in the design of the forensic work, to comply with court requirements, and to execute other tasks as detailed on the invoices submitted herewith.

16.     The Receiver and his team also handled numerous investor inquiries, assembled claims, and took steps to design a claims review protocol to be employed to apply the forensic work product to adjust the claims.  One of the more significant findings in regard to the claims is that numerous earlier investors failed to report the extent of the ponzi payments received, which will reduce the net cash loss overall by at least $5 million and therefore more equitably distribute the recovered funds among the later investors, who suffered the largest losses.

---

[1] These expenses are included on the New Horizons statements – even though this are business asset expenses, they are being disclosed because they are being provided by New Horizons.

17. In regard to claims, the Receiver also made distributions to investors consistent with the claims determinations to date. This was based upon prior work and some work in the fourth quarter. It resulted in direct distributions to investors totaling just over $1.46 million, and a claims settlement through which investor received an additional approximately $600,000.

18. Finally, the Receiver worked to further refine their analysis of the Shelly assets, to address certain open matters with regard to Shelly investments, and to work with Shelly in regard to executing the protocol the Court approved at the end of the third quarter.

19. Statements further detailing the efforts of the Receiver and his professionals, as well as the costs incurred, are detailed in the accompanying appendix. The following chart summarizes the statements, which appear in the appendix in the order stated on the chart:

| Firm | Month | Amount |
|---|---|---|
| Ahuja & Clark, PLLC | Oct-Dec | 93,878.50 |
| Receiver | October | 3,654.00 |
| Receiver | November | 3,006.00 |
| Receiver | December | 2,430.00 |
| New Horizons - Prof'l | October | 40,887.25 |
| New Horizons - Prof'l | November | 20,486.58 |
| New Horizons - Prof'l | December | 16,867.75 |
| New Horizons - Contractors | October | 7,942.51 |
| New Horizons - Contractors | November | 4,003.74 |
| New Horizons - Contractors | December | 7,884.24 |
| Munsch Hardt | October | 10,370.18 |
| Munsch Hardt | November | 12,288.20 |
| Munsch Hardt | December | 6,452.40 |
| Law Office of Jared Perez | November | 2,432.20 |
| | | 232,583.55 |

**Application of Johnson Factors**

20. The primary concern in regard to professional fees is that the fee awarded be reasonable. *Blum v. Stenson,* 465 U.S. 886, 893 (1984). In this Circuit, the applicable test is set forth in *Johnson v. Georgia Hwy. Express, Inc.*, 488 F.2d 714 (5th Cir. 1974). Under that test, a

court must first determine the loadstar amount by multiplying the reasonable number of hours billed by a reasonable billing rate. That amount can then be adjusted by various factors.

21. The following reviews this Application with regard to each of the *Johnson* factors:

(a) <u>The time and labor required</u>. The time and labor required are set forth in detail in the statements contained in the accompanying appendix.

(b) <u>The novelty and difficulty of the questions</u>. The questions addressed by the professionals herein are common to enforcement receiverships generally, but handling such receivership cases is a narrow specialty requiring experienced professionals conversant with a substantial body of largely common law and customary practice.

(c) <u>The requisite skill to perform the service</u>. The fiduciary and legal services required the employment of individuals possessing considerable experience and capacity in handling equity receiverships. The Receiver, his counsel, and his support staff have considerable experience in these areas. The Receiver's support team also includes persons with more general administrative and logistical capacities of they type ordinarily required to administer assets such as those present in this case, to make business judgments, and to otherwise execute certain administrative functions.

(d) <u>The preclusion of other employment due to the acceptance of the case</u>. The Receiver and his professionals have not declined any representation solely because of their services as Receiver and counsel for the Receiver.

(e) <u>The customary fee</u>. The hourly rates sought herein are at least commensurate with the rates charged by other practitioners of similar experience levels in the Western District of Texas and in the case of the Receiver and his professionals. Both the Receiver

and his counsel have discounted their standard rates by ten percent and agreed to a $65,000 cap for the first month of the case.

