IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, § § § § § § § | |
| V. | Case No. 6:23-cv-00321-ADA |
| ROY W. HILL, et al. | |

## RECEIVER'S FOURTH INTERIM FEE APPLICATION

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Receiver Albert C. Black III ("Receiver") submits this Fourth Interim Fee Application, respectfully stating:

## Introduction

1. This Application seeks the Court's approval of the fees and expenses incurred by Byron Veech, who is the expert retained to opine as to the CETA equipment and purported technology.

2. Mr. Veech's considered opinion is that Mr. Hill is wrong about the CETA equipment and purported technology. In Mr. Veech's opinion, the CETA equipment should be sold for scrap because the purported technology is not viable.

3. This separate application is tendered because Mr. Veech's invoices are the only administrative expenses contested by Mr. Hill.

4. Mr. Hill has advised the Receiver that he objects because the Receiver advised that Mr. Veech would be tendering a final report. Mr. Hill seems unable or unwilling to understand that paragraphs 6-16 of the Receiver's Quarterly Report for the Fourth Quarter of 2023 contain the final report of Mr. Veech (Doc. 66, at 2-8).

RECEIVER'S FOURTH INTERIM FEE APPLICATION – Page 1

5.      In any event, Mr. Veech's work product, as detailed in the quarterly report, justifies the fees and expenses he charged.  Under a lodestar approach, Mr. Veech actually incurred the hours stated, and the rate applied is the one approved by the Court when the Court approved Mr. Veech's retention.  The value of his work is that the Receiver can now move forward to appropriately dispose of CETA equipment with the guidance and support of the considered opinion of a qualified and credible expert in the field.

## Amount Sought

6.      This application seeks approval to pay $94,171 for fees and expenses of Mr. Veech.

7.      Mr. Veech's invoices are contained in the accompanying appendix.

## Services Provided

8.      Mr. Veech was retained because the Receiver had a difficult choice to make.  On the one hand, Mr. Hill's inventory values the CETA equipment at $75 million.  On the other hand, the principal spokesperson for the technology is Mr. Hill.  So, what the Receiver needed was a credible person conversant with coal-based energy technology, equipment, and business undertakings, who could advise the Receiver as to whether the CETA equipment and technology had such value or not.

9.      To address this problem, the Court approved the retention of Byron Veech (Docs. 47-48 & text order dated September 28, 2023).

10.     As detailed in his CV (Doc. 48 at 2-5), He has spent a substantial portion of a more than forty-year career in the coal industry.  He also has experience as a plant and coal lab chemist.  The principal equipment owned by CETA consists of coal refining machinery and two small carbon capture research/demonstration models.  It should be noted that none of the final design of the carbon capture unit are operational.  Mr. Veech has substantial experience with the construction, operations of and the decommissioning of coal-fired power plants.  He is also

conversant with efforts to refine coal, including the chemical processes that have been attempted and worked at a DOE refined coal research project in the 1980s. He is further conversant with the chemistry and methods available to clean gas streams in oil and gas operations. Using his training and experience, Mr. Veech has undertaken a substantial review and analysis of the CETA records and physical equipment, and has interviewed witnesses.

11. Mr. Veech's charge was to assess and to determine the highest and best use of the items identified by Mr. Hill as assets of CETA in his sworn inventory.

12. Mr. Veech was given access to the collected electronic and hard copy CETA records in the Receiver's document repository. Mr. Veech toured the Fairfield and Streetman sites. He examined equipment onsite at the fabricator that had not been delivered. He examined equipment being stored by the Receiver. He interviewed Mr. Hill, PWC personnel, and others.

13. Based upon his work in compiling these information sources, Mr. Veech put together an overview as to how the equipment came to exist. For example, Mr. Veech noted that it seems Mr. Hill was influenced by the coal-fired Big Brown Power Plant located near Fairfield, as well as the coal mine that was a substantial source of its fuel. Big Brown was constructed in 1971 and operated until 2018. One substantial source of fuel was locally-mined lignite. In 2007 and 2008, the possible closing of the plant for environmental and economic reasons was a matter of some concern in Fairfield. At that time, Mr. Hill was the Mayor of Fairfield. Thus, when CETA was incorporated and opened an office on Main Street in Fairfield in 2009, CETA's stated objectives included helping the plant stay in operation by creating a cleaner type of fuel or, at least, helping the mine stay in operation by improving the performance of coal generally as a fuel. To accomplish this, CETA examined several "Clean Coal" processes and determined that coal pyrolysis could be useful.

