IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION § | |
| § | |
| V. § | Case No. 6:23-cv-00321 |
| § | |
| ROY W. HILL, et al. § | |

## MOTION FOR INSTRUCTIONS CONCERNING CETA LIQUIDATION AND INTERIM DISTRIBUTION

Receiver Albert C. Black III ("Receiver") seeks instructions as to whether to liquidate CETA equipment and effect an interim distribution, and, if so, the steps to be taken, respectfully stating:

### Introduction

1.   After careful consideration and expert consultation, the Receiver's considered opinion is that the CETA technology does not have commercial value and that accordingly the CETA equipment should be liquidated, the CETA patents should be abandoned, and the CETA working capital and proceeds of liquidation should be distributed to investors as partial restitution.

2.   Defendant Roy Hill disagrees. He asserts the technology is commercially viable and so the equipment and working capital should be employed to attempt to achieve commercial viability.

3.   CETA expended as much as $70 million since 2015, and apparently more before that date, and so this is a matter of sufficient import that the Receiver presents this dispute to the Court and requests instructions.

### Applicable Authority

4.   Where there is a doubtful or important matter, it is appropriate for a receiver to seek instructions from the supervising court, and that court has the power to provide instructions.

*Northern Fin. Corp. v. Byrnes*, 5 F.2d 11, 12 (8th Cir. 1925) ("[Receivers] are at liberty, and are in fact encouraged to apply at all times to the court for instructions and advice, and such is their duty in any doubtful or important matter arising in the course of their duties."); see also 2 CLARK ON RECEIVERS § 361, at 618-19 (1992) ("Receivers have a very large latitude in the matter of asking advice and seeking protection of the court appointing them with reference to discharge of their duties. They are at all times entitled to apply to the court for instructions.").

5. The Fifth Circuit has approved pro-rata distributions to fraud victims based upon the equitable power of a federal court. *U.S. v. Durham*, 86 F.3d 70, 73 (5th Cir. 1996); *SEC v. Forex Asset Mgt.*, 242 F.3d 325 (5th Cir. 2001).

**Facts**

6. The Receiver was appointed on May 3, 2023 (Doc. 8).

7. The receivership pertains to Defendant Roy W. Hill ("Hill"), his company Defendant Clean Energy Technology Association, Inc. ("CETA"), Defendant Eric Shelly ("Shelly") and one of Shelly's companies (Doc. 32 at 1).

8. Shelly and others raised money to supposedly purchase for investors interests in equipment developed by CETA that CETA was supposedly using to generate revenues that supported the payment of returns to investors (*id.* at 5).

9. In fact, the returns were funded with later investor money (*id.* at 6). In other words, CETA was a Ponzi scheme.

10. The CETA equipment was supposed to have included a large number of carbon capture units located in the field as an adjunct to oil and gas production operations and coal refining equipment generating higher quality coal, rare earth minerals, and proprietary solvents (*id.*). In fact, the carbon capture units were largely not manufactured and they were not deployed in the field (*id.* at 7).

MOTION FOR INSTRUCTIONS – CETA LIQUIDATION / DISTRIBUTION – Page 2

11. Additionally, CETA built certain equipment purporting to be commercial coal distillation equipment (Doc. 34, at 3). Some equipment along those lines was found at industrial sites in Fairfield and Streetman, Texas (*id.*).

12. On August 25, 2023, the Court entered agreed judgments on liability against Mr. Hill (Doc. 41) and Mr. Shelly (Doc. 38).

13. On September 21, 2023, the Receiver field a motion seeking to retain an expert in the type of technology at issue in this case, specifically Byron Veech, who, due to his deep background in the coal industry and chemistry, is particularly well-qualified to assist the Receiver in assessing the equipment and making recommendations for its disposition (Doc. 47, at 1 & Doc. 48, at 2-5). The Motion was not opposed, and the Court granted the motion by text order on September 28, 2023.

14. As detailed in his CV (Doc. 48 at 2-5), Mr. Veech holds a Bachelor of Science degree in Chemistry and Environmental Studies from Millikin University, as well as a Master of Science, Management and Finance degree from Lindenwood University. He has spent a substantial portion of a more than forty-year career in the coal industry. He has experience as a plant and coal lab chemist. He has substantial experience with the construction, operations of and the decommissioning of coal-fired power plants. He is also conversant with efforts to refine coal, including the chemical processes that have been attempted and worked at a DOE refined coal research project in the 1980s. He is further conversant with the chemistry and methods available to clean gas streams in oil and gas operations.

