IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, § § §<br><br>   Plaintiff, § § §<br>V. § §<br> § §<br>ROY W. HILL, ERIC N. SHELLY, § §<br>CLEAN ENERGY TECHNOLOGY § §<br>ASSOCIATION, INC., and § §<br>FREEDOM IMPACT CONSULTING, LLC, § §<br> § §<br>   Defendants. § § | Case No. 6:23-cv-00321-ADA |

**RECEIVER'S QUARTERLY REPORT FOR THE THIRD QUARTER OF 2024**

   Receiver Albert C. Black III ("Receiver") provides this quarterly report for the period July 1, 2024 through September 30, 2024, respectfully stating:

**Introduction**

   1.   This quarterly report is made pursuant to the requirements of the Order Appointing Receiver ("Appointment Order") (Doc. 8, at 16, para. 53).

**I.   SUMMARY OF THE OPERATIONS OF THE RECEIVER**

   2.   During the third quarter of 2024, the Receiver engaged in the following principal activities:

   **A.   Interim Distribution and Liquidation**

   3.   As reported in the Receiver's last two quarterly reports, an interim distribution has been delayed due to the objection of Roy Hill to the making of an interim distribution. A distribution will be delayed until the Court rules on Mr. Hill's objection. The motion is fully briefed. The timing of a ruling will depend upon the demands of the Court's docket.

B. **Investor Claims Work**

4.	During the third quarter, work continued to reconcile claims against the bank records and other records.

5.	The claims work is an involved process because CETA did not maintain a single ledger of investments. Most investors initially transferred funds to intermediary entities or to a promoter. But, sometimes those same investors made direct deposits into CETA accounts. Payments back to investors were similarly handled. The following chart illustrates the issue:



That said, the creation of a single ledger is possible by combining CETA records, bank records, promoter accountings, and investor claim forms. By the end of the third quarter, the Receiver had made substantial progress toward creating a consolidated list of individual investors, and the Receiver expects to be able to present a completed initial claims analysis during the fourth quarter, such that, if the Court approves an interim distribution, the Receiver will be able to proceed. Investors should expect to see a letter either approving their claim(s) or identifying discrepancies.

6.	As of the writing of this report, the identified investor deposits for the period 2009 to 2023 has increased to nearly $344 million, and return payments to investors total approximately $190 million, leaving a net cash loss of approximately $154 million. The total investor dollars invested during the period prior to 2018 remains under investigation.

7.	Total investor claims have risen to 975, although those claims are likely to be consolidated somewhat because some investors appear in the records under similar but not identical names, some invested both individually and as married couples, some invested

individually and through IRA accounts, and some employed affiliated entities. The Receiver is grouping these claims for consistent treatment.

8.  The claims process has now produced a reasonably clear picture of the period covered by the SEC's Complaint, which is January 1, 2019 to May 3, 2023. During that period the investor deposits total approximately $323 million. Other deposits total approximately $370,000. Investor payments total nearly $188 million. The net cash loss is approximately $135 million.

9.  The claims process also shows CETA offered investments at least dating back to 2009. Between 2009 and 2015, the investments were largely based upon stock sales. In 2016, these stock offerings continued, and there were also investment offerings to finance supposed Department of Energy research grants, occasions where suppliers purchased stock in the hope of obtaining work from CETA, and investments premised upon supposed working interests in coal distillation units. The sale of interests in the coal distillation projects proved popular, which led to the significant increase in investments in 2017-2019.

10. Together with the claims analysis, the Receiver is compiling the underlying records of the various projects that CETA offered.

11. The Receiver intends to produce a claims analysis report and a set of underlying documentation. At present, in addition to the claims process, the Receiver has been served with discovery in parallel proceedings where such information has been requested in substance.

C. **Potential Claw-back Claims**

12. The Receiver has previously reported that he is examining three sets of potential claims based upon the transfers made from accounts funded by investors – transfers of Ponzi payments that exceeded an investor's investment, transfers related to the Allen Brothers business, and transfers to The Roy Hill Trust #2 ("Trust #2).

