IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

|  |  |  |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff, | § § | |
| V. | § § | Case No. 6:23-cv-00321-ADA |
| ROY W. HILL, ERIC N. SHELLY, CLEAN ENERGY TECHNOLOGY ASSOCIATION, INC., and FREEDOM IMPACT CONSULTING, LLC, | § § § § § § | |
| Defendants. | § § | |

## RECEIVER'S QUARTERLY REPORT FOR THE FOURTH QUARTER OF 2024

Receiver Albert C. Black III ("Receiver") provides this quarterly report for the period October 1, 2024 through December 31, 2024, respectfully stating:

### Introduction

1.      This quarterly report is made pursuant to the requirements of the Order Appointing Receiver ("Appointment Order") (Doc. 8, at 16, para. 53).

## I.      SUMMARY OF THE OPERATIONS OF THE RECEIVER

2.      During the fourth quarter of 2024, the Receiver engaged in the following principal activities:

### A.  Interim Distribution and Liquidation

3.      As reported in the Receiver's last two quarterly reports, an interim distribution has been delayed due to the objection of Roy Hill ("Hill") to the making of an interim distribution. A distribution will be delayed until the Court rules on Hill's objection. The Receiver's motion for a distribution is fully briefed. The Court has set this motion for hearing on February 28, 2025.

4.      The motion seek approval to distribute two-thirds of the recovered CTA cash and liquidation proceeds (Doc. 75).  This would be a distribution of approximately $44.5 million, leaving approximately $22 million in CETA cash and liquidation proceeds.

5.      The Receiver continues to recommend a reserve of approximately $22 million.  At the time the motion was filed, the Receiver cited the potential for additional claims to emerge as a leading reason for the reserve.  That did occur, but claims have now trickled off and the analysis of the records as a whole indicates few, if any, additional claims are likely.  However, the Receiver still believes a reserve of approximately one-third of the funds is appropriate because the oldest claims will take time to fully reconcile and the information presently available indicates the probable aggregate net cash loss that has not been finally determined is likely one quarter entire claims pool, such that a one-third reserve allows a sufficient margin for error.   The foundation for the reserve estimate size is discussed more fully below.

**B.  Compilation of Claims Ledger**

6.      During the fourth quarter, work continued to reconcile claims against the bank records and other records.  Following is a report setting forth the results of that work to date.

*1.  Claims Ledger*

7.      The Receiver has created a master claims ledger ("Claims Ledger") for all claims arising out of the operations of Clean Energy Technology, Inc. ("CETA").

8.      A copy of the Claims Ledger is attached as Exhibit C.

9.      The claims arise from investors ("Investors") and vendors ("Vendors") (collectively "Claimants").

10.      The Receiver has assigned claim numbers either upon receipt of a claim, when the Receiver's team identified a probable Claimant in the course of their work, or, in a few cases, where it was helpful to reconcile the underlying accounting ("Claim Number").

11.     The Receiver has approved claims, in whole or in part, pertaining to $252 million invested, as to which Investors suffered an aggregate net cash loss of $142 million (Ex. C at 1). The approved claims are listed first in alphabetical order.  Next, there is a list of claims approved in part but still in process because the Investor invested in projects for which the accounting is not fully complete.  Finally, there is a list of rejected claims, which includes one claim that was used to reconcile the accounting, specifically in regard to transfers to or from Freedom Impact Consulting, LLC ("FIC").

12.     The Claims Ledger will now be periodically updated and published in quarterly reports.  The basis for the Claims Ledger is explained below.

13.     Investor communications pertaining to the Claims Ledger will include sending out letters directly to those Claimants whose claims have been approved, revised, or denied, as well as those that are in progress because of a need for information or clarification.  As claims are determined, the Receiver will continue to send letters to individual claimants.  In the claims approval motion, the Receiver proposes a more formal process of claims notification, an objection period, and court resolution.  Absent an order to such effect, the Receiver will continue an informal process.

### 2.  *Underlying Documentation and Records Summaries*

14.     To create the Claims Ledger, the Receiver assembled the following types of documents:  (a) bank records, (b) claims and supporting documents, (c) receivership records recovered by the Receiver, and (d) accountings provided by promoters ("Underlying Documentation").[1]  The Receiver also created (a) an excel workbook summarizing the bank

---

[1] The Receiver is producing the Underlying Documentation and the Summaries, subject to the protective order entered by the Court in this case, to the parties to this case and to parties in parallel litigation who have served discovery upon the Receiver.  The Court's protective order directs recipients of such information to maintain the confidentiality of the information.

records, including a single list of all transactions reflected in the bank records ("Bank Records Summary"), (b) a working claims reconciliation ("Claims Hub"), and (c) other records summaries on particular topics (collectively, "Summaries").

