IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION | § § | |
| V. | § § § | Case No. 6:23-cv-00321 |
| ROY W. HILL, et al. | § | |

**RECEIVER'S PRE-HEARING BRIEF ON**
**MOTION FOR INSTRUCTIONS CONCERNING**
**CETA LIQUIDATION AND INTERIM DISTRIBUTION**

Receiver Albert C. Black III ("Receiver") submits this pre-hearing brief as to the motion for instructions concerning CETA liquidation and distribution (Doc. 75), respectfully stating:

**Introduction**

1.  The Receiver seeks instructions so that the Court may direct the receivership[1] in regard to several important issues: (a) the mechanics of claim determinations and objections; (b) the timing of distributions; and (c) the liquidation or abandonment of CETA equipment, patents, and trademarks.

2.  The Court's discretion in this equitable proceeding is broad. The Court may do what the Court determines is "fair and reasonable", and the Court may divide the assets in the Receiver's possession in "a logical way".[2]

3.  The Receiver attempts to propose a fair, reasonable, and logical path forward. Most important, though, the Receiver wishes to move forward as the Court prefers.

---

[1] Where there is a doubtful or important matter, it is appropriate for a receiver to seek instructions from the supervising court, and that court has the power to provide instructions. *Northern Fin. Corp. v. Byrnes*, 5 F.2d 11, 12 (8th Cir. 1925) ("[Receivers] are at liberty, and are in fact encouraged to apply at all times to the court for instructions and advice, and such is their duty in any doubtful or important matter arising in the course of their duties."); see also 2 CLARK ON RECEIVERS § 361, at 618-19 (1992) ("Receivers have a very large latitude in the matter of asking advice and seeking protection of the court appointing them with reference to discharge of their duties. They are at all times entitled to apply to the court for instructions.").

[2] *SEC v. Stanford Int. Bank, Ltd.*, 927 F.3d 830, 840 (5th Cir. 2019); *SEC v. Wealth Mgt., LLC*, 628 F.3d 323, 332-33 (7th Cir. 2010); *SEC v. Forex Asset Mgt.*, 242 F.3d 325, 331 (5th Cir. 2001); *U.S. v. Durham*, 86 F.3d 79 (5th Cir. 1996).

**Issues Presented**

I.  **Claims Procedures and Hill's Dispute of CETA Stockholder Claims.**

4.  Hill's pre-hearing brief asserts an interim distribution should await the Court's determination of the claims of the few claimants who purchased CETA stock.

5.  The Receiver submits that the best way to address this new challenge is to approve the claims procedures that the Receiver has proposed. The Receiver has proposed a process whereby the Receiver would (a) determine investor claims based upon a net cash loss methodology, (b) determine vendor claims based upon the invoice amount, (c) provide notice of the determination by direct notice where possible and allow a thirty-day window for objections, (d) additionally provide notice by filing and publication on the Receiver's website, and (e) tender any disputed claims to the Court for determination. It does not appear that these steps are controversial with Mr. Hill.

6.  Under the proposed claim procedures, the Receiver would file a specific report and recommendation for the Court's consideration, and would provide notice to both Hill and the involved claimants to allow all parties to be heard.

7.  Rather than hold up the entire distribution, the Receiver can reserve an amount that is at least sufficient to pay the claimants a pro-rata share if the claims are ultimately allowed.

II. **Whether to Effect an Interim Distribution or Wait Until All Claims Are Resolved**

8.  Hill challenges whether an interim distribution should be made when not all claims have at least been determined by the Receiver. The Receiver accepts this as a fair point, but for a different reason. The claims process is now much further advanced than it was at the time the motion for instructions was filed last April. Indeed, it is nearly complete.

9.  The Receiver therefore proposes to check his reserve estimate by waiting until all claims have been initially determined, notice has been given, and the thirty-day objection period

has run. The Receiver projects that the proposed reserve of $20 million is more than adequate to account for any disputed claims. But, the Receiver is prepared to wait to be sure for a short time longer, since that time is now very near.