(f) <u>Whether the fee is fixed or contingent</u>. The Receiver and his professionals' fees are fixed insofar as monies exist by way of receivership assets from which to pay such fees. Payment of such fees, however, is subject to Court approval, and is contingent upon the availability of receivership assets.

(g) <u>Time limitations imposed by the client or other circumstances</u>. The early steps in the receivership were conducted on an emergent basis. Thereafter, the Receiver and his professionals have generally not faced unusual time pressures.

(h) <u>The amount involved and the results obtained</u>. The amount involved in this case can be measured in a number of ways. First, this case involves invested funds of approximately $300 million and a net cash loss in excess of $200 million. Second, the remaining assets have a presently estimated market value of approximately $74 million. Third, this case involves substantial investments by over 800 investors who are entitled to know what actually happened and to address the tax implications of what occurred with the benefit of accurate knowledge. The results obtained are many, including the implementation of the asset freeze, the halting of the fraudulent conduct both through the asset freeze and the provision of accurate and truthful information, the winding up of the CETA operations and all that entails, the interim resolution of claims and inquiries, and the proper administration of a receivership estate. Ultimately, this case will provide both restitution to investors and proper payment of other claims consistent with applicable law.

(i) <u>The experience, reputation and ability of the attorneys</u>. Munsch Hardt is a broad-based commercial firm with substantial experience in the handling of matters generally

related to civil trial law, dispute resolution, bankruptcy and general workout matters. The practice of the attorneys specifically in this case regularly includes the representation of investors and other persons involved in business transactions in which the investors or other parties are victims or aggrieved in some fashion. The Receiver and his counsel have also served as receivers or participated in other receiverships. The reputations of the Receiver and his counsel are recognized and respected in their community and area of practice.

        (j)    <u>The undesirability of the case</u>. The service as Receiver and the representation of the Receiver incident to this case has not been undesirable.

        (k)    <u>The nature and length of the professional relationship with the client</u>. This is not a factor with regard to this engagement.

        (l)    <u>Award in similar cases</u>. The Receiver submits that the fees requested in this case are commensurate with awards approved in comparable cases.

## Certification

The undersigned hereby certifies that the fees and expenses incurred herein and reflected on this Application were incurred in the best interests of the Receivership Estate; and (with the exception of the Billing Instructions agreed to with the Commission) the Receiver has not entered into any agreement, written or oral, express or implied, with any person or entity concerning the amount of compensation to be paid or to be paid from the Receivership Estate, or any sharing thereof. Additionally, as required by the Billing Instructions, the undersigned hereby additionally certifies that he has read this Application, that to the best of his knowledge, information and belief formed after a reasonable inquiry, the Application and all fees and expenses herein are true and accurate and comply with the Billing Instructions, that all fees contained in the Application are based on the rates listed in the Applicant's original fee schedule and such fees are reasonable,

necessary and commensurate with the skill and experience required for the activity performed, that he has not included in the amount for which reimbursement is sought the amortization of the cost of any investment, equipment, or capital outlay (except to the extent such may exist in the permitted allowable amounts set forth in the Billing Instructions with regard to photocopies), and in seeking reimbursement for a service which was justifiably purchased or contracted for a professional from a third party, he requests reimbursement only for the amount billed by and paid to the vendor and he is not making a profit on any reimbursable services provided by him.

## Conclusion

WHEREFORE, the Receiver prays that the Court approve the administrative expenses sought herein.

Respectfully submitted,

*/s/ Dennis Roossien*
Dennis L. Roossien, Jr.
Texas Bar No. 00784873
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75201-6659
Telephone:  214.855.7535
droossien@munsch.com

COUNSEL FOR RECEIVER

## CERTIFICATE OF CONFERENCE

I hereby certify that this motion is not opposed by the Plaintiff nor Roy Hill, who are the only parties who have appeared through counsel.  Mr. Hill objects only to the fees of Byron Veech, which are accordingly submitted by separate application.

*/s/ Dennis Roossien*

## **CERTIFICATE OF SERVICE**

      I hereby certify that a true and correct copy of the foregoing instrument was served electronically in compliance with the Court's Electronic Filing Procedures on all counsel of record who are deemed to have consented to electronic service.

                                             */s/ Dennis Roossien*