14. Mr. Veech helped the Receiver understand that, generally speaking, there is nothing new about pyrolysis. Generally speaking, there is nothing new about pyrolysis. It is a process by which materials such as wood are turned into charcoal, and coke for metal working, and has since ancient times. The fact that a similar process can create liquid by-products was known to the ancient Egyptians, who created embalming fluid from cedar wood. It generally involves applying low heat and limiting oxygen to the combustion process. It is used in reducing organic materials to pure carbon (Char), and creating by products such as sulfuric acid, tars and solvents. The Char is even used in various methods of cooking food.

15. Mr. Veech's investigation determined CETA applied this old technology by placing coal in a sealed lower temperature reducing environment to produce combustible char, liquids and various gasses. Its stated objective was to produce a solid product that would have more concentrated energy (BTU) content, as well as by-products of oily liquids and combustible gas, while also removing the water and some of the environmentally undesirable materials in the course of the distillation process.

16. Mr. Veech's investigation further traced the early development and construction of the CETA equipment. In 2009, CETA employees apparently created lab-scale coal pyrolysis equipment, at least this is what CETA later reported in its investment marketing materials. They apparently promoted the creation of a "Mini Pilot Unit" weighing 100 pounds. They began work at a site in Fairfield on Bateman Street. They coined the term "CoalLite" to describe the refined coal. This initial effort appears to have attracted certain substantial investors. This allowed CETA to create larger equipment at the Fairfield plant. By 2012, the equipment was able to produce demonstration quantities of CoalLite, oils and solvents, and synthetic gas.

17. While this may have been impressive to some, Mr. Veech could see that this was an application of known technology to produce an expected result.

18. Nonetheless, CETA circulated plans for a larger scale operation. According to CETA promotional materials, CETA reached out to utility companies, mines, investment brokers, and individual investors, some of whom inspected the test site and the products produced. But, funds for a large installation could not be raised. What could be raised was used to created somewhat larger demonstration units at the Fairfield plant. Mr. Hill reported that, in 2013, he championed an effort to purchase the Big Brown plant and the mine, which, in his view, would have allowed CETA to have a platform for proving the value of the CoalLite product. The proposals were not accepted. Mr. Hill also reported that CETA had many discussions in this timeframe with coal suppliers and power generation groups, both domestic and foreign, none of which were fruitful.

19. In 2017 and 2018, various brokers were more successful in raising money from investors. The additional funds allowed CETA to develop an additional site in Streetman for the purpose of building larger versions of the original CoalLite distillation units.

20. Although these were built, Mr. Veech's experience with coal powerplants allowed him to perceive that they were not significantly used.

21. In addition to the coal refining, CETA promoted a secondary technology. Sometime in 2014 Mr. Hill turned to presenting the solvent for use in the oil and gas industry. It was branded as CETASolve. The proposal was that this solvent could be employed in what was described as a carbon capture unit (CCU), which would be incorporated into well heads and oil pipelines.

22. Again, small-scale demonstration models were created. Additionally, the central component was manufactured, principally by the PWC company in Corpus Christi.

23. It was the CCUs that Mr. Shelly principally promoted in the 2020-2023 timeframe. Although there were supposedly over 150 CCUs installed and operating in the field, in fact, PWC reported they only manufactured 47 of the central components.

24. In late 2022 and 2023, CETA also worked to set up a larger laboratory. This was not completed.

25. So, this was the history behind what the Receiver found when he was appointed in May 2023 – there was equipment at the Fairfield and Streetman sites, laboratory equipment in a warehouse, and partially fabricated equipment at PWC. None of this equipment was in commercial operation.