15. Using his training and experience, Mr. Veech has undertaken a substantial review and analysis of the CETA records and physical equipment, and has interviewed witnesses (Doc. 66 at 1-2).

16. Mr. Veech's final report is contained in the Receiver's most recent quarterly report at paragraphs 6-16 (Doc. 66, at 2-8).

17. Mr. Veech's charge was to assess and to determine the highest and best use of the items identified by Mr. Hill as assets of CETA in his sworn inventory (*id.* at 2).

18. Mr. Veech was given access to the collected electronic and hard copy CETA records in the Receiver's document repository (*id.* at 3). He toured the Fairfield and Streetman sites (*id.*). He examined equipment onsite at the fabricator that had not been delivered (*id.*). He examined equipment being stored by the Receiver (*id.*). He interviewed Mr. Hill, PWC personnel, and others (*id.*).

19. Based upon his work in compiling these information sources, Mr. Veech put together an overview as to how the equipment came to exist (*id.* at 3). It seems Mr. Hill was influenced by the coal-fired Big Brown Power Plant located near Fairfield, as well as the coal mine that was a substantial source of its fuel. Big Brown was constructed in 1971 and operated until 2018. One substantial source of fuel was locally-mined lignite. In 2007 and 2008, the possible closing of the plant for environmental and economic reasons was a matter of some concern in Fairfield. At that time, Mr. Hill was the Mayor of Fairfield. In 2009, CETA was incorporated and opened an office on Main Street in Fairfield. CETA's stated objectives included helping the plant stay in operation by creating a cleaner type of fuel or, at least, helping the mine stay in operation by improving the performance of coal generally as a fuel. To accomplish this, CETA examined several "Clean Coal" processes and determined that coal pyrolysis could be useful.

20. The Receiver's quarterly report presents Mr. Veech's findings and conclusions as follows (Doc. 66 at 3-8):

    a. Generally speaking, there is nothing new about pyrolysis. It is a process by which materials such as wood are turned into charcoal, and coke for metal working, and

has since ancient times. The fact that a similar process can create liquid by-products was known to the ancient Egyptians, who created embalming fluid from cedar wood. It generally involves applying low heat and limiting oxygen to the combustion process. It is used in reducing organic materials to pure carbon (Char), and creating by products such as sulfuric acid, tars and solvents. The Char is even used in various methods of cooking food.

b. CETA applied this old technology by placing coal in a sealed lower temperature reducing environment to produce combustible char, liquids and various gasses. Its stated objective was to produce a solid product that would have more concentrated energy (BTU) content, as well as by-products of oily liquids and combustible gas, while also removing the water and some of the environmentally undesirable materials in the course of the distillation process.

c. In 2009, CETA employees may have created lab-scale coal pyrolysis equipment, at least this is what CETA later reported in its investment marketing materials. They apparently promoted the creation of a "Mini Pilot Unit" weighing 100 pounds. They began work at a site in Fairfield on Bateman Street. They coined the term "CoalLite" to describe the refined coal. This effort appears to have attracted certain substantial investors. This allowed CETA to create larger equipment at the Fairfield plant.

d. By 2012, the equipment was able to produce demonstration quantities of CoalLite, oils and solvents, and synthetic gas.

e. Again, this was an application of known technology to produce an expected result. Plans were circulated, however, for a larger scale operation.

f.  According to CETA promotional materials, CETA reached out to utility companies, mines, investment brokers, and individual investors, some of whom inspected the test site and the products produced. But, funds for a large installation could not be raised. What could be raised was used to create somewhat larger demonstration units at the Fairfield plant.

g.  Mr. Hill reported that, in 2013, he championed an effort to purchase the Big Brown plant and the mine, which, in his view, would have allowed CETA to have a platform for proving the value of the CoalLite product. The proposals were not accepted. Mr. Hill also reports that CETA had many discussions in this timeframe with coal suppliers and power generation groups, both domestic and foreign, none of which were fruitful.