13.     This effort has been undertaken because of the traditional role of a receiver to gather back the stolen funds into one place.  Consistent with this, the appointment order directs the Receiver to investigate diversions of investor funds and to pursue such funds under causes of action including the imposition of a constructive trust and fraudulent transfer (Doc. 8 at 14, ¶43).  This order is consistent with applicable law in regard to the imposition of a constructive trust.[1]  The underlying equitable principle is that a thief does not acquire beneficial title, but merely bare legal title – like a trustee.[2]  The beneficiary of the constructive trust is the victim of the theft.  The thief's legal obligation is to use the funds for the benefit of the victim and to return the funds intact.  With that theory in mind, one can see that when a receiver steps in, then the supervising court may employ its equitable power to recover and to return stolen property, even if that property has been further transferred.  A federal equity receiver also has standing to pursue fraudulent transfers of the assets of the receivership defendants under the Texas Fraudulent Transfer Act.[3]

14.     During the third quarter, the Receiver completed a review of transfers to net winners, and concluded that, while the aggregate amount of such transfers is significant, the individual amounts received per investor do not warrant collection efforts.

15.     During the third quarter, the Receiver also worked to further develop the details of the facts pertaining to the Allen Brothers transaction.  As indicated in prior reports, the Allen Brothers transaction involved transfers totaling approximately $5 million from CETA accounts for which CETA received a note in that amount that was interest-only for five years.  The transfers

---

[1]  *American Cancer Soc. v. Cook*, 675 F.3d 524, 529-30 (5th Cir. 2012).

[2]  *A Thief as a Constructive Trustee,* 37 Yale L.J. 654 (1928).

[3]  *Janvey v. Dillon Gage, Inc.,* 856 F.3d 377, 384 & fn. 1 (5th Cir. 2017); *see Akin Gump v. E Court, Inc.*, 2003 WL 21023030 (Tex. App. – Austin) (explaining under parallel equitable principles of Texas law that "when the receiver acts to protect innocent creditors of insolvent corporations ... the receiver acts in a dual capacity, as a trustee for both the stockholders and the creditors, and as trustee for the creditors he can maintain and defend actions done in fraud of creditors even though the corporation would not be permitted to do so").

pertained to the settlement of a dispute within the Allen family over ownership and control of the Allen Brothers business. Roy Hill caused CETA to finance litigation by Alton Allen's side of the family against Pat Allen's side of the family, to cover shortfalls in the business operations, and to fund the ultimate settlement in which Pat's heirs transferred their approximately one-half interest in the business to Alton Allen in exchange for a cash payment. The Receiver's initial contacts with the Allen Brothers sought to discern whether the Allen Brothers were able to pay the note to CETA that documented the financing provided by CETA. After receiving financial information, engaging in discussions with the Allen Brothers representatives, and allowing time for the business to attempt to improve its operations, it became clear that the Allen Brothers would not ever be able to pay the note. As such, the Receiver came to view the situation as involving improper transfers of investor funds, and the focus turned to assessing whether claims existed to recover the funds under the above-described theories of constructive trust or fraudulent transfer.

16. To assess whether such claims properly exist, it was necessary to determine the details of each transfer and what was exchanged for the transfers.

17. The transfers were determined to be the following:



RECEIVER'S QUARTERLY REPORT – Q3 2024 – Page 5

18.   The value exchanged from the point of view of CETA was an interest-only note that matures in 2028.  The note was nominally secured by the Allen Brothers business and related assets.

19.   The value exchanged with regard to the transfers to Pat Alton's heirs was an approximately one-half interest in the Allen Brothers business and related assets.

20.   If the value exchanged for the transfers was the reasonable equivalent of the funds transferred, then it would not be proper for the Receiver to pursue recovery of the transfers.  So, the Receiver examined that question closely.  The Receiver determined the Allen Brothers business and related assets have only nominal value.  The following facts found by the Receiver show this to be the case:

- The business is centered on keeping very old pumpjacks in operation with hand-made boats, old tools, and long-term local hands.  They operate over water in a substantially exploited reservoir.  Drilled in the early twentieth century, the wells are considered stripper wells today, and many are shut-in. The wells need constant maintenance.  Keeping pumps adjusted, lubricated, and repaired is a regular affair requiring personnel experienced with the vintage equipment and temperament of the particular well.  Storms can take dozens of wells offline, as well as flood gathering points.  Locally available oil prices are lower than spot market prices because of the need to transport the oil.  The aforementioned lifting costs parallel those prices.  It is essentially a break-even business.