15.    The Bank Records Summary summarizes bank records obtained from the SEC, CETA, or directly from the institution.  To create the Bank Records Summary, the Receiver retained a forensic accountant to compile a detailed excel workbook.  A central item is a master worksheet with all transactions was compiled that listed each transaction by name, amount, date, and account.  Notes were added, and transactions were classified more specifically with the benefit of other Underlying Documentation.  Common counterparty names were developed to allow transactions to be grouped together.  Investor transactions were isolated.  Investor transactions were classified by involved promoter.  Following is a high-level summary of the results for transactions during the period January 1, 2015 to May 3, 2023:[2]

| Project Promoter | Deposits ($) | Deposits (% of Total) | Disbursements ($) | Disbursements (% of Total) |
|---|---|---|---|---|
| E. Shelly | $ 174,463,415 | 50.69% | $ 66,492,572 | 23.77% |
| Investor Funds | $ 173,613,415 | 50.44% | $ 66,456,687 | 23.75% |
| Direct Transaction with Eric Shelly / "Shelly" Company | $ 850,000 | 0.25% | $ 35,885 | 0.01% |
| D. Zook | $ 63,301,079 | 18.39% | $ 56,184,881 | 20.08% |
| Investor Funds | $ 45,934,100 | 13.35% | $ 14,825,806 | 5.30% |
| Direct Transaction with David Zook / A "Zook" Company | $ 17,366,979 | 5.05% | $ 41,359,075 | 14.78% |
| Abide | $ 55,080,692 | 16.00% | $ 50,168,121 | 17.93% |
| Investor Funds | $ 54,396,596 | 15.80% | $ 44,111,121 | 15.77% |
| Direct Transaction with Pamela Abide / an Abide Company | $ 289,548 | 0.08% | $ 4,615,111 | 1.65% |
| Direct Transaction with Sharon Foreman / Trace Bodin or Company | $ 226,250 | 0.07% | $ 1,276,478 | 0.46% |
| Direct Transaction with Trace Bodin or Roxanne Johnson or Company | $ 155,000 | 0.05% | $ 165,411 | 0.06% |
| Direct Transaction with Sharon Foreman or Trust | $ 13,298 | 0.00% | $ - | 0.00% |
| Hill | $ 21,271,790 | 6.18% | $ 15,005,225 | 5.36% |
| Investor Funds | $ 21,159,790 | 6.15% | $ 12,622,051 | 4.51% |
| Direct Transaction with Roy Hill / Edwina Hill | $ 112,000 | 0.03% | $ 2,383,174 | 0.85% |
| Keels | $ 10,790,000 | 3.13% | $ 6,021,059 | 2.15% |
| Investor Funds | $ 10,575,000 | 3.07% | $ 4,917,364 | 1.76% |
| Direct Transaction with William (Billy) Keels or Trust/Company | $ 215,000 | 0.06% | $ 1,103,696 | 0.39% |
| Unibank SBA 7(a) Loan | $ 9,900,000 | 2.88% | $ 699,921 | 0.25% |
| Investor Funds | $ 9,900,000 | 2.88% | $ 699,921 | 0.25% |
| N/A - Non Investor Transaction | $ 6,149,543 | 1.79% | $ 63,521,772 | 22.71% |
| N/A - Non Investor Transaction | $ 6,149,543 | 1.79% | $ 63,521,772 | 22.71% |
| Unknown Promoter | $ 3,030,000 | 0.88% | $ - | 0.00% |
| Investor Funds | $ 3,030,000 | 0.88% | $ - | 0.00% |
| N/A - Claimant is Vendor | $ 216,625 | 0.06% | $ 21,671,664 | 7.75% |
| N/A - Claimant is Vendor | $ 216,625 | 0.06% | $ 21,671,664 | 7.75% |
| Grand Total | $ 344,203,145 | 100.00% | $ 279,765,215 | 100.00% |

---

[2] Disbursements include payments to investors who did not suffer a net cash loss and to promoters.  As a result, the approved net cash loss will be higher.

16.     The Receiver Claims Hub was created to reconcile, first, the Claim Forms[3] and supporting documents that the Receiver obtained by utilizing the lines of communication through which the investments were solicited, and through direct contact with Investors achieved when hundreds of Investors originally contacted the Receiver following the appointment order.[4]   The receiver either provided Claim Forms to an Investor or directed Investors to the CETA website (www.cleanenergy.com), which the Receiver re-directed to a site that hosted a copy of the Claim Form with instructions, as well as the appointment order, complaint, and quarterly reports filed in this case (pnc.5fd.myftpupload.com).[5]   The Receiver affirmatively contacted promoters of the scheme to obtain contact information.  The Receiver sought Investor contact information from promoters and CETA files.  The Receiver will continue to reach out to Investors by means of correspondence utilizing the contact information available in CETA files, provided by promoters, provided by Investors, or received in the course of efforts to reach out to Investors with whom CETA may not have had only indirect contact during the course of its operations.

17.     The Bank Records Summary and Claims Hub utilized Claims support documentation and receivership records from CETA, Hill, and Eric Shelly ("Shelly") in order to identify and classify cash transactions.  The receivership records include bank records, emails,

---

[3] The claim form is a standardized form, created by the receivership team, which requests claimants provide the following information: claimant contact information: narrative explaining claim, name of payor of invested funds, project in which claimant invested, date and cash amount invested, bank account/ wire instructions for investments, name of payee of returns, date and cash amount received, bank account from which returns received, net cash loss total, any additional supporting their claim, and a signed certification ("Claim Form").

[4] Word of the appointing of the Receiver was obviously passed widely because the Receiver immediately received hundreds of inquiries from Investors.  Also, the SEC provides litigation releases whenever a receivership is initiated in connection with an enforcement action that litigation release was the first hit on google when the undersigned searched "Clean Energy Technology Association Inc.".

[5] The CETA site is no longer active, but one of the top hits when the undersigned performed a google search for the CETA site was the Receiver's website.  Also, investors are being provided both sites on a regular basis.

texts, electronic records, accounting records, and hard copy records. The Receiver loaded these records and the accumulated bank records on a desktop computer that was originally located in the CETA offices. The computer is also configured to have access to CETA servers, emails, and the QuickBooks accounting system consistent with the original network. Hard copy documents are maintained adjacent to this computer and in an attached warehouse. Access to these documents has been made available to the parties to this case and others involved in parallel litigation. The Claims Hub framework was created with the benefit of accountings the Receiver solicited from promoters who created investment vehicles through which investments were made ("Promoter Accountings").