10. What the Receiver opposes, however, is a delay based upon Hill's assertion that the more than $60 million he accumulated by running a Ponzi scheme should be held back while steps are taken to provide further demonstrations of the coal distillation equipment.

### III. Whether to Hold Back an Interim Distribution to Obtain a Further Evaluations

11. Hill finally asserts an interim distribution should await to enable "independent evaluations of the technology assets" (Doc. 111 at 4). This assertion should be rejected.

12. First, the Receiver already retained an independent expert in the field to provide advice (Doc. 47, 48), and the Receiver is following that advice. That expert reported the coal distillation units are not commercially viable (Doc. 66 & Doc. 93 at 2-3). So, there is no reason to hold back $40 million as potential working capital for the purpose of developing the technology.

13. Second, the proposed "independent evaluations" do not address the issue of the lack of economic viability. Hill asks that the Receiver facilitate a live demonstration for (a) Douglas Matheney, who asserts "no one is going to pay what it is really worth without seeing it in operation" (Doc. 87 at 4-5), and to (b) Rusty Bell, who looks forward to an "in-operation visit" (Doc. 81-1, at 4). But, the CETA records reveal Mr. Matheney was a "Special Advisor to the Secretary" of the "Office of Fossil Energy" during the first Trump administration who, in 2017, facilitated a trip to Texas by persons with the U.S. Department of Energy ("DOE") to see the CETA project (Doc. 93 at 39). He was "one of the many temporary staffers Trump has installed in federal agencies" and his background is in politics and coal lobbying (*id.* at 40). The result of the DOE inspection was a report that reads similarly to that of the Receiver's own expert (*id.* at 4-76). Notably, the DOE report tracks the opinions of the expert the Receiver retained. It states that

"CETA is highly reluctant to describe its business model, targeted customer segments, and value propositions for liquid product sales" (*id.* at 16), that CETA would face competition (*id.*), that the "revenue model for each product stream should be validated" because "there is no other way to determine the maximum allowable capital costs without considering the market wherein the technology competes" (*id.*), and that "a more rigorous, completed economic evaluation including capital costs, completed valuation of product streams, market analysis, and operating costs at a commercial, full scale application is recommended prior to scale-up" (*id.* at 18). The issue was therefore not that the coal distillation units did not function, but rather that they were not commercially viable. As for Mr. Bell, Mr. Matheney introduced him to CETA in April 2023 – the month before the Court imposed the receivership (*id.* at 75). He is with the Office of Transformation at the Gillette College Foundation in Wyoming (*id.*; doc. 80-1 at 4). He notes the Powder River Basin of Wyoming has coal companies who "all recognize the decline in future thermal coal use" and hopes to see "the operating facility at Fairfield, Texas in actual operation as a part of our due diligence process for the operating companies of interest" (Doc. 80-1 at 4). No doubt, upon examination, even if the equipment was demonstrated, the very next question would be economic value and viability.

14. Third, CETA's coal distillation units were demonstrated for more than two decades, from 2009 to 2023 (Doc. 66 at 4-5).

15. Fourth, Hill provides no competing analysis, expert, or compilation of CETA documents to demonstrate economic viability.

16. Therefore, the Receiver recommends that the equipment be marketed for the scrap metal that it is, that the patents and trademarks be abandoned, and that funds accumulated through a Ponzi scheme be distributed as restitution.

Respectfully submitted,

*/s/ Dennis Roossien*
Dennis L. Roossien, Jr.
Texas Bar No. 00784873
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 4000
Dallas, Texas 75201-6659
Telephone: 214.855.7535
droossien@munsch.com

COUNSEL FOR RECEIVER

## CERTIFICATE OF SERVICE

I hereby certify that on the 26th day of February, 2025, this document will be served by the Clerk's electronic procedures immediately upon its filing on all counsel of record.

*/s/ Dennis Roossien*