26. Mr. Veech observed that there was very little documentation reflecting test results, and the condition of the equipment indicated relatively little use. He found only 1500 tons of coal, and 500 tons of the CoalLite product, which, he explains, in the coal business, is not much. Moreover, from his observation and experience, Mr. Veech could see that Mr. Hill's assertion that the equipment operated regularly was not true. Although Mr. Hill gave detailed stories of how the equipment was wound down over the weekends and brought back up into operation the next week, the physical evidence indicates this did not occur. When asked about operating records, Mr. Hill referred to the "red files" and the digital historical records, which, when examined, indicated between 70 and 100 total runs of the coal distillation demonstration units. Mr. Veech calculated the volumes of materials that would be involved in actual operations, and they are very much larger than the physical evidence indicates were actually processed.

27. Mr. Veech also found the records do not support the view that commercial sales of the products ever occurred. Mr. Hill did not dispute this point.

28. Mr. Veech noted the assets had served as the basis of a fraudulent scheme. Based upon the evidence he gathered, Mr. Veech was able to confirm that Mr. Hill's detailed, generally hand-written, statements for investor quarterly reports as to the commercial operation of the units were entirely falsified.

29. Mr. Veech compiled the following additional observations:

(1) The Fairfield plant does not appear capable of processing a large volume of coal, and does not appear to have done so. He points out that coal is messy to handle and is processed in large volumes that leave significant physical evidence, which he did not find. Neither does the Fairfield plant have the rail service needed for cost efficient operations.

(2) There was little evidence of the purchase of coal for the operation. Perhaps as many as five modest purchases occurred.

(3) There was a limited amount of CETASolve onsite.

(4) This are no records of shipping of CETASolve from the site. Very large volumes would have been employed if commercial operations had been occurring as claimed by the quarterly statements CETA issued to investors.

(5) The coal distillation units were designed to have operating needs for a very large volume of coal, which, as noted, was not supported by evidence or records.

(6) There was not even an operating demonstration model of the commercial design of the carbon capture unit.

(7) The Fairfield and Streetman plants do not bear physical evidence of material operations.

(8) The business records of CETA are poor.

(9) The claims about operations and results in the investment marketing materials are not supported by business records of such purported operations.

(10) The volumes of product found onsite are very low compared to what would be present at an operating facility if the operations had actually been occurring in the volumes indicated in the quarterly statements provided to investors.

(11) Records indicate CETA had fallen behind on payments to some of the earlier investors.

(12) In all of the records, no exact location was ever recorded for an operating unit; simply the term "Field" was used in the quarterly statements.

30. Mr. Veech advised the Receiver in regard to others who have explored pyrolysis for refining coal. He explained that there are a few domestic companies exploring coal pyrolysis using somewhat different designs, and that there are also companies in Europe, Asia and India that are seeking to convert biomass and waste materials into synthetic gas. He reported that they all work to some degree, but there are economic and emissions issues. In other words, even if CETA had come up with something viable, CETA would face competition.

31. Mr. Veech concluded that CETA's demonstration coal distillation units do, in fact, work to a degree, but there are issues presented in regard to scale, economics, and a generally unfavorable domestic view of carbon-based combustion. Moreover, CETA was never commercially successful in any respect.

32. In summary, Mr. Veech concluded the coal pyrolysis or distillation process is not new, but rather CETA took old technology and claimed that by containing the entire process of distillation and cooling, they could make the entire process more environmentally friendly by reducing the emissions. The patents CETA holds were directly linked to the more contained system but these ideas were never fully tested on any kind of scale that is meaningful. The four products they produced were basically the same as have always been generated by the coal pyrolysis process. CETA did find some new applications for the products they produced and some interesting ideas. But, they were not commercially viable, and they would face substantial regulatory opposition as well.

33. Mr. Veech counseled that, much of the equipment was tailored for CETA, such that while some equipment can be sold for use elsewhere, most will have to be sold for scrap. Additionally, he noted, some environmental remediation will be necessary.

34. Based upon the evidence developed to date, and the further findings and opinions of Mr. Veech, the Receiver will be recommending the restoration to the investors of a large majority of the CETA cash, and the liquidation of the CETA equipment.

## Application of Johnson Factors

35. The primary concern in regard to professional fees is that the fee awarded be reasonable. *Blum v. Stenson,* 465 U.S. 886, 893 (1984). In this Circuit, the applicable test is set forth in *Johnson v. Georgia Hwy. Express, Inc.*, 488 F.2d 714 (5th Cir. 1974). Under that test, a court must first determine the loadstar amount by multiplying the reasonable number of hours billed by a reasonable billing rate. That amount can then be adjusted by various factors.