h.  It seems that sometime in 2014 Mr. Hill turned to presenting the solvent for use in the oil and gas industry. It was branded as CETASolve. The proposal was that this solvent could be employed in what was described as a carbon capture unit (CCU), which would be incorporated into well heads and oil pipelines. Again, small-scale demonstration models were created.

i.  Although there were supposedly over 150 CCUs installed and operating in the field, in fact, the fabricator CETA principally used reports they only manufactured 47 of the central components.

j.  Commencing in 2014 and expanding in 2018, various brokers were more successful in raising money from investors than CETA had been in the past. This allowed CETA to develop an additional site in Streetman for the purpose of building ten more of the commercial size versions of the original CoalLite distillation units.

k.  Although these were built, the ten units at Streetman and five of the eleven units at Batmen were never completed, and the first six commercial units at Batemen were operational but were not significantly used.

l.  In late 2022 and 2023, CETA also worked to set up a larger laboratory.

m.  As a result, when the Receiver was appointed in May 2023, there was equipment at the Fairfield and Streetman sites, laboratory equipment in a warehouse, and partially fabricated equipment at PWC. None of this equipment was in commercial operation.

n.  There was very little documentation reflecting operating or test results, and the condition of the equipment indicated relatively little use. There was only 1500 tons of coal, and 500 tons of the CoalLite product, which, in the coal business, is not much.

o.  Mr. Hill's assertion that the equipment operated regularly is at odds with the physical evidence. Although Mr. Hill gave detailed stories of how the equipment was wound down over the weekends and brought back up into operation the next week, the physical evidence indicates this did not occur. When asked about operating records, Mr. Hill referred to the "red files" and the digital historical records, which, when examined, indicated between 70 and 100 total runs of the coal distillation demonstration units. The volumes of materials that would be involved in actual operations are very much larger than the physical evidence indicates were actually processed.

p.  The records do not support the view that commercial sales of the products ever occurred.

q. Mr. Hill's detailed, generally hand-written, statements for investor quarterly reports as to the commercial operation of the units were entirely falsified.

r. The Fairfield plant does not appear capable of processing a large volume of coal, and does not appear to have done so. Coal is messy to handle and is processed in large volumes that leave significant physical evidence, which he did not find. Neither does the Fairfield plant have the rail service needed for cost efficient operations.

s. There was little evidence of the purchase of coal for the operation. Perhaps as many as five modest purchases occurred.

t. There was a limited amount of CETASolve onsite.

u. There are no records of shipping of CETASolve from the site. Very large volumes would have been employed if commercial operations had been occurring as claimed by the quarterly statements CETA issued to investors.

v. The coal distillation units were designed to have operating needs for a very large volume of coal, which, as noted, was not supported by evidence or records.

w. There was not even an operating demonstration model of the commercial design of the carbon capture unit.

x. The Fairfield and Streetman plants do not bear physical evidence of material operations.

y. The business records of CETA are poor.

z. The claims about operations and results in the investment marketing materials are not supported by business records of such purported operations.

aa. The volumes of product found onsite are very low compared to what would be present at an operating facility if the operations had actually been occurring in the volumes indicated in the quarterly statements provided to investors.

bb. Records indicate CETA had fallen behind on payments to some of the earlier investors.

cc. In all of the records, no exact location was ever recorded for an operating unit; simply the term "Field" was used in the quarterly statements.

dd. There are a few domestic companies exploring coal pyrolysis using somewhat different designs, but most ventures have not been economically successful.

ee. There are also companies in Europe, Asia and India that are seeking to convert biomass and waste materials into synthetic gas.

ff. They all work to some degree, but there are economic and emissions issues.

gg. CETA's efforts would therefore face competition.

hh. CETA's demonstration coal distillation units do work to a degree, but there are issues presented in regard to scale, economics, and a generally unfavorable domestic view of carbon-based combustion.  Moreover, CETA was never commercially successful in any respect.

ii. In summary, the coal pyrolysis or distillation process in not new.  Rather, CETA took old technology and claimed that by containing the entire process of distillation and cooling, they could make the entire process more environmentally friendly by reducing the emissions.  The patents CETA holds were directly linked to the more contained system but these ideas were never fully tested on any kind of scale that is meaningful.  The four products they produced were basically the same as have always been generated by the coal pyrolysis process.  CETA did find some new

        applications for the products they produced and some interesting ideas. But, they were not commercially viable, and they would face substantial regulatory opposition as well.

    jj. Much of the equipment was tailored for CETA. While some equipment can be sold for use elsewhere, most will have to be sold for scrap. Additionally, some environmental remediation will be necessary.