- The business cannot be improved by increasing efficiency.  Most of the work is done by long-term employees who are capable and reasonably paid. The current stripper approach is the most effective and practical method of extracting what remains in the formation, even though that approach costs just about as much as it yields, even when doing it on the cheap.

- The formation has so many wells drilled so closely together that the costs outweigh the benefits of techniques such as fracking, waterflood or other pressurization efforts.

- The business is not the type that can be built up and sold.  No buyer could be much more efficient than the existing personnel.  No large company could make investments that would effect a greater overall profit.  Rather, the business opportunity is one for small operators willing to work hard for modest pay and limited, inconsistent profits, if any.

- The company financials fit with expectations.  Financials produced for the years 2021-2023 indicate the company did not generate a profit overall.  Additionally, efforts made to increase production in 2021 did not hold; rather, production fell from 2022 to 2023.

- Hill's contributions actually cost the business approximately $600,000 in the latter part of 2022 and early 2023. Hill's contribution of funds to pay the lawyers did not create a benefit to the company itself. Worse, the result was that $1.7 million in revenue was detained when the other side of the family struck back by asserting claims to the oil purchaser. To offset this, Hill provided payments totaling $1.1 million to allow the company to break-even from June 2022 to January 2023, but this did not entirely make up for the suspended revenue. When the settlement with the other side of the family was funded in March 2023, the suspended $1.7 went toward the settlement, along with the $3.6 million Hill took from CETA.

- The settlement itself did not materially benefit Alton Allen. He received half of a business that has little value. He incurred $5 million in debt to CETA.

- The settlement was not premised upon a valuation of the business. Neither side had developed experts in support of their views of value; rather, the litigation was actually in its early stages.

- Hill's involvement inflated the settlement because he had CETA dollars at his disposal. Absent Hill's funding, there were no sources from which a settlement of anything more than a nominal amount could have been accomplished.

- The business is not generating profits sufficient to employ a third-party to provide senior management. Any valuation of the business would have to take into account the need to have someone provide senior management. In a good month, the business generates net cash flow of approximately $20,000. In a bad month, the business loses money.

- The business faces millions in unfunded plugging liability. Out of the 600 wells owned, only about half have been placed in operation. The business needs to continue to be in a position of ostensibly bringing more wells online in order to have an explanation for why the wells are not being plugged and abandoned.

- The business cannot support any material traditional financing.

21. As these findings became more concrete, the Receiver moved to cost/benefit questions, and engaged with Alton Allen's side of the family with regard to an appropriate resolution, and how best to include Pat Allen's side of the family in the discussions.

22. That is where things stood at the end of the third quarter.

23. Should the matter not be resolved amicably, and should the Receiver determine litigation is necessary, the next step is to put the matter before the Court by means of a report and recommendation.

24. During the third quarter, the Receiver held back on separately presenting a report and recommendations to the Court regarding Trust #2. The Receiver did take additional steps to evaluate the extent of probable assets of Trust #2, but the Receiver held back on a report and recommendation as the questions of whether to pursue litigation are related because of the potential impact on the timing of the closure of the estate should litigation be authorized.

25. The work on this aspect of the receivership will continue into the fourth quarter.

D. **Shelly Personal Assets and Liabilities**

26. During the third quarter of 2024, since Shelly and the SEC have not yet resolved the extent of civil penalties to be charged against the Shelly assets, the Receiver continues to seek principally to maintain the status quo with regard to the Shelly assets.

E. **Unibank Controversy**

27. As previously reported, the receiver has been advised by Unibank that it opposes distributions to investors who borrowed funds in order to invest in CETA projects, and those investors have advised that Unibank should be held responsible for its role in this matter. The Receiver continued to monitor this parallel controversy. The receiver also complied with document production requests from both sides of this litigation.