### 3. *Reconciliation of Claims Pertaining to the Keels Projects*

18.     The Receiver started the claims process with a reconciliation of the claims pertaining to CETA projects for which Keels was the promoter ("Keels Projects"). This was done early in the process because of the pendency of certain funds Keels had voluntarily detained, which the Receiver brought to the Court's attention in November 2023 by way of a report and recommendation (see Doc. 50), and also in order to assess the available records to see what would be necessary to develop a claims ledger.

19.     The Receiver determined the Keels Investors suffered an aggregate net cash loss of $6,169,227 (Doc. 50 at 4 & Table on Exhibit D hereto).

20.     In examining the Keels Investor claims, the Receiver reached a number of conclusions that informed his next steps in regard to creating a claims ledger.

21.     First, the Receiver attempted to work from CETA records. It became clear that CETA did not maintain accurate records of the Keels Projects, nor accurate records of the underlying contributions to those projects made by the Keels Investors. However, the CETA

records did provide insight to interpret the transactions shown in the bank records and to test the accounting Keels provided.

22.    Second, the Receiver learned that Keels had maintained his own accounting in order to be able, for example, to produce tax documents, to divide distributions from CETA appropriately among individual investors, and to generally account for the individual investments in the project partnerships he created.  The Receiver found that this accounting was not perfect, but it was a good starting point.  Indeed, with the benefit of that accounting, the Receiver was able to utilize bank records and CETA records to arrive at figures in which the Receiver has confidence and with which Keels ultimately agreed.

23.    The Receiver therefore set about to duplicate the process with the other promoters.

24.    Meanwhile, the Receiver continued to gather Claim Forms and supporting documentation from as many investors as possible.

25.    Finally, once the Bank Records Summary was available, the Receiver tested his prior work against the bank records and found the work validated the Keels claim determinations.

### 4. Claims Pertaining to the Conduct in the Complaint – the Shelly Claims.

26.    The Receiver next turned to the portion of the claims relating to the combined efforts of Hill, CETA, Shelly, and FIC that coincide with the Complaint filed by the Securities and Exchange Commission ("SEC") in this case (Doc. 1) (the "Shelly Claims").

27.    The methodology for the reconciliation of the Shelly Claims was as follows.

28.    First, again, the Receiver looked for adequate CETA records to determine how much was invested and how much was returned either in regard to Shelly Projects or to Investors in Shelly Projects.  The Receiver found neither.

29.    Second, the Receiver therefore turned to the Promoter Accounting Shelly provided. It showed the total amount invested in CETA due to Shelly Projects and the individual

contributions received from and returns paid to individual Investors in the Shelly Projects (the "Shelly Accounting"). The Shelly Accounting had substantial credibility because it was maintained contemporaneously, although it lacked entries for April and May 2003. It proved to be a good place to start.

30. Third, the Receiver tested the Shelly Accounting against the available Investor Claim Forms and supporting documentation, bank records showing investments and distributions, wiring instructions, email correspondences to and from claimants, marketing materials, bills of sale, operating agreements, tax forms, and various receivership records. As in this case of Keels, this work produced a number of adjustments.

31. The largest adjustment to the Shelly Accounting was to address the fact that the accounting ended in March 2023 due to the interruption of the receivership. The Receiver added contributions made after that date, particularly in regard to 12 Carbon Capture, LP, CC6 Shares 2022, LP, Oshares 05, LP, and SYN 21, LP ("End Projects").

32. A second adjustment was to exclude certain projects where Investor funds were transferred into another issuer that is the subject of its own civil enforcement action. These Investors were "rolled over" into the CETA Projects. In other words, these Investors contributed no money to CETA and therefore have no net cash loss relative to CETA. These are the following: MCA Shares (FCF1), MCA Shares (FCF 2), MCA Shares (FCF 3), and MCA Shares (FCIF) ("MCA Projects").

33. A third adjustment was to look at only the cash contributions made to Oshares 01, LP ("Oshares 01") and CDF-1, LLC ("CDF-1"). This included following funds from the CDF-1 account at Wells Fargo into the Oshares 01 account at C&N. From that account, most of the CDF-1 funds were further transferred to CETA. The Receiver questioned Shelly in regard to this transaction. The Receiver obtain an accounting from a promoter who worked with Shelly, who

provided a supplemental accounting. Ultimately, the Receiver concluded the CDF-1 individual Investors did provide approximately $3.4 million to the CDF-1 account, and that those claims should be treated as having the net cash loss identified on the supplemental promoter accounting. The Receiver determined CDF-1 was supposed to have a real estate component that did not come together, resulting in the rollover to Oshares 01. The Receiver determined to ignore that rollover for the purpose of determining investor net cash losses, which the Receiver classified according to the original CDF-1 investment. The Receiver segregated and approved the claims of those persons who provided funds directly to Oshares 01.