36. The following reviews this Application with regard to each of the *Johnson* factors:

(a) <u>The time and labor required</u>. The time and labor required are set forth in detail in the statements contained in the accompanying appendix. The time was actually expended,

and the rate charged is the one approved by the Court when approving the retention of Mr. Veech (Docs. 47-48 & minute order).

(b) <u>The novelty and difficulty of the questions</u>.  The viability of the CETA equipment and technology is a matter that should be entrusted to an expert under the circumstances presented here.

(c) <u>The requisite skill to perform the service</u>.  Mr. Veech has substantial specialized experience with the coal-based energy industry and appropriate credentials upon which to credibly opine as to the CETA equipment and technology.

(d) <u>The preclusion of other employment due to the acceptance of the case</u>.  This is not a factor.

(e) <u>The customary fee</u>. As noted, the hourly rates were approved by the Court as a part of the original retention of Mr. Veech.

(f) <u>Whether the fee is fixed or contingent</u>. The fee is fixed.

(g) <u>Time limitations imposed by the client or other circumstances</u>. Time limitations are not a factor.

(h) <u>The amount involved and the results obtained</u>.  The forensic reconstruction of the bank records indicates approximately $70 million was spent on CETA equipment, employees, vendors, and the like.  Absent a credible expert opinion, the Receiver could not move ahead with selling the equipment for scrap, regardless of his initial impressions.  The result of Mr. Veech's work is that the Receiver will not have to store and safeguard the equipment interminably, will be able to release the majority of the tens of millions of dollars for restitution, and can defend his decision relative to the objection of Mr. Hill and potentially others.  The Receiver has also been able to provide a truthful report to the defrauded investors.

    (i) <u>The experience, reputation and ability of the professional</u>.  Mr. Veech has had a full career in the relevant field and has a good reputation.

    (j) <u>The undesirability of the case</u>.  This is not a factor.

    (k) <u>The nature and length of the professional relationship with the client</u>.  This is not a factor.

    (l) <u>Award in similar cases</u>.  Mr. Veech's fees are not inconsistent with the cost of expert witness services in like circumstances.

## **Certification**

  The undersigned hereby certifies that the fees and expenses incurred herein and reflected on this Application were incurred in the best interests of the Receivership Estate; and (with the exception of the Billing Instructions agreed to with the Commission) the Receiver has not entered into any agreement, written or oral, express or implied, with any person or entity concerning the amount of compensation to be paid or to be paid from the Receivership Estate, or any sharing thereof.  Additionally, as required by the Billing Instructions, the undersigned hereby additionally certifies that he has read this Application, that to the best of his knowledge, information and belief formed after a reasonable inquiry, the Application and all fees and expenses herein are true and accurate and comply with the Billing Instructions, that all fees contained in the Application are based on the rates listed in the Applicant's original fee schedule and such fees are reasonable, necessary and commensurate with the skill and experience required for the activity performed, that he has not included in the amount for which reimbursement is sought the amortization of the cost of any investment, equipment, or capital outlay (except to the extent such may exist in the permitted allowable amounts set forth in the Billing Instructions with regard to photocopies), and in seeking reimbursement for a service which was justifiably purchased or contracted for a

professional from a third party, he requests reimbursement only for the amount billed by and paid to the vendor and he is not making a profit on any reimbursable services provided by him.

## Conclusion

WHEREFORE, the Receiver prays that the Court approve the administrative expenses sought herein.

Respectfully submitted,

/s/ Dennis Roossien
Dennis L. Roossien, Jr.
Texas Bar No. 00784873
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75201-6659
Telephone:  214.855.7535
droossien@munsch.com

COUNSEL FOR RECEIVER

## CERTIFICATE OF CONFERENCE

I hereby certify that this motion is not opposed by the Plaintiff, but is opposed by Roy Hill. Mr. Hill's objection was based solely upon his view that the quarterly report is not a final report.

/s/ Dennis Roossien

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument was served electronically in compliance with the Court's Electronic Filing Procedures on all counsel of record who are deemed to have consented to electronic service.

/s/ Dennis Roossien