21. The Receiver observed Mr. Hill's inventory does not value the most significant supposed assets, but instead uses the phrase "to be determined" in respect of: "Ceta Solve, gas and oil"; "Fairfield Plant", "Streetman Plant", and "4 patents" (Doc. 66-4). In fact, the inventory appears to be tracking Mr. Hill's rough estimation of how much was spent on various items, as opposed to what they may actually be worth (*id.*).

22. The frozen CETA cash and marketable securities total approximately $66 million (Doc. 66, at 12).

23. The CETA equipment is a mixture of custom-made equipment, some general purpose equipment, and some unused lab equipment.

24. Keeping the CETA equipment secure and/or stored, and keeping the industrial sites secure and maintained, requires monthly expenditures (Doc. 70, at 11).

## Relief Sought

25. The Receiver requests that the Court instruct the Receiver in regard to whether to proceed with a general liquidation of the CETA equipment and an interim distribution of the cash and proceeds of the liquidation.

26. Based upon the evidence developed to date, and the further findings and opinions of Mr. Veech, the Receiver recommends the liquidation of the CETA equipment, the abandonment of the technology, and the distribution, in stages, of the CETA liquid assets.

27. As to such liquidation, given the variety of equipment involved and the large number of individual pieces, the Receiver proposes to employ the discretion provided in the appointment order to liquidate items other than real estate (Doc. 8 at 12), although the Receiver intends to obtain where feasible at least two bids from unrelated third parties. With regard to equipment supplied by vendors who were not paid in full, the Receiver proposes to employ the discretion the appointment order provides in regard to compromising claims as appropriate (*id.*).

28. As to an interim distribution, the Receiver proposes to (a) complete his reconciliation of the claims submitted, (b) provide notices to each claimant of the approved amount, (c) advise disputed claimants of a thirty-day opportunity to object to any adverse claim determination, (d) file a notice of approved claims and disputed claims, (e) effect thirty days later a pro-rata interim distribution of two-thirds of the aggregate value of the then available CETA cash and/or securities to approved claimants based upon their respective net cash loss amounts relative to the entire loss amount as reflected by approved claims and the higher amount of the disputed claims, while reserving reserve an amount sufficient to pay any disputed claims, (f) tender such disputes to the Court for determination, (g) effect further interim distributions as disputed claims are resolved by the Court or by agreement, and (h) utilize the remainder as the Court may further direct. In recommending an interim distribution of two-thirds of the CETA cash and liquidation proceeds, the Receiver is balancing the needs and interests of the investors in obtaining restitution, the costs of maintaining the CETA equipment, the uncertainty that additional investor claims may yet be presented, and the relative costs and potential benefits of pursuing certain claims already identified in the Receiver's quarterly reports. Of these factors, the uncertainty that additional investor claims may yet be presented is the largest single factor counseling against a larger interim distribution. The Receiver intends to propose further interim distributions as the case proceeds and the likelihood of trailing claims diminishes.

## Conclusion

WHEREFORE, the Receiver prays that the Court grant the relief sought.

                Respectfully submitted,

                */s/ Dennis Roossien*
                Dennis L. Roossien, Jr.
                Texas Bar No. 00784873
                MUNSCH HARDT KOPF & HARR, P.C.
                500 N. Akard Street, Suite 4000
                Dallas, Texas 75201-6659
                Telephone: 214.855.7535
                droossien@munsch.com

                COUNSEL FOR RECEIVER

## CERTIFICATE OF CONFERENCE

I hereby certify that this motion is not opposed by the Plaintiff, but is opposed by Defendant Hill. These parties are the only ones who have appeared through counsel.

                */s/ Dennis Roossien*

## CERTIFICATE OF SERVICE

I hereby certify that on the 1st day of April, 2024, this document will be served by the Clerk's electronic procedures immediately upon its filing on all counsel of record.

                */s/ Dennis Roossien*