F. **Other Receivership Activities**

28. The Receiver and his team continue to respond to investor inquiries.

29. As a result of the need to obtain a Court determination in regard to the CETA assets, the Receiver continued to take steps to secure and/or store the CETA equipment, and to address environmental concerns at the industrial sites on an interim basis.

30. The Receiver has complied with administrative requirements, including addressing tax issues, keeping a receivership accounting, keeping an accounting of Shelly's compliance with the court-approved protocol, addressing vendor claims, and the like.

31.     The Receiver checked leads on certain additional assets and records, and attempted to establish contact with custodian.

32.     The Receiver has interacted with the parties to the main action.

## II.     SUMMARY OF ASSETS AND LIABILITIES

### A.     Cash versus Administrative Expenses

33.     The receivership estate's combined cash and publicly traded liquid securities is reflected on the attached Exhibit A.  The amount is $67,152,504.18.

34.     As of the end of the fourth quarter, the Receiver's professionals have been paid $848,055.09.

### B.     Receipts and Disbursements

35.     Exhibit A shows receipts and disbursements for the quarter and since inception.

### C.     Receivership Assets

#### CETA Cash

36.     The CETA portion of the receivership estate's combined cash and publicly traded liquid securities is approximately $66 million.

#### Shelly Investments and Real Estate

37.     The remainder of the cash pertains to Shelly's personal account and proceeds of the sale of a property in Florida, as detailed on Exhibit B hereto.  There are also investments and real estate have an estimated value of approximately $5.6 million.  Other than his mortgage, Shelly has no liabilities.

#### CETA Equipment and Real Estate

38.     The CETA equipment has been determined to have essentially salvage value.

39.     CETA owns industrial yards in Fairfield and Streetman, Texas.  The value has not been determined.

40. CETA Land and Mineral Investments, Inc. appears to own a few lots of limited value in Caddo Parish, Louisiana. The value has not been determined.

<u>Hill Assets</u>

41. Mr. Hill does not appear to have material assets denominated in his own name. Mr. Hill is reportedly and apparently being supported by the assets of Trust No. 2 and/or family members.

**D. Claims Held by the Receivership Estate**

42. As reported above, the Receiver has identified claims relative to the Allen Brothers business and Trust #2.

43. The Receiver has determined there are no net winner claw-back claims that should be pursued via litigation given the cost/benefit analysis, passage of time, and potential defenses.

**E. Claims of Creditors Against the Receivership Estate**

44. The Receiver has compiled a working claims ledger.

45. In regard to investor claims, with the benefit of the above-described forensic accounting, the investor claims is examining, verifying, and, as appropriate, adjusting claims. The Receiver intends to engage in individual investor communications before an updated claims ledger is presented.

46. The Receiver has reached further compromises with certain vendors and intends to continue to work through vendor claims.

47. Claims and claim inquiries may be submitted through the former CETA website, located at www.cetaenergy.com.

F. **Creditor Claims Proceedings**

48.     During the past quarter, the Receiver added additional resources to complete a claims analysis so as to be in position to make an interim distribution if the Court determines that an interim distribution should occur for the reasons discussed above.

III.    **CONTINUATION OF THE RECEIVERSHIP**

49.     This topic is covered in detail in the Receiver's prior reports. The basic situation has not changed, and therefore the Receiver recommends that the receivership be continued.

    Respectfully submitted,

*/s/ Dennis Roossien*
Dennis L. Roossien, Jr.
Texas Bar No. 00784873
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 4000
Dallas, Texas 75201-6659
Telephone: 214.855.7535
droossien@munsch.com

COUNSEL FOR RECEIVER

**CERTIFICATE OF SERVICE**

I hereby certify that on the 30th day of October, 2024, a true and correct copy of the foregoing instrument was served electronically in compliance with the Court's Electronic Filing Procedures on all counsel of record who are deemed to have consented to electronic service.

    */s/ Dennis Roossien*