34.     Fourth, the Receiver compared the Shelly Accounting to the summarized bank records reflecting the transfers of the Shelly-related Investors. As illustrated on the chart below, individual Shelly Investors first deposited funds into project accounts at C&N Bank. From those accounts, the project partnerships transferred funds to CETA accounts at Wells Fargo Bank. Within the CETA accounts, Investor funds were commingled. The Investor funds were used for CETA operations, CETA equipment, transfers to insiders, and payments back to C&N project accounts. From the project account, disbursements were made to individual investors, FIC, and to others under Shelly's direction. This flow of funds is illustrated on the following chart:



The Receiver first examined the Shelly project-level accounting by isolating the transfers between the CETA accounts and the C&N project accounts. The Receiver next examined the Shelly individual investor accounting by reconciling Claim Forms as reflected in the Claims Hub, and by

comparing the project transfers with CETA against the aggregate of the underlying individual investor transactions.  The Receiver also took into account the fact that the scheme was halted in progress, such that there were some funds remaining in the C&N accounts pertaining to three of the End Projects.  The Receiver next determined how much money flowed from the CETA accounts back to the C&N project accounts, and, of those funds, how much went to Investors, to FIC, and was withdrawn from the project accounts.  With the benefit of the figures determined from the bank records in regard to project-level investments and in regard to the individual investments, the Receiver was able to validate or correct the Shelly Accounting.

35.    The result was the approval of Shelly Claims with a total net cash loss of $127,233,930 (see subset of claims summarized on Exhibit D).  Investors other than Shelly invested $170,119, 985 and received returns of $42,886,055.52 (*id.*).  Claimants who invested solely in Shelly projects have been approved in full.  Claimants who invested in connection with Shelly and other promoters have been approved as to the Shelly projects only.[6]  The Receiver did not approve a claim relative to Shelly's investments.[7]

### 5. Claims Pertaining to Other Investors – Proposal to Reserve Funds.

36.    The Receiver is presently undertaking a similar approach with regard to the claims of other investors.  These claims can be grouped as those pertaining to efforts of Hill and CETA in collaboration with Abide, Zook, and small promoters, as well as efforts of Hill and CETA only.

---

[6] These are principally Investors who invested in both Shelly-related and Abide-related projects.  As discussed in the next section, the Receiver has not yet completed the accounting of the Abide-related projects.

[7] Although he invested $3,507,500 and received only $1,550,097 in distributions, the total CETA sent to CETA projects accounts under Shelly's control was $66,456,687, of which Investors received nearly $43 million, Shelly's company FIC received at least $8,027,006 as compensation for fundraising, investor relations, and administration (Ex. D at 9),[7] and the remaining approximately $15 million was withdrawn from the project accounts that Shelly controlled (as to which Shelly reports at least part of the reason was for legal and accounting expenses).  Under applicable Fifth Circuit authority, such compensation is recoverable, and therefore the Receiver determined Shelly's investor claim was entirely offset.

37.     In regard to any CETA accounting, once again, the CETA accounting was incomplete and unreliable in respect of these other Investor claims.

38.     The Receiver therefore again sought accountings from Abide and Zook, and received Claim Forms from smaller promoters.

39.     Next, the Receiver tested the Abide and Zook accountings against the Bank Records Summary.  But, there were a number of discrepancies.  First, the Abide accounting did not include earlier projects in which Investors came out net positive.  The Receiver advised these needed to be included to achieve net cash loss figures, and received more information.  However, as to several net positive projects, Abide was unable to provide the amount of returns.  The Receiver tabulated the total aggregate cash flows for Abide Investors and compared them to the Bank Records Summary, but the figures were substantially different.  In regard to the Zook accounting, the Receiver determined many returns were processed through Zook's company, and, here too, the aggregate figures were not in line with the bank records.

40.     The Receiver therefore clarified with Abide and Zook the extent to which Investors sent and received funds directly to or from CETA accounts.  The Receiver determined that, as to Abide, all transactions to and from CETA were made directly between CETA and the Investors, and, as to Zook, all deposits by Investors were made directly.  Likewise, the smaller promoter transactions, and, of course, the CETA transactions were executed in the same way.  Based upon this, the Receiver is implementing a procedure to isolate transactions in the bank records by Investor and to compare those to the Claim Forms available and the promoter accountings that are available.  The Receiver has thus far classified all of the bank records by the Claim Number for the claim to which they appear to relate, and will be working through the claims, generally favoring the bank records as the ultimate source of an Investor's net cash loss.

41.    The Receiver also considered whether the proposed reserve would be adequate. The Receiver took into consideration the following information that sheds light upon the probable size of the net cash loss suffered by other Investors, as compared to the claims already determined of the Keels and Shelly Investors.

42.    The unreconciled other investor transactions presently identified as pertaining to Zook Investors total approximately $63 million in deposits and $56 million in returns.  The Zook accounting states that, in regard to investors who suffered a loss, there were $50 million in investments and $32 million in returns.  These figures indicate a probable net cash loss between $7 million and $18 million.  Because the Zook investors include a substantial number of net winners, one would estimate the net cash loss will likely end up being toward the larger net figure. Additionally, although Zook was an investor who later suffered large losses, the total returns include compensation to Zook, such that, again, one would expect the ultimately net cash loss to lean toward the larger figure.

43.    The unreconciled other investor transactions presently identified as pertaining Abide Investors total approximately $55 million in deposits (inclusive of approximately $900,000 contributed by Abide and certain of her associates) and approximately $44 million in returns (exclusive of approximately $7 million in returns to Abide and certain of her associates, which, the Receiver determined during the past quarter were due to compensation for marketing and investor relations).  The Abide accounting states that, in regard to investors who suffered a loss, there were $38 million in investments and $31 million in returns.  These figures indicate a probable net cash loss between $7 million and $11 million.  Here, the Receiver again estimates toward the larger figure due to the presence of many net winners in the Abide Investor population.

44.    The Receiver next considered the remaining $21 million in net cash losses shown by the Bank Records Summary for exclusively Hill/CETA Investors, and observed that this

Investor population likely did not include many net cash winners, and clearly included quite a few later Investors. The Receiver therefore concluded this population of Claimants likely did suffer approximately $21 million in net cash losses.

45.     The Receiver finally considered the claims submitted by persons who purchased stock in CETA. Three such investors have submitted credible and detailed claims totaling $29 million. A fourth investor did not submit a claim, and the bank records indicate this is because that investor later invested in projects and received back more than was invested, such that a claim would not have been approved. Three further investors were vendors who

46.     In summary, the claims work to date indicates it is feasible to effect an interim distribution of two-thirds of the CETA funds, while reserving one-third of the CETA funds. Totaling together the Keels claims, the Shelly project losses, and the CETA equity claims, the aggregate known net cash loss is $162 million. Taking together the outside figures for the Zook, Abide, and other investor claims, the probable additional net cash loss comes to as much as $50 million. The proportion between the claims allowed and the claims estimated is about 75/25. The proportion between the funds distributed and funds reserved is about 66/33. Therefore, the Receiver believes he is allowing a reasonable margin for error.

### *6. Net Cash Loss Methodology and Pro Rata Distribution*

47.     In the motion seeking to effect an interim distribution, the Receiver proposes to employ a net cash loss method to determine Investor claims, and proposes a pro rata distribution across all Investor claims. The following sets for the basis for that recommendation.

48.     In regard to the methodology, the Receiver could, on the one hand, determine claims according to the individual contractual rights established between CETA and the Investors and/or project entities in the documents executed by those parties. On the other hand, the Investor Claims could be adjusted equitably based upon net cash losses incurred. Whether to adjust claims

based upon the contracts or based upon their underlying equitable nature depends upon whether the claims arise from a fraudulent scheme, and, to a lesser extent, whether the claims arise from a Ponzi scheme.  In Ponzi schemes, the Fifth Circuit has approved the use of the net cash loss methodology to evaluate claims.

49.    There is a further determination to be made when there are identifiable phases of a fraudulent scheme.  In such a case, whether to treat claims as a single pool or separate pools depends upon whether the representations are substantially similar and whether there is at least some commingling of funds.

50.    For the reasons stated below, the Receiver selected a net cash loss methodology, grouped the claims into a single pool, and determined net cash losses to effect a pro rata distribution of recovered assets.  The claims that arose from 2015 forward were based upon a continuous Ponzi scheme.  Those claims arose from a series of substantially similar representations.  The claims prior to 2015 can be distinguished, but it is equitable to include those claims in the distribution.

### (1) Commonalities of Claims

51.    The claims reflected on the Claims Ledger are overwhelmingly Investor Claims.

52.    The Investor Claims have a common element, in that they arise from efforts to raise funds based upon the technology promoted by CETA under the direction of Hill.  These efforts date to 2009.  During the period 2009 through 2014, these efforts principally sought to raise equity in CETA and/or what was supposed to be its operating company, Freestone Energy, Inc.  At that time, the principal technology pertained to coal distillation that produced sample quantities of COAL*lite*™, which was a denser form of coal, and CETA*solve*™, which is a solvent of the type

created in the course of coal distillation.[8]  Starting in 2015 and continuing until May 2023, CETA promoted projects that were supposed to produce returns to the involved Investors derived from revenues generated through the commercial application of the CETA technology.  Many of those projects pertained to coal distillation.  In approximately 2019, CETA also began to promote projects pertaining to carbon capture units that were supposed to be attached to natural gas wells at or near the wellhead and that would utilize CETA*Solve* to refine the natural gas streams and to serve as or produce injection fluids as a byproduct.  A few 2015-16 projects pertained to supposed grants from the Department of Energy, and some later projects involved supposed saltwater disposal well operations.

### (2) Differences in Representations from which the Claims Arise.

#### (a) CETA Shares / Freestone Reg. D Offering

53.    As noted, during the period 2009 to 2015, nearly all of the fundraising efforts were undertaken by Hill, his staff, and a few Investors who served on the CETA board or promoted the investment.  They purchased equity.  The representations pertained to the CETA technology, principally the coal distillation technology.  A case can be made that the original representations were not fraudulent, and, even to the extent the nature and viability of the technology was overstated, the argument can be made that CETA and Hill were simply overly optimistic.  That said, during the period from 2015 to 2023, these Investors were told that they would receive revenues once the equipment had been repurchased from the other Investors through payment of CETA revenues.

---

[8] As detailed in the Receiver's Quarterly Report for the Fourth Quarter of 2024 (Doc. 66), commencing in approximately 2009, CETA worked to create demonstration equipment that utilized the well-known process of coal distillation to produce denser coal and a solvent, but CETA did not achieve commercial viability.

54.     More specifically in regard to the equity offerings, during the period 2009 through 2014, Hill principally obtained funding from three individuals in exchange for CETA shares and a small Reg. D offering made for Freestone Energy, Inc. in the total amount of approximately $29 million.  Toward the end of this period and continuing into 2015, CETA shares were sold to a fourth Investor as well (who also later invested in CETA Projects).[9]

55.     A distinction can be drawn between these equity investments and the later offerings, since, at the time of the investment, specific returns were not promised.  There was no Ponzi scheme during this period.

56.     Moreover, the funds invested by the first three investors were fully dissipated prior to 2015.

57.     There are indications Hill attempted to raise money for CETA projects, but these efforts do not appear to have been successful, except to the extent they resulted in the selling of CETA shares.

### (b) Project-Based Investments.

58.     In 2015, fundraising rapidly expanded due to the involvement of active promoters. These included Pam Abide and her associates and firm ("Abide"), Dave Zook and his associates and affiliated entities ("Zook"), Shelly and his firm Freedom Impact Consulting, LLC ("FIC"), and a few others, such as Keels.  Hill supported these efforts, and raised some funds on his own, but the vast majority of the increase was due to the involvement of these promoters and the creation of CETA "projects".

---

[9] CETA also sold shares to three prospective vendors in the 2015 timeframe based upon representations that CETA would provide work to those Investors.  All three vendors complained when work was not forthcoming, and some retained counsel.  All three vendors recovered their investments.  Therefore, they have no claims.

59.     Following is an overview of the context that the Underlying Documentation provide in respect of the representations made as to CETA "projects".

### (i) Shelly Projects

60.     As detailed more fully below, Shelly created separate entities for CETA "projects" that were often promoted as a series – e.g., 01 Carbon Capture, LP; 02 Carbon Capture, LP, etc. ("Shelly Projects"). Altogether, there were 69 Shelly Projects.

61.     Most of the projects pertained to the supposed acquisition by the project partnership of carbon capture units.  As an example taken from documentation of Shelly projects with 'Carbon Capture' in the name, the private placement memorandum ("PPM") indicates the partnership was created to own and operate Mobile $CO_2$ Transmission Pipeline Units, which would be leased to a natural gas producer to remove $CO_2$ from gas streams in the transmission pipeline.  The plan referenced is the $CO_2$ units' use:

> of a proprietary solvent CETASolve$^{TM}$ to absorb the $Co_2$, which can then be used for enhanced oil recovery […], which will change the way that natural gas will be processed.

Thus, the use of CETA's technology onsite by means of the attached CCU is also supposed to save the producer the cost of transporting the gas for processing.

62.     However, as the Receiver has previously reported, there were no CCUs installed at well sites, and, in fact, there was only one mockup and about 40 CCU shells.

63.     The Shelly projects were based upon the premise that revenues from operations would fund quarterly returns for Investors.  Following is one example of the language in the offering documents:

> The investment opportunity offers a working interest on an oil or gas well from which revenue could be generated as a result of the excess oil or gas produced and sold derived from the owner's use of the Carbon Capture Unit.

Another business plan indicates that revenue will be received from a lease agreement with the gas well and pipeline operator for the CO2 removal, which will give the project a working interest in the well and additional revenue will be derived from the oil producers' use of the saturated solvent for enhanced oil and gas recovery.

64.    As demonstrated by the bank records, however, there was no actual revenue.

65.    The SYN01, LP PPM provides details about the carbon capture units ("CCU") as follows:

> The CCU would be leased to a natural gas producer to facilitate two functions: […] removal of CO2 from gas streams at the well site and the reinjection of CO2 into the wells to facilitate Enhanced Oil Recovery' which was indicated to allow natural oil and gas producers to extract additional oil and gas from the wells which they would otherwise not be able to extract.

The PPM further states:

> [T]he Carbon Capture Units use a proprietary solvent (CETASolve™) to absorb the CO2. This solvent will be utilized initially to capture CO2 out of pipelines to make the gas stream more marketable by capturing […] the CO2. The CO2 is then absorbed into the solvent which is then reinjected into natural gas producer's gas wells to improve production in that same geographic area.

66.    However, there are no examples of this actually happening.

67.    Some projects included related items, such as associated pipelines to which the CCUs were supposedly attached, and some involved a supposed smaller version of the CCUs

known as a "NOMAD" carbon capture unit. For example, certain SYN PPMs offer between one and six Mobile $CO_2$ Transmission Pipelines, and one NOMAD Carbon Capture Unit. Specifically in relation to the associated pipeline, the SYN 01 PPM states:

> the Company (project) was formed in order to purchase and operate a package of Mobile $CO_2$ Transmission Pipelines which allows the Company to have a working interest in gas wells that uses this proprietary distillation processes to increase production of the wells.

68.    However, there were no such configurations.

69.    Some projects also assert the fluid that was a byproduct of the coal distillation process and the filtration of natural gas streams by the CCUs would also be used as an injection fluid by the well operator. The business plan section states the partnership will:

> own and operate a Mobile $CO_2$ Transmission Pipeline Unit (Carbon Capture Unit), which will be leased to a natural gas producer to remove $CO_2$ from gas streams at the transmission pipeline.

This project discusses the patented technology designed and developed by CETA and the use of CETASolve to absorb the $CO_2$ , which could ultimately be "used for enhanced oil recovery."

70.    However, there are no examples of the actual commercial use of CETASolve as an injection fluid.

71.    A few projects describe leveraging the revenues from the CCUs to fund real estate development.

72.    However, this did not actually take place.

73.    The Shelly Projects supposedly offered tax advantages. In podcasts, Shelly explained that mobile oil and gas equipment was subject to 80% depreciation in the first year under the tax laws that would create a deduction against ordinary income.

74. However, in the absence of actual installations and operations, this tax benefit did not actually exist.

### (ii) Zook Projects

75. Some of Zook's marketing materials pertained to the CETA coal distillation technology that preceded the CCU offerings and, in fact, dated to 2009. For example, one describes the business purpose of Carbon Processing Fund 2020-L, LP as:

> the Company was formed for the purpose of investing in numerous proprietary
> distillation processes that convert raw coal into liquid, solid, and gas products using
> proprietary equipment and processes developed by our partner, CETA.

The offering promises preferred returns arising from such operations.

76. But, the coal distillation equipment was merely demonstrative. It was not employed commercially, and so did not generate revenues.

77. Others of Zook's marketing materials embraced not just coal distillation, but also the CCUs and other technology. One states:

> The business of the Company […] is to create a fund that will acquire numerous
> Coal Distillation Units, Gas Extraction and Drying Equipment, Mobile CO2 Units,
> and other possible proprietary distillation units and processed owned by CETA.

These offerings also state: "each Partner will receive their Preferred Return".

78. However, none of the CETA technology was employed commercially, and they did not generate revenues for distribution to Investors.

79. Zook offerings also promised the above-described illusory tax advantages.

### (iii) Abide Projects

80.     There were 18 Abide offerings.  They concerned either the support of CETA's efforts to obtain grants that supposedly funded the Investor returns, to employ CETA technology commercially to fund Investor returns, and to fund saltwater disposal wells.

81.     As to the latter, some of the Abide projects identified the objective as to acquire a commercial saltwater injection system to remove saltwater produced by the wells, further acquire a new group of wells, and drill new wells at other depths to enhance production levels. The investment offering requests fundraising of $6,000,000, with a description of the returns as follows: "For this project, we will pay to you your pro rata portion […] over a period of three years […] for twelve quarters with the first quarterly payment due to you on April 30th, 2023."

82.     Another project specifies that Investors can participate in the purchase of certain "WGS" and "SMR" equipment and machinery that CETA can use whereby the Investor participants receive a percentage of quarterly rental payment proceeds plus a repurchase installment amount.  The Participation Agreement for an additional separate project is similarly described, with the objective to purchase electrical transmission, software, gas storage, and communications machinery and equipment.

83.     Again, tax advantages from the investment are also cited as a benefit to Investors.

### (iv) Keels Projects

84.     The Keels projects were variations of the Shelly Projects.  Keels negotiated with Hill and Abide to bring a group of friends and family to invest directly with CETA.

### (v) Miscellaneous Projects

85.     Although most claims arise from circumstances where Hill worked with a promoter who, in turn, was providing PPMs or similar documents to Investors, that was not only the case. Projects with only one or a few Investors include: WRK Energy, GP, Southern Dioxide GP, MS

Capture GP, Southern Energy Group, GP, Seattle Gas Solutions, GP, Ryan James PL21, GP, and Allimar Holdings, among potential others. These projects appear to primarily represent money invested to take full ownership of individual CO2 units. Per the identified and reviewed Bills of Sale for these projects, each CO2 Unit has a unique identification number, (e.g., "Transferred Properties: CO2 Unit# CETA-NO.2021-PIL-CO2-LOC-59-X-77"). Irrespective of which investment promoter was involved, the basis of all project information we reviewed pertains to carbon capture technology or CETA's claim to use a proprietary distillation process for oil and gas drilling. In other words, they were comparable to the offerings described above. Some of these investments were funded with borrowings from Unibank.

### (vi) Ponzi Payments

86.    While CETA projects have some variations as noted above, nearly all arose from what became a continuous and intertwined Ponzi scheme. As a result, these Investor Claims have a dominant common thread, and there was commingling of the funds over a continuous period.

87.    To explain, during the period January 2015 to May 2023 (when the Receiver was appointed), CETA paid returns to the CETA Project Investors as follows:

88.    The source of those funds was a steady flow of dollars derived from later investors and paid to earlier investors. This is illustrated on the following chart, which shows the pattern of a receipt of investor funds overlaid with the payment of investor returns leading toward a classic collapse of the scheme, which CETA was headed toward when the SEC intervened:



89.    Conversely, CETA did not have revenues from which to pay returns to investors. From January 2015 forward, over 98% of the funds deposited into CETA accounts were sourced from Investors, such that later Investors funded the payments to earlier Investors:



90.     In regard to commingling, from 2015 forward, Investors provided funds to CETA accounts and Investor funds traveled through those accounts in a circle back to pay Investors:



91.     In contrast, the CETA equity investments made from 2009 forward and into early 2015 did not result in return payments.

**(3) Conclusions and Recommendations.**

92.     These facts result in several conclusions with regard to the claims methodology and whether to make a pro rata distribution from a single pool.

93.     First, equitable principles should be applied because the overwhelming majority of the Investor Claims arise from fraudulent conduct.

94.     Second, while, as discussed below, the SEC's Complaint essentially targets the Shelly phase of the scheme, the Receiver recommends that all of claims arising from 2015 forward be grouped into a single pro rata distribution because they arose in the course of a continuous Ponzi scheme.

95.     Third, while   the Court could exercise its discretion to exclude the equity investments made during the earlier timeframe, it is proper to include those claims given that all of the claims arise from the promotion of the CETA technology and those investors were prevented from bringing any claims they might have had by Hill's misrepresentations that they would be receiving distributions in the future once the equipment was repurchased from the newer investors and utilized by CETA to make money.  While the Receive has not reached a firm conclusion as to the nature of the original representations, there is a reasonable chance Hill did make misrepresentations during this earlier period.  That said, the inclusion of these claims has a

meaningful impact upon the restitution paid because the net cash loss will increase from approximately $265 million to $294 million – an increase of approximately 10%. In considering the pending motion to approve an interim claims distribution, therefore, the Court will ultimately have to decide whether to include these claims.

96.     Therefore, the Receiver recommends a pro rata distribution based upon relative net cash losses of Investor Claimants.

### C.  Potential Claw-back Claims

97.     The Receiver last reported that he is still examining two sets of potential claims based upon the transfers made from accounts funded by Investors – transfers related to the Allen Brothers business and transfers to The Roy Hill Trust #2.

98.     In the last quarter while seeking to resolve Abide Investor claims, the Receiver identified transfers of approximately $6 million to Abide and her associates, principally one of them.

99.     The Receiver reached a settlement of a part of the Allen Brothers claims, and has opened communications in regard to the other part.

100.    The Receiver also intends to work to settle the other claims if possible, and, if not, will move the Court for leave to bring suits.

### D.  Shelly Personal Assets and Liabilities

101.    During the third quarter of 2024, since Shelly and the SEC have not yet resolved the extent of civil penalties to be charged against the Shelly assets, the Receiver continues to seek principally to maintain the status quo with regard to the Shelly assets.

### E.  Unibank Controversy

102.    As previously reported, the receiver has been advised by Unibank that it opposes distributions to Investors who borrowed funds in order to invest in CETA projects, and those

Investors have advised that Unibank should be held responsible for its role in this matter. The Receiver continued to monitor this parallel controversy. The Receiver also complied with document production requests from both sides of this litigation. The Receiver is working to isolate claims that involved Unibank funds, but the Receiver is noting that such claims may not be entirely transparent to the Receiver due to a lack of CETA records classifying these investments and a lack of direct funding to the CETA accounts.

    **F.**  **Other Receivership Activities**

    103.    The Receiver and his team continue to respond to Investor inquiries.

    104.    As a result of the need to obtain a Court determination in regard to the CETA assets, the Receiver continued to take steps to secure and/or store the CETA equipment, and to address environmental concerns at the industrial sites on an interim basis.

    105.    The Receiver has complied with administrative requirements, including addressing tax issues, keeping a receivership accounting, keeping an accounting of Shelly's compliance with the court-approved protocol, addressing vendor claims, and the like.

    106.    The Receiver checked leads on certain additional assets and records, and attempted to establish contact with custodian.

    107.    The Receiver has interacted with the parties to the main action.

**II.**    **SUMMARY OF ASSETS AND LIABILITIES**

    **A.**  **Cash versus Administrative Expenses**

    108.    The receivership estate's combined cash and publicly traded liquid securities is reflected on the attached Exhibit A. The amount is $66,836,523.93

    109.    As of the end of the fourth quarter, the Receiver's professionals have been paid $1,360,495.07.

**B.  Receipts and Disbursements**

110.    Exhibit A shows receipts and disbursements for the quarter and since inception.

**C.  Receivership Assets**

CETA Cash

111.    The CETA portion of the receivership estate's combined cash and publicly traded liquid securities is approximately $66 million.

Shelly Investments and Real Estate

112.    The remainder of the cash pertains to Shelly's personal account and proceeds of the sale of a property in Florida, as detailed on Exhibit B hereto.  There are also investments and real estate have an estimated value of approximately $5.6 million.  Other than his mortgage, Shelly has no liabilities.

CETA Equipment and Real Estate

113.    The CETA equipment has been determined to have essentially salvage value.

114.    CETA owns industrial yards in Fairfield and Streetman, Texas.  The value has not been determined.

115.    CETA Land and Mineral Investments, Inc. appears to own a few lots of limited value in Caddo Parish, Louisiana.  The value has not been determined.

Hill Assets

116.    Mr. Hill does not appear to have material assets denominated in his own name.  Mr. Hill is reportedly and apparently being supported by the assets of Trust No. 2 and/or family members.

**D.  Claims Held by the Receivership Estate**

117.    As reported above, the Receiver has identified claims relative to the Allen Brothers business, Trust #2, and Abide and her associates.

118.    The Receiver has determined there are no net winner Investor claw-back claims that should be pursued via litigation given the cost/benefit analysis, passage of time, and potential defenses.

**E.    Claims of Creditors Against the Receivership Estate**

119.    The Receiver has compiled the attached Claims Ledger.

120.    In regard to Investor Claims, with the benefit of the above-described forensic accounting, the Investor Claims is examining, verifying, and, as appropriate, adjusting claims. The Receiver intends to engage in individual Investor communications before an updated claims ledger is presented.

121.    The Receiver has reached further compromises with certain vendors and intends to continue to work through vendor claims.

122.    Claims and claim inquiries may be submitted through the Receiver's website, which is located at pnc.5fd.myftpupload.com.

**F.    Creditor Claims Proceedings**

123.    During the past quarter, the Receiver continued to utilize additional resources to complete a claims analysis so as to be in position to make an interim distribution if the Court determines that an interim distribution should occur for the reasons discussed above.

**III.    CONTINUATION OF THE RECEIVERSHIP**

124.    This topic is covered in detail in the Receiver's prior reports.  The basic situation has not changed, and therefore the Receiver recommends that the receivership be continued.

Respectfully submitted,

*/s/ Dennis Roossien*

Dennis L. Roossien, Jr.
Texas Bar No. 00784873
Munsch Hardt Kopf & Harr, P.C.
500 N. Akard Street, Suite 4000
Dallas, Texas 75201-6659
Telephone:  214.855.7535
droossien@munsch.com

COUNSEL FOR RECEIVER

## CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of February, 2025, a true and correct copy of the foregoing instrument was served electronically in compliance with the Court's Electronic Filing Procedures on all counsel of record who are deemed to have consented to electronic service.

*/s/ Dennis